**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | ) |
| In re: | ) Chapter 11 |
| SEARS HOLDINGS CORPORATION, | ) Case No. 18-23538 (RDD) |
| *et al.*, | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| | ) |

| | |
|---|---|
| SEARS HOLDINGS CORPORATION; KMART HOLDING CORPORATION; SEARS, ROEBUCK AND CO.; SEARS DEVELOPMENT CO.; SEARS, ROEBUCK DE PUERTO RICO, INC.; KMART CORPORATION; KMART OF WASHINGTON, LLC; SEARS, ROEBUCK ACCEPTANCE CORP.; BIG BEAVER OF FLORIDA DEVELOPMENT, LLC; INNOVEL SOLUTIONS, INC.; KMART STORES OF ILLINOIS, LLC; MAXSERV, INC.; SEARS BRANDS, LLC; SEARS HOLDINGS MANAGEMENT CORP.; SEARS BRANDS BUSINESS UNIT CORP.; SHC DESERT SPRINGS, LLC; STI MERCHANDISING, INC.; TROY COOLIDGE NO. 13, LLC AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF SEARS HOLDINGS CORPORATION, *ET AL.*, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| EDWARD SCOTT "EDDIE" LAMPERT; ESL INVESTMENTS, INC.; RBS PARTNERS LP; CRK PARTNERS LLC; SPE MASTER I LP; ESL PARTNERS LP; SPE I PARTNERS LP; RBS INVESTMENT MANAGEMENT LLC; ESL INSTITUTIONAL PARTNERS LP; ESL INVESTORS, LLC; JPP LLC; JPP II LLC; FAIRHOLME FUNDS, INC.; FAIRHOLME CAPITAL MANAGEMENT, LLC; CASCADE INVESTMENTS, LLC; CYRUS CAPITAL PARTNERS, LP; CRESCENT 1, LP; CANARY SC FUND, LP; CYR FUND, LP; CMH VI, LP; CYRUS OPPORTUNITIES MASTER FUND II, LTD.; CRS MASTER FUND, LP; CANARY SC MASTER FUND, LP; CYRUS SELECT OPPORTUNITIES MASTER FUND, LTD.; CYRUS SPECIAL STRATEGIES MASTER FUND, LP; CYRUS 1740 MASTER FUND, LP; BENEFIT STREET 2018, LLC; CESAR L. ALVAREZ; BRUCE BERKOWITZ; PAUL G. DEPODESTA; KUNAL KAMLANI; WILLIAM C. KUNKLER III; STEVEN MNUCHIN; THOMAS J. TISCH; ANN N. REESE; ROBERT SCHRIESHEIM; ROBERT RIECKER; SCOTT HUCKINS; LEENA MUNJAL; DAVE RODNEY; LAWRENCE MEERSCHAERT; JOSEPH JORDAN; SERITAGE GROWTH PROPERTIES, INC.; SERITAGE GROWTH PROPERTIES, LP; SERITAGE KMT MEZZANINE FINANCE LLC; SERITAGE SRC MEZZANINE FINANCE LLC; SERITAGE KMT FINANCE LLC; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Adversary Proceeding

Case No. 19-08250 (RDD)

| | |
|---|---|
| SERITAGE SRC FINANCE LLC; SERITAGE GS | ) |
| HOLDINGS LLC; SERITAGE SPS HOLDINGS LLC; | ) |
| SERITAGE MS HOLDINGS LLC; DUFF & PHELPS, | ) |
| LLC; CUSHMAN & WAKEFIELD, INC. AND JOHN | ) |
| AND JANE DOES 1–500 | ) |
| | ) |
| Defendants. | ) |
| | ) |

## TABLE OF CONTENTS

**INTRODUCTION**..................................................................................................**4**

**JURISDICTION** ..................................................................................................**14**

**THE PARTIES** ....................................................................................................**15**

**FACTUAL BACKGROUND** ............................................................................**33**

    A.    Plaintiffs' Businesses ................................................................33

    B.    Control of Sears by Lampert, the ESL Defendants and Fairholme Capital ........34

    C.    Coordination Between the Controlling Insider Shareholders .............................36

    D.    Sears's Financial Results and Condition...............................................................40

        1.    Sears's Deteriorating Financial Performance ................................................41

        2.    Sears's Deteriorating Operating Performance ...............................................47

        3.    Third Parties Express Concerns About Sears's Solvency.............................53

    E.    Sears's Unrealistic, Bad-Faith Projections of Future Performance ....................56

        1.    Sears's Top-Down, "Aspirational" Planning Process ...................................57

        2.    The Consistent and Material Discrepancy Between Projections and Reality ......................................................................................................60

        3.    The Culpable Parties' and Duff & Phelps's Knowledge that the Projections Were Unachievable ...................................................................63

    F.    Lampert and ESL Face Increasing Redemption Pressure from ESL's Investors................................................................................................................68

    G.    Formation and Failure of the RPT Committee ...................................................77

**THE DEFENDANTS' WRONGFUL CONDUCT GIVING RISE TO THE CLAIMS AND CAUSES OF ACTION CONTAINED HEREIN** ...................................**79**

    A.    The April 2014 Lands' End Spin-off Wrongfully Transferred More Than $1 Billion of Value from Sears to Its Shareholders.................................................79

        1.    Lampert Insists on a Spin-off to Benefit Shareholders, Rather than Alternatives that Would Have Generated More Proceeds for Sears ..............80

        2.    Lampert Limits the Pre-Spin Dividend to Benefit the New Shareholders of Lands' End, Including ESL and Himself, at the Expense of Sears...........82

        3.    The Lands' End Spin-off Left Sears Holdings and Sears Roebuck Insolvent on a Cash-Flow Basis.................................................................84

        4.    The Lands' End Spin-off Left Sears Holdings and Sears Roebuck with Unreasonably Small Capital ........................................................90

        5.    The Culpable Parties Acted with Fraudulent Intent.......................................92

    B.    The July 2015 Seritage Transaction Fraudulently Transferred Hundreds of Millions of Dollars of Value to the Seritage Defendants, the Conflicted Insiders and Other Sears Holdings Shareholders.................................................94

1.    With Sears Facing a Liquidity Crisis, Lampert Proposes a Sale-and-Lease-Back Transaction without Adequate Consideration of Alternatives ................................................................................97

2.    Lampert Directs and Strongly Advocates for the Seritage Transaction .........98

3.    The Seritage Subscription Rights Were Valuable Securities Transferred from Sears Holdings to Sears Holdings's Shareholders for No Consideration ...............................................................................101

4.    In Connection with the Sale-and-Lease-Back Transaction, Sears's Real Estate and Joint Venture Interests Were Transferred to KMT Mezz, SRC Mezz and SPS Portfolio Holdings LLC ..........................................105

5.    The Sale-and-Lease-Back Undervalued the Transferred Real Estate Assets and Joint Venture Interests by At Least Hundreds of Millions of Dollars ...................................................................................107

6.    Onerous Master Lease Terms Further Benefited Seritage at Sears's Expense .................................................................................114

7.    Sears Holdings, Kmart Holding and the Real Estate Transferors Were Insolvent Under the Balance-Sheet Test at the Time of the Seritage Transaction ...........................................................................117

8.    Sears Holdings, Kmart Holding and the Real Estate Transferors Were Insolvent under the Cash-Flow Test at the Time of the Seritage Transaction ...........................................................................121

9.    Sears Holdings, Kmart Holding and the Real Estate Transferors Had Unreasonably Small Capital at the Time of the Seritage Transaction ..........129

10.    The Culpable Parties Acted with Actual Fraudulent Intent ..........................130

11.    The Release Entered into in the Seritage Derivative Litigation Was a Fraudulent Transfer .................................................................132

C.    The Culpable Parties Caused the Debtors to Enter the Related-Party Financings and Pay "Interest" and "Fees" with Actual Fraudulent Intent ..........137

1.    The Related-Party Financings Were Equity Contributions, Not Loans, Despite the Defendants' Attempts to Paper Them as Such ............................141

2.    The Controlling Insider Shareholders Proposed the Related-Party Financings for Their Own Benefit ...............................................143

3.    The Directors Breached Their Fiduciary Duties When They Approved the Related-Party Financings .......................................................147

4.    The Officers Engaged in Self-Dealing and Failed to Provide Meaningful Oversight When They Engineered the Related-Party Financings .................152

5.    The Additional Subsidiary Guarantors on the 2018 Term Loan Facility Received No Consideration in Exchange for Obligations Incurred and Liens Granted Pursuant to the 2018 Term Loan Facility ..............................153

6.    The Related-Party Financings Borrowers Were Insolvent at the Time of the Related-Party Financings and When Payments Were Made On Account Thereof .......................................................................154

**INAPPLICABILITY OF CERTAIN MARKET EVIDENCE TO SOLVENCY CONSIDERATIONS** ...................................................................................156

    A.    Valuations Based on Contemporary Market Evidence Are Unreliable for Evaluating Sears's Solvency.................................................................156

    B.    Historical Share Prices Reflected Market Manipulations by Sears Insiders........157

    C.    The Trading Prices of Sears's Securities Were Inflated by a Market Belief that ESL and Lampert Would Always Provide Additional Capital.....................159

    D.    Sears Holdings's Stock Price Was Inflated Because Market Participants Knew ESL and Lampert Were Seeking to Siphon Off Value from the Company to Shareholders.................................................................159

    E.    Sears's Securities Did Not Trade in an Efficient Market on Account of Material Misrepresentations and Omissions by the Company ...........................160

    F.    A Retrojection Analysis Based on the Sale to Transform Demonstrates that the Market Had Overvalued Sears Holdings's Equity for Several Years ...........164

**SEARS FILES FOR BANKRUPTCY** ...............................................................165

Count 1    Avoidance of the Lands' End Spin-off as an Actual Fraudulent Transfer Against the Controlling Insider Shareholders.......................................167

Count 2    Avoidance of the Lands' End Spin-off as a Constructive Fraudulent Transfer Against the Controlling Insider Shareholders.......................................168

Count 3    Recovery of the Lands' End Illegal Dividend Against the Controlling Insider Shareholders and the Directors (Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Tisch and Reese) of Sears Holdings ...................................170

Count 4    Unjust Enrichment Against the Controlling Insider Shareholders and the Conflicted Directors (Lampert, Alvarez, Mnuchin and Tisch) of Sears Holdings Relating to the Lands' End Spin-off.....................................171

Count 5    Breach of Fiduciary Duty Against the Controlling Insider Shareholders in Connection with the Lands' End Spin-off.........................................172

Count 6    Breach of Fiduciary Duty Against the Directors (Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Tisch and Reese) and the Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings in Connection with the Lands' End Spin-off .................................................................175

Count 7    Breach of Fiduciary Duty Against the Directors (Riecker) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Roebuck in Connection with the Lands' End Spin-off.........................................179

Count 8    Aiding and Abetting Breach of Fiduciary Duty Against the Controlling Insider Shareholders, the Directors (Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Tisch and Reese) and Officers (Lampert, Schriesheim, Riecker and Huckins) in Connection with the Lands' End Spin-off ...............................180

Count 9    Aiding and Abetting Breach of Fiduciary Duty Against Duff & Phelps in Connection with the Lands' End Spin-off.........................................182

Count 10  Avoidance of the Seritage Rights Transfers as Actual Fraudulent Transfers Against the Controlling Insider Shareholders, the Conflicted Directors (Lampert, Alvarez, Mnuchin and Tisch) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings ............................................................183

Count 11  Avoidance of the Seritage Rights Transfers as Constructive Fraudulent Transfers Against the Controlling Insider Shareholders, the Conflicted Directors (Lampert, Alvarez, Mnuchin and Tisch) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings ..........................186

Count 12  Recovery of the Seritage Illegal Dividend Against the Controlling Insider Shareholders and the Directors (Lampert, Mnuchin, Tisch, Alvarez, Kamlani, Kunkler, DePodesta and Reese) of Sears Holdings...............................187

Count 13  Avoidance of the Seritage Real Estate Transfers as Actual Fraudulent Transfers Against the Seritage Defendants ...........................................................188

Count 14  Avoidance of the Seritage Real Estate Transfers as Constructive Fraudulent Transfers Against the Seritage Defendants ...........................................................190

Count 15  Avoidance of the Seritage Release as an Actual Fraudulent Transfer Against the Seritage Derivative Defendants (Lampert, Mnuchin, Tisch, Alvarez, Reese, Kamlani, Kunkler, DePodesta, ESL, the Fairholme Defendants and Seritage) ...................................................................................................191

Count 16  Avoidance of the Seritage Release as a Constructive Fraudulent Transfer Against the Seritage Derivative Defendants (Lampert, Mnuchin, Tisch, Alvarez, Reese, Kamlani, Kunkler, DePodesta, ESL, the Fairholme Defendants and Seritage) ...................................................................................194

Count 17  Declaratory Judgment that the Seritage Release is Null and Void or Otherwise Unenforceable Against the Seritage Derivative Defendants (Lampert, Mnuchin, Tisch, Alvarez, Reese, Kamlani, Kunkler, DePodesta, ESL, the Fairholme Defendants and Seritage).......................................................195

Count 18  Breach of Fiduciary Duty Against the Controlling Insider Shareholders in Connection with the Seritage Transaction...........................................................196

Count 19  Breach of Fiduciary Duty Against the Directors (Lampert, Mnuchin, Tisch, Alvarez, Kamlani, Kunkler, DePodesta and Reese) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings in Connection with the Seritage Transaction ......................................................................................198

Count 20  Breach of Fiduciary Duty Against Directors (Schriesheim, Riecker, Huckins, Munjal and Rodney) and Officers (Lampert, Schriesheim, Riecker, Huckins and Meerschaert) of the Real Estate Transferors in Connection with the Seritage Transaction ...........................................................................................203

Count 21  Aiding and Abetting Breach of Fiduciary Duty Against the Controlling Insider Shareholders, Directors (Lampert, Mnuchin, Tisch, Alvarez, Kamlani, Kunkler, DePodesta and Reese) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings and the Directors (Schriesheim, Riecker, Huckins, Munjal and Rodney) and Officers

(Lampert, Schriesheim, Riecker, Huckins and Meerschaert) of the Real Estate Transferors in Connection with the Seritage Transaction .........................207

Count 22 Unjust Enrichment Against the Controlling Insider Shareholders, the Conflicted Directors (Lampert, Alvarez, Mnuchin and Tisch) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings, the Directors (Schriesheim, Riecker, Huckins, Munjal and Rodney) and Officers (Lampert, Schriesheim, Riecker, Huckins and Meerschaert) of the Real Estate Transferors and the Seritage Defendants Relating to the Seritage Transaction ............................................................................209

Count 23 Aiding and Abetting Breach of Fiduciary Duty Against Duff & Phelps and C&W in Connection with the Seritage Transaction ..............................................211

Count 24 Avoidance and Recovery of Any Payments Made by the Related-Party Financings Borrowers on Each of the Related-Party Financings as Actual Fraudulent Transfers Against the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the Related-Party Financers (the ESL Financers, Tisch, BS 2018, Berkowitz and Fairholme Capital) and Cascade .......................214

Count 25 Avoidance and Recovery of Any Payments Made by the Related-Party Financings Borrowers on Each of the Related-Party Financings as Constructive Fraudulent Transfers Against the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the Related-Party Financers (the ESL Financers, Tisch, BS 2018, Berkowitz and Fairholme Capital) and Cascade ..................................................................................219

Count 26 Avoidance and Recovery of the Obligations Incurred and the Liens Granted by the Additional Subsidiary Guarantors on the 2018 Term Loan Facility as Constructive Fraudulent Transfers Against the ESL Financers and the Cyrus 2018 Term Loan Financers....................................................................221

Count 27 Unjust Enrichment Relating to the Related-Party Financings Against the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the Related-Party Financers (the ESL Financers, Tisch, BS 2018, Berkowitz and Fairholme Capital), Cascade, the Controlling Insider Shareholders and the Conflicted Directors (Lampert, Alvarez, Berkowitz, Kamlani, Mnuchin and Tisch) of Sears Holdings ......................................................................225

Count 28 Breach of Fiduciary Duty Against the Controlling Insider Shareholders in Connection with the Related-Party Financings....................................228

Count 29 Breach of Fiduciary Duty Against the Conflicted Directors (Lampert, Alvarez, Berkowitz, Kamlani, Mnuchin and Tisch) of Sears Holdings in Connection with the Related-Party Financings....................................232

Count 30 Breach of Fiduciary Duty Against the Members of the RPT Committee (Reese, DePodesta and Kunkler) of Sears Holdings in Connection with the Related-Party Financings .......................................................236

Count 31 Breach of Fiduciary Duty Against the Officers (Lampert, Schriesheim, Riecker and Huckins) of the Related-Party Financings Borrowers and

Directors (Schriesheim, Riecker and Huckins) of Certain of the Related-Party Financings Borrowers in Connection with the Related-Party Financings .................................................................................239

Count 32 Breach of Fiduciary Duty Against the Directors (Riecker, Meerschaert and Jordan) and Officers (Lampert and Riecker) of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility ........................................................243

Count 33 Aiding and Abetting Breach of Fiduciary Duty Against the Controlling Insider Shareholders, the Directors (Lampert, Alvarez, Berkowitz, Kamlani, Mnuchin, Tisch, Reese, DePodesta, Kunkler, Schriesheim, Riecker and Huckins) and Officers (Lampert, Schriesheim, Riecker and Huckins) of the Related-Party Financings Borrowers and the Directors (Riecker, Meerschaert and Jordan) and Officers (Lampert and Riecker) of the Additional Subsidiary Guarantor Directors in Connection with the Related-Party Financings .................................................................................247

Count 34 Disallowance of Lampert's, the ESL Defendants', Cascade's, the Cyrus Defendants', Tisch's, BS 2018's, the Fairholme Defendants', Berkowitz's and the Seritage Defendants' Claims Not Subject to the APA ..............................249

Count 35 Equitable Subordination Against Lampert, the ESL Defendants, the Fairholme Defendants, Berkowitz, Tisch and the Seritage Defendants ................253

**PRAYER FOR RELIEF** ..................................................................................................**255**

DEFINED TERMS

2012 Solvency Projections ........................................................................72

2014 Solvency Projections ........................................................................86

2015 Solvency Projections ......................................................................124

ABL ..........................................................................................................85

ABL Lenders .............................................................................................67

Additional Subsidiary Guarantor Directors ...........................................243

Additional Subsidiary Guarantors on the 2018 Term Loan Facility .........18

Advisor Defendants ....................................................................................2

Alvarez .......................................................................................................2

Annual Plan ..............................................................................................57

Ares ...........................................................................................................70

AUM ...........................................................................................................68

Berkowitz ....................................................................................................2

Big Beaver ...................................................................................................1

BS 2018 ......................................................................................................2

C&W ...........................................................................................................2

Cascade ......................................................................................................2

CEO ............................................................................................................4

CFO ............................................................................................................8

Chancery Court .......................................................................................135

Confirmation Order ....................................................................................1

Conflicted Directors ...................................................................................7

Conflicted Insiders .....................................................................................7

Controlling Insider Shareholders ..............................................................7

Creditors' Committee ..................................................................................1

Culpable Parties .........................................................................................8

Cyrus ..........................................................................................................2

Cyrus 2018 Term Loan Financers .............................................................2

Cyrus Defendants .......................................................................................2

Cyrus Financers .........................................................................................2

Cyrus L/C Financers ..................................................................................2

x

DCF .................................................................................................................. 117

Debtor Plaintiffs ................................................................................................ 1

Defendants ......................................................................................................... 3

Deloitte .............................................................................................................. 97

DePodesta .......................................................................................................... 2

Directors ............................................................................................................ 2

DPO ................................................................................................................... 54

Duff & Phelps ................................................................................................... 2

E&Y ................................................................................................................... 120

EBITDA ............................................................................................................ 6

EBITDAP .......................................................................................................... 59

EBITDARP ....................................................................................................... 87

Effective Date ................................................................................................... 166

ESL .................................................................................................................... 1

ESL Defendants ................................................................................................ 2

ESL Financers ................................................................................................... 1

ESL PIK Toggle Notes Claims ........................................................................ 253

ESL Released Claims ....................................................................................... 253

ESL Shareholders ............................................................................................. 1

Fairholme Capital ............................................................................................. 2

Fairholme Defendants ...................................................................................... 2

Fairholme Funds ............................................................................................... 2

Fitch ................................................................................................................... 54

Huckins .............................................................................................................. 2

Innovel ............................................................................................................... 1

Jordan ................................................................................................................ 2

Kamlani .............................................................................................................. 2

KCD Brands ...................................................................................................... 119

Kmart ................................................................................................................. 1

Kmart Directors ................................................................................................ 106

Kmart Holding .................................................................................................. 1

Kmart of Illinois ............................................................................................... 1

Kmart of Washington ....................................................................................... 1

KMT Mezz .................................................................................................................2

Kunkler .....................................................................................................................2

Lampert ....................................................................................................................1

Lands' End ................................................................................................................5

Lands' End Dividend ..............................................................................................170

Lands' End Spin-off .................................................................................................7

Lands' End Transfers .............................................................................................167

LGP/TH ..................................................................................................................80

Management Corp ....................................................................................................1

Master Leases .........................................................................................................95

MaxServ ...................................................................................................................1

Meerschaert .............................................................................................................2

Members of the RPT Committee .............................................................................8

Mnuchin ...................................................................................................................2

Moody's ..................................................................................................................53

Munjal ......................................................................................................................2

NASDAQ ................................................................................................................14

Non-Core Committee .............................................................................................70

NYSE ......................................................................................................................14

Officers ....................................................................................................................2

Orchard ..................................................................................................................42

Other Financers .....................................................................................................30

PBGC ......................................................................................................................40

Petition Date ............................................................................................................6

Plaintiffs ..................................................................................................................1

Plan ......................................................................................................................166

Real Estate Transferor Directors ....................................................................30, 203

Real Estate Transferors .....................................................................................10, 16

Reese .......................................................................................................................2

REIT .........................................................................................................................5

Related-Party Financers .......................................................................................30

Related-Party Financings ................................................................................5, 138

Related-Party Financings Borrowers ...................................................................18

Riecker .................................................................................................................2

Rodney .................................................................................................................2

RPT Approval Policy ...........................................................................................77

RPT Committee ...................................................................................................13

S&P ......................................................................................................................49

Sale-and-Lease-Back ..........................................................................................94

Schriesheim .........................................................................................................2

Sears ....................................................................................................................1

Sears Brands .......................................................................................................1

Sears Brands Business Unit ...............................................................................1

Sears Canada ......................................................................................................43

Sears Development .............................................................................................1

Sears Holdings ....................................................................................................1

Sears Holdings Board .........................................................................................4

Sears Roebuck ....................................................................................................1

Sears Roebuck de Puerto Rico ...........................................................................1

Seritage ...............................................................................................................2

Seritage Defendants ...........................................................................................2

Seritage Derivative Defendants .........................................................................133

Seritage Derivative Litigation ............................................................................133

Seritage Dividend ...............................................................................................187

Seritage Judgment ..............................................................................................135

Seritage Operating Partnership ..........................................................................2

Seritage Real Estate Transfers ...........................................................................9

Seritage Release .................................................................................................133

Seritage Rights ...................................................................................................101

Seritage Rights Offering .....................................................................................9

Seritage Transaction ...........................................................................................9

SHC Desert Springs ............................................................................................1

SHO ......................................................................................................................43

SHO Rights ..........................................................................................................71

SRAC ...................................................................................................................1

SRC Mezz ............................................................................................................2

STI Merchandising ........................................................................................................................1

SYW ............................................................................................................................................40

Tisch ............................................................................................................................................2

Troy Coolidge ............................................................................................................................1

## FIRST AMENDED COMPLAINT

The Official Committee of Unsecured Creditors of Sears Holdings Corporation, *et al.* (the "Creditors' Committee"), acting, pursuant to the *Order (I) Confirming Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated Debtors and (II) Granting Related Relief*, dated October 15, 2019 [ECF No. 5370] (the "Confirmation Order"), on behalf of Sears Holdings Corporation ("Sears Holdings"); Kmart Holding Corporation ("Kmart Holding"); Sears, Roebuck and Co. ("Sears Roebuck"); Sears Development Co. ("Sears Development"); Sears, Roebuck de Puerto Rico, Inc. ("Sears Roebuck de Puerto Rico"); Kmart Corporation ("Kmart"); Kmart of Washington, LLC ("Kmart of Washington"); Sears, Roebuck Acceptance Corp ("SRAC"); Big Beaver of Florida Development, LLC ("Big Beaver"); Innovel Solutions, Inc. ("Innovel"); Kmart Stores of Illinois LLC ("Kmart of Illinois"); MaxServ, Inc. ("MaxServ"); Sears Brands, LLC ("Sears Brands"); Sears Holdings Management Corp. ("Management Corp."); Sears Brands Business Unit Corp. ("Sears Brands Business Unit"); SHC Desert Springs, LLC ("SHC Desert Springs"); STI Merchandising, Inc. ("STI Merchandising"); and Troy Coolidge No. 13, LLC ("Troy Coolidge" and, collectively with the foregoing entities, the "Debtor Plaintiffs" and, the Debtor Plaintiffs together with the Creditors' Committee, the "Plaintiffs"),[1] files this First Amended Complaint against (i) Edward Scott "Eddie" Lampert ("Lampert"); (ii) ESL Investments, Inc. ("ESL"); (iii) RBS Partners, LP, CRK Partners, LLC, SPE Master I., LP, ESL Partners LP, SPE I Partners, LP, RBS Investment Management, LLC, ESL Institutional Partners, LP and ESL Investors, LLC (together with ESL, the "ESL Shareholders"); (iv) JPP, LLC and JPP II, LLC (the "ESL Financers," and, together with the ESL Shareholders, the

---

[1] Each of the Debtor Plaintiffs was a debtor that filed for bankruptcy under chapter 11 of the U.S. Bankruptcy Code on October 15, 2018. This First Amended Complaint refers to the overall business enterprise of the Debtor Plaintiffs together with certain non-Debtor affiliates as "Sears."

"ESL Defendants"); (v) Fairholme Funds, Inc. ("Fairholme Funds"); (vi) Fairholme Capital

Management, LLC ("Fairholme Capital" and, together with Fairholme Funds, the "Fairholme

Defendants" ")"; (vii) Cascade Investment, LLC ("Cascade"); (viii) Cyrus Capital Partners, LP

("Cyrus"); (ix) Crescent 1, LP, Canary SC Fund, LP, CYR Fund, LP and CMH VI, LP (the "Cyrus

L/C Financers"), (x) Crescent 1, LP, Cyrus Opportunities Master Fund II, Ltd., CRS Master Fund,

LP, Canary SC Master Fund, LP, Cyrus Select Opportunities Master Fund, Ltd., Cyrus Special

Strategies Master Fund, LP and Cyrus 1740 Master Fund, LP (the "Cyrus 2018 Term Loan

Financers" and, together with the Cyrus L/C Financers, the "Cyrus Financers," and, the Cyrus

Financers, together with Cyrus, the "Cyrus Defendants"); (xi) Benefit Street 2018, LLC ("BS

2018"); (xii) Cesar L. Alvarez ("Alvarez"); (xiii) Bruce Berkowitz ("Berkowitz"); (xiv) Paul G.

DePodesta ("DePodesta"); (xv) Kunal Kamlani ("Kamlani"); (xvi) William C. Kunkler III

("Kunkler"); (xvii) Steven Mnuchin ("Mnuchin"); (xviii) Thomas J. Tisch ("Tisch"); (xix) Ann N.

Reese ("Reese" and, together with Lampert, Alvarez, Berkowitz, DePodesta, Kamlani, Kunkler,

Mnuchin and Tisch, the "Directors"); (xx) Robert Schriesheim ("Schriesheim"); (xxi) Robert

Riecker ("Riecker"); (xxii) Scott Huckins ("Huckins" and, together with Lampert, Schriesheim

and Riecker, the "Officers"); (xxiii) Leena Munjal ("Munjal"); (xxiv) Dave Rodney ("Rodney");

(xxv) Lawrence Meerschaert ("Meerschaert"); (xxvi) Joseph Jordan ("Jordan"); (xxvii) Seritage

Growth Properties, Inc. ("Seritage"); (xxviii) Seritage Growth Properties, LP (the "Seritage

Operating Partnership"), Seritage KMT Mezzanine Finance LLC ("KMT Mezz"), Seritage SRC

Mezzanine Finance LLC ("SRC Mezz"), Seritage KMT Finance LLC, Seritage SRC Finance LLC,

Seritage GS Holdings LLC, Seritage SPS Holdings LLC and Seritage MS Holdings LLC (together

with Seritage, the "Seritage Defendants"); (xix) Duff & Phelps, LLC ("Duff & Phelps"); (xxx)

Cushman & Wakefield, Inc. ("C&W" and, together with Duff & Phelps, the "Advisor Defendants")

and (xxxi) John and Jane Does 1–500 (collectively with Lampert, the ESL Defendants, Fairholme

Defendants, Cascade, the Cyrus Defendants, BS 2018, the Directors, the Officers, Munjal, Rodney,

Meerschaert, Jordan, the Seritage Defendants, Duff & Phelps and C&W, the "<u>Defendants</u>").

**Introduction**

1.      By the time of their bankruptcy filings in October 2018, the Debtors[2] were woefully insolvent by billions of dollars.  This level of insolvency did not occur overnight.  Instead, the Debtors' insolvency and the inevitable bankruptcy filings were the result of a years-long effort by Lampert—Sears's Chief Executive Officer ("CEO"), Sears Holdings's controlling shareholder and Chairman of the Sears Holdings Board of Directors (the "Sears Holdings Board")—in concert with and assisted by other Defendants (including other officers, directors and shareholders) to transfer billions of dollars of Sears's assets for his benefit and the benefit of other Sears Holdings shareholders in exchange for grossly inadequate consideration or no consideration at all.  This First Amended Complaint seeks to make the Debtor Plaintiffs—Sears Holdings and certain of its Debtor subsidiaries—whole for these thefts of assets, the rank self-dealing of multiple Defendants and numerous other breaches of fiduciary duty.

2.      Throughout his tenure with Sears and despite the various fiduciary obligations he owed, Lampert acted with one guiding principle:  to use Sears and its prime assets to improve his personal, and his investment fund's, bottom line—***despite*** the harm it caused to Sears and its

---

[2]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, LLC (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC (5554); Sears Protection Company (Florida), LLC (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, LLC (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

creditors.  Altogether, Lampert caused billions of dollars of cash and other assets to be transferred

to himself, Sears Holdings's other shareholders and other third parties (including affiliates of

Lampert), beyond the reach of the Debtor Plaintiffs' creditors and for no value to the Debtor

Plaintiffs.  These assets included (i) 100% of Lands' End, Inc. ("Lands' End"), a profitable Sears

business that, at the time of its transfer, had an enterprise value of $1.3 billion; (ii) rights to

purchase shares of Seritage, a new real estate investment trust ("REIT"), which were worth

hundreds of millions of dollars but were dividended to Lampert and others for no consideration

and (iii) 266 of Sears's premier properties, handed to the Seritage Defendants for at least hundreds

of millions of dollars below their fair value.

3.       In addition to these asset transfers, from 2016 to 2018, Sears Holdings and other

Debtor Plaintiffs paid more than $400 million in "interest" and "fees" on account of "loans" made

by Lampert, his affiliates and others (the "Related-Party Financings").  The assumption of these

purported debt obligations was intentionally and constructively fraudulent.  Furthermore, despite

the efforts of Lampert, ESL and others to disguise the Related-Party Financings as loans, these

transactions were, in fact, equity contributions, and any obligations incurred pursuant to them

constitute fraudulent transfers.  For these reasons, the "interest" and "fees" paid on the Related-

Party Financings were themselves fraudulent conveyances that unjustly enriched Lampert, ESL,

the Related-Party Financers and the Other Financers, as defined and described herein.

4.       As Lampert and other Defendants stripped Sears of billions of dollars of assets and

wrongfully encumbered remaining property with new obligations and liens, Sears was suffering

billions of dollars of losses annually and had not generated positive cash flow from operations for

years.  Between fiscal years 2011 and 2014 (the year in which the Lands' End shares were

distributed to shareholders), Sears had a cumulative net loss of $7.1 billion.  Between 2015 and

the Debtors' bankruptcy filings on October 15, 2018 (the "<u>Petition Date</u>"), Sears suffered additional net losses between $4.7 billion and $5.6 billion.  By at least 2014 and continuing through the bankruptcy filings in 2018, the Debtor Plaintiffs were insolvent and had insufficient capital to remain in business.  Lampert and other Defendants knew this but nonetheless continued to pursue further asset transfers for their own enrichment.

5.      Lampert and other Defendants also knew that Sears had no realistic plan to return to profitability and solvency.  At Lampert's personal direction, Sears's employees, including certain of the Defendants, repeatedly produced financial plans reflecting outlandish, bad-faith predictions that Sears would experience an immediate and dramatic turn-around from deep and mounting losses to sudden profitability.  Rather than attempt to project Sears's financial results in good faith, Sears's annual plans were based on top-down orders from Lampert.  Without any legitimate reason and despite Sears's immense and consistent losses, these plans simply ***assumed***, with absolutely no basis, that profits would appear.  Year after year, hundreds of millions of dollars of Earnings Before Interest, Taxes, Depreciation and Amortization ("<u>EBITDA</u>") were attributed to what internal Sears documents called "***go-gets***"—unidentified initiatives that, the plans assumed, somehow would be discovered, implemented and profitable.  Sears continued to produce these false projections year after year, even as baseless projections of huge profits were consistently followed by the reality of huge losses.

6.      During the relevant period, Lampert and ESL were Sears Holdings's largest shareholders, holding approximately 50% of Sears Holdings's issued and outstanding stock.  Another large shareholder, Fairholme Capital, held between 15% and 30% of Sears Holdings's stock and had affiliated directors on the Sears Holdings Board that approved and/or advocated for all of these wrongful, self-dealing transactions.  Tisch, another member of the Sears Holdings

Board who approved and/or advocated for the wrongful transactions, personally held approximately 3% of Sears Holdings's stock and, thus, was conflicted. All of these Sears Holdings fiduciaries were on both sides of some or all of the transactions at issue in this Adversary Proceeding. Together, these controlling insider shareholders—Lampert, the ESL Shareholders, Fairholme Capital and Tisch (the "Controlling Insider Shareholders")—received at least 70% of the value of the 2014 Lands' End spin-off (the "Lands' End Spin-off"), 75% of the value of the 2015 Seritage rights distribution and hundreds of millions of dollars in interest payments and fees paid by the Debtor Plaintiffs on account of the Related-Party Financings. Controlling Insider Shareholders, Lampert and Tisch, served as members of the Sears Holdings Board when each of the subject transactions was approved.

7.      The Controlling Insider Shareholders worked hand-in-hand with the six affiliated Directors[3] who approved some or all of these transactions:  Lampert himself; Alvarez, a director of Fairholme Funds, Fairholme Capital's parent company; Berkowitz, Fairholme Funds's founder and president; Kamlani, the president of ESL; Mnuchin, an investor in ESL and former vice chairman of ESL; and Tisch, an investor in ESL and manager of BS 2018 (the "Conflicted Directors"[4] and, together with the Controlling Insider Shareholders, the "Conflicted Insiders"); four ostensibly independent Directors who recommended the transactions to the full Sears

---

[3]      "Directors" refers to those members of the Sears Holdings Board who, at a given point in time, served as members of the Sears Holdings Board. At the time of the Lands' End Spin-off (as defined herein), Lampert, Alvarez, Mnuchin, Tisch, Reese, DePodesta and Kunkler served as members of the Sears Holdings Board. At the time of the Seritage Transaction (as defined herein), Lampert, Alvarez, Berkowitz, Kamlani, Mnuchin, Tisch, Reese, DePodesta and Kunkler served as members of the Sears Holdings Board. Lampert, Alvarez, Berkowitz, Mnuchin, Tisch, Reese, DePodesta and Kunkler approved some or all of the Related-Party Financings that occurred while they served as members of the Sears Holdings Board.

[4]      "Conflicted Directors" refers to those members of the Sears Holdings Board who, at a given point in time, were conflicted by virtue of their affiliation with one or more of the Controlling Insider Shareholders. In the case of the Lands' End Spin-off, the Conflicted Directors are Lampert, Alvarez, Mnuchin and Tisch. In the case of the Seritage Transaction, the Conflicted Directors are Lampert, Alvarez, Berkowitz, Mnuchin and Tisch. In the case of the Related-Party Financings, the conflicted Directors are Lampert, Alvarez, Berkowitz, Kamlani, Mnuchin and Tisch, each of whom approved some or all of the Related-Party Financings.

Holdings Board for approval:  Kamlani, DePodesta, Kunkler and Reese (the "<u>Members of the RPT</u>

<u>Committee</u>")[5] and four senior Officers[6] who engineered the transactions: Lampert; Schriesheim—

Sears's Chief Financial Officer ("<u>CFO</u>") from August 2011 through October 2016; Riecker—

Sears's Chief Accounting Officer and Controller and CFO beginning in 2017; and Huckins—

Sears's Treasurer.  Together, the Controlling Insider Shareholders, Directors and Officers are

referred to as the "<u>Culpable Parties</u>").

8.    This First Amended Complaint seeks to recover from the Defendants for their

pervasive wrongdoing in connection with three categories of transactions.  *First*, in April 2014,

Sears Holdings spun off Lands' End to Sears Holdings's shareholders for no consideration and left

Sears Holdings and Sears Roebuck, Lands' End's parent company, with unreasonably small capital

and incapable of paying their existing and intended future debts.  Prior to the spin-off, Lands' End

operated one of Sears's few remaining profitable businesses, having been described by *The Wall*

*Street Journal* as one of Sears's "crown jewels."  The Lands' End Spin-off was approved by the

Sears Holdings Board, which was populated by conflicted directors including Lampert, Mnuchin,

Tisch and Alvarez.  In transferring Lands' End to Sears Holdings's shareholders, the Culpable

Parties refused to consider an unsolicited third-party indication of interest that valued Lands' End

at $1.6 billion (inclusive of net debt), failed even to consider a sale to an unaffiliated third party or

to undertake a meaningful marketing process and refused to increase Lands' End's borrowing to

---

[5]    "<u>Members of the RPT Committee</u>" refers to those members of the Sears Holdings Board who, at a given point in time, served as members of the RPT Committee.  In the case of the Lands' End Spin-off, the Members of the RPT Committee include Reese and Kunkler.  In the case of the Seritage Transaction, the Members of the RPT Committee include Reese, Kunkler and Kamlani.  In the case of the Related-Party Financings, the Members of the RPT Committee include Reese, Kunkler and DePodesta.

[6]    Each of the Officers facilitated the approval of the Lands' End Spin-off, the Seritage Transaction and some or all of the Related-Party Financings.  Defendants Munjal, Rodney, Meerschaert and Jordan also were officers of Sears who facilitated the approval of certain transactions.  In the case of the Seritage Transaction, Munjal and Rodney served as directors of certain Real Estate Transferors (as defined herein) and Meerschaert served as an officer of certain Real Estate Transferors.  In the case of the Related-Party Financings, Meerschaert and Jordan served as directors of certain Additional Subsidiary Guarantors on the 2018 Term Loan Facility (as defined herein).

support a larger "pre-spin" dividend from Lands' End to Sears Holdings (as recommended by the lead banker).  As a consequence of the transaction, Sears Holdings's shareholders received Lands' End shares worth at least $800 million, $500 million of which went to the Controlling Insider Shareholders.

9.      Patently, the Lands' End Spin-off was designed to benefit Lampert and other Sears Holdings shareholders at the expense of the Debtor Plaintiffs and their creditors.  In a textbook understatement, *The Wall Street Journal* presciently warned, "Lampert is carving out some of the best pieces of [Sears] for its shareholders, moves that could leave bondholders at risk if its remaining businesses continue to deteriorate."  That deterioration was more than foreseeable; it was inevitable and *did* in fact continue, without abatement.

10.      *Second*, in June and July 2015, the Culpable Parties caused Sears Holdings to undertake a rights offering (the "Seritage Rights Offering") permitting Sears Holdings's shareholders to invest in Seritage, a newly created REIT, and a sale-and-lease-back agreement allowing Seritage to take ownership of 266 of Sears's premier retail stores for a grossly understated purchase price and to lease them back to Sears pursuant to prejudicial master-leases laden with off-market and one-sided terms (the "Seritage Real Estate Transfers," and, together with the Seritage Rights Offering, the "Seritage Transaction").  The Seritage Transaction exacerbated Sears's financial distress, lack of adequate capital and inability to pay its debts and left the Debtors balance-sheet insolvent as well.

11.      The Seritage Rights Offering gave Sears Holdings's shareholders (again, predominantly Lampert, the ESL Shareholders and the other Controlling Insider Shareholders) the ability to purchase Seritage's common stock at an artificially deflated price for no consideration to Sears.  The Culpable Parties intended for the subscription rights to transfer value away from

9

Sears and to Sears Holdings's shareholders. The Sears Holdings Board achieved that goal: hundreds of millions of dollars of value were transferred from Sears Holdings to its shareholders through the distribution of the rights for no consideration.

12.     After launching the Seritage Rights Offering, certain Debtor Plaintiffs[7] transferred to Seritage their real estate interests in 266 of their most profitable stores and agreed to lease back the subject property. The purchase price paid to the applicable Debtor Plaintiffs undervalued the transferred real estate by at least hundreds of millions of dollars. The amount of the purchase price was not negotiated. Instead, at the direction of Lampert and the Conflicted Insiders, the purchase price for 235 of the real estate interests was established by appraisals conducted for Sears by C&W. But, as the Culpable Parties knew or were reckless in not knowing, the C&W appraisals grossly undervalued the real estate interests because the appraisals were fundamentally flawed and, among other things, intentionally used under-market future lease rates as the primary basis for their valuations. At the behest of Lampert, ESL and the other Culpable Parties, C&W and financial advisor Duff & Phelps packaged phony appraisals and projections and presented those materials to the Sears Holdings Board. C&W and Duff & Phelps acted as "gatekeepers" to information necessary for directors and officers to assess the Seritage Transaction.

13.     The Seritage Transaction also saddled Sears with hundreds of millions of dollars of rent—in fact, continued lease payments from Sears to Seritage were a primary motivation for the Culpable Parties causing the applicable Debtor Plaintiffs to enter the Related-Party Financings that were entered into after the Seritage Transaction, i.e., to keep Sears breathing and out of bankruptcy as long as possible. Indeed, the first 10-Q filed by Seritage (June 30, 2015) highlighted the risk that the Debtors were or would become insolvent and enter bankruptcy as the principal risk

---

[7]     Sears Holdings, Sears Roebuck, Sears Development, Sears Roebuck de Puerto Rico, Kmart and Kmart of Washington, defined herein as the "Real Estate Transferors."

confronting Seritage. At the same time, Seritage and other Defendants also were enriched by termination fees ultimately paid by Sears when it closed unprofitable stores. As the Culpable Parties intended, in the years since the transaction closed, Seritage thrived and paid handsome dividends to its investors—principally Lampert, the ESL Shareholders and the other Controlling Insider Shareholders.

14.   At the time of the Lands' End Spin-off and Seritage Transaction, Sears was in what Lampert himself described as a "death spiral"—cannibalizing core assets to meet ordinary course obligations without any realistic plan to return to profitability. Its businesses did not generate anywhere near sufficient cash flow to pay its debts as they came due (including interest and principal on billions of dollars in debt and obligations to fund the pension plan for approximately 100,000 retirees). At the time of both transactions, Sears Holdings and other transferors (Sears Roebuck and the Real Estate Transferors,[8] respectively) had unreasonably small capital and were unable to pay their debts as they came due. At the time of the Seritage Transaction, Sears Holdings and the Real Estate Transferors also were insolvent under the balance-sheet test.

15.   *Third*, following the Seritage Transaction and continuing through the Petition Date, Sears staved off collapse only by selling core assets (including its iconic Craftsman brand and related business) and entering into a series of insider "loans" (which, as explained herein, really were disguised equity contributions) totaling billions of dollars with Lampert, the ESL Financers, the Cyrus Financers, Cascade, Tisch, BS 2018, Fairholme Capital and Berkowitz. The "loans" all were secured, which protected the insiders and other lenders while harming the applicable Debtor Plaintiffs' unsecured creditors, and were routinely presented to the supposed "independent" directors on an emergency basis without any time for meaningful analysis of whether the Related-

---

[8]   As defined herein.

Party Financings were in Sears's best interest. During this period, Sears continued to incur operating losses of at least $1.978 billion in FY 2016 and $430 million in FY 2017, with no sign that the losses would ever end and no sign that Sears could ever return to solvency, regain sufficient capitalization or pay its debts when they came due. Indeed, a primary motive behind the loans was not to benefit Sears, but simply to keep Sears in business for as long as possible so it could make rent payments to Seritage, giving Seritage time to find new tenants or new uses for the real estate it had acquired from Sears in 2015. The conflicts inherent in the Related-Party Financings were egregious—Sears Holdings's fiduciaries Lampert, ESL, Fairholme Capital, Schriesheim, Riecker and Huckins approved and/or advocated for Sears Holdings and certain of its subsidiaries to enter into the Related-Party Financings and at the same time were all Seritage shareholders. On information and belief, directors Mnuchin and Tisch were Seritage shareholders and continued to hold stock in Seritage when they approved and/or advocated for Sears Holdings and certain of its subsidiaries to enter into certain of the Related-Party Financings.

16.    Between April 2016 and the Petition Date, Lampert and the ESL Financers contributed approximately $3 billion in financings to Sears, and Fairholme Capital and Berkowitz contributed an additional $25 million. Despite being styled as loans, these financings were actually equity contributions made by insiders. Although the Debtors, including each of the Debtor Plaintiffs, were insolvent, these "loans" had tolerable risk to the "lenders" because they were collateralized by Sears's most valuable remaining real estate, ground leases, inventory, receivables and intellectual property assets. Disguising the Related-Party Financings as loans caused the borrowers to pay at least $400 million in "interest" and other "fees" to the ESL Defendants and at least $1 million to Fairholme Capital and Berkowitz. The Culpable Parties breached their fiduciary duties by self-dealing and causing certain of the Debtor Plaintiffs to enter into these "loans" and

12

incur these obligations unnecessarily. Under these unique circumstances—patent insolvency/unreasonably small capital/inability to pay debts, *plus* the impossibility of a turn-around, *plus* billions of dollars in additional operating losses, *plus* egregiously conflicted and self-dealing fiduciaries, *plus* the improper motives for accepting the funds and undertaking the faux obligations—certain guarantors and the borrowers of each of the Related-Party Financings, respectively, received no, or less than reasonably equivalent value in exchange for incurring their purported debt obligations. This gives rise to a panoply of claims as set forth herein.

17. The Culpable Parties took steps to create the appearance of independent review for these hopelessly conflicted transactions, but those steps were nothing more than window dressing. The Culpable Parties created the Related-Party Transaction Sub-Committee of the Sears Holdings Board (the "RPT Committee") ostensibly to assess certain aspects of the Lands' End Spin-off, Seritage Transaction and the Related-Party Financings on an independent basis. The RPT Committee, however, failed to protect the interests of the Debtor Plaintiffs and their creditors or provide any meaningful check on the insiders' self-dealing acts. For example, the members of the RPT Committee purported to rely on egregiously inadequate solvency opinions that they knew were based on wholly fabricated forecasts (the financial plans fabricated by Lampert, or at his direction, each year). Despite Sears's abysmal financial results and dismal prospects for a turnaround, the RPT Committee focused completely on the interests of Sears Holdings's stockholders—willfully ignoring each of the Debtor Plaintiffs' insolvency, lack of adequate capital and guaranteed future inability to pay debts when due—and, thus, imposed grievous injury on Sears and the Debtor Plaintiffs' creditors. Indeed, in the Seritage Transaction, the RPT Committee's mandate was limited to a review of the Controlling Insider Shareholders' equity ownership in Seritage and, thus, did not cover any of the other critical aspects of the transaction,

including the price of the rights offering, the value or price of the transferred properties, the one-sided lease terms or Sears's financial condition.  Further, the RPT Committee improperly allowed the Conflicted Directors to lobby the Sears Holdings Board to approve and to vote on the self-dealing transactions.  The Conflicted Insiders cannot contend, as either a legal or factual matter, that the RPT Committee cleansed or mitigated their conflicts for any of these transactions.

18.    As set forth below, Defendants are obligated to repay the billions of dollars of value looted from the Debtor Plaintiffs.  While it is too late to undo the complete torching of Sears, Lampert and the other Defendants should face the consequences of their many years of improper conduct through which they siphoned substantial value away from the Debtor Plaintiffs and their creditors.

## <u>Jurisdiction</u>

19.    This Court has subject-matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Each of the Plaintiffs consents to the entry of a final order or judgment by the Bankruptcy Court on the causes of action asserted herein.

20.    This Court has personal jurisdiction over each of the Defendants under Rule 7004(f) of the Federal Rules of Bankruptcy Procedure.

21.    This Court also has personal jurisdiction over each of the Defendants under N.Y. C.P.L.R. §§ 301 and 302 because Plaintiffs' claims arise from acts by Defendants, in person or through agents, transacting business within New York, committing tortious acts within New York and/or committing tortious acts causing injury to persons or property within New York.  At the relevant times, Sears Holdings (ticker symbol:  SHLD) was traded on the NASDAQ Stock Market ("<u>NASDAQ</u>"), a securities exchange located in New York.  The shares of Lands' End (ticker symbol:  LE) traded on NASDAQ and the shares of Seritage (ticker symbol:  SRG) and the Seritage subscription rights traded on the New York Stock Exchange ("<u>NYSE</u>"), another securities

exchange located in New York.  The Lands' End and Seritage Transactions both involved property

owned, directly or indirectly, by Debtor Sears Roebuck, a New York corporation, including (in the

case of Lands' End and Seritage) substantial interests in real property located in New York.  Each

of these transactions also was accomplished through the use of lawyers, financial advisors and/or

financial institutions located in New York.  Moreover, the Seritage Defendants, as well as

defendant Tisch, reside in New York.

22.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1409(a) and (c).

### The Parties

23.      Plaintiff Creditors' Committee is the Official Committee of Unsecured Creditors of

the Debtors appointed in the chapter 11 cases by the Office of the United States Trustee and granted

joint standing with the Debtors to pursue the claims and causes of action contained herein pursuant

to the terms of the Confirmation Order.

24.      Debtor Plaintiffs are Debtors in the chapter 11 cases filed on the Petition Date.

25.      Plaintiff Sears Holdings is and was the direct or indirect parent of the other Debtor

Plaintiffs.  Sears Holdings is a borrower or guarantor of certain debt outstanding as of the Petition

Date.  At all relevant times, Sears Holdings was incorporated in Delaware.

26.      Plaintiff Kmart Holding is a direct subsidiary of Sears Holdings.  At all relevant

times, Kmart Holding was incorporated in Delaware.

27.      Plaintiff Sears Roebuck is and was a direct subsidiary of Sears Holdings and was

the parent of Lands' End until 2014.  Sears Roebuck also held title, directly or indirectly, to much

of the real estate transferred in the Seritage Transaction.  Sears Roebuck is a borrower on certain

Related-Party Financings.  At all relevant times, Sears Roebuck was incorporated in New York.

28.      Plaintiff Sears Development is and was an indirect subsidiary of Sears Holdings

(through Sears Roebuck).  Sears Development held title to some of the real estate transferred in

the Seritage Transaction. Sears Development is a borrower on certain Related-Party Financings and is one of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility, as defined herein. At all relevant times, Sears Development was incorporated in Delaware.

29.     Plaintiff Sears Roebuck de Puerto Rico is and was an indirect subsidiary of Sears Holdings (through Sears Roebuck). Sears Roebuck de Puerto Rico held title to some of the real estate transferred in the Seritage Transaction. At all relevant times, Sears Roebuck de Puerto Rico was incorporated in Delaware.

30.     Plaintiff Kmart is and was an indirect subsidiary of Sears Holdings (through Kmart Holding). Kmart held title to some of the real estate transferred in the Seritage Transaction. Kmart is also the successor by merger to several other entities that held title to some of the real estate transferred in the Seritage Transaction.[9] Kmart is a borrower on certain Related-Party Financings. At all relevant times, Kmart was incorporated in Michigan.

31.     Plaintiff Kmart of Washington is and was an indirect subsidiary of Sears Holdings (through Kmart Holding and Kmart). Kmart of Washington held title to some of the real estate transferred in the Seritage Transaction. Kmart of Washington is a borrower on certain Related-Party Financings. At all relevant times, Kmart of Washington was incorporated in Washington.

32.     Collectively, Sears Roebuck, Sears Development, Sears Roebuck de Puerto Rico, Kmart Holding, Kmart and Kmart of Washington are referred to herein as the "Real Estate Transferors."

---

[9]     Those entities are:  Troy CMBS Property, LLC; Troy Coolidge No. 3, LLC; Troy Coolidge No. 8, LLC; Troy Coolidge No. 9, LLC; Troy Coolidge No. 19, LLC; Troy Coolidge No. 20, LLC; Troy Coolidge No. 25, LLC; Troy Coolidge No. 26, LLC; Troy Coolidge No. 28, LLC; Troy Coolidge No. 33, LLC; Troy Coolidge No. 34, LLC; Troy Coolidge No. 36, LLC; Troy Coolidge No. 37, LLC; Troy Coolidge No. 41, LLC; Troy Coolidge No. 43, LLC; Troy Coolidge No. 45, LLC; Troy Coolidge No. 51, LLC; Troy Coolidge No. 54, LLC; and Troy Coolidge No. 58, LLC.

33.     Plaintiff SRAC is and was an indirect subsidiary of Sears Holdings (through Sears Roebuck).  SRAC is a borrower on certain Related-Party Financings.  At all relevant times, SRAC was incorporated in Delaware.

34.     Plaintiff Big Beaver is and was an indirect subsidiary of Sears Holdings (through Kmart and Kmart Holding).  Big Beaver is a borrower on certain Related-Party Financings.  At all relevant times, Big Beaver was incorporated in Florida.

35.     Plaintiff Innovel is and was an indirect subsidiary of Sears Holdings (through Sears Roebuck).   Innovel is a borrower on certain Related-Party Financings.  At all relevant times, Innovel was incorporated in Delaware.

36.     Plaintiff Kmart of Illinois is and was an indirect subsidiary of Sears Holdings (through Kmart and Kmart Holding).  Kmart of Illinois is a borrower on certain Related-Party Financings.  At all relevant times, Kmart of Illinois was incorporated in Illinois.

37.     Plaintiff MaxServ is and was an indirect subsidiary of Sears Holdings (through Sears Roebuck).  MaxServ is a borrower on certain Related-Party Financings.  At all relevant times, MaxServ was incorporated in Delaware.

38.     Plaintiff Sears Brands is and was an indirect subsidiary of Sears Holdings (through Sears Business Unit Corp., Management Corp. and Kmart Holding).  Sears Brands is one of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility, as defined herein.   At all relevant times, Sears Brands was incorporated in Delaware.

39.     Plaintiff Management Corp. is and was an indirect subsidiary of Sears Holdings (through Kmart Holding).  Management Corp. is a borrower on certain Related-Party Financings. At all relevant times, Management Corp. was incorporated in Delaware.

40.    Plaintiff Sears Brands Business Unit is and was an indirect subsidiary of Sears Holdings (through Management Corp.).  Sears Brands Business Unit is one of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility, as defined herein.  At all relevant times, Sears Brands Business Unit was incorporated in Illinois.

41.    Plaintiff SHC Desert Springs is and was an indirect subsidiary of Sears Holdings (through Kmart and Kmart Holding).  SHC Desert Springs is a borrower on certain Related-Party Financings.  At all relevant times, SHC Desert Springs was incorporated in Delaware.

42.    Plaintiff STI Merchandising is and was an indirect subsidiary of Sears Holdings (through Kmart and Kmart Holding).  STI Merchandising is one of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility, as defined herein.  At all relevant times, STI Merchandising was incorporated in Michigan.

43.    Plaintiff Troy Coolidge is and was an indirect subsidiary of Sears Holdings (through Kmart and Kmart Holding).  Troy Coolidge is a borrower on certain Related-Party Financings.  At all relevant times, Troy Coolidge was incorporated in Michigan.

44.    Collectively, Sears Holdings, Sears Roebuck, SRAC, Kmart, Kmart of Washington, Kmart of Illinois, Big Beaver, Innovel, MaxServ, Sears Development, Management Corp., SHC Desert Springs and Troy Coolidge are referred to herein as the "Related-Party Financings Borrowers."

45.    Collectively, Sears Development, Sears Brands, Sears Brands Business Unit and STI Merchandising are referred to herein as the "Additional Subsidiary Guarantors on the 2018 Term Loan Facility."

46.    Defendant Lampert was chairman of the Sears Holdings Board from the time of the 2005 Kmart/Sears merger until his resignation on February 12, 2019.  He was also the CEO of

18

Sears from February 2013 until the day before the Petition Date. In addition, Lampert is the sole founder, owner, chairman and CEO of ESL (as well as a limited partner in certain of the ESL Shareholders) and a chairman of the board of trustees of Seritage. On information and belief, Lampert resides in Florida.

47.    Defendant ESL is an investment manager incorporated in Delaware, with its principal place of business in Florida. ESL is controlled by Lampert, who is its sole owner. On information and belief, ESL's principal investments during the relevant period were in Sears and companies spun off from Sears.

48.    Defendants RBS Partners, LP; CRK Partners, LLC; SPE Master I, LP; ESL Partners LP; SPE I Partners, LP; RBS Investment Management, LLC; ESL Institutional Partners, LP; and ESL Investors, LLC are investment funds controlled by Lampert and ESL that were shareholders of Sears Holdings at all relevant times. ESL was the general partner of RBS Partners, LP and ESL Investors, LLC, the manager of RBS Investment Management, LLC and the sole member of CRK Partners, LLC. RBS Partners, LP was the general partner of SPE Master I, LP, ESL Partners, LP and SPE I Partners, LP and the manager of ESL Investors, LLC. RBS Investment Management, LLC was the general partner of ESL Institutional Partners, LP. All of the ESL Shareholders are incorporated in Delaware.

49.    Together, Lampert and the ESL Shareholders held approximately 48% of Sears Holdings's stock at the time of the Lands' End Spin-off, approximately 48% of Sears Holdings's stock at the time of the Seritage Rights Offering and approximately 50% of Sears Holdings's stock from 2016 to 2018 when the Related-Party Financings occurred. Lampert and the ESL Shareholders also initially owned approximately 44% of the Seritage Operating Partnership directly and approximately 2% of the Operating Partnership through their ownership of Seritage

Class A shares.  As of September 2019, they owned approximately 6% of Seritage Class A shares,

which (directly or through subsidiaries) holds title to the Seritage real estate assets, and, thus,

materially benefited from the rent payments made to and other rights extended to Seritage.  On

information and belief, Lampert and the ESL Shareholders held Seritage Class A shares at the time

when each of the Related-Party Financings occurred.  Throughout the relevant time period,

Lampert's and the ESL Shareholders' disclosures on Schedule 4 and Schedule 13D as well as Sears

Holdings's definitive proxy statements attributed the entirety of Lampert's and the ESL

Shareholders' holdings to both Lampert and the ESL Shareholders.

50.     Defendant Fairholme Funds, founded in 1999, is an investment company that

manages Fairholme Capital, an investment advisor to Fairholme Funds.  Alvarez is a member of

Fairholme Funds's board of directors.  Berkowitz is the President and a director of Fairholme

Funds.

51.     Defendant Fairholme Capital, founded in 1997 by Berkowitz, is an investment

advisor incorporated in Delaware, with its principal place of business in Miami, Florida.

Fairholme Capital is a subsidiary of Fairholme Funds.  Fairholme Capital held approximately 23%

of Sears Holdings's stock at the time of the Lands' End Spin-off, approximately 25% of Sears

Holdings's stock at the time of the Seritage Rights Offering and between 22% and 26% of Sears

Holdings's stock between 2016 and 2018 when the Related-Party Financings occurred.  Between

December 31, 2015, and March 16, 2018, Fairholme Capital (together with Berkowitz, Fairholme

Capital's founder and Chief Investment Officer and President of Fairholme Funds) held between

13% and 5% of Seritage stock.  On information and belief, Fairholme Capital and Berkowitz

continued to hold Seritage shares when each of the Related-Party Financings occurred.  Fairholme

Capital's interests were represented on the Sears Holdings Board by Alvarez (a director of

20

Fairholme Funds) from December 2013 to May 2017 and by Berkowitz from February 2016 to October 2017. Fairholme Capital and Berkowitz also were lenders on the Second Lien Credit Facility, as defined herein, and received "interest payments" and other "fees" on account of the Second Lien Credit Facility.

52.     Defendant Tisch has been a member of the Sears Holdings Board since 2005 and a member at various times of the audit, compensation and nominating and governance committees of the Sears Holdings Board. As a director, Tisch approved the Lands' End Spin-off, the Seritage Transaction and all of the Related-Party Financings. Tisch also is an investor in ESL (as a limited partner in certain of the ESL Defendants). Tisch also owned or controlled approximately 3.5% of Sears Holdings's stock at the time of the Lands' End Spin-off and the Seritage Rights Offering and between 3% and 4% of Sears Holdings's stock from 2016 to 2018 when the Related-Party Financings occurred. Tisch owned shares of Sears Holdings's stock personally and controlled other shares held by his brothers, family trusts and family foundations (including Tisch Foundation, Inc. and The Alice M. & Thomas J. Tisch Foundation, Inc.). Tisch had sole voting power over certain shares in Sears Holdings's stock held by trusts of which he and/or his brothers were trustees and/or beneficiaries. Tisch also had shared voting power over additional shares of Sears Holdings's stock, including the shares held by two family foundations. On information and belief, Tisch also owned shares in Seritage when the Related-Party Financings occurred. Tisch also individually participated as a lender in the Second Lien Credit Facility and, on information and belief, was paid "interest" and "fees" by the Related-Party Financings Borrowers. Tisch also managed BS 2018, a lender on the FILO Loan Facility, as described herein. Tisch was a member of the Sears Holdings Board when the Second Lien Credit Facility and the FILO Loan Facility were entered. As such, Tisch was conflicted and engaged in self-dealing with respect to each of

the transactions listed above.  These transactions were not fair to Sears, and Tisch breached his duties in many respects.  On information and belief, Tisch resides in New York.

53.     Defendant Alvarez was a member of the Sears Holdings Board from December 18, 2013 until May 10, 2017.  As a director, Alvarez approved the Lands' End Spin-off, the Seritage Transaction and Related-Party Financings, as described herein.  Alvarez is also a director of Fairholme Funds.  As such, Alvarez was conflicted and engaged in self-dealing with respect to each of the transactions listed above.  These transactions were not fair to Sears, and Alvarez breached his duties in many respects.  On information and belief, Alvarez resides in Florida.

54.     Defendant Berkowitz was a member of the Sears Holdings Board from February 24, 2016 to October 31, 2017.  As a director, Berkowitz approved of the Related-Party Financings.  Berkowitz also is the founder and President of Fairholme Funds.  Berkowitz and Fairholme Capital owned an aggregate of approximately 13% of Seritage Class A shares at the time of the Seritage Transaction and, as of March 2018, they held an aggregate of approximately 5%.  On information and belief, Berkowitz and Fairholme Capital held Seritage shares when each of the Related-Party Financings occurred.  Moreover, Berkowitz individually participated as a lender in the Second Lien Credit Facility and, on information and belief, was paid "interest" and "fees" by Sears Holdings and the other Related-Party Financings Borrowers.  As such, Berkowitz was conflicted and engaged in self-dealing with respect to each of the transactions listed above.  These transactions were not fair to Sears, and Berkowitz breached his duties in many respects.  On information and belief, Berkowitz resides in Florida.

55.     Defendant Kamlani was a member of the Sears Holdings Board from December 3, 2014 to February 12, 2019.  He was a member of the audit committee of the Sears Holdings Board from 2014 to 2015 and a member of the RPT Committee from December 2014 to March 2016.  As

22

a member of the RPT Committee, Kamlani recommended the Seritage Transaction for approval to the Sears Holdings Board; then, as a member of the Sears Holdings Board, Kamlani approved the Seritage Transaction.  Kamlani also approved the Related-Party Financings as a member of the Sears Holdings Board.  Although he ostensibly was an independent director, Kamlani approved virtually everything requested/demanded by the Culpable Parties and utterly failed to discharge his duties to Sears Holdings.  In March 2016, Lampert hired Kamlani as the President of ESL, but Kamlani continued to serve as a member of the Sears Holdings Board for three more years.  As such, Kamlani was conflicted with respect to each of the transactions listed above.  These transactions were not fair to Sears, and Kamlani breached his duties in many respects.  On information and belief, Kamlani resides in Florida.

56.    Defendant Mnuchin was a member of the Sears Holdings Board from March 30, 2005 until December 2, 2016 and a member of the audit committee from 2005 to 2009.  Mnuchin is a longtime personal friend of Lampert's, having been his college roommate at Yale University and his colleague at Goldman, Sachs & Co. in the 1980s.  As a director, Mnuchin approved the Lands' End Spin-off, the Seritage Transaction and of the Related-Party Financings.  Mnuchin also was an investor in ESL (as a limited partner in certain of the ESL Shareholders), ESL's Vice-Chairman from December 2002 to August 2003 and a member of ESL's Board of Directors at all relevant times.  As such, Mnuchin was conflicted and engaged in self-dealing with respect to each of the transactions listed above.  These transactions were not fair to Sears, and Mnuchin breached his duties in many respects.  On information and belief, Mnuchin resides in either California, New York or Washington D.C.

57.    Defendant Kunkler has been a member of the Sears Holdings Board since 2009 and a member of the RPT Committee since its formation in 2012.  As a member of the RPT Committee,

Kunkler recommended for approval to the Sears Holdings Board the Lands' End Spin-off, the Seritage Transaction and the Related-Party Financings; then, as a member of the Sears Holdings Board, Kunkler approved these transactions. Kunkler ostensibly was an independent director but approved virtually everything requested/demanded by the other Culpable Parties and utterly failed to discharge his duties to Sears Holdings. These transactions were not fair to Sears, and Kunkler breached his duties in many respects. On information and belief, Kunkler resides in Illinois.

58.     Defendant DePodesta has been a member of the Sears Holdings Board and a member of the RPT Committee since 2016. As a member of the RPT Committee, DePodesta recommended for approval to the Sears Holdings Board the Related-Party Financings; then, as a member of the Sears Holdings Board, DePodesta approved these transactions. DePodesta ostensibly was an independent director but approved virtually everything requested/demanded by the other Culpable Parties and utterly failed to discharge his duties to Sears Holdings. These transactions were not fair to Sears, and DePodesta breached his duties in many respects. On information and belief, DePodesta resides in Ohio.

59.     Defendant Reese has been a member of the Sears Holdings Board and a member of the audit committee of the Sears Holdings Board since 2003. Reese has served on and sometimes chaired the RPT Committee since its formation in 2012. She also served on the Real Estate Special Committee of the Sears Holdings Board from its formation in 2016 until its dissolution. As a member of the RPT Committee, Reese recommended for approval to the Sears Holdings Board the Lands' End Spin-off, the Seritage Transaction and the Related-Party Financings; then, as a member of the Sears Holdings Board, Reese approved these transactions. Reese ostensibly was an independent director but approved virtually everything requested/demanded by the other Culpable Parties and utterly failed to discharge her duties to Sears Holdings. These transactions

were not fair to Sears, and Reese breached her duties in many respects.  On information and belief, Reese resides in New York.

60.     Lampert, Tisch, Alvarez, Mnuchin, DePodesta, Kunkler and Reese served as members of the Sears Holdings Board when the Lands' End Spin-off was considered and approved.  Lampert, Tisch, Alvarez, Kamlani, Mnuchin, DePodesta, Kunkler and Reese served as members of the Sears Holdings Board when the Seritage Transaction was considered and approved.  Lampert, Alvarez, Tisch, Berkowitz, Kamlani, Mnuchin, DePodesta, Kunkler and Reese served as members of the Sears Holdings Board when the Related-Party Financings were considered and approved.   Each of the foregoing Defendants voted to approve all of the transactions at issue, and though Lampert abstained from voting on the Seritage Transaction and the Related-Party Financings, he nevertheless participated in the discussions and evaluations of all of these transactions and advocated for their approval.

61.     Defendant Schriesheim was the CFO and Executive Vice President of Sears from August 2011 through October 2016 and oversaw all aspects of Sears's financial operations.  In that capacity, Schriesheim had primary responsibility for Sears's liquidity planning and for preparing Sears's annual budgets and financial forecasts, including responsibility in determining how to fill gaps between what individual business units had claimed, what they would be able to achieve and what Lampert and the Sears Holdings Board dictated they achieve.  Schriesheim also was one of three primary Sears employees who interacted with Duff & Phelps in connection with the solvency and capital adequacy opinions it issued and which purportedly were used by the Directors to justify the asset dispositions discussed herein.  He was closely involved in the development of the three-year projections provided to Duff & Phelps, signed off on those projections and served as the "overall project manager" in dealing with Duff & Phelps.  In addition to his interactions with Duff

& Phelps, Schriesheim also provided substantive assistance in executing the asset dispositions at issue in this First Amended Complaint.  For example, he produced an Officer's Certificate in connection with the Lands' End Spin-off to aid in obtaining board approval for the transaction.  He was intimately involved in the development and execution of the Seritage Transaction and presented the Seritage Transaction to the Sears Holdings Board for approval.  He approved the Seritage Transaction in his capacity as a director of Kmart, directing that Kmart transfer 64 separate properties to Seritage.  Schriesheim was an officer of Sears when certain of the Related-Party Financings occurred and had served as a director of certain individuals of the Related-Party Financings Borrowers, approving the Related-Party Financings on their behalf.  Schriesheim participated in the Seritage Rights Offering and, on information and belief, continued to hold shares in Seritage when certain Related-Party Financings occurred.  He was a member of the Non-Core Committee, as defined herein.  Schriesheim was a Sears Holdings shareholder, who participated in and benefitted from the transactions at issue herein.  As such, Schriesheim was conflicted and engaged in self-dealing with respect to each of the transactions listed above.  These transactions were not fair to Sears, and Schriesheim had breached his duties in many respects.  On information and belief, Schriesheim resides in Illinois.

62.    Defendant Riecker became the Chief Accounting Officer and Controller of Sears between 2010 and 2011, and was promoted to Head of Capital Markets in 2016 and CFO in 2017. At all times, Riecker was a senior leader in the Sears organization and had responsibility for many aspects of Sears's financial operations.  Riecker was involved in engineering and considering the Lands' End Spin-off.  In addition, on information and belief, Riecker was ultimately responsible for approving the Lands' End Spin-off as the sole director of Sears Roebuck.  Riecker also served as the sole Trustee and as president and Treasurer of Seritage Growth Properties during the period

when the Seritage Transaction was being considered, and he signed the S-11 governing the Seritage

Rights Offering and four amendments thereto.  Riecker was the signatory on each of the various

securities filings issued by Sears Holdings related to the Seritage Transaction.  Riecker also

approved the Seritage Rights Offering on behalf of Seritage in a written resolution dated April 12,

2015.  He approved the Seritage Transaction in his capacity as a director of Kmart and as the sole

director of Sears Roebuck, directing that Kmart transfer 64 separate properties to Seritage and

directing that Sears Roebuck transfer 162 properties to Seritage.  He also served as the sole member

of the board of Sears Development and approved the sale of certain real estate assets held by Sears

Development to Seritage through certain intermediate transactions.  Riecker thus acted in

numerous roles on both sides of the Seritage Transaction.  Riecker also was the principal person

at Sears who worked with Duff & Phelps in connection with the solvency and capital adequacy

opinions it issued, which were used by the Directors to justify the asset dispositions discussed

herein.  Riecker reviewed drafts of the solvency opinions and had conversations with Duff &

Phelps representatives regarding the underlying financial projections Duff & Phelps relied upon

for Seritage and Lands' End.  He also had discussions with Duff & Phelps regarding the sensitivity

cases it ran in connection with its analyses.  Riecker also was involved in and familiar with the

internal budgeting and forecasting process at Sears and was closely involved in the development

of the three-year projections provided to Duff & Phelps, which he signed off on.  Riecker also was

the person to whom C&W addressed the flawed appraisals that undervalued the stores that were

transferred in the Seritage Transaction.  Riecker served as an officer of Sears when certain of the

Related-Party Financings occurred.  He also served as a director of certain of the Related-Party

Financings Borrowers, approving the Related-Party Financings on their behalf.  Riecker also

approved the 2018 Term Loan Facility on behalf of certain of the Additional Subsidiary Guarantors

on the 2018 Term Loan Facility.  Riecker participated in the Seritage Rights Offering and, on information and belief, continued to hold shares in Seritage when certain of the Related-Party Financings occurred.  He was a member of the Non-Core Committee, as defined herein.  Riecker was a Sears Holdings shareholder who participated in, and benefitted from the underlying transactions at issue herein.  As such, Riecker was conflicted and engaged in self-dealing with respect to each of the transactions listed above.  These transactions were not fair to Sears, and Riecker breached his duties in many respects.  On information and belief, Riecker resides in Illinois.

63.    Defendant Huckins served as Treasurer of Sears from June 2012 through September 2016, during which time he was a key member of Sears's senior management team.  Huckins was one of three primary Sears employees who interacted with Duff & Phelps in connection with the solvency and capital adequacy opinions it issued, and which were used by Sears to justify the asset dispositions discussed herein.  Huckins was closely involved in the development of the three-year financial projections provided to Duff & Phelps, with significant responsibility for developing the underlying model that informed these projections.  Huckins signed off on those projections and had conversations with Duff & Phelps representatives regarding those projections.  According to Naren Sinha, Sears's Senior Vice President of Finance, Huckins did "a lot of the heavy lifting" with Duff & Phelps.  Huckins also had responsibility for liquidity planning at Sears and put together the model used for liquidity planning purposes around the time of the Seritage Transaction.  He approved the Seritage Transaction in his capacity as a director of Kmart, directing that Kmart transfer 64 separate properties to Seritage.  Huckins served as an officer of Sears when certain of the Related-Party Financings occurred.  He also served as a director of certain of the Related-Party Financings Borrowers, approving the Related-Party Financings on their behalf.

Huckins was a Sears Holdings shareholder who participated in the underlying transactions. Huckins also participated in the Seritage Rights Offering and, on information and belief, continued to hold shares in Seritage when certain of the Related-Party Financings occurred.  As such, Huckins was conflicted and engaged in self-dealing with respect to each of the transactions listed above. These transactions were not fair to Sears, and Huckins breached his duties in many respects.  He was a member of the Non-Core Committee, as defined herein.  On information and belief, Huckins resides in Illinois.

64.    Defendants ESL Financers are investment funds controlled by Lampert and ESL. The ESL Financers and ESL Shareholders were jointly controlled by Lampert and ESL.  Lampert was and is the sole member and sole owner of JPP, LLC, and ESL Partners LP was and is the sole member and sole owner of JPP II, LLC.  RBS Partners, LP was and is the manager of JPP II, LLC. The ESL Financers are incorporated in Delaware.  The ESL Financers were lenders on each of the Related-Party Financings.  On information and belief, the ESL Defendants received at least $400 million in "interest" and "fees" paid on account of the Related-Party Financings.

65.    Defendant Cascade is a privately owned holding and investment company headquartered in Kirkland, Washington.  Cascade was a lender on the 2016 Secured Loan Facility, as defined and discussed below, and, on information and belief, received "interest payments" and other "fees" paid in connection with the 2016 Secured Loan Facility.

66.    Defendant Cyrus is an investment advisor with its principal place of business in New York.  Cyrus manages each of the limited partnerships referred to as the Cyrus Financers. The Cyrus L/C Financers are lenders on the Letter of Credit Facility, as defined herein.  The Cyrus 2018 Term Loan Financers are lenders on the 2018 Term Loan Facility.  On information and belief,

the Cyrus Defendants received "interest payments" and other "fees" from the Debtor Plaintiffs on account of the Letter of Credit Facility and 2018 Term Loan Facility.

67.    Defendant BS 2018 is a privately owned investment manager with its principal place of business in New York, New York.  BS 2018 is a secured lender on the FILO Loan Facility, as defined and discussed herein, and, on information and belief, received "interest payments" and other "fees" paid in connection with the FILO Loan Facility.  Tisch managed BS 2018 and served as a member of the Sears Holdings Board at the time when the FILO Loan Facility was obtained.

68.    Collectively, the ESL Financers, Tisch, BS 2018, Berkowitz and Fairholme Capital are referred to as the "Related-Party Financers."  Together, the Cyrus Financers and Cascade are referred to herein as the "Other Financers."

69.    Defendant Munjal was a director of Sears Roebuck de Puerto Rico.  In that capacity, Munjal approved the transfer of certain Sears Roebuck de Puerto Rico real estate assets to Seritage through certain intermediary steps.  On information and belief, Munjal resides in Illinois and served as the Chief Digital Officer of Sears Holdings.

70.    Defendant Rodney was a director of Sears Roebuck de Puerto Rico.  In that capacity, Rodney approved the transfer of certain Sears Roebuck de Puerto Rico real estate assets to Seritage through certain intermediary steps.  On information and belief, Rodney resides in Illinois and served as the Regional Vice President of Sears Roebuck.

71.    Defendant Jordan, as a director of Sears Development, approved the 2018 Term Loan Facility, as defined herein.  On information and belief, Jordan resides in Illinois and previously served as the Vice President and Corporate Controller of Sears Holdings.

72.    Collectively, Schriesheim, Riecker, Huckins, Munjal and Rodney are referred to herein as the "Real Estate Transferor Directors."

73.     Defendant Meerschaert, as a director of Sears Brand Management, approved the 2018 Term Loan Facility, as defined herein.  On information and belief, Meerschaert resides in Illinois and served as the Vice President, Tax of Sears Holdings.

74.     Defendant Seritage is a publicly traded REIT (NYSE:SRG) incorporated in Maryland.  Its principal place of business is in New York.

75.     Defendant Seritage Operating Partnership is Seritage's operating partnership.  The Seritage Operating Partnership is registered in Delaware and has its principal place of business in New York.  Lampert, the ESL Defendants and Seritage are the owners of the Seritage Operating Partnership.

76.     Defendant Seritage KMT Mezz was an indirect subsidiary of Sears Holdings (through Kmart) and, following the Seritage Transaction, was and is an indirect subsidiary of Seritage (through Seritage Operating Partnership).  KMT Mezz was the initial transferee of Seritage KMT Finance LLC (described below).

77.     Defendant SRC Mezz was an indirect subsidiary of Sears Holdings (through Sears Roebuck) and, following the Seritage Transaction, was and is an indirect subsidiary of Seritage (through Seritage Operating Partnership).  SRC Mezz was the initial transferee of Seritage SRC Finance LLC, Seritage GS Holdings LLC, Seritage SPS Holdings LLC and Seritage MS Holdings LLC (described below).

78.     Defendant Seritage KMT Finance LLC was an indirect subsidiary of Sears Holdings (through Kmart) and, following the Seritage Transaction, was and is an indirect subsidiary of Seritage (through Seritage Operating Partnership and KMT Mezz).  Seritage KMT Finance LLC is incorporated in Delaware and has its principal place of business in New York.

Seritage KMT Finance LLC was an initial transferee of certain real estate assets transferred in the Seritage Transaction.

79.    Defendant Seritage SRC Finance LLC was an indirect subsidiary of Sears Holdings (through Sears Roebuck) and, following the Seritage Transaction, was and is an indirect subsidiary of Seritage (through Seritage Operating Partnership and SRC Mezz).  Seritage SRC Finance LLC is incorporated in Delaware and has its principal place of business in New York.  Seritage SRC Finance LLC was an initial transferee of certain real estate assets transferred in the Seritage Transaction.

80.    Defendants Seritage GS Holdings LLC, Seritage SPS Holdings LLC and Seritage MS Holdings LLC were indirect subsidiaries of Sears Holdings (through Sears Roebuck) and, following the Seritage Transaction, were and are indirect subsidiaries of Seritage (through Seritage Operating Partnership and SRC Mezz).  Seritage GS Holdings LLC, Seritage SPS Holdings LLC and Seritage MS Holdings LLC are incorporated in Delaware and have their principal places of business in New York.  They were initial transferees of certain joint venture interests in real estate assets that were transferred in the Seritage Transaction.

81.    Defendant Duff & Phelps is a Delaware limited liability company headquartered in New York, New York.  In the years leading up to the Debtor Plaintiffs' bankruptcy filings, Duff & Phelps was engaged by Sears to provide a number of solvency and valuation opinions, including solvency analyses for the October 2012 SHO rights offering, the November 2012 Sears Canada partial spin-off, the April 2014 Lands' End Spin-off and the July 2015 Seritage Transaction, as discussed in greater detail below.  Including these engagements, Sears engaged Duff & Phelps on 32 separate occasions between 2006 and the Petition Date, and Duff & Phelps has received millions of dollars in fee payments in exchange for these services.

32

82.     Defendant C&W is a Chicago-based real estate services company.  C&W was engaged by Sears to provide appraisal services in connection with the Seritage Transaction.

83.     On information and belief, defendants John and Jane Does 1 through 500 are individuals and entities who engaged in wrongful conduct that harmed one or more of the Debtor Plaintiffs and/or received proceeds or otherwise improperly benefitted from the misconduct alleged herein and whose names and addresses are presently unknown.

### Factual Background

#### A.    Plaintiffs' Businesses

84.     Prior to the Petition Date, Sears Holdings was the ultimate holding company for the other Debtor Plaintiffs that operated under two nationwide retail brands, "Sears" and "Kmart." Until the late 1980s, Sears Roebuck and Kmart were the largest and second largest retailers in the United States by sales.

85.     Sears Roebuck's department stores averaged 150,000 square feet and often served as anchor tenants in shopping malls.  Sears Roebuck sold a wide variety of products, including appliances, apparel, consumer electronics, outdoor furniture and automotive tires and batteries.

86.     Kmart's stores averaged 100,000 square feet and were located primarily in strip malls.  Kmart also sold a variety of products, including apparel, consumer electronics, children's toys, lawn items and groceries.

87.     According to Sears Holdings's SEC filings, Sears's key competitors included, depending on the products, big-box stores like Target and Walmart; department stores like J.C. Penney, Kohl's and Macy's; home improvement stores like Home Depot and Lowe's; consumer electronics stores like Best Buy and online retailers like Amazon.

B.    <u>Control of Sears by Lampert, the ESL Defendants and Fairholme Capital</u>

88.    Lampert and the ESL Shareholders acquired control of Kmart after it filed for bankruptcy protection in January 2002 by purchasing Kmart bonds and bank debt with an aggregate face value of more than $1 billion at significant discounts.  Kmart emerged from bankruptcy in 2003 with Lampert and the ESL Shareholders owning approximately 53% of its stock and with Lampert as chairman of its board of directors.  Lampert quickly packed the Kmart board with other directors loyal to him and ESL, including Mnuchin and Tisch.

89.    As chairman, Lampert led Kmart into a merger with Sears Roebuck.  Immediately prior to the merger, Lampert and the ESL Shareholders held approximately 53% of Kmart's stock as well as 15% of Sears Roebuck's stock.  The merger was announced in November 2004 and closed in March 2005.  After the merger, Sears Holdings became the parent company of both retailers; Lampert and the ESL Shareholders held approximately 39% of Sears Holdings's stock and Lampert was chairman of the Sears Holdings Board, which also included two other ESL-affiliated directors:  Mnuchin and Tisch.

90.    After the merger, Lampert and the ESL Shareholders continued to acquire Sears Holdings's shares and, by August 2008, and at many times thereafter, Lampert and the ESL Shareholders together held an outright majority of Sears Holdings's shares.

91.    In early 2013, Lampert orchestrated the ouster of the then-current CEO and installed himself as CEO of Sears.  From then on, Lampert was extremely involved in Sears's management and operations, wearing multiple hats in order to influence every material transaction.

92.    Later in 2013, Fairholme Capital gained board representation when Defendant Alvarez joined the Sears Holdings Board.  By the end of FY 2013, Fairholme Capital owned more than 20% of Sears Holdings's stock; at the time of the Lands' End and Seritage Transactions, approximately 25% and when each of the Related-Party Financings occurred, between 15% and

34

30%.   Fairholme Capital's principal, Berkowitz, was in frequent contact with Lampert, who supported the addition of Alvarez and then Berkowitz to the Sears Holdings Board.

93.     Lampert and the ESL Shareholders themselves had sufficient power to control Sears.   Additionally, Lampert, the ESL Shareholders and Fairholme Capital held a combined ownership of approximately 75% of Sears Holdings's stock and their close coordination gave them control of Sears.

94.     A majority (four of the seven) of the directors of Sears Holdings who approved the Lands' End Spin-off—Alvarez, Lampert, Mnuchin and Tisch—had substantial investments in the ESL Defendants (Lampert, Mnuchin and Tisch) or an affiliation with Fairholme Capital (Alvarez). Lampert and Tisch also owned substantial shares of Sears Holdings stock individually.

95.     Despite their conflicts, Mnuchin, Tisch and Alvarez also approved the Seritage Transaction.   Another director, Kamlani, recommended the Seritage Transaction for approval to the Sears Holdings Board as a member of the RPT Committee and then approved the Seritage Transaction as a member of the Sears Holdings Board.   Though not affiliated with ESL at the time of the Seritage Transaction, Kamlani became the president of ESL less than nine months later in 2016.   As Kamlani admitted, during his tenure as a member of the Sears Holdings Board prior to joining ESL, it was "no secret that I was getting anxious and wanted to get back to work," which was "not lost on Eddie."   During this period, the position of president of ESL (filled by George L. Mikan III until December 2014) remained vacant.   Kamlani's desire to fill this position gave Kamlani, who at the time sat on the RPT Committee, a strong personal incentive to acquiesce to Lampert's wishes and approve the Seritage Transaction.   The record shows that Kamlani did everything possible to appease Lampert.   By Kamlani's own admission, the RPT Committee during his time on it, never failed to recommend for approval transactions proposed by Lampert.

35

96.    These same five directors approved (or, in Lampert's case, pushed for approval of) all or many of the Related-Party Financings.  Lampert was a director when each of the Related-Party Financings occurred, and though he recused himself from voting, he nonetheless advocated for the Related-Party Financings to the Sears Holdings Board and lobbied members of the Sears Holdings Board to approve the transactions.  Kamlani and Tisch were directors of Sears Holdings at all relevant times and approved each of the Related-Party Financings.  Alvarez was a member of the Sears Holdings Board from December 2013 to May 2017 and approved all of the Related-Party Financings that occurred during that time.  Berkowitz was a member of the Sears Holdings Board from February 2016 to October 2017 and approved all of the Related-Party Financings that occurred during that time.  Mnuchin was a director from March 2005 to December 2, 2016 and approved all of the Related-Party Financings that occurred during that time.

97.    Despite Lampert standing on both sides of each transaction as both a controlling shareholder of Sears Holdings and the primary stakeholder of ESL—and, thus, standing to profit handsomely from each transaction—Lampert and the Conflicted Insiders were able to advocate for and/or vote on self-dealing transactions.  Moreover, by Kamlani's and Reese's own admissions, the RPT Committee never failed to recommend for approval insider transactions proposed by Lampert.

## C.    Coordination Between the Controlling Insider Shareholders

98.    Fairholme Capital and Berkowitz—Fairholme Capital's founder, principal and president—worked in close coordination with ESL and Lampert at all relevant times, and together they exercised near-total control over Sears.

99.    Shortly after Lampert became CEO of Sears, Berkowitz wrote to Lampert, "Presently, Fairholme Capital and affiliates own over 17% of outstanding common [shares] **and**

36

*you have our vote*.  Your paper trail and increasing company ownership cannot be ignored.  *I look*

*forward to being your silent partner* for at least the next 30 years." (emphasis added).

100.    Fairholme Capital was deeply invested in Sears.  According to an internal

Fairholme Capital document, as of March 31, 2015, 66% of the securities in the "Fairholme Capital

Partnership" were issued or guaranteed by Sears Holdings.  Thus, Fairholme Capital had

substantial incentive to stay involved in Sears's management.  Lampert and Berkowitz, who lived

near each other in Miami, conducted numerous face-to-face meetings and were in continuous

communication about Sears throughout the relevant period.  They frequently discussed Sears's

businesses, its capital structure and potential capital transactions (including potential financings,

efforts to raise liquidity and potential joint ventures).  Berkowitz had similar such conversations

with other senior individuals at ESL, including Kamlani, and senior personnel at Sears, including

Riecker.  During a meeting of the Sears Holdings Board during which Centerview made a

presentation regarding potential strategic alternatives for maximizing Sears's value, Berkowitz

was particularly "outspoken" according to Marc Puntus, who gave the presentation.

101.    While Lampert and ESL took the lead in pushing Sears's corporate strategy,

including the spin-off of core assets and financing transactions discussed herein, Fairholme Capital

consistently acted in lockstep with Lampert and ESL and supported their efforts.  Not once did any

Fairholme Capital representative on the Sears Holdings Board (including Berkowitz and Alvarez)

vote against Lampert or ESL's proposed corporate activities, and Fairholme Capital benefited from

those corporate activities alongside Lampert and ESL.

102.    For example, the Seritage Transaction was structured specifically to accommodate

both the ESL Shareholders' and Fairholme Capital's ownership interest in Sears Holdings.  At the

time of the Seritage Transaction, Fairholme Capital and its related entities beneficially held

37

approximately 25% of Sears Holdings's stock.  In order to allow Fairholme Capital and its related

entities to fully participate in the Seritage Transaction but still ensure that Seritage qualified as a

REIT, the Seritage Transaction was structured to allow Fairholme Capital and its related entities

to enter into an exchange agreement with Seritage whereby many of Fairholme Capital's and its

related entities' Class A subscription rights were exchanged for the right to purchase other non-

voting classes of shares of Seritage.  The result allowed Fairholme Capital to maximize its interests

in Seritage without violating the relevant tax rules and restrictions.

103.     Fairholme Capital was closely involved in the management and operations of Sears

in other respects.  For example, Berkowitz took an active personal role in negotiating with Bank

of America regarding Sears's asset-backed loan facility and amendments thereto.  As Sears's

liquidity portfolio continued to deteriorate, Berkowitz took it upon himself to look to find new

sources of financing and communicated directly with Bank of America regarding Sears's efforts

to address its liquidity concerns.

104.     Moreover, starting in 2013, Fairholme Capital performed an in-depth analysis of

Sears's real estate, involving visits to more than 110 stores located throughout the United States

and Puerto Rico and interviewing more than two dozen real estate professionals.  With the help of

consultants, Fairholme Capital created property valuation templates that were distributed to more

than 40 experts to value 200 properties in detail.  Through its pipeline of experts, Fairholme Capital

developed a system that allowed it to monitor Sears's real estate activities, a function it took on

because Sears's own real estate department was non-responsive to inquiries, and landlords were

frustrated with the company.  This deep understanding of Sears's real estate allowed Fairholme

Capital to take an active role in 2017 in supporting Sears's efforts to exit leases and sell properties

to third parties.

105.    Fairholme Capital was also involved as a lender to Sears Holdings and was certain of its subsidiaries.  In September 2014, Fairholme Capital purchased a 6.25% participation in a $400 million loan from ESL to Sears Roebuck, Sears Development and Kmart secured by certain real property.  Fairholme Capital later consented to a modification of that loan expressly tying the maturity of the loan to the completion of the Seritage Transaction.  Both Fairholme Capital and Berkowitz later became lenders to Sears Holdings under the Second Lien Credit Agreement, dated as of September 1, 2016 (and as subsequently amended).

106.    Fairholme Capital was a holder of Sears Holdings's unsecured debt as well.  According to the Sears Holdings 2015 10-K, "at January 30, 2016 and January 31, 2015, respectively, Fairholme Capital held an aggregate of approximately $360 million and $205 million of principal amount of [Sears Holdings's] Senior Unsecured Notes."  The 2015 10-K further provides that Fairholme Capital held $14 million of SRAC Notes at January 30, 2016.  Fairholme Capital continued to hold $253 million of the Senior Unsecured Notes as of the Petition Date.

107.    Tisch also worked closely with Lampert to exercise control over Sears.  Tisch consulted frequently with Lampert regarding material aspects of the transactions that are the subject of this Adversary Proceeding, including the valuation of certain Sears real estate, corporate governance of Seritage and whether to enter into certain Related-Party Financings.

108.    This is no surprise given how deeply Tisch was invested in ESL.  In fact, members of the Tisch family own a controlling interest in ESL Partners, LP, and, upon information and belief, Tisch had been a major investor in ESL for decades, including at all relevant times with respect to the transactions described herein, and held shares in ESL prior to becoming a member of the Sears Holdings Board.  As of February 12, 2017, Tisch personally held approximately 33% of ESL Partners, LP—an interest valued at more than $454 million-and the Tisch family

collectively held approximately 60% of ESL Partners, LP—an interest valued at approximately $835 million. This investment continued at roughly the same level through the Debtors' bankruptcy filings. Given his and his family's significant stake in ESL, Tisch's consent effectively was required each time ESL wished to extend additional credit to Sears, and ESL actively sought and obtained Tisch's consent (and that of his family members) prior to entering into the transactions that are the subject of this Adversary Proceeding.

109.    Tisch also was a Related-Party Financer in his own right, investing $20 million in Sears in July 2017, pursuant to the First Amendment to the Second Lien Credit Agreement as described herein. Tisch also managed BS 2018, a lender on the FILO Loan Facility, as described herein.

## D.    Sears's Financial Results and Condition

110.    After peaking in 2006 by every relevant measure, Sears began an unrelenting decline. Beginning in 2006, Sears's revenue declined every year; its operating income and net income fell to *de minimis* levels in FYs 2009–2010 and went negative thereafter.

111.    At the same time, in a vicious cycle, Sears was forced to close stores and reduce capital expenditures, which undercut its ability to generate revenue. Sears was facing increased competition—both from more successful brick-and-mortar stores and online market places—and losing market share. And Sears's Shop Your Way ("SYW") loyalty program—which Lampert claimed as his key initiative and proselytized as the savior of Sears's future and an essential source of potential future profitability—consistently failed to deliver results.

112.    As a result, key third parties raised serious concerns about Sears's solvency. Sears's suppliers demanded shorter trade terms, resulting in an effective loss of hundreds of millions of dollars of trade credit. The Pension Benefit Guaranty Corporation ("PBGC") raised concerns about Sears's ability to honor its billions of dollars of liabilities to its unfunded, defined-benefit

40

pension plans and threatened to terminate the plans, ultimately forcing Sears to "ring fence" collateral to protect the interests of the plans and PBGC.

### 1.    Sears's Deteriorating Financial Performance

113.    Prior to the Lands' End Spin-off and the Seritage Transaction, multiple financial metrics clearly showed that Sears's performance was in a steep, multi-year freefall.   Between FY 2006 and FY 2014, Sears's revenue declined steadily from approximately $53 billion to $31 billion—approximately 41%.   Sears had operating losses (i.e., losses before interest and taxes) in each year beginning in FY 2011 of between $838 million and $1.5 billion.   Between FY 2011 and FY 2014, Sears had incurred cumulative net losses of more than $4.8 billion.[10]

---

[10]    Sears used a retail fiscal year that ran approximately from February 1 to January 31.  Following this retail convention, Sears refers to a fiscal year by the calendar year in which it began.  For example, FY 2012 began January 29, 2012 and ended February 2, 2013.  Sears filed with the SEC its results for FY 2013 in March 2014 (just prior to the Lands' End Spin-off) and the results for FY 2014 in March 2015 (a couple months prior to the Seritage Transaction).

41

114.    ***Revenue***.   Since FY 2006, when Sears generated approximately $53 billion in revenue, Sears's revenue declined each and every year.   For FY 2013 and FY 2014, Sears reported revenue of approximately $36 billion and $31 billion, respectively.   Sears's revenue for FY 2014 was more than $20 billion (or 40%) below its FY 2006 peak and more than $10 billion (or 25%) below its results in FY 2011, only three years earlier.   The decline was not attributable only to store closings; as shown below, same-store sales declined each year since the merger.



115.    ***Cash Flow from Operations***.   Sears achieved only marginal cash flow from operations in FY 2010, followed by negative cash flow from operations each year thereafter.   Prior to the Orchard Supply Hardware Stores Corp. ("Orchard"), Sears Hometown and Outlet Stores,

Inc. ("SHO") and Sears Canada Inc. ("Sears Canada") transactions,[11] Sears had cash flow from operations of approximately $120 million (FY 2010) and then, prior to the SHO and Sears Canada transactions, negative $280 million (FY 2011).  Continuing up to and during the Lands' End Spin-off and Seritage Transaction, Sears had cash flow from operations of negative $300 million (FY 2012), negative $1.11 billion (FY 2013) and negative $1.39 billion (FY 2014).



116.    ***Operating Income (Loss)***.  Sears achieved only marginal operating income in FY 2008, FY 2009 and FY 2010, and, since then, it had reported ***negative*** operating income (an operating loss) every year beginning in FY 2011.  Prior to the Orchard, SHO and Sears Canada transactions, Sears posted operating income of just $300 million to $670 million (FYs 2008–2010) and then, prior to the SHO and Sears Canada transactions, an annual operating loss of approximately $1.5 billion (FY 2011).  Continuing up to and during the Lands' End Spin-off and Seritage Transaction, Sears posted annual operating losses of approximately $840 million (FY 2012), $930 million (FY 2013) and $1.51 billion (FY 2014)—a total operating loss of $4.78 billion in only four years.  In the years reported immediately prior to the Seritage Transaction,

---

[11]    As discussed *infra*, ¶¶ 179–91.

FY 2013 and FY 2014, Sears's operating losses deepened by 11% and 62% year-over-year, respectively.



117.    ***Pre-tax Income (Loss)***.  Sears earned modest pre-tax income in FY 2008, FY 2009

and FY 2010, and, since then, it has reported negative pre-tax income (a pre-tax loss) for each and

every year, beginning in FY 2011.  Prior to the Orchard, SHO and Sears Canada transactions, Sears

posted only marginal GAAP pre-tax income of $180 million to $390 million (FYs 2008–2010) and

then, prior to the SHO and Sears Canada transactions, a GAAP pre-tax loss of approximately $1.75

billion (FY 2011).  Continuing and during the Lands' End Spin-off and Seritage Transaction, Sears

posted GAAP pre-tax losses of approximately $1.01 billion (FY 2012), $970 million (FY 2013),

$1.69 billion (FY 2014) and 1.39 billion (FY 2015).



118.    ***Net Income***.  Sears barely achieved positive net income in FY 2008, FY 2009 and

FY 2010, and, since then, it had reported deep net losses each and every year, beginning in

FY 2011.  Prior to the Orchard, SHO and Sears Canada transactions, Sears had only marginal net

income of approximately $50 million to $240 million (FYs 2008–2010) and then, prior to the SHO

and Sears Canada transactions, a net income loss of approximately $3.14 billion (FY 2011).

Continuing and during the Lands' End Spin-off and Seritage Transaction, Sears continued to have

net income losses of approximately $930 million (FY 2012), $1.37 billion (FY 2013) and $1.68

billion (FY 2014)—an aggregate loss in four years of $7.12 billion.  In the two years reported

immediately prior to the Seritage Transaction, Sears's net income losses deepened by 47% and

23% year over year, respectively.



119.    *Adjusted EBITDA*.   Sears's reported Adjusted EBITDA was positive during FY

2011–2012 (though way down from prior years) and then negative starting in FY 2013.   Prior to

the SHO and Sears Canada transactions, Sears posted Adjusted EBITDA of just $200 million (FY

2011)—down 80% year over year.   Continuing up to and during the Lands' End Spin-off and

Seritage Transaction, Adjusted EBITDA slightly rebounded for one year (FY 2012) before turning

sharply negative—$490 million (FY 2013) and then negative $720 million (FY 2014)—in the

period leading up to the Lands' End Spin-off.   The slight rebound in FY 2012 resulted primarily

from one-off occurrences, including gains on asset sales, pension settlements and impairment

charges.   In terms of operating metrics between FYs 2011 and 2012, the results were more or less

consistent.



## 2.    Sears's Deteriorating Operating Performance

120.    Sears's deteriorating condition also was reflected in several troubling operational

trends:    store closures, same-store sales declines, reduced investment in stores (capital

expenditures), increased competition, decreased market share and the failure of the SYW

loyalty/membership program to drive increased sales.   In view of these operating trends, it was

abundantly clear that Sears had no viable path to service and discharge its debt when due, let alone return to profitability.

121.    ***Store closures***.  At the end of 2006, Sears operated more than 3,433 stores in the United States, including 935 Sears-branded "broadline" (later referred to as "full-line") stores, 1,388 Kmart-branded stores and 1,110 specialty stores (including 1,075 Orchard, SHO and Lands' End stores).  Lampert publicly denied at the time that he planned to close "tens of dozens" or even "hundreds" of stores, stating that only a few of the poorest performing stores would be closed.

122.    To the contrary, over the next decade, Sears in fact closed more and more stores. Even after controlling for the significant number of stores that were spun off in the Orchard, SHO, Sears Canada transactions and the Lands' End Spin-off (by omitting those stores from the prior period numbers), Sears reduced its store count between 2006 and 2017 by 1,356 stores, or 58%.



123.    As Sears's losses began to mount, Lampert began to talk about a supposed strategy of closing Sears's worst stores to "right-size" Sears, decreasing its operating expenses and

---

[12]    For the sake of consistency, the above chart removes all Orchard, SHO, Sears Canada and Lands' End stores from 2006 to 2013.

increasing its profitability.  But Sears's problems were the result of a prolonged lack of innovation, intense competition, failed management strategies and under-investment at the corporate level, of which the store-level problems were only a symptom.  At the time, the strategy of closing money-losing stores—which had been tried unsuccessfully by peers like Toys "R" Us and Sports Authority—could not return Sears to profitability.  Instead, it would result in a "death spiral."

124.    Closing stores created the temporary illusion of boosting Sears's balance sheet with revenue from the liquidation of inventory and/or the sale of real estate and with reduced operating expenses, but store closures also eroded Sears's long-term revenue base.  Despite Lampert's professed emphasis on online channels, in-store sales remained responsible for 97% or more of Sears's revenue at all relevant times.

125.    In addition to undercutting Sears's revenue base, store closures undercut the value of Sears's affiliated brands (such as Craftsman, DieHard and Kenmore), whose reputations were linked to that of Sears and which relied upon Sears's in-store sales for much of their market share.

126.    ***Reduced Capital Expenditures***.    Under Lampert's leadership, Sears's capital expenditures in maintaining and upgrading its stores declined drastically.  As many analysts noted, Sears's failure to invest in its stores made its stores increasingly unattractive to customers and further reduced Sears's chances for long-term profitability.   In March 2014, an Albion analyst report stated, "It is common knowledge that Sears refuses to invest in its store base."  Similarly, Standard & Poor's ("S&P") noted in several of its reports, published throughout 2014 and 2015, that "[a] lack of store upgrades has hurt the company's ability to attract and retain talented merchants, to engage store employees, and to win new customers."

127.    As Rob Schriesheim (who was hired shortly thereafter to serve as CFO) wrote to Louis D'Ambrosio (Sears's CEO at the time) and Lampert in June 2011:  "[I]t seems there has

been less investment in store assets and labor as compared to competitors and same-store sales trends have not been favorable."

128.    As shown earlier, Schriesheim was right.  Sears's same-store sales had declined every year since the Sears/Kmart merger, demonstrating that Sears's supposed effort to "right-size" its business by removing unprofitable stores was a failure.  Those same-store sales continued to decline during the period that Lampert was engaging in the wrongful conduct alleged herein, amounting to a cumulative decline in same-store sales of more than 33% from 2012 to 2017:



129.    ***Increased competition and loss of market share***.  According to reports issued by IBISWorld, Sears's market share in the department store industry—a declining and intensely competitive industry—had been shrinking since at least 2008, from 24.0% in March 2008 to 17.4% in May 2013, 16.6% in February 2014 and 15.3% in May 2015.  Sears was losing market share both to larger brick-and-mortar retailers (such as Walmart) and online sellers (such as Amazon). As an Imperial Capital analyst noted in January 2012, "Sears's retail operating platforms have been hurt by underinvestment and poor execution while the competitive climate has intensified."

130.    ***The failure of Shop Your Way***.   Since the Kmart/Sears merger, Lampert has promised to "transform" Sears.  That transformation never materialized.  As Imperial Capital noted in January 2012, Sears "still suffers from the lack of a clear definitive 'go to market' strategy and 'point of differentiation,' based on observations we made during store visits, phone calls made to the company, discussions with current employees, customers, investors, and industry participants."

131.    Lampert claimed that the centerpiece of the promised transformation was SYW, a no-cost (to customers) membership rewards program created in 2009 that was supposed to provide Sears with data about its customers that it could leverage to drive results.   Specifically, the information obtained from SYW was supposed to enable Sears to increase margins with personalized pricing while also reducing expenditures on traditional marketing.  In exchange for their personal information, SYW members receive coupons, free shipping and "points" that can be converted into cash.  As explained by director Reese, the goal of SYW was to have SYW members direct "more share of wallet" to Sears.

132.    While many customers signed up for SYW, Sears has never succeeded in its goal of causing members to increase materially their purchases from Sears and in any case, SYW membership has declined steadily since 2015.

133.    SYW did not offer Sears a material competitive advantage.  Indeed, many of Sears's competitors already had launched similar (and superior) programs prior to SYW.  Amazon, for example, launched "Amazon Prime"—a paid membership program that offers members, among other benefits, two-day free shipping on eligible purchases—in 2005.  Best Buy launched "Reward Zone," a customer loyalty program, in 2004.  Macy's launched "Star Rewards," another customer loyalty program, in 2005.  And J.C. Penney introduced a rewards program in 2008.

134.    Beginning as early as 2012, Sears Holdings's directors began to request metrics from management that would indicate the transformation's progress.  However, Sears management did not track data that would support the notion that the transformation—which depended solely on the success of SYW—was working.  Had they tracked such metrics, they would have learned that the transformation was not working.  Indeed, based on actual and estimated data, from 2013 to 2017, there was a 33% decline both in active SYW memberships and in spending by SYW members, as shown in the chart below.  By 2014, it was impossible for Sears's directors and officers to have believed that SYW was going to help return Sears to profitability.



135.    In May 2017, Centerview (an advisor retained by the Strategic Planning Committee of the Sears Holdings Board and given access to company data) advised that "SYW must result in significant margin and/or volume increases to be breakeven; Company analysis indicates program generates positive ROI, but absolute contribution levels have yet to achieve scale."  Centerview also noted that "SYW membership and activity levels have trended downward over the past four years."  Centerview concluded that, "given its limited penetration and user base, we view SYW as

an incremental 'enabler' to help improve operating efficiency rather than a transformative 'game-changer' that alters the Company's near-term operating trajectory."

136.    According to a senior Centerview banker involved in advising Sears, "There weren't enough active members buying enough stuff at high enough prices."  The "strategy, it wasn't working."  Contrary to their stated views, Lampert and other insiders clearly knew that SYW could not halt Sears's steep decline.

### 3.    Third Parties Express Concerns About Sears's Solvency

137.    In light of the Sears's declining financial and operating performance, Sears's solvency was increasingly called into doubt by third parties, including rating agencies (which downgraded Sears's credit ratings), suppliers (which reduced their trade credit to Sears) and PBGC (which demanded protection and threatened to terminate the Sears pension plans).

138.    *Rating agencies*.  In the years leading up to the Lands' End Spin-off and Seritage Transaction, all three major rating agencies took notice of Sears's deteriorating financial and operating performance and repeatedly downgraded Sears's credit ratings.

139.    Moody's Investors Service ("Moody's") downgraded Sears's issuer rating, corporate family rating and probability of default rating from Ba2 (which it had held since 2009) to Ba3 in July 2011.  Moody's further downgraded Sears to B1 in December 2011 and then again to B3 in January 2012.   In January 2014, Moody's again downgraded Sears to Caa1.[13]   In November 2014, Moody's revised its rating outlook to negative.

---

[13]    According to Moody's, "Obligations rated Caa are judged to be speculative of poor standing and are subject to very high credit risk."

53

140.    S&P downgraded Sears from BB- (which it had held since 2009) to B+ in May 2011.  S&P further downgraded Sears to B in November 2011 and CCC+ in January 2012.[14]  S&P issued a negative outlook in August 2012, presaging further downgrade.

141.    Fitch Ratings ("Fitch") downgraded Sears's issuer rating to B in June 2011.  Fitch further downgraded Sears to CCC in December 2011.[15]  Fitch similarly downgraded Sears's senior secured debt rating to BB in June 2011, to B+ in December 2011, to B in September 2012, to B- in September 2013 and then CCC in September 2014.

142.    As Sears's CFO Rob Schriesheim conceded in a January 2012 email to other Sears executives following the initial downgrades:  "The rating agencies actually do have their facts correct on our balance sheet and liquidity."  Schriesheim noted that Sears's year-end debt-to-EBITDA ratio was at least 8x (even without counting billions of dollars of unfunded pension obligations, which, Schriesheim admitted, "is debt" too).

143.    *Suppliers*.  As a result of the increasing costs of factoring and credit insurance, as well as independent suppliers' concerns about Sears's solvency, Sears's suppliers contracted their trade credit to Sears.  Since FY 2009, Sears's Days Payable Outstanding ("DPO")—an aggregate measure of the average number of days Sears was able to defer vendor payments—had been significantly below that of Sears's peer group and generally declining.  The decline in Sears's DPO from FY 2010 to FY 2014 represented a loss of more than $200 million of trade credit from suppliers of goods.  The decline in DPO was due to demands from suppliers for more favorable payment terms.  Other suppliers ceased taking orders from Sears, forcing Sears to find replacements or to discontinue certain product lines.

---

[14]    According to S&P, "In the event of adverse business, financial, or economic conditions, the obligor [of a CCC obligation] is not likely to have the capacity to meet its financial commitments on the obligation."

[15]    According to Fitch, "[d]efault is a real possibility" on CCC obligations.

144.    In the words of former Sears Vice President of Profit Improvement, Lynn Walsh:
"The suppliers wanted to shorten payment terms as our credit and financial standing became less
stable.  It got to the point of being absurd.  It was like, wink, nod.  Oh yeah, we're going to grow
2% next year.  Ha.  Given last year we decreased double digits.  I ended up leaving, because I had
no integrity anymore.  I was trying to negotiate on the promise that we've got a plan to grow the
business, knowing that was never going to happen."

145.    **PBGC**.  Prior to the Lands' End Spin-off and Seritage Transaction, PBGC—a
federally chartered corporation that insures private defined-benefit pension plans—had serious
concerns about Sears's solvency and ability to pay its underfunded pension obligations.  As of
August 13, 2014, PBGC asserted that Sears Holdings's pension was underfunded by $3.2 billion.

146.    Based on these concerns, by no later than March 2014, PBGC sent Sears a set of
detailed information requests for non-public information.  Among other things, PBGC asked about
Sears's "long-term business plan," the "spin-offs" and "dispositions" "currently under
consideration" (specifically including Lands' End) and the value of Sears's real estate.  PBGC
requested that Sears provide this information by April 2, 2014—which was prior to the closing
date of the Lands' End Spin-off.

147.    By no later than July 30, 2014—well before the Seritage Transaction—PBGC had
communicated to Sears its view that "the risk of loss to PBGC is ***great and increasing***" (emphasis
added).  PBGC explained that its view was based on "a number of factors, including [Sears's]
operating losses, the significant uncertainty around the Company's business plan, and accelerating
cash-burn rates, which could result in a near-term liquidity issue."  As a result, PBGC said, "we
believe we must act now."

148.    Under the Employee Retirement Income Security Act of 1974 (ERISA), PBGC is authorized to file litigation to terminate a pension plan if it expects to incur unreasonable losses with respect to the plan, i.e., because the plan sponsor is or becomes insolvent and unable to meet its obligations.  By no later than August 2014, PBGC had threatened Sears with litigation unless Sears agreed to begin negotiating the provision of additional security to its pension plans.  Sears initially asked PBGC to detail its views in a letter, but then reversed course and asked PBGC ***not*** to put its position in writing.

149.    If PBGC had sued, its concerns about Sears's solvency would have been made public.  Instead, while PBGC and Sears negotiated, PBGC's concerns were kept secret.   In September 2015—after the closing of the Seritage Transaction—Sears disclosed that it had signed a term sheet with PBGC and, in March 2016, PBGC and Sears announced a settlement that granted the pension plans rights with respect to certain of Sears's real estate, with an appraised value of approximately $890 million, as well as the subsidiary holding Sears's primary intellectual property assets (such as Kenmore, Craftsman and DieHard).

E.      **Sears's Unrealistic, Bad-Faith Projections of Future Performance**

150.    Despite Sears's declining financial performance and worsening financial condition, Sears continued to produce financial projections assuming an immediate and dramatic turnaround in its performance.  These bogus projections were prepared and adjusted at Lampert's insistence and adopted in bad faith.  After years of missed projections and by the time of the Lands' End Spin-off and Seritage Transaction, the Culpable Parties knew there was no chance that the projections upon which all analyses of the appropriateness of the transactions were based could be achieved.

### 1.    Sears's Top-Down, "Aspirational" Planning Process

151.    Sears's fiscal year ends on or around January 31.  Prior to the beginning of each fiscal year, Sears's management presented a "Plan" to the Sears Holdings Board with projections of future performance.  From the merger through FY 2012 (the year beginning February 1, 2012), management presented a "Three Year Plan."   After Lampert became CEO in early 2013, management stopped preparing three years of projections in the ordinary course, limiting projections to an annual basis.  During Lampert's tenure, in or around January of each year, Sears's management presented the Sears Holdings Board with a "Plan Update" or "Plan Review" (hereinafter referred to as the "Annual Plan") for the upcoming fiscal year.

152.    Those Annual Plans set top-down goals for annual financial performance established directly by Lampert.   These top-down goals, or "targets," consistently bore no relationship to Sears's past performance or any realistic prospect of future performance and instead were set based upon the amount of revenue and operating profits management believed would be needed to cover operating costs, interest and other expenses and to achieve a desired level of return on capital for Sears Holdings's shareholders.  In other words, the targets were purely aspirational.

153.    Those top-down goals were then "allocated" to Sears's various business units, and each business unit was tasked with developing or identifying "initiatives" that would allow the business unit to achieve the goal allocated to it by the Annual Plan.  The identification of those initiatives was driven by the need—indeed, the mandate—to achieve the top-down goals rather than by the business unit's realistic projection of what could be achieved in the upcoming year. Schriesheim, who as CFO was intimately involved in the forecasting process and prepared budgets throughout the relevant period, described the process as "reverse engineering to try to figure out where we will need to be."

154.    The business units consistently fell short of identifying (or successfully implementing) initiatives that, even if somehow successful, would achieve their allocated goals. As a result, the Annual Plans were replete with both specious identified initiatives and wholly "unidentified initiatives"—characterized by the Annual Plans themselves as "go-gets"—and associated revenue and related goals that were attributed to specific business units.  In addition, these business unit goals, in aggregate, often fell far short of the corporate-level Annual Plan target, leaving a further unallocated "gap."  Nevertheless, Sears's fiduciaries treated the annual top-down plan as achievable, year after year, despite the obvious flaws in such plans and despite missing plan targets every year by billions of dollars.

155.    During FY 2012 through FY 2015, significant portions of the Annual Plan targets were not supported by identified business unit initiatives (again, even assuming that the initiatives would be successful).  In FY 2012, 19% of Sears's year-over-year Earnings Before Interest, Taxes, Depreciation, Amortization and Pension Expense ("EBITDAP") projected improvement was based on these gaps or go-gets.  In FY 2013, 49% of the year-over-year EBITDAP projected improvement was attributed to gaps or go-gets.  In FY 2014 (prior to the Lands' End Spin-off), 39% of the year-over-year EBITDAP projected improvement was attributed to gaps or go-gets.  In FY 2015 (prior to the Seritage Transaction), 49% of the year-over-year EBITDAP projected improvement was attributed to gaps or go-gets.



156.    In the FY 2014 Annual Plan, for example, the combined business unit plans were $200 million below the $1.4 billion corporate target, and those business unit plans themselves included $480 million of go-gets or unidentified initiatives.  Thus, of the $1.4 billion target, $680 million—nearly 50%—was unsupported and unexplained by any identified business initiative.

## 2. The Consistent and Material Discrepancy Between Projections and Reality

157.     As a result of this bad-faith planning process, it is no surprise that, for the period FY 2012 to the Petition Date (and thereafter), Sears's actual performance has never come close by any significant metric to meeting the projections set forth in its Annual Plans.  Every year, Sears's Annual Plan would project that its revenue and gross margins would increase; yet, every year, revenue and gross margins decreased and missed projections in dramatic fashion.  Similarly, every year, Sears's Annual Plan would project that EBITDAP would increase dramatically and, from FY 2013 forward, turn from negative to positive, and yet every year, Sears's EBITDAP either decreased or increased so little that its misses against the plan nonetheless were staggering. EBITDAP remained hundreds of millions negative from FY 2013 onwards, despite projections that it would turn positive by hundreds of millions every year.

158.     The same is true of the multi-year projections provided to Duff & Phelps and used for the various "solvency analyses" that Duff & Phelps performed for the October 2012 SHO rights offering, the November 2012 Sears Canada partial spin-off, the April 2014 Lands' End Spin-off and the July 2015 Seritage Transaction, as discussed in greater detail below.  Those multi-year projections predicted that revenue, gross margins and EBITDAP would grow and continue to grow, when in reality those metrics continued to decline and/or remain negative.

159.    ***Revenue***.    From FY 2012 to FY 2017, Sears's actual annual revenue has consistently been $3–5 billion short of the projections in Sears's Annual Plans (for FY 2010 and 2011, it missed by even more).  In other words, just forecasting 12 months into the future, Sears fell short of its top line revenue number by equal to or more than 10%—8 years in a row.  Sears's revenue has fallen even further short of Sears's even more optimistic multi-year projections that were provided to Duff & Phelps as support for its solvency opinions.



160.    ***Gross Margin***.  Sears's actual gross margins also have consistently fallen $1–3 billion short of Sears's annual projections.



161.    ***EBITDA and EBITDA margin***.  Sears's EBITDA and EBITDA margin projections also failed to reflect reality.  For FY 2013 to FY 2017, Sears projected that it would earn ***positive***

61

EBITDA and *positive* EBITDA margin.  Yet, in each of those years, Sears's EBITDA and EBITDA

margin were **negative**.  For example, in FY 2013, Sears projected that it would have ***positive*** $1.4

billion of EBITDA, when in reality it actually had ***negative*** $340 million of EBITDA—a miss of

$1.74 billion on a plan forecasting (using the term loosely, to say the least) just one year ahead.



162.    ***Multi-Year Projections***.  Almost every year, Sears projected that its revenue for the

next year would be ***higher*** than its revenue for the prior year.  This is so even when the prior year

includes revenue from businesses that were spun off and stores that were closed (and, thus, would

no longer contribute to Sears's revenue).  And yet, every year, Sears's revenue was in fact lower.

As with revenue, Sears projected every year that its gross margins for the next year would ***grow***

relative to the prior year and, yet, every year, Sears's gross margins continued to *shrink*.  Moreover, as with revenue, multi-year projections given to Duff & Phelps were even more aggressive (and missed even more dramatically).  Whereas the annual projections at least acknowledged that EBITDAP and EBITDAP margin might decline (while remaining positive), the multi-year projections that Sears provided to Duff & Phelps generally projected a continued *increase* in EBITDAP and EBITDAP margin.

3.   **The Culpable Parties' and Duff & Phelps's Knowledge that the Projections Were Unachievable**

163.   Sears's bad-faith Annual Plans failed to account for, among other things, the negative impact on results from (i) Sears's declining financial performance, (ii) store closures and spin-offs of profitable businesses, (iii) declining capital expenditures, (iv) increasing competition and declining market share, (v) the failure of SYW to materially counteract negative trends and (vi) solvency concerns from suppliers and PBGC.  In light of all of these facts, as discussed above, it was grossly unrealistic to project that revenue, gross margin and EBITDAP would somehow suddenly improve.

164.   The materiality and consistency of the discrepancies between Sears's projections and its actual results cannot be explained by random chance or unforeseen circumstances.  By the time of the Lands' End Spin-off and Seritage Transaction in 2014 and 2015, Sears had fallen short of its Annual Plan projections since at least FY 2010.  During those years, Sears had missed most of the targets in its Annual Plans for (among other key performance indicators) revenue, gross margin and EBITDAP.  And not just by a hair, but by material amounts:  Sears had missed its revenue targets by between 9.9% and 12.9%; gross margin targets by between 12.4% and 21.7% and EBITDAP targets by an average of approximately $1.5 billion per year in the relevant period and yet continued, year after year, to project positive EBITDAP despite a history of negative

growth.  Again, continued misses of forecasts just 12 months into the future of this magnitude
cannot be explained by anything other than bad-faith, fantasy-laden budgeting practices.

165.    Even more troublesome, and perhaps even a recognition of the baseless projections
provided to Duff & Phelps, on multiple occasions the Sears Holdings Board used far more
conservative projections for internal liquidity planning than the projections provided to Duff &
Phelps.  For example, in August 2014, Sears's internal modeling indicated that the company
needed between $500 million and $750 million by the first week of October 2014 based on
planning scenarios for FY 2014 that ranged from EBITDA of between negative $500 million and
negative $1 billion.  Notably, these internal projections were far more conservative than those
projections that formed the basis of Duff & Phelps's solvency opinions related to the Lands' End
Spin-off only a few months earlier.  In those projections, Sears assumed an EBITDA of $1 billion,
$1.7 billion and $2.2 billion for fiscal years 2014–2016, respectively.  Similarly, the projections
the Sears Holdings Board reviewed during the discussions of the Seritage Transaction were far
more conservative than those that were provided to Duff & Phelps, as discussed in greater detail
below.  Indeed, on February 16 and May 5, 2015, the Sears Holdings Board reviewed materials
that projected Sears's liquidity forecast for November 2015 based on EBITDA projections for FY
2015 of $600 million, $0 and negative $500 million.

166.    As a result, by the time of the relevant transactions, the Culpable Parties could not
have reasonably or in good faith expected that Sears would achieve the performance levels
projected.  And, knowing that these unrealistic projections were the basis for Duff & Phelps's
solvency opinions, the Culpable Parties could not have relied upon those opinions in good faith.

167.    Witness have admitted that the Annual Plans reflected management's aspirations
rather than what was realistically anticipated.  For example, Schriesheim, the CFO until May 2016,

admitted the Annual Plans had a "high degree of execution risk" and "were a pretty aggressive stretch." According to Schriesheim, the "philosophy" of the Annual Plans was "aspirational in nature to drive an outcome." Kamlani similarly admitted "it was not lost on the [B]oard that the company was in a pattern of constantly missing its forecasts." A representative from Centerview also noted that it "had formed a view that [Sears] was consistently missing its projections." As Riecker, who succeeded Schriesheim as CFO, candidly explained, "you are not going to plan to lose money."

168.    So too, Duff & Phelps was well aware of the grave errors in management's projections. In the words of the lead Duff & Phelps representative, Sears's numbers were "woefully short of forecasted performance," and Sears "had a terrible history of performing against projections"—in other words, a "history of not meeting their projections." Duff & Phelps Managing Director who worked on a number of opinions for Sears refused to say whether he even believed management's projections were credible, stating, "We made no statement regarding whether or not we think they're credible."

169.    By the time of the Land's End Spin-off and Seritage Transaction, Duff & Phelps was well aware of Sears's modus operandi: Sears management would provide Duff & Phelps with projections predicting a grand turnaround, forecasting massive increases in projected revenues and gross margins, but Sears dramatically underperformed those forecasts every time. Though Duff & Phelps knew from experience that it could not trust management's projections, it continued to accept and use them, year after year, as the basis for "solvency" and "fairness" opinions it prepared and presented to the Sears Holdings Board. Duff & Phelps was paid millions of dollars in connection with dozens of other engagements for Sears as well (32 in total).

170.    The extent to which Duff & Phelps repeatedly ignored historical results is staggering.  As shown in the graph below, Duff & Phelps consistently adopted highly optimistic management projections *despite* direct knowledge of Sears's total inability to project future earnings accurately.  For example, at the time of the Lands' End Spin-off, Duff & Phelps knew that during the SHO/Canada transaction, Sears had forecasted $936 million in earnings in 2013 but earned negative $340 million (a delta of $1.376 billion).  At the time of the Seritage Transaction, Duff & Phelps knew full well that during the Lands' End Spin-off, Sears had forecasted $1.048 billion in earnings in 2014 but earned negative $638 million (a delta of $1.686 billion).



171.    The one thing Duff & Phelps did to account for these outrageous misses was run "sensitivity" cases whereby it tested Sears's financial condition even at lower forecasted earnings.  But as shown in the graph below, these sensitivities were wholly inadequate to account for the magnitude of Sears's historical misses.  Rather than assume continuing historical trends or even zero earnings (which would still have been an improvement), Duff & Phelps still pretended Sears would experience massive growth in EBITDA in these sensitivity cases.  For example, at the time of the Lands' End Spin-off, Duff & Phelps reduced its forecast for Sears's EBITDA for 2015, from $1.656 billion to $421 million, notwithstanding that Sears had earned negative $340 million in

2013 (i.e., it projected at least $761 million in EBITDA growth over two years as a "downside" sensitivity); at the time of the Seritage Transaction, Duff & Phelps reduced its forecast for Sears's EBITDA for the following year, 2016, from $420 million to $198 million, notwithstanding that Sears had earned negative $638 million in 2014 (i.e., as a "downside" sensitivity, it projected at least $836 million in EBITDA growth over two years).



172.    Sears's lenders under its asset-backed loan (the "ABL Lenders") were keenly aware of Sears's chronic inability to meet its financial projections.  According to then-CFO Schriesheim, Sears had "no credibility" with the ABL Lenders due to its repeated misses, and so the ABL Lenders demanded that Sears provide them with a separate set of "realistic numbers."

173.    Later, when Lampert became a lender of last resort, he demanded more rigorous forecasting, called "clean-sheet" forecasting.  Clean-sheet forecasting was developed in 2012 in order to create a baseline forecast using adjusted historical store revenues—referred to as "clean sheet sales."  This baseline forecast also included additional revenue drivers—referred to as "initiatives"—for each of the business units.  Because clean sheet forecasts were based on historical trends, they reflected more tempered expectations compared with top-down projections described herein and, therefore, were more accurate.  Though clean-sheet forecasting was

performed by Sears management since as early as 2012, on information and belief, clean-sheet forecasts were not provided to third parties. By 2016, when Lampert realized he would be the sole or main source of funding going forward, he decided to implement a more reliable forecasting process, which adjusted the Management Forecast P&L with historical sales figures or clean sheet sales.

**F.     Lampert and ESL Face Increasing Redemption Pressure from ESL's Investors**

174.    In Q1 2005, following the Kmart/Sears merger, ESL had assets under management ("AUM") of more than $11 billion. ESL's AUM peaked at more than $16 billion in Q2 2007, primarily due to Sears Holdings's stock price increase. During that stock price rise—which was driven in large part by stock buy-backs that cost Sears approximately $5 billion—ESL pocketed more than approximately $2 billion in "performance fees" from its investors (in addition to "management fees" of 1% or 2% of AUM).[16] But those early returns did not last. According to *Institutional Investor*, ESL has suffered annualized losses averaging 6% per year beginning in 2005.

175.    As its losses mounted, ESL faced increasing demands for redemptions from its investors. According to news reports, notable redeeming investors included: billionaire Michael Dell; billionaire entertainment mogul David Geffen, who withdrew the last of his funds in 2007, and the heirs of the Ziff Davis Publishing Company, who withdrew their funds between 2011 and 2013. After a five-year "lockup" expired at the end of 2012, during 2013, ESL was forced to redeem nearly $3.5 billion from investors advised by Goldman Sachs. As a result, during 2011, 2012 and 2013, ESL made in-kind distributions of Sears Holdings's shares (as well as AutoNation, Inc., Orchard and SHO shares) to meet investor redemptions.

---

[16]      ESL also pocketed an additional $135 million in performance fees in 2013 as a result of Sears's approximately 20% stock price increase during that year.

176.    Due to the combined effect of redemptions and Sears Holdings's stock price drop, by the time of the Lands' End Spin-off (2Q 2014), ESL's AUM had fallen to $2.5 billion; and by the time of the Seritage Transaction (3Q 2015), $1.6 billion.[17]  As a result of this drop, ESL's revenue from fees declined substantially.



177.    These increasing demands for redemptions by ESL's investors put pressure on Lampert to find ways to deliver returns to Sears Holdings's shareholders.  Because Lampert was unable to improve Sears's performance, and because Sears was unable to fund further stock buy-backs, Lampert's attention turned to spin-offs and rights offerings.

---

[17]    ESL's AUM follows a conventional fiscal year that is equal to the calendar year (i.e., January 1 to December 31), unlike Sears's fiscal year (running from February 1 to January 31).

178.    In 2012, Lampert formed and chaired a management committee euphemistically called the "non-core asset committee" (the "Non-Core Committee") to consider dispositions of major assets. The Non-Core Committee comprised, among others, Lampert, Schriesheim, Riecker and Huckins. That group eventually oversaw each of the major dispositions of assets that followed, including the transactions at issue in this Adversary Proceeding.

179.    When ESL was facing crippling demands for redemptions from its own investors, between December 2011 and November 2012, Sears Holdings spun off its entire stake in Orchard, rights to purchase all of SHO (a wholly owned subsidiary of Sears Holdings) and a significant stake in Sears Canada to its shareholders. At the time, the Controlling Insider Shareholders owned between 80.1% and 81.2% of Sears Holdings's stock, and the Sears Holdings Board was dominated by Lampert, two other ESL investors (Tisch and Mnuchin) and a CEO (Louis D'Ambrosio) beholden to the three of them. When the transfers were made, Sears's cash flow from operations, operating income, pre-tax income and net income had already dropped first to *de minimis* levels (FY 2010) and then to negative levels (FY 2011)—levels from which the Culpable Parties knew Sears was unlikely ever to recover.

180.    ***The December 2011 Orchard Spin-off***.  In December 2011, Sears Holdings spun off its entire 80.1% common stock and 100% preferred stock stake in Orchard as a dividend to its shareholders. Orchard (acquired by Sears Roebuck in 1996) was a regional home improvement retailer with 89 stores, all located in California. In 2005, Sears Roebuck sold a 19.9% stake in Orchard to Ares Capital Management ("Ares"), a hedge fund, and retained the remaining 80.1%. At the time of the spin-off, Orchard was much more profitable than the rest of Sears on a relative basis, having posted an EBITDA margin of between 10.5% and 12.6% every year since the Kmart/Sears merger. Indeed, Orchard had posted positive EBITDA each and every year since its

70

initial public offering in 1993.  Orchard earned profits of $8.7 million in FY 2010, the fiscal year

preceding the spin-off.

181.    Each Sears Holdings shareholder received 0.045163493 of Orchard common class

A shares and 0.045163493 of Orchard preferred shares per share of Sears Holdings held.  After the

spin-off, Lampert and the ESL Shareholders held 49.1% of Orchard common stock; Ares 19.9%;

Fairholme Capital 12.2%; Tisch 3% and other public shareholders 15.9%.  After the spin-off,

Lampert and the ESL Shareholders also held 61.3% of Orchard's preferred stock; Fairholme

Capital 15.3%; Tisch 3.7% and other public shareholders 19.9%.  The Orchard shares had

substantial value, likely in excess of $100 million

182.    ***The October 2012 SHO Rights Offering***.  SHO was a wholly owned direct

subsidiary of Sears Holdings that sold appliances and tools under Sears's brands.  On April 30,

2012, Sears Holdings filed a registration statement on Form S-1 for 23.1 million shares, or 100%,

of common stock of SHO.  Sears Holdings also created 105,919,089 rights to purchase shares of

SHO (the "SHO Rights").  The SHO Rights gave their holders the option to purchase 0.22 shares

of common stock of SHO at an exercise price payable to Sears of $15 per share.  Sears Holdings

distributed all 105,919,089 of the SHO Rights to its shareholders on September 7, 2012.

183.    The Controlling Insider Shareholders owned more than 77% of Sears Holdings's

stock and, thus, received more than 77% of the SHO Rights.  Specifically, Lampert and the ESL

Shareholders owned 62% of Sears Holdings's stock, Fairholme Capital owned 15% of Sears

Holdings's stock and Tisch owned approximately 4% of Sears Holdings's stock and received

comparable percentages of the SHO Rights.

184.    In an attempt to justify the SHO rights offering, Sears Holdings commissioned

solvency opinions based on unrealistic, bad-faith projections of Sears's future performance.  While

Sears Holdings retained Duff & Phelps to provide a solvency opinion on behalf of the Sears

Holdings Board to support the transaction, Duff & Phelps based its opinion on projections from

management regarding Sears's performance (the "2012 Solvency Projections").   The 2012

Solvency Projections were deeply flawed and predicted, incredibly, that revenue, EBITDAP and

EBITDAP margin, which had been declining, would instead begin to grow through 2017.

| SHO & Sears Canada Solvency Projections - Provided by Sears to D&P | | |
|---|---|---|
| | **FY12** | **FY13** | **FY14** |
| Revenue | $ 34,225 | $ 34,678 | $ 36,066 |
| Gross Margin | $ 12,689 | $ 13,047 | $ 13,749 |
| EBITDAP | $     901 | $   1,400 | $   1,997 |
| EBITDAP Margin | 2.6% | 4.0% | 5.5% |

185.    Unsurprisingly, Sears's actual results fell dramatically short of the projections. Rather than turning around, revenue steadily fell, and EBITDA and EBITDA margin fell and remained negative.





18





19

---

18       Business plans show "Business Profit," which is an acceptable proxy for EBITDA.  Moreover, Duff
& Phelps only provided 6 months of pension cost for the 2012 year, which have been annualized in this chart.
19       Business plans show "Business Profit," which is an acceptable proxy for EBITDA.  Moreover,
Duff & Phelps only provided 6 months of pension cost for the 2012 year, which have been annualized in this chart.

186.    Lampert's efforts to liquidate Sears for his and the other Controlling Insider Shareholders' benefit were not lost on the market.  Indeed, a Credit Suisse analyst correctly concluded in February 2012 (after the SHO rights offering was announced) that Lampert was stripping valuable assets from a failing venture:

> The actions taken last week once again show the brilliance of Eddie Lampert, as he took control of what still may turn out to be an unwinnable situation.  Effectively, we read his multiple announcements as saying:  I now see that returning to positive operating cash flow levels is likely impossible, so let me keep the ship afloat while I dispose of the dinnerware and other valuable items before abandoning.  (Our interpretation).  The company needs to portray an image of stability even as the assets leave through the back door as that is the best way to maximize asset values. It will likely end badly, but by delaying that, the company can take out many of the valuable assets.

187.    The next month, Credit Suisse correctly inferred the intent behind and consequences of the Defendants' course of conduct:  "Over time, selling off the profitable assets is unlikely to be a winning strategy.  Sears already announced that it is spinning off 20% of its EBITDA later this year [with SHO], and if it sells Lands' End, that may represent a large part of its remaining US EBITDA.  Combined with selling some of its best locations, one has to wonder why they are digging the turnaround hole deeper before attempting to climb out, ***unless they are not planning that climb***" (emphasis added).

188.    ***The November 2012 Sears Canada Spin-Off***.  Prior to the November 2012 partial spin-off of Sears Canada to Sears Holdings's shareholders, Sears Holdings indirectly owned 95.5% of Sears Canada (through Sears Roebuck and certain of its subsidiaries).  In November 2012, Sears Holdings spun off 44.5% of Sears Canada, or 45,374,623 shares of Sears Canada, to its shareholders—reducing Sears Holdings's remaining stake in Sears Canada to just 51%.  At the time, senior management at Sears valued the approximately 45 million shares sought to be distributed at roughly $585 million.

75

189.     Despite analyses from Sears's tax advisors suggesting that a pre-spin dividend by Sears Canada would have significant tax benefits for Sears Holdings (including an opportunity to utilize either the foreign tax credit or Sears's net operating loss), Sears Canada did not pay *any* pre-spin dividends.  Instead, just two months *after* the spin-off, on December 31, 2012, Sears Canada paid to its shareholders a $102.4 million dividend.  If this dividend had been paid before the spin-off, 95.5% of it would have been paid to Sears Holdings (and 4.5% to Sears Canada's public shareholders).  Instead, because the dividend was paid after the spin-off, only 51% of the dividend was paid to Sears Holdings.  The value representing the difference between 51% and 95.5% was instead paid to Sears Holdings's shareholders (who became Sears Canada's shareholders as a result of the partial spin-off).  The primary beneficiaries were Lampert and the ESL Shareholders, followed by Fairholme Capital and Tisch.[20]

190.     Like the Orchard spin-off and SHO rights offering, the Sears Canada partial spin-off primarily benefited insiders.  The Controlling Insider Shareholders owned approximately 81% of Sears Holdings's stock at the time of the Sears Canada partial spin-off and, thus, personally received 81% of the distribution, or nearly 36% of the equity in Sears Canada.  Specifically, Lampert and the ESL Shareholders owned approximately 62% of Sears Holdings's stock, Fairholme Capital owned approximately 15% of Sears Holdings's stock and Tisch owned 3.6% of Sears Holdings's stock.  In total, the Controlling Insider Shareholders received at least $507 million in value from the Sears Canada partial spin-off.

---

[20]     Indeed, the board of directors of Sears Canada approved another C$509.4 million dividend in FY 2013.  Through both of these dividends, ESL received a direct benefit of over C$100 million.  The motive underlying those dividends appears to have been entirely self-interested, too.  On November 5, 2018, a court-appointed monitor in the recent Sears Canada bankruptcy case found that ESL pressured Sears Canada into the dividend because of ESL's "urgent liquidity need at that time to satisfy redemption requests by clients of certain of its funds."

191.    Like the SHO rights offering, the Sears Canada partial spin-off was premised on unrealistic, bad-faith projections of Sears's future performance.  For the Sears Canada partial spin-off, Duff & Phelps made only minor updates to its solvency analysis for the SHO rights offering, essentially updating the analysis to account for the SHO transaction.  As with the SHO rights offering, Duff & Phelps continued to accept, unrealistically, that Sears's revenue, EBITDAP and EBITDAP margin, which had been declining, would instead begin to grow through 2017.

192.    Each of the Orchard spin-off, SHO rights offering and Sears Canada partial spin-off divested Sears of valuable assets for the benefit of the Controlling Insider Shareholders.  The transactions satisfied the demands of shareholders but failed to right the path of a declining Sears and failed to address Sears's needs and interests.  As it became ever more clear to the Controlling Insider Shareholders that Sears was doomed, Lampert, the ESL Shareholders and other shareholders set out to extract Sears's remaining assets for their own benefit, despite Sears's insolvency and with *de minimis* consideration for Sears or its creditors.

**G.    Formation and Failure of the RPT Committee**

193.    In 2012, with additional related-party transactions on the horizon, the Audit Committee of the Sears Holdings Board adopted a written related-party transactions approval policy (the "RPT Approval Policy") pursuant to which the RPT Committee was created. Defendants Reese and Kunkler have been members of the RPT Committee since its formation and were members of the RPT Committee when each of the transactions that form the basis of the claims and causes of action asserted herein were approved.  Kamlani was a member of the RPT Committee from the time he joined the Sears Holdings Board in December 2014 until the time he became President of ESL in 2016.  Kamlani was a member of the RPT Committee when the Seritage Transaction was recommended for approval to the Sears Holdings Board.  DePodesta was

a member of the RPT Committee beginning in March 2016 and recommended Board each of the Related-Party Financings for approval to the Sears Holdings.

194.    As the RPT Approval Policy provides, "No director shall participate in any discussion or approval of a Related Party Transaction for which he or she is a Related Party, except that the director shall participate only to the extent required to provide all material information concerning the Related Party Transaction."  Under the express and unequivocal terms of the RPT Approval Policy, Lampert and the other Conflicted Directors—Alvarez, Berkowitz, Tisch, Mnuchin and Kamlani—never should have participated in discussions of the Sears Holdings Board regarding related-party transactions in which they were conflicted, beyond providing material information to the Sears Holdings Board that no one else could provide.  In spite of this, Lampert actively participated in meetings of the Sears Holdings Board when related-party transactions were being considered.  Other insiders including Alvarez, Berkowitz, Tisch, Mnuchin and Kamlani also were involved in board discussions and failed to recuse themselves from voting on related-party transactions, despite their conflicts.

195.    The mechanics of the RPT Committee's review process was neither designed nor capable of preventing the self-dealing described herein.  The RPT Committee did not have the full and final authority to approve or reject related-party transactions; that authority remained with the full Sears Holdings Board at all times.  Instead, the RPT Committee had authority merely to issue recommendations to the full Sears Holdings Board to approve or reject related-party transactions, and the full Sears Holdings Board was not bound by these recommendations in any way.

196.    In practice, the RPT Committee recommended the approval of every related-party transaction without meaningfully considering the fairness of the transaction from the perspective of Sears or its creditors.  As described herein, despite years of red flags signaling Sears's inevitable

demise, the RPT Committee recommended for approval asset-disposing transactions for which the

Debtor Plaintiffs received inadequate or no consideration.  Then, while the Debtor Plaintiffs were

insolvent and restructuring was inevitable, the RPT Committee recommended numerous

transactions, which unnecessarily saddled certain Debtor Plaintiffs with billions of dollars of

"debt," causing those Debtor Plaintiffs to pay hundreds of millions of dollars in "interest" and

"fees" while suffering billions of dollars in further operating losses.

<u>**The Defendants' Wrongful Conduct Giving Rise to the Claims and Causes of Action Contained Herein**</u>

197.    Following the Orchard, SHO and Sears Canada transactions, Sears's financial

performance continued to deteriorate and demands for redemptions by ESL's investors continued

to increase.  Lampert and the other Culpable Parties orchestrated three sets of transactions.  ***First***,

Sears spun-off Lands' End to Lampert and the other Controlling Insider Shareholders for far less

than reasonable equivalent value.  ***Second***, Sears sold 266 of its real estate assets to an entity

controlled by Lampert and other Controlling Insider Shareholders for hundreds of millions of

dollars less than reasonably equivalent value and, for no consideration, gifted rights to buy equity

in that new entity at a heavily discounted price to Sears Holdings's shareholders.  ***Third***, from

2016 to 2018, Sears issued billions of dollars of "debt," which was incurred for improper purposes,

including protecting Lampert's and the other Culpable Parties' investments in Seritage and causing

Sears to pay hundreds of millions of dollars in "interest" and "fees" to Lampert and other Culpable

Parties.

**A.**     <u>**The April 2014 Lands' End Spin-off Wrongfully Transferred More Than $1 Billion of Value from Sears to Its Shareholders**</u>

198.    Lands' End is a multi-channel retailer of casual clothing, accessories and home

products.  Sears acquired Lands' End in June 2002 for $1.9 billion.  Sears Holdings owned Lands'

End indirectly through Sears Roebuck, its wholly owned subsidiary.  Because of its strong cash

flow and profitability (particularly in comparison to Sears's other business units), Lands' End was one of Sears's "crown jewels."[21]  In 2012, for example, Lands' End had revenue of $1.6 billion and gross margin of $704.1 million.

199.    The April 2014 Lands' End Spin-off constitutes a fraudulent transfer and an illegal dividend.  The Lands' End Spin-off transferred the Lands' End business (worth at least $1.3 billion at the time) from Sears to Sears Holdings's shareholders, the largest of whom were the Controlling Insider Shareholders.  The shareholders paid no consideration for shares in Lands' End.  The transaction occurred at a time when Sears Holdings and Sears Roebuck intended to incur or reasonably should have believed they would incur debts beyond their ability to pay and had unreasonably small capital, or left Sears Holdings and Sears Roebuck in such a financial condition.

### 1.    Lampert Insists on a Spin-off to Benefit Shareholders, Rather than Alternatives that Would Have Generated More Proceeds for Sears

200.    Sears began planning a potential spin-off of Lands' End in 2012.  Despite planning the Lands' End Spin-off for at least two years, Sears never seriously considered or pursued any alternatives, including a third-party sale of Lands' End, which would have maximized the proceeds to Sears and left such proceeds available to creditors, nor did Sears engage an investment banker to conduct a sale process or obtain an independent valuation.  As Lampert has conceded, there was speculation "that [Sears was] shopping around Lands' End, which was never true."

201.    As Lampert and other insiders knew, prospective buyers existed.  On January 9, 2014, Sears received an unsolicited indication of interest from Leonard Green & Partners and the Tommy Hilfiger investment group ("LGP/TH") regarding Lands' End.  LGP/TH stated that they were "highly interested" in investing in Lands' End, which they valued at $1.6 billion (including

---

[21]    Suzanne Kapner, "Sears Weighs Spin-off of Lands' End; Move Could Unlock Value as Company Struggles with Its Sears and Kmart Chains," *The Wall Street Journal*, Oct. 30, 2012.

net debt).  LGP/TH proposed a "sponsored spin" transaction that would give LGP/TH a 25% stake in Lands' End (alongside Sears Holdings's shareholders) and deliver proceeds of either $850 million or $1 billion (depending on the transaction structure) to Sears.

202.    Lampert summarily rejected this opportunity.    Just six days later, Lampert personally told LGP/TH that the proposed transaction was a "non-starter"—not because it failed to maximize proceeds to Sears, but because it would have diluted his and ESL's stake in Lands' End relative to a non-sponsored spin.  As Schriesheim (Sears's then-CFO) explained to another Sears employee at the time, "[Lampert] was trying to optimize cash for [Sears] *while maximizing his (ESL) equity stake* . . . because he knows that [Lands' End] is worth a great deal outside of [Sears]" (emphasis added).

203.    Ultimately, Lands' End was distributed to Lampert, the ESL Shareholders and Sears Holdings's other shareholders for no consideration following a pre-spin dividend from Lands' End of $500 million.  The transfer of Lands' End shares was approved by and made by Sears Holdings, which initially received the shares from Sears Roebuck.  Market multiple analyses based on Lands' End's historical revenue and EBITDAR confirm that the standalone company had an enterprise value of at least $1.3 billion.  Lampert and ESL, as the largest Sears Holdings shareholders, were by far the largest beneficiaries of the transaction, receiving a pro rata share of the Lands' End equity value equal to their equity holdings in Sears Holdings.

204.    The spin-off itself involved a dividend paid to Sears Holdings's shareholders, according to resolutions of the Sears Holdings Board.  In recognition of the massive value that was being stripped from Sears Roebuck and passed along to Sears Holdings's shareholders, the Sears Holdings Board authorized cash dividends, called "make whole awards," to holders of unvested

shares of Sears Holdings stock.  These cash dividends were paid to a total of 48 holders of unvested Sears Holdings shares.

205.    When asked why alternatives that would have resulted in greater proceeds to Sears were not pursued, Lampert conceded that the spin-off was "just a way of separating the two companies" (which, of course, also would have been accomplished by a third-party sale).  When pressed on the alternative of a sale, Lampert said Lands' End was spun off rather than sold because it was valuable, and he wanted shareholders—of which, of course, he and ESL were by far the largest—and not creditors to enjoy that value.  In Lampert's own words, he "didn't think hard about the creditors in the Lands' End deal."

### 2.    Lampert Limits the Pre-Spin Dividend to Benefit the New Shareholders of Lands' End, Including ESL and Himself, at the Expense of Sears

206.    Lampert also rejected suggestions to increase Lands' End's new borrowings in order to support a larger pre-spin dividend, despite knowing Lands' End's value far exceeded the anticipated $500 million pre-spin dividend.[22]  After the transaction was announced, the lead banker at Bank of America Merrill Lynch (the lead arranger for the new debt) suggested to Schriesheim and Lampert that the transaction could deliver "significantly more cash to Sears."  The lead banker advised that Lands' End could borrow 4.5x of its full year 2013 EBITDA and dividend that same amount to Sears before the spin-off.  He further stated that this level of debt "would NOT be considered overly aggressive by the debt markets—particularly if [Lands' End's] full year 2013 EBITDA showed nice improvement over full years 2012 levels" (which it did).

207.    Lands' End's 2013 EBITDA (according to the Duff & Phelps solvency analysis) was $141 million.  Thus, according to the lead banker's initial advice, Lands' End could have paid

---

[22]        A November 30, 2013 Ernst & Young impairment analysis and an April 3, 2014 International Strategy & Investment Group valuation report echoed the LGP/TH indication of interest valuation, concluding that Lands' End's enterprise value was between $1.4 billion and $1.5 billion.

Sears a pre-spin dividend of approximately $635 million. Indeed, once Lands' End's strong results for full year 2013 became known, Bank of America suggested that Lands' End could in fact borrow an amount equal to 5.3x its 2013 EBITDA, which would have resulted in a pre-spin dividend to Sears of approximately $747 million. Instead, at Lampert's direction, Lands' End borrowed only $515 million and paid a pre-spin dividend of only $500 million.

208.    Lampert overruled the lead banker's advice because following it would have decreased the value improperly transferred to shareholders, particularly ESL and himself.

### 3. The Lands' End Spin-off Left Sears Holdings and Sears Roebuck Insolvent on a Cash-Flow Basis

209.    Despite Schriesheim's Officer's Certificate to the contrary, Sears Holdings and Sears Roebuck were left with unreasonably small capital and unable to pay their debts as they were expected to come due after the Lands' End Spin-off.  At the time of the Lands' End Spin-off, Sears Holdings had funded debt obligations with an aggregate principal amount of more than $4.2 billion, and Sears Roebuck was liable on substantially all of that debt.  Together with interest, these Debtors required more than $4.7 billion (and more than $4.3 billion by 3Q 2018 alone) to pay off their debts.  The schedule under which these obligations (which, importantly, does not include significant pension obligations) would come due was as follows:



210.    Sears's total cash and cash equivalents immediately after the Lands' End Spin-off (including the pre-spin dividend) were approximately $842 million.  Even *assuming* that Sears Holdings and Sears Roebuck were able to use *all* of these funds for principal and interest payments (rather than to fund continued operating losses, as actually occurred), these Debtors *still* would have required more than $3.4 billion of *additional* free cash flow by 3Q 2018 to satisfy its obligations.  Indeed, these Debtors would have required $841 million by 1Q 2016, another $363

million between 2Q 2016 and 1Q 2018, then $976 million in 2Q 2018, followed by another $1.286

billion in 3Q 2018:



211.    Sears had no basis to expect to earn anything close to what it needed.  After the

Lands' End Spin-off, it could not reasonably have expected to earn $841 million in free cash flow

by 1Q 2016 (when the asset-based loan ["ABL"] came due).  In reality, Sears ultimately saw free

cash flow of approximately *negative* $1.7 billion in FY 2014, *negative* $2.4 billion in FY 2015 and

*negative* $1.5 billion in FY 2016.  After Lands' End, the only way the existing ABL principal

payment due in 1Q 2016 could be made, was by selling core assets.  And that is what ultimately

happened as the ABL was paid down with a portion of the proceeds of the Seritage Transaction

(discussed in more detail below).

212.    But even with non-ordinary-course sales of core assets, after the Lands' End Spin-

off, Sears Holdings and Sears Roebuck could not reasonably have funded the cumulative $4.3

billion in principal and interest payments by 3Q 2018 (when the Second Lien Notes would come

due) in addition to ongoing operating losses.  Not coincidentally, 3Q 2018 is when these Debtors

ultimately filed for bankruptcy, with $304 million of the Second Lien Notes or notes exchanged

for Second Lien Notes in March 2018 outstanding.

213.     In light of Sears's declining financial performance over the preceding years and the numerous adverse qualitative trends, as detailed above, it was not reasonable to assume that Sears could achieve the level of cash flow necessary for timely debt principal and interest payment.  In the three immediately prior fiscal years to the Lands' End Spin-off, Sears had failed to generate *any* cash flow from operations.  Nor did it generate *any* earnings to cover interest expenses in the fiscal year immediately prior to the Lands' End Spin-off.  In that year, Sears also had *negative* free cash flow of $1.4 billion and *negative* Adjusted EBITDA of $337 million.  In the four immediately prior fiscal years, FYs 2010–2013, Sears had suffered a cumulative net loss of $5.3 billion.

214.     Duff & Phelps, the valuation advisor hired yet again to opine on Sears Holdings's solvency at the time of the spin-off, opined that Sears Holdings was solvent only by—yet again—adopting management's speculative top-down projections about future performance.  Specifically, Duff & Phelps was provided with three-year projections created by management for FY 2014 through FY 2016, which Duff & Phelps extrapolated into five- and ten-year projections (the "2014 Solvency Projections").  The first projection year was prepared in accordance with the top-down planning process described above.  The latter two years of projections were, as Duff & Phelps knew, prepared solely for Duff & Phelps's use in formulating its opinion, rather than for any ordinary course business purpose.

**Lands' End Solvency Projections - Provided by Sears to D&P**

| ($ in millions) | FY14 | FY15 | FY16 |
|---|---|---|---|
| Revenue | $ 32,071 | $ 33,399 | $ 34,414 |
| Gross Margin | 11,442 | 12,062 | 12,641 |
| EBITDAP | 1,146 | 1,755 | 2,253 |
| *EBITDAP Margin* | *3.60%* | *5.30%* | *6.50%* |

215.   Like the 2012 Solvency Projections, which had proven to be wildly optimistic, the 2014 Solvency Projections were unrealistic and unreasonable, and Sears never came even remotely close in any year to achieving any aspect of the forecast.  In the base case, Duff & Phelps assumed that revenue, gross margin, Earnings Before Interest, Taxes, Depreciation, Amortization, Rent Expense and Pension Expense ("EBITDARP") and EBITDAP would *increase* rather than continue to *decrease* (and, in the case of EBITDAP, would turn *positive* instead of *negative*) and would continue to increase dramatically over the entire three-year projection period.



216.    Even in the sensitivity case, Duff & Phelps assumed that Sears's revenue decline would slow and then turn to growth and that EBITDAP and EBITDAP margin would become positive and increase (rather than remaining negative and continuing to decrease).



217.    In other words, even the "sensitivity" case erroneously assumed a substantial turnaround in Sears's profitability.  As detailed above, these optimistic assumptions were not supported by Sears's historical financial performance, by the initiatives included within Sears's FY 2014 Annual Plan or by the prevailing conditions affecting Sears's operating performance. Even the sensitivity projections were inflated wildly relative to actual performance.  Duff & Phelps did not consider the far more realistic likelihood that Sears's results would stay on the same downward track or that they would, at best, stabilize at 2013 levels.  Schriesheim produced his Officer's Certificate certifying Sears Holdings's financial health following the Lands' End Spin-off based on the same flawed projections, despite his intimate knowledge of Sears's past performance and significant financial challenges.

218.    Based instead on reasonable and appropriate assumptions, Sears would continue to have *negative* free cash flow and, after the Lands' End Spin-off, would be left with insufficient

capital and, between 2014 and 2016, would be unable to make scheduled debt principal and interest payments. Indeed, under Duff & Phelps's optimistic sensitivity case at the time of the Lands' End Spin-off, Sears Holdings would have been unable to repay more than $2.2 billion of existing debt at maturity without a refinancing or an unusual sale of assets in excess of $2 billion. Even this tenuous situation would have required a turnaround of the business, with revenue growth increasing 2.0% (despite a decline of 4.4% in the prior year) and EBITDAP margins increasing to 2.7% (despite a margin of negative 1.6% in the prior year). If Duff & Phelps's analysis was adjusted to hold FY 2013 EBITDAP constant through the following 5 years—a favorable assumption as compared to actual results—Sears would have been unable to maintain sufficient liquidity to continue operations as early as 2016 and, in 2018, even after Duff & Phelps's assumption of a $2.2 billion refinancing, Sears would have had negative liquidity of $3.1 billion.



| ($ in millions) | FY14 | FY15 | FY16 | FY17 | FY18 |
|---|---|---|---|---|---|
| D&P Sensitivity Case Liquidity | $ 2,362 | $ 1,982 | $ 2,006 | $ 1,959 | $ 2,090 |
| D&P EBITDAP Forecasts | 112 | 506 | 640 | 744 | 820 |
| Adjusted D&P EBITDAP Forecasts | (483) | (483) | (483) | (483) | (483) |
| *Incremental Impact on Liquidity* | (595) | (989) | (1,123) | (1,227) | (1,303) |
| Cummulative Impact on Liquidity | $ (595) | $ (1,585) | $ (2,708) | $ (3,934) | $ (5,238) |
| Adjusted D&P Sensitivity Case Liquidity | $ 1,767 | $ 397 | $ (702) | $ (1,975) | $ (3,148) |

Note: Liquidity is calculated as excess cash (cash balance above minimum $400 million requirement assumption per D&P analysis) and revolver availability

219.     This supports a finding that the Lands' End Spin-off left Sears Holdings and Sears Roebuck insolvent on a cash-flow basis.

220.     As noted, Sears Holdings and Sears Roebuck were co-obligors or guarantors for much of the Debtors' debt.  Specifically, Sears Roebuck was a guarantor for substantially all of the Debtors' debt, including $2.3 billion under the First Lien Credit Agreement and $1.24 billion in Second Lien Notes.  Sears Holdings and Sears Roebuck also were jointly and severally liable for Sears's pension liabilities (on the order of $1.1 billion at the time) as a member of a "controlled group."  Sears had negative cash flow and Sears Holdings and Sears Roebuck were co-obligors on many of the same obligations.  Once Sears Holdings failed to pay its joint obligations with Sears Roebuck, Sears Roebuck also would have been unable to pay them.

### 4.     The Lands' End Spin-off Left Sears Holdings and Sears Roebuck with Unreasonably Small Capital

221.     Sears Holdings and Sears Roebuck also had unreasonably small capital after the Lands' End Spin-off.

222.     As detailed above, Sears's multi-year performance leading up to the Lands' End Spin-off demonstrated that it was unable to generate sufficient profits to sustain operations or

adequately address existing liabilities.  Indeed, Sears could not generate *any* profits and could only temporarily sustain its operations by selling off core assets and falling further into debt.

223.    In December 2013, S&P informed Huckins that it would be publishing a bulletin regarding the anticipated spin-off, including the belief that it would "make it more difficult for Sears to turn the operating performance of its core operations around in the near term" and that Sears "will remain cash flow negative" and "continue to pursue asset sales to bolster its liquidity in 2014 while maintaining 'adequate' liquidity."

224.    Unsurprisingly, S&P's belief proved correct.  After the Lands' End Spin-off, Sears had insufficient capital or reserves to account for its normal business operations and to repay its existing debt load, much less sustain operations through any difficulties likely to arise in its lines of business, including a general or deepening industry-wide economic downturn.  It certainly did not help that, under Lampert's leadership, Sears's capital expenditures had declined drastically, reflecting lower investment in maintaining and upgrading its stores and well below those of its key competitors.  As analysts noted around the time of the Lands' End Spin-off, Sears's failure to invest in its stores made its stores increasingly unattractive to customers and further reduced Sears's chances for long-term profitability.  As S&P noted in several of its reports, published throughout 2014 and 2015, "[a] lack of store upgrades has hurt the company's ability to attract and retain talented merchants, to engage store employees, and to win new customers."  Sears also was left with insufficient capital or reserves even to survive a continuation of established trends in its free cash flow, net sales, margins and net profits (losses).  Sears's projections that its performance would reverse suddenly in FY 2014—just as Sears had incorrectly projected the year before (FY 2013), the year before that (FY 2012) and the year before that (FY 2011)—were unreasonable.

225.    Indeed, if Duff & Phelps's sensitivity case performance projections were used in Duff & Phelps's market multiples analysis, Sears would show negative net asset value of $3.1 billion, implying insolvency.  Duff & Phelps calculated this equity deficit in its work papers but, for unknown reasons, elected not to present the result in its presentation to the Sears Holdings Board.

226.    Therefore, Sears Holdings and Sears Roebuck were left with unreasonably small capital.  Schriesheim's Officer Certificate to the board of directors of Sears Roebuck in support of the Lands' End Spin-off showed that Sears Roebuck had total equity of $6.384 billion.  But that valuation relied upon an $8.254 billion intercompany receivable due to Sears Roebuck, on information and belief, largely or entirely from Sears Holdings.  Because Sears Holdings was insolvent and had unreasonably small capital, that intercompany receivable was impaired.  As a result, even this single correction reveals that Sears Roebuck also was insolvent and had unreasonably small capital.

### 5.    The Culpable Parties Acted with Fraudulent Intent

227.    The Sears Holdings Board, which at that time included Lampert, Mnuchin, Tisch and Alvarez, approved the Lands' End Spin-off.  The Culpable Parties acted with the intent to hinder, delay and/or defraud Sears Holdings and Sears Roebuck and their respective creditors through the Lands' End Spin-off.  This intent can be inferred from several traditional "badges of fraud."

228.    *First*, the transfer was to insiders.  In Lampert's words, he wanted to give Lands' End to "ourselves."  The Controlling Insider Shareholders owned approximately 70% of Sears Holdings's stock and, thus, personally received approximately 70% of the equity of Lands' End. In total, the Controlling Insider Shareholders received at least $560 million in value from the

Lands' End Spin-off.  The Controlling Insider Shareholders were well aware of the bad faith and illegality of this transfer.

229.   *Second*, Lands' End comprised a significant percentage of Sears's EBITDA-producing assets.  In FY 2012 (the last year in which Sears had positive EBITDA), Lands' End comprised 17.3% of Sears's EBITDA.  The year before, FY 2011, Lands' End had comprised *a majority, 52.3%*, of Sears's EBITDA.  Lands' End likely comprised an even higher percentage of Sears Roebuck's EBITDA-producing assets (assuming that Sears, Sears Roebuck and Kmart all had positive EBITDA).

230.   *Third*, Sears Holdings and Sears Roebuck received no consideration in the spin-off.  The shareholders paid nothing to Sears Holdings or Sears Roebuck in exchange for the Lands' End stock that they received.  As noted, the pre-spin dividend was paid with funds borrowed by Lands' End, which, as a wholly owned subsidiary, already belonged to Sears Holdings and Sears Roebuck.

231.   *Fourth*, the transfer was unusual and not in the ordinary course of business.

232.   *Fifth*, as noted above, the Lands' End Spin-off (i) occurred at a time when Sears Holdings and Sears Roebuck intended to incur or reasonably should have believed they would incur debts beyond their ability to pay and had unreasonably small capital or (ii) left Sears Holdings and Sears Roebuck in such condition.

233.   *Finally*, the Culpable Parties (and Duff & Phelps) knew that the 2014 Solvency Projections realistically could not be achieved.  By this time, Sears had fallen short of the performance projections in its four immediately preceding Annual Plans, for fiscal years 2010 through 2013.  Sears also had fallen short of the multi-year projections that had been submitted to Duff & Phelps in the 2012 Solvency Projections for its analysis of the SHO rights offering and

Sears Canada partial spin-off. These shortcomings were material. For example, Sears's actual EBITDAP fell short of its Annual Plan projections by $900 million in FY 2012 and $1.7 billion in FY 2013.

234.    In the words of former CEO Alan Lacy: "In 2014, with the Lands' End Spin-off, and then the Seritage spin-off . . . , that's when it seemed to shift into, [Lampert's] managing for cash flow, or liquidation. Everybody knew how the movie was going to end. It was just a question of how many minutes are left."

**B.    The July 2015 Seritage Transaction Fraudulently Transferred Hundreds of Millions of Dollars of Value to the Seritage Defendants, the Conflicted Insiders and Other Sears Holdings Shareholders**

235.    The Seritage Transaction constituted a fraudulent transfer and an illegal dividend and gives rise to a variety of common law claims. The sale-and-lease-back agreement and related agreements between a number of Sears entities and Seritage (the "Sale-and-Lease-Back")[23] undervalued the transferred real estate by hundreds of millions of dollars and saddled Sears with grossly one-sided and costly lease terms. The Seritage Rights Offering transferred highly valuable subscription rights to Sears Holdings's shareholders (principally to the Controlling Insider Shareholders) for no consideration to any Sears entity. All the while, the Controlling Insider Shareholders were well aware of the illegality of the fraudulent transfers and illegal dividends they received.

236.    The Seritage Transaction consisted of two primary steps. ***First***, Sears Holdings transferred subscription rights to purchase shares of Seritage common stock to the Controlling

---

[23]    The Sale-and-Lease-Back comprises several related contracts (and amendments thereto), including: (i) the Subscription, Distribution and Purchase and Sale Agreement by and between Sears Holdings and Seritage, dated June 8, 2015; (ii) the Contribution and Sale Agreement between Kmart Corporation, Marin Access LLC, Kmart of Washington, LLC, Plaza Guaynabo Limited Partnership, S.E., Sears Roebuck, Sears, Roebuck de Puerto Rico, Inc., Sears Development Co., Seritage KMT Finance LLC and Seritage SRC Finance LLC, dated July 7, 2015 and (iii) the Master Lease by and among Seritage SRC Finance LLC, Seritage KMT Finance LLC, Kmart Operations LLC and Sears Operations LLC, dated July 7, 2015.

Insider Shareholders and other Sears Holdings shareholders for no consideration.  The exercise

price of these rights was derived from artificially low appraisals of the real estate to be transferred,

and, as a result, the Seritage Rights Offering conveyed several hundred millions of dollars of value

to Sears Holdings's shareholders for no consideration to Sears.[24]  For Lampert, the ESL

Shareholders and Fairholme Capital, the value of the Seritage subscription rights was even greater.

Those insiders benefited from a side agreement pursuant to which they exchanged some of their

subscription rights plus cash for other classes of Seritage stock and interests in the Seritage

Operating Partnership, which were more valuable than the common shares the subscription rights

entitled them to.

237.    *Second*, Sears sold to the Seritage Defendants the title (or joint venture interests)

for the land relating to 266 stores expected to have positive operating results—235 stores that Sears

owned in full and 31 stores in which Sears owned 50% as part of a joint venture—for a purchase

price of approximately $2.58 billion[25] while simultaneously agreeing to lease those spaces back

from the Seritage Defendants.  The purchase price for the 235 Sears-owned stores was based upon

appraisals of the properties performed by C&W.  But, as C&W and the Culpable Parties knew,

those appraisals were fundamentally flawed, and, as a result, those properties were undervalued

by at least hundreds of millions of dollars.  The 31 joint venture properties also were undervalued

in the sale to Seritage as evidenced by subsequent transaction history.  Sears leased back each of

the properties conveyed to Seritage under burdensome "Master Leases" (the "Master Leases")

---

[24]    In connection with the Seritage Transaction, the Sears Holdings Board provided a cash dividend to holders of unvested stock who were unable to participate in the Seritage Rights Offering, as they had in the Lands' End Spin-off.  Payment of these cash amounts is an implicit acknowledgment that each of the Lands' End Spin-off and the Seritage Transaction constituted a transfer of value from Sears to Sears Holdings's shareholders.

[25]    Sears received cash consideration of $2,582,572,012.35.  Certain public disclosures inaccurately referred to a purchase price of approximately $2.7 billion.  The higher figure was calculated by improperly counting the fees paid to the third-party professionals who worked on the transaction and other amounts that were, in reality, paid to Seritage rather than Sears.

agreements, which provided Seritage the right to "recapture" or "redevelop"—i.e., evict Sears from up to 50% of the space at most of the stores, and up to 100% of the space at 21 of the stores—while requiring that Sears pay a penalty of one year's rent if Sears wished to terminate any lease prematurely.

238.    When the Seritage Transaction closed in July 2015, Sears's financial condition was even worse than it had been fifteen months earlier when Lands' End was spun off.  That was due in part to Sears's continuing losses (it recorded a net loss of $1.68 billion in FY 2014) and, in part, to the Lands' End Spin-off itself, which divested Sears of one of its few profitable subsidiaries.  As a result, Sears was insolvent on a balance-sheet basis prior to closing the Seritage Transaction and certainly as a consequence of the Seritage Transaction, in addition to lacking adequate capital to operate Sears's businesses and pay their debts as they came due in the near future.

239.    The terms of the Seritage Transaction—including the price Seritage paid Sears for the properties, the rent and other terms of the leases between Sears and Seritage and the terms of the rights offering—were established unilaterally by Lampert and others who reported to him and without any negotiation.  Lampert, however, was grossly conflicted because, once the transaction went through, he and ESL would be by far the largest shareholders of Seritage.  No consideration was given to the interests of Sears or its creditors.

240.    Lampert was only able to obtain approval of the Seritage Transaction from the Sears Holdings Board with the assistance of the Advisor Defendants.  The Advisor Defendants acted as gatekeepers to key information—namely, C&W was responsible for determining the purchase price of the properties and Duff & Phelps was responsible for opining on the fairness of the sale and Sears Holdings's solvency—and knowingly provided false or misleading information to the Sears Holdings Board.  These Advisor Defendants occupied positions of trust, and they knew that

the Sears Holdings Board would only approve the Seritage Transaction based upon satisfactory

assurances from them that the Culpable Parties could later attempt to invoke as a shield when

inevitably sued for their misconduct.  But rather than provide truthful appraisals and opinions, both

C&W and Duff & Phelps provided fundamentally flawed analyses that facilitated the deeply unfair

terms of the Seritage Transaction and failed to capture Sears's insolvency.

### 1. With Sears Facing a Liquidity Crisis, Lampert Proposes a Sale-and-Lease-Back Transaction without Adequate Consideration of Alternatives

241.    The Seritage Transaction was developed and approved in the face of an approaching

liquidity and operational crisis for Sears.  In mid-2014, shortly after the Lands' End Spin-off, Sears

management began to predict a liquidity shortfall the following year.

242.    Then, in the fall of 2014, Sears's auditor, Deloitte & Touche ("Deloitte"), raised

concerns about Sears's ability to continue as a going concern, highlighting Sears's negative

operating cash flows, recurring losses from operations, consecutive years of declining margins,

dependence on revolving credit arrangements with limited availability and small cushions on debt

covenant ratios.  Given Sears's worsening financial situation, Deloitte ultimately concluded that

Sears could not remain a going concern, *through FY 2015*, unless it took meaningful, significant

action. [26]

243.    To address these liquidity concerns, Lampert first presented the potential real estate

Sale-and-Lease-Back transaction to the Sears Holdings Board on September 9, 2014.  From the

outset, the Sale-and-Lease-Back transaction was conceived as a related-party transaction, under

which Sears's assets would be sold for the benefit of Sears Holdings's shareholders.  The Sale-

and-Lease-Back transaction to insiders was presented alongside alternatives such as a real estate

---

[26]    Notably, in light of Sears's prolonged history of failing to meet forecasts, Deloitte did not accept management's forecasts in performing its going concern analysis.  Instead, Deloitte assumed Sears would lose up to $500 million in EBITDA in FY 2015.

loan, a real estate mortgage investment conduit loan and borrowing against treasury shares, none of which, notably, would have transferred value from Sears to Sears Holdings's shareholders.

244.    Other alternatives—such as selling the real estate at arm's length to third parties, entering into the Sale-and-Lease-Back transaction with a third party or creating a business unit or subsidiary of Sears Holdings that could lease the real estate to other tenants while allowing Sears to retain the upside benefit of the real estate—were not presented or seriously considered.

245.    Critically, no outside advisor was hired to evaluate or market the properties for sale to a third party, and in fact, no process was run to test what the market might pay.

**2.    Lampert Directs and Strongly Advocates for the Seritage Transaction**

246.    By September 21, 2014, Sears was moving forward with the creation of a REIT. Because legal restrictions on ownership concentration in REITs would have prevented Sears Holdings's largest shareholders—Lampert, the ESL Shareholders and Fairholme Capital—from owning the same percentage of the REIT as they owned of Sears Holdings, substantial attention was devoted to developing customized transaction features involving the creation of new classes of stock that would benefit these large shareholders.

247.    By October 2014, Sears's internal liquidity planning scenarios began to assume proceeds from a Sale-and-Lease-Back transaction. By November 2014, the principal elements of the transaction—including the creation of a new REIT, an estimate of the number of properties to be sold to the REIT and the terms of the Master Leases whereby the REIT would lease the properties back to Sears, subject to the REIT's right to recapture space—were in place.

248.    Lampert and ESL then directed Sears to assemble a portfolio of valuable properties that Sears eventually would sell to the REIT. Because only Sears's profitable stores would be able to pay the rent called for under the Master Leases, Lampert and ESL eliminated from consideration for the portfolio most of the sites where the stores' long-term operating results were likely to be

breakeven or negative—meaning only the most profitable stores were included in the Seritage portfolio. In other words, Sears retained properties relating to its least profitable stores that were most likely to be closed, while placing its most profitable stores (i.e., those least likely to close and which were most critical to Sears's earnings) into a structure in which their landlord would have a right to recapture 50% or 100% of the space.

249.     Throughout the process of designing the Seritage Transaction, Lampert—acting as CEO, Chairman of the Sears Holdings Board and controlling shareholder of Sears Holdings with the ability under Delaware law to remove other board members—advocated strongly for approval of the Seritage Transaction. When Lampert participated in meetings of the Sears Holdings Board during which the Seritage Transaction was discussed, he did so as a fiduciary of Sears Holdings, providing the Sears Holdings Board with information about the alleged potential benefits of the Seritage Transaction for Sears. Lampert also:

 a. provided updates on Sears management's discussions and negotiations with mall owners concerning potential real estate joint ventures;

 b. explained that the Seritage Transaction was being pursued because it was expected to result in a higher value to Sears than alternative transactions such as additional loans, and that pursuing the Seritage Transaction would improve Sears's position to pursue other strategic alternatives in the future;

 c. shared management's proposals for the intended proceeds of the Seritage Transaction;

 d. affirmed his belief that Sears had always followed proper corporate governance while discussing the Seritage Transaction and other related-party transactions;

 e. confirmed that many factors were considered in negotiating the structure of the Seritage Transaction and that many advisors were involved to ensure that the structure of the Seritage Transaction was optimal from tax and legal perspectives;

 f. explained his belief that there were shareholder protection reasons for the 75% voting requirement for electing or removing trustees of the REIT;

g.   explained that, in the absence of the Seritage Transaction, Sears would not have had the bargaining leverage which enabled it to achieve the value it achieved in the joint ventures;

h.   expressed his belief that the Seritage Transaction would provide Sears with a more optimal footprint while providing additional value to Sears Holdings's shareholders;

i.   warned of the potential risk that Sears would have to rely on its current shareholders to subscribe or over-subscribe to the Seritage Rights Offering if the Seritage Rights did not have value; and

j.   warned that the failure to close the transaction exactly as Lampert proposed would lead to "liquidation mode" and require management to close and sell additional stores; thus, after foreclosing consideration of any alternative that would not enrich the shareholders at the expense of Sears and its creditors, Lampert, in effect, told the Sears Holdings Board it had no choice but to approve the deal he put before them.

Though he certainly was motivated by personal gain as reflected by the terms of the deal and pricing, Lampert gained an unfair benefit through self-dealing while trying to give off the appearance that he was acting as a fiduciary of Sears Holdings during the Sears Holdings Board's consideration of the Seritage Transaction.

250.   Lampert's vocal advocacy for the Seritage Transaction also violated the RPT Approval Policy.   Throughout meetings of the Sears Holdings Board, Lampert consistently advocated for adoption of the Seritage Transaction, and, by allowing Lampert to argue in favor of this related-party transaction, the Sears Holdings Board violated the very policies it had established to prevent undue influence by a director who was interested in a related-party transaction.   For example, when asked at a Sears Holdings Board call on June 5, 2015 for his view on Seritage, he told Sears Holdings Board members that "he would vote 'yes' were he to vote," thus communicating his strong desire that the other Sears Holdings Board members approve the transaction.

251.    Ultimately, Lampert's zealous advocacy was a success, and he faced no opposition or serious questions from other members of the Sears Holdings Board when it came time to approve the Seritage Transaction.

### 3. The Seritage Subscription Rights Were Valuable Securities Transferred from Sears Holdings to Sears Holdings's Shareholders for No Consideration

252.    The Seritage Transaction involved two distinct steps:  the Seritage Rights Offering issued in June 2015 followed by the Sale-and-Lease-Back of real estate assets in July 2015.

253.    With respect to the Seritage Rights Offering, the newly created REIT (Seritage) issued and delivered to Sears Holdings 106,597,798 unitized subscription rights ("Seritage Rights") pursuant to a "Subscription, Distribution and Purchase and Sale Agreement" between Sears Holdings and Seritage dated June 8, 2015.  The Seritage Rights gave their ultimate holders the option to purchase new shares of common stock of Seritage at an exercise price payable to Seritage of $29.58 per share.[27]  At that point, Sears Holdings possessed all of the value inherent in the subscription rights, i.e., the value of Seritage above $29.58 per share.

254.    That same day, Sears Holdings distributed all of the Seritage Rights to its shareholders, more than 75% of whom were the Controlling Insider Shareholders.  The shareholders did not pay Sears Holdings any consideration in exchange for the Seritage Rights.

255.    The Seritage Rights were valuable securities.  Between June 9 and June 26, 2015, the Seritage Rights traded on the NYSE.  During the trading period, the volume-weighted average trading price of the Seritage Rights was $3.75, meaning the market was willing to pay a significant premium over the $29.58 exercise price set by Sears.  The Seritage Rights, which were transferred for no consideration, were worth hundreds of millions of dollars.

---

[27]    The balance of Seritage's capital structure consisted of third-party financing secured by the real estate to be acquired from Sears.

256.    Sears's senior management, including Schriesheim, Riecker and Huckins, all of whom were Sears Holdings's shareholders who stood to make significant profits in the Seritage Rights Offering, monitored the trading price of the rights on a daily basis.  During this time, Schriesheim, Sears's then-CFO, specifically observed in an email to Kamlani (then a member of the Sears Holdings Board, and shortly thereafter, ESL's President), which he forwarded to Riecker and Huckins, that "to the degree that a right trades in the 'positive' the market perceives there is value."  Schriesheim laid out the logic even more precisely in a subsequent email exchange with Riecker, noting that "one might also expect the shares of [Sears] to trade flat with where they were before all this began since SHLD is getting cash in an amount of $2.6B in consideration for selling assets valued at $2.6B . . . ***unless investors believe that the assets being sold are worth more than the cash received*** . . . if rights trade in positive territory, investors perceive there to be value in excess of the cost to exercise the right." (emphasis added).  Huckins calculated the implied value of Seritage as the rights offering price plus twice the trading price of the Seritage Rights.  And just weeks before the transaction closed, Schriesheim wrote in an email to Sears management, including Riecker and Huckins, that "the market thinks [Sears] is selling something for about $600M less than it is worth."[28]  Around that same time, Schriesheim and Huckins exchanged emails confirming they were participating in the Seritage Rights Offering.

257.    Once the rights were issued, Schriesheim, Riecker, Huckins and other members of Sears's management were all monitoring and aware of the trading price of the Seritage Rights at the same time they were taking the necessary corporate steps, including the transfer of the underlying properties, to consummate the overall transaction in advance of the July 7 closing.

---

[28]    The market valued Seritage at significantly more than the subscription price ***despite*** incomplete and often misleading information, which, if disclosed in full, would have increased the perceived value of Seritage.

258.    ESL and Lampert similarly were aware that the trading price for the rights implied a significantly higher valuation for the real estate to be sold to Seritage and the accompanying lease back than the $2.58 billion purchase price Seritage was to pay.  For example, Lampert, while working with an employee of ESL on June 17, 2015, valued ESL's anticipated investment in Seritage using a $36.48 share price.  The next day, on June 18, 2015, he received an analysis from CRT Capital concluding that Seritage had a total enterprise value of $3.262 billion, implying a $38.34 share price.

259.    As reflected in Lampert's contemporaneous comments to the Sears Holdings Board, the Seritage Rights were intended to have a substantial positive trading price.  Specifically, the minutes reflect that Lampert told the Sears Holdings Board that he wanted the Seritage Rights to "be attractive to investors" and to provide "value to Sears's shareholders who chose to sell their rights."   In their mediation statement submitted in connection with the Seritage Derivative Litigation (as defined herein), counsel for Sears Holdings, the Directors, Lampert and ESL described the Seritage Rights as "akin to a dividend."  Perhaps most tellingly, during a meeting of the Sears Holdings Board, Lampert expressed an interest in ESL *over-subscribing* for the Seritage Rights to the extent other Sears Holdings shareholders failed to participate in the Seritage Rights Offering.

260.    That the Seritage Rights were intended to have positive value is further reflected in the efforts of Lampert, the ESL Shareholders and Fairholme Capital to guarantee they would maintain the same pro rata ownership of Seritage as they had in Sears Holdings.  Had the Seritage Rights been properly valued, the upside of investing in Seritage would have been limited for Lampert, the ESL Shareholders and Fairholme Capital, and Lampert, the ESL Shareholders and Fairholme Capital would not have gone through the tortured process they engineered in order to

maintain the same pro rata ownership.   Moreover, the value conveyed to Lampert, ESL Shareholders and Fairholme Capital was materially greater than the value conveyed to other Sears Holdings shareholders because the securities Lampert, the ESL Shareholders and Fairholme Capital were able to obtain by "exchanging" their Seritage Rights gave Lampert, the ESL Shareholders and Fairholme Capital the special ability to block a change of control.

261.   It is critical to note that the exercise price of the Seritage Rights was derived directly from the valuation of the real estate performed by C&W (as discussed herein).   Specifically, the exercise price equaled the purchase price of the real estate, less associated costs, less total debt raised by Seritage of approximately $1.16 billion, divided by the total number of shares to be issued.   Had the real estate been properly valued (rather than low-balled), the exercise price of the Seritage Rights would have been higher, providing little to no incremental value to Sears Holdings's shareholders who would have been indifferent to participating in the transaction.   But, because the Culpable Insiders intended to provide Sears Holdings's shareholders with value for participating in the Seritage Rights Offering, the real estate valuations necessarily had to undervalue the real estate that was the subject of the transaction.   Thus, the transaction was designed to undervalue the real estate conveyed in order to provide financial benefits to Sears Holdings's shareholders at the expense of Sears.

262.   Two years after the Seritage Transaction, Schriesheim reflected on his investment in Seritage in an email to Riecker, noting that he had sold his shares at about $45 per share after purchasing them at the $29.58 offering price (a 52% gain).   Schriesheim went on to describe the tremendous upside in the Seritage Transaction, commenting that he "[knew] the math pretty well" and that he had "always felt like [Seritage] was positioned well in [the] market."

4.      **In Connection with the Sale-and-Lease-Back Transaction, Sears's Real Estate and Joint Venture Interests Were Transferred to KMT Mezz, SRC Mezz and SPS Portfolio Holdings LLC**

263.     The second step in the Seritage Transaction was the transfer of certain of Sears's real estate assets to Seritage for hundreds of millions of dollars less than the true market value of those assets. Given the complexity of Sears's corporate structure, this required a number of intermediate transactions.

264.     *First*, various Kmart subsidiaries (including the entities listed in footnote 1) (i) contributed properties to Seritage KMT Finance LLC (an entity formed for the purpose of the Seritage Transaction) for no consideration or (ii) distributed the properties to Kmart for no consideration so that Kmart could contribute them to Seritage KMT Finance LLC also for no consideration. Certain other subsidiaries of Kmart (including Kmart of Washington) sold properties to Seritage KMT Finance LLC for inadequate consideration (based on the appraisals described below).

265.     *Second*, Sears Roebuck and various Sears Roebuck subsidiaries contributed properties to Seritage SRC Finance LLC (an entity formed for the purpose of the Seritage Transaction) for no consideration. Certain other subsidiaries of Sears Roebuck (including Sears Development and Sears Roebuck de Puerto Rico) also sold properties to Seritage SRC Finance LLC for inadequate consideration (based on the appraisals described below).

266.     *Third*, Sears Roebuck contributed its joint venture interests in GS Portfolio Holdings LLC and MS Portfolio LLC (each of which owned significant real estate assets) for no consideration to Seritage GS Holdings LLC and Seritage MS Holdings LLC (two more entities formed for the purpose of the Seritage Transaction), respectively.

267.     *Fourth*, Kmart contributed Seritage KMT Finance LLC to KMT Mezz (another entity formed for the purpose of the Seritage Transaction) for no consideration.

268.    *Fifth*, Sears Roebuck contributed Seritage SRC Finance LLC, Seritage GS Holdings LLC and Seritage MS Holdings LLC to SRC Mezz (another entity formed for the purpose of the Seritage Transaction) for no consideration.

269.    In connection with the foregoing, Kmart acted at the direction of its three directors, Schriesheim, Riecker and Huckins (collectively, the "Kmart Directors").  The Kmart Directors directed that Kmart take all actions in furtherance of the Seritage Transaction, including the sale of 64 of the properties transferred to Seritage, in a Unanimous Written Consent in Lieu of a Special Meeting of the Board of Directors of Kmart on June 26, 2015.

270.    Following Kmart's approval of the sale of 64 properties transferred to Seritage, Meerschaert, in his capacity as Vice President, Tax, Assistant Treasurer and Secretary of Kmart Holding, caused Kmart Holding to adopt and approve the Contribution and Sale Agreement pursuant to which the Real Estate Transferors—Sears Roebuck, Sears Development, Sears Roebuck de Puerto Rico, Kmart and Kmart of Washington—conveyed those 64 properties to Seritage, in an Action by Written Consent of Sole Member of Kmart Corporation, dated June 26, 2015.  Subsequently, on July 7, 2015, Meerschaert, in his capacity as Vice President, Tax, Assistant Treasurer and Secretary, caused Kmart to transfer an additional six properties to Seritage by executing a Bill of Sale.

271.    Likewise, in connection with the foregoing, Sears Roebuck acted at the direction of its sole director, Riecker.  Riecker directed that Sears Roebuck take all actions in furtherance of the Seritage Transaction, including the sale of 162 separate properties to Seritage, in a Unanimous Written Consent in Lieu of a Special Meeting of the Board of Directors of Sears Roebuck on June 30, 2015.  Subsequently, on July 7, 2015, Meerschaert, in his capacity as Vice President, Tax,

Assistant Treasurer and Secretary, caused Sears Roebuck to transfer an additional six properties to Seritage by executing a Bill of Sale.

272.    Sears Development also acted at the direction of its sole director, Riecker.  Riecker directed that Sears Development take all actions in furtherance of the Seritage Transaction, including the sale of a property to Seritage SRC Finance LLC in a Unanimous Written Consent in Lieu of a Special Meeting of the Board of Directors of Sears Development on July 1, 2015.

273.    Continuing the trend, Sears Roebuck de Puerto Rico acted at the direction of its directors, Munjal and Rodney.  Munjal and Rodney directed that Sears Roebuck de Puerto Rico take all actions in furtherance of the Seritage Transaction, including the sale of two properties to Seritage SRC Finance LLC in a Unanimous Written Consent in Lieu of a Special Meeting of the Board of Directors of Sears Roebuck de Puerto Rico on July 1, 2015.

**5.    The Sale-and-Lease-Back Undervalued the Transferred Real Estate Assets and Joint Venture Interests by At Least Hundreds of Millions of Dollars**

274.    On or about July 7, 2015, Sears and Seritage closed on the Sale-and-Lease-Back of 266 Sears stores, including 235 properties that Sears owned in full and 31 properties that Sears owned 50% of as part of a joint venture.

275.    Seritage paid Sears a total of $2.58 billion, net of costs, for the real estate assets and joint venture interests, a purchase price that was based (as to the 235 wholly owned properties) on appraisals performed by C&W.  It was not the result of any negotiation between Sears and Seritage, and in fact not a single person or entity sought to increase the purchase price on Sears's behalf or considered the validity or fairness to Sears of the C&W appraisals.  This purchase included:  (i) the purchase of KMT Mezz from Kmart; (ii) the purchase of SRC Mezz and SPS Portfolio Holdings LLC from Sears Roebuck and (iii) the purchase of certain other real estate assets from Kmart (and one of its subsidiaries) and Sears Roebuck.

276.    C&W's appraisals, each of which was addressed to Riecker, were fundamentally flawed and undervalued the 235 properties that Sears owned in full by hundreds of millions of dollars, which, in turn, meant Seritage underpaid at least that much for the properties.   The appraisals were flawed in multiple respects.   All of the Defendants included in the Seritage Transaction knew or were reckless in not knowing that Sears's properties were being sold for less than fair market value.

277.    *First*, as dictated by the terms of C&W's engagement agreement with Sears Holdings, in valuing the properties, C&W considered only the "income capitalization" approach, i.e., the present value of the future rental payments that Sears would make to Seritage.   At the very least, C&W also should have applied the "sales comparison" approach by looking at comparable sales to assess value.   Failing to include the sales comparison approach was highly atypical for a real estate appraisal process, especially when the highest and best use of many of these properties was not as leased to Sears (which lease could be terminated unilaterally by Seritage).   Each of the C&W appraisals contained the same, factually false boilerplate language stating that insufficient sales existed to make the comparison approach useful.   This was not correct on a national or a regional market basis; moreover, it was not correct even at some county and municipality market levels.   Not only had there, in fact, been a substantial number of market transactions around large anchor tenant stores in recent years, not one of which was utilized in any of the appraisals, but Sears *itself* had sold approximately $1.5 billion worth of real estate in the two years preceding the Seritage Transaction.

278.    *Second*, C&W improperly and systematically utilized lower than average "market rents" in its income capitalization methodology.   Determining the appropriate "market rent" was a critical first step in the income capitalization approach.   Overall, the "market rents" calculated by

C&W for each of the 235 properties transferred to Seritage were, on a portfolio-wide basis, ***30.2%
below*** average comparable market rents (and that is prior to taking into consideration the additional
reduction C&W took to account for the unusual terms of the Master Leases described below).
Since the $2.58 billion purchase price was determined based on the income capitalization method
(i.e., treating the rental income streams from these properties as perpetuities and dividing the net
operating income by a capitalization rate), the use of artificially low rents had the direct effect of
substantially lowering the price that Seritage paid Sears for the properties.    C&W employed
different rationales to lower the rents for different properties, but the overall result was a
substantially below-market average rent, often below the low end of ***all*** other rental comparables
considered.

279.    ***Third***, C&W further reduced the rent streams it used to value the properties by
between 20% and 30%.  This reduction in rent payable by Sears purportedly was intended to offset
the benefit to Seritage of the recapture and redevelopment rights and the other unusual features of
the planned Master Leases.  In other words, the parties recognized the leases had very unfavorable
terms for Sears and intentionally set the rent substantially below otherwise market rents.  But by
using this under-market rent as the basis for its appraisals, C&W materially undervalued the
properties by a significant multiple of the amount by which the rent was discounted.  For example,
if C&W understated the annual rent at a given property by $1 million on account of the lease terms,
the purchase price would be lowered by $12.5 million at an 8% capitalization rate ($1 million
divided by .08).  The recapture and redevelopment provisions thus resulted in a ***lower*** overall
valuation even though those same provisions were a recognized ***benefit*** to Seritage.  A feature of
the deal that should have caused Seritage to pay more actually caused it to pay less.

280.     As some of the C&W appraisals acknowledged, because C&W valued the property

using the rental rate that Sears would pay Seritage, C&W should have adjusted the capitalization

rate downward (thereby increasing its valuations) to adjust for the effect of the below-market rent.

However, instead of applying *lower* capitalization rates, C&W routinely applied rates at the *high*

end of its calculated range (thereby again lowering the value).   Indeed, C&W's average

capitalization rate of 8.16% was higher than the averages in both datasets that C&W consulted.

As C&W has acknowledged, it is a matter of simple arithmetic that applying a *higher* capitalization

rate to the same expected cash flow results in *lowering* the resulting appraised value.  This was in

addition to using lower than market rents, to which the further value-lowering, higher-

capitalization rate was applied.

281.     *Fourth*, the C&W appraisal process failed to value the properties based on their

highest and best use.  The valuation technique employed by C&W assumed that Sears would

continue renting the properties at below-market rents, even though the premise of the Seritage

Transaction—as provided for in the Master Leases—was that Seritage would recapture and

redevelop the properties from Sears and re-let them to other tenants at higher rents.  C&W's failure

to consider the properties' highest and best use was a violation of the professional appraisal

standards that C&W is required to follow and precludes these appraisals, even if all of the other

errors did not exist, from being fair market valuations of the real estate.

282.     By contrast, the proper, industry-standard approach would consider the highest and

best use for each property and, when it indicated a value higher than assuming perpetual occupancy

at a discounted rental rate, would use a combination of (i) a residual development value analysis

based on a discounted cash-flow method to determine the developable value of the properties in

question and (ii) a comparable sales approach for development properties.   C&W never did

anything of the sort, nor did any other advisor, even though it is obvious that an appraiser looking to obtain the highest price for the benefit of Sears (or determine the fair market value) would have done so.

283.    *Fifth*, the C&W appraisals were riddled with errors and inconsistencies.[29]    The quality control process at C&W was decentralized and had limited ability to confirm that individual appraisers across different offices and geographies adequately documented their appraisals and applied consistent analyses and assumptions where appropriate.    To that end, Duff & Phelps observed "internal inconsistencies" in C&W's analysis and reported that Riecker, who was running the process from Sears's perspective, had "not been too pleased with the quality of C&W's work" and "blasted Cushman for their ineptitude."    An independent review of a sample of the C&W appraisals confirms numerous errors and inconsistencies, all of which were apparent at the time.

284.    Subsequent events confirm that C&W's rents were systematically too low, and, thus, that the $2.58 billion purchase price was too low.    *First*, cognizant that leasing to Sears does not represent the highest and best use of many of the newly acquired properties, Seritage has redeveloped and re-tenanted (or begun the process of redeveloping) Sears stores at a rapid pace, with such activity increasing 34% quarter-over-quarter since the fourth quarter of 2015.    On January 17, 2017, Seritage announced that it had signed new leases totaling 2.2 million square feet, increasing third-party rental income by 94% since Seritage's formation.    As of September 2018, Seritage had already redeveloped or was in the process of redeveloping 79 stores (i.e., approximately 26 per year).

285.    Seritage's recapture and redevelopment strategy has been a success as evidenced by Seritage's ability to achieve a staggering *3.5x to 4.5x* "rental uplift" upon re-leasing space

---

[29]    The appraisals themselves were not made publicly available to the market as of the transaction.

formerly occupied by Sears, thereby validating the underlying premise of the Seritage Transaction and demonstrating that the "highest and best use" should have been a key consideration in the appraisal process.

286.    Seritage has passed its success along to its owners (i.e., the Sears Holdings shareholders who participated in the Seritage Rights Offering).  Following the July closing of the Seritage Transaction, Seritage began paying quarterly dividends.  In fact, Seritage paid quarterly dividends from December 2015 to June 2019, totaling approximately $220 million.  On information and belief, the Controlling Insider Shareholders have received at least $131 million in dividends from Seritage.

287.    *Second*, the undervaluing of all the properties C&W appraised also is apparent from C&W's valuation of 17 of the 31 joint venture properties (i.e., properties owned 50% by Sears and 50% by its joint venture partners).[30]  The total value of the 31 joint venture properties was $858 million, based on the $429 million paid by the joint venture partners to Sears for 50% ownership in the properties.  Although C&W appraised 17 of the 31 properties at a total value of $364 million as part of its process for the Seritage Transaction, those same properties were valued at a total of $520 million in connection with the sale of the joint venture partners' 50% interest in them to Seritage—a number reached through what Sears's Head of Real Estate, Jeff Stollenwerck, described as a "true" third-party and arm's length negotiation with the joint venture partners.  This negotiated sales price was, on average, 43% higher than C&W's appraisals for Sears's 50% interest in the same joint ventures, demonstrating that the appraisals were woefully beneath fair market purchase prices that would have been negotiated had a true marketing and valuation process been

---

[30]    C&W did not value the other 14 joint venture properties as part of its engagement.

employed (and presumably below what Sears would have received for its 50% joint venture interest had it just negotiated at arm's length with Seritage as did its joint venture partners).

288.    **Third**, Sears has sold to buyers other than Seritage many other stores valued by C&W for well above the C&W appraisal price, suggesting that C&W generally undervalued Sears's stores.  Beginning in 2016 and continuing into 2018, Sears sold 36 properties that had been appraised by C&W.  Collectively, those stores had been valued at $565 million by C&W, but Sears was able to sell them (unlike the Seritage Transaction) at arm's length, even in a generally anemic retail sales market, for $793 million, more than 40% above appraised value.

289.    After correcting for these and other errors, a fair valuation would have resulted in a purchase price of at least hundreds of millions of dollars more than Seritage paid.

290.    Finally, it is important to note that Fairholme Capital—who performed extensive analyses of Sears's real estate portfolio—also concluded that C&W's valuations were woefully low.  In a letter to Fairholme Capital's shareholders sent April 9, 2015, Berkowitz noted that Fairholme Capital's "initial analyses of [the Seritage] portfolio shows an estimated gross value of $5 billion," which was approximately twice the C&W valuation.  Berkowitz understood the windfall Fairholme Capital could expect to receive in light of this undervaluation.  He continued in the letter: "If [Sertiage's] total purchase price equals $2.5 billion and is fully funded with equity, then each dollar of value will only cost us 50 cents. Any use of leverage by [Seritage] would further improve our economics."

291.    In a document drafted in December 2016, Fairholme Capital reflected on why its valuation was so much greater than C&W's appraisals.  As Fairholme Capital explained, "Cushman and Wakefield has to stick with the standard appraisal methodology and does not value based on development potential."  Fairholme Capital does not mention that the "standard appraisal

methodology" C&W had to use is not what is standard in the industry (or standard to reach a fair market value) but rather is the non-market "standard" which C&W was instructed by Sears fiduciaries to use and which was actually ***built in*** to C&W's engagement letter with Sears. This, of course, was one of the primary reasons that C&W's appraisals of the Seritage properties were woefully below fair value: C&W failed to take into consideration the properties' highest and best use. Fairholme Capital itself valued 84 of the 235 properties contributed to Seritage and found that those properties alone were worth between $1.3 billion and $3.3 billion, proportionately much greater than the approximately $2.2 billion at which C&W valued ***all*** 235 properties taken together.[31]

292.    Remarkably, instead of taking steps to correct C&W's clear undervaluation of the Seritage properties, Fairholme Capital seized the windfall offered by the undervaluation ***despite*** owing fiduciary duties to Sears Holdings because of its status as a Controlling Insider Shareholder.

**6.      Onerous Master Lease Terms Further Benefited Seritage at Sears's Expense**

293.    The Sale-and-Lease-Back contained one-sided, off-market terms that benefited Seritage and harmed Sears. Two terms in particular were unfair to Sears: (i) Seritage's right to "recapture" up to 50% of the space at 214 of the properties it purchased and 100% of the space at the remaining 21 properties (plus auto care centers) and (ii) Sears's obligation to pay a punitive termination fee calculated as one year's rent if Sears elected to terminate the lease with respect to individual stores.

294.    Seritage's recapture rights harmed Sears because it left Sears's most profitable stores vulnerable to eviction or having their footprint materially reduced. Indeed, the insiders, on behalf of Sears and Seritage, made preliminary plans for the space to be recaptured even before

---

[31]     The difference between $2.15 billion and the total C&W valuation is the appraised value of the joint venture interests.

the completion of the Seritage Transaction, a fact that was never disclosed to investors in public filings which reference only mere "rights" to recapture space in the future. Notably, the Master Leases imposed no limitation on Seritage's right to lease the space to anyone, including competitors of Sears. Sears received no benefit from the higher rents to be received by Seritage nor the redevelopment profits which accrued on account of its former real estate sold to Seritage at a bargain price.

295.    Sears's liability to pay a punitive termination fee harmed Sears because it increased the cost of Sears's stated strategy of closing unprofitable stores. The day before the Seritage Transaction, Sears could close a store without paying any fee to anyone (and could sell the property for market value); the day after closing the Seritage Transaction, Sears could only close its stores upon paying one year's rent plus reimbursing Seritage for all carrying costs and receive nothing from the sale of the property. These termination fees would become a material expense for Sears as its business declined and store closures increased. According to Jeffrey Stollenwerck, Sears's head of real estate, even as the Seritage Transaction was being negotiated, Sears's performance continued to decline, such that certain stores included in the Seritage Transaction that had been EBITDA-positive when the transaction was first contemplated were EBITDA-negative by the time the transaction closed. In the months and years after the Seritage Transaction, Sears closed many of these EBITDA-negative stores, and paid a termination fee to do so—a termination fee Sears would not have been required to pay prior to the Seritage Transaction.

296.    Moreover, Sears was prohibited from exercising the termination right to reduce aggregate rent under the Sale-and-Lease-Back by more than 20% per year. In other words, to the extent Sears wanted to exit stores faster than 20% per year, it had to keep paying rent and then, when it could contractually exit, pay an additional one-year rental penalty.

297.   Taken together, the Sale-and-Lease-Back terms ensured a lose/lose for Sears.  With respect to Sears's unprofitable stores, Sears would continue to pay Seritage rent, while also paying Seritage for the "privilege" of closing those stores.  With respect to Sears's profitable stores, Seritage had the one-way option to evict Sears from half of all of the space in the stores and relet or redevelop the site at a multiple of the rents that Sears was paying, and Sears would share none of the upside of re-letting the stores at higher rents.  Duff & Phelps, Sears's advisor on the transaction, estimated the value to Seritage (and the detriment to Sears) of these unusual lease terms at between $214 and $488 million.

298.   The Sale-and-Lease-Back was not the product of an arm's length negotiation process.  Because Seritage did not exist prior to the transaction, all decisions about Seritage were made by Sears personnel and—as Schriesheim, former CFO of Sears, explained to counsel for the Subcommittee—mainly by Lampert himself.  Jeffrey Stollenwerck similarly stated that he was not aware of any "negotiation" of the Sale-and-Lease-Back or of any person tasked with protecting Sears's interests, as opposed to someone focused solely on maximizing the benefits of the transaction to Seritage.  Indeed, Lampert dictated the terms to his attorneys who drew up the leases.

299.   Nor did Sears Holdings allow a disinterested committee of the Sears Holdings Board (such as the RPT Committee) to negotiate the terms.  The RPT Committee, in evaluating the transaction, did not have an independent real estate appraisal firm or an independent solvency firm and never considered hiring either.  The RPT Committee never evaluated or weighed in on the C&W appraisals, the Solvency Analysis or Fairness Opinion issued by Duff & Phelps, the terms of the Master Leases or the overall fairness of the transaction from Sears's perspective.  Rather, the RPT Committee's sole focus in reviewing the transaction was whether Lampert and ESL were getting a better deal than other Sears Holdings **shareholders**.  The RPT Committee was

not tasked with considering and did not consider any of the other key aspects of the transaction, including the price of the rights offering, the value of the properties themselves, the one-sided lease terms or Sears's solvency (or insolvency).  The RPT Committee did not consider Sears's creditors and whether the transaction would harm them.  And of course, the RPT Committee approved management's bad-faith projections year after year, despite knowing Sears's historical performance and its history of missing its projections by hundreds of millions, if not billions, of dollars.  It also bears noting that Kamlani, one of the four members of the RPT Committee at the time, joined ESL as its President in March 2016, less than one year after the Seritage Transaction closed.

300.    The transaction's one-sided terms and transfer of value from Sears to Sears Holdings's shareholders are the predictable result of this flawed process.

**7.      Sears Holdings, Kmart Holding and the Real Estate Transferors Were Insolvent Under the Balance-Sheet Test at the Time of the Seritage Transaction**

301.    At the time of the Seritage Transaction, Sears Holdings had a negative net asset value and its liabilities exceeded its assets at fair value and, thus, was insolvent under the balance-sheet test.

302.    In connection with the Seritage Transaction, Sears Holdings retained Duff & Phelps to provide a solvency opinion.  That solvency opinion concluded that Sears Holdings was solvent on a balance-sheet basis under three methodologies—(i) a discounted cash flow ("DCF") analysis, (ii) a market approach and (iii) a sum-of-the-parts analysis.  But the Duff & Phelps solvency analysis was riddled with errors and flawed assumptions.

303.    ***First***, both the DCF and market approach relied on Duff & Phelps's acceptance of Sears management's bad-faith projections of future financial performance.  Had Duff & Phelps used reasonable projections (or historical results) in connection with its solvency analysis—as it

117

should have and as Sears's fiduciaries should have insisted—it would have determined that it was insolvent prior to the Seritage Transaction under either of these standard balance-sheet valuation methodologies. Critically, the multi-year projections created by Sears's senior management at the direction of Lampert and provided to Duff & Phelps to use in connection with its solvency opinion were created explicitly and exclusively for the purpose of obtaining a solvency opinion, and were never used for any other corporate purpose.

304. Any solvency analysis based on credible forecasts would have shown Sears Holdings to be insolvent at the time of the Seritage Transaction. For example, if Duff & Phelps had assumed historical trends would continue in its DCF analysis, or even that Sears Holdings's businesses would have improved enough to get to zero, rather than negative EBITDA, it would have been forced to conclude that Sears Holdings was insolvent by billions of dollars. For example, if Duff & Phelps had assumed Sears would lose $453 million per year in perpetuity (an amount less than the $546 million it had lost on an annual basis over the prior three years), it would have been forced to conclude that Sears had a total asset value of *negative* $2.7 billion, with liabilities of approximately $6 billion. Tellingly, when Duff & Phelps provided a solvency opinion in connection with the Lands' End Spin-off in 2014, it performed a sensitized DCF analysis using lower projections—something it did not do for Seritage. Had Duff & Phelps done so for the Seritage Transaction using the same sensitivities (which sensitivities still assumed substantial EBITDAP growth), the analysis would have shown Sears Holdings to be insolvent.

305. Valuation methods under the market approach (such as using multiples of earnings derived from comparable publicly traded companies) properly based on historical earnings or even a realistic or responsible forecast rather than the inflated projections also would have shown Sears

Holdings to have little, if any, enterprise value and, therefore, to be insolvent by billions of dollars at the time of the Seritage Transaction.

306.    Plaintiffs dispute the propriety of assessing Sears's solvency on a sum-of-the-parts basis.  Nevertheless, to the extent it would have been appropriate to look at the non-going concern value of Sears's assets—using a "sum-of-the-parts" analysis—the result would be the same:  Sears Holdings was insolvent on a balance-sheet basis at the time of the Seritage Transaction.  A sum-of-the-parts analysis assumes assets will be monetized in an orderly liquidation.  This valuation approach shows that Sears Holdings was insolvent by more than $2 billion at the time of the Seritage Transaction.

307.    In issuing its solvency opinion, Duff & Phelps performed a sum-of-the-parts analysis, called a "fair value of assets," which it described as "analogous" to an orderly liquidation.  But the particular analysis Duff & Phelps performed was deeply flawed and inconsistent with established methodologies.  Among other flaws, Duff & Phelps did not account for the costs that would have to be incurred in order to realize the value of Sears's assets in an orderly liquidation; instead, Duff & Phelps assumed, for example, that Sears would receive 100 cents on the dollar for the value of its inventory.

308.    In its "fair value of assets" analysis, Duff & Phelps also underestimated Sears's pension obligations and did not account for leasehold termination costs.

309.    Duff & Phelps also improperly utilized inflated trademark valuations for the Kenmore, Craftsman and Diehard brands (the "KCD Brands") that did not represent the value Sears itself ascribed to those brands.  Instead, Duff & Phelps valued the brands using a "hypothetical strategy" to "monetize and exploit the brands" that Sears "never implemented." Notably, Duff & Phelps never conducted any study to determine whether Sears's "hypothetical

strategy" would maximize the revenue associated with these brands.  As a result of this "strategy," despite falling revenue at Sears, a declining number of Sears stores and decreasing KCD Brands revenue, Duff & Phelps claimed an overall $3.8 billion valuation of the KCD Brands.  If Duff & Phelps had valued the KCD Brands based on Sears's "given strategy," as Ernst & Young ("E&Y") did as part of its annual impairment analysis as required under FASB Accounting Standards Codification Topic 350, the KCD brands would have been valued at $1.096 billion, approximately two-thirds less than the figure used in Duff & Phelps's solvency analysis.  Even still, this $1.096 billion was inflated given it was derived from deeply flawed forecasts provided by management.

310.    Kmart Holding and the Real Estate Transferors also were insolvent on a balance-sheet basis prior to and/or as a consequence of the Seritage Transaction.

311.    Sears Roebuck and Kmart (both Real Estate Transferors) were co-obligors or guarantors for most of Sears's debt, including $1.123 billion under the First Lien Credit Agreement, $1.24 billion of Second Lien Notes and a $200 million Secured Short-Term Loan from ESL.  Sears Development (also a Real Estate Transferor) also was a co-obligor for the Secured Short-Term Loan.  Kmart Holding and each of the Real Estate Transferors also were jointly and severally liable for Sears's pension liabilities (on the order of $2.3 billion) as members of a "controlled group."  Given that the Real Estate Transferors were co-obligors on much of Sears Holdings's debt but individually had far fewer assets, it follows that if Sears Holdings was insolvent, the Real Estate Transferors also were insolvent.

312.    Sears Holdings's insolvency also means it would have been unable to pay in full any intercompany claims that the Real Estate Transferors might have had against it, further impairing the value of the Real Estate Transferors.  For example, in its solvency opinion, Duff & Phelps opined that Sears Roebuck had a net asset value of $3.959 billion as of April 4, 2015, but

120

Duff & Phelps's valuation relied upon a $6.59 billion intercompany receivable due to Sears Roebuck largely from Sears Holdings. Because Sears Holdings was insolvent, that intercompany receivable was impaired. Correcting even that single error reveals that Sears Roebuck was insolvent on a balance-sheet basis.

### 8. Sears Holdings, Kmart Holding and the Real Estate Transferors Were Insolvent under the Cash-Flow Test at the Time of the Seritage Transaction

313. Sears Holdings, Kmart Holding and the Real Estate Transferors also were insolvent under the cash-flow test, both before and after the Seritage Transaction.

314. At the time of the Seritage Transaction, Sears Holdings had existing debt obligations with an aggregate principal amount of more than $3.7 billion, and Kmart Holding and the Real Estate Transferors were liable on substantially all of that debt. Together with interest, these Debtors required a total of more than $4.7 billion in cash (and more than $4.2 billion in cash by 4Q 2019) to pay off that debt. The schedule under which these obligations would come due and the running total of necessary cash was as follows.



121

315.    Sears's cash and cash equivalents immediately after the Seritage Transaction (including the $2.58 billion purchase price) totaled approximately $3 billion.  By quarter end, after paying down the ABL due in 1Q 2016, Sears Holdings had just more than $1.8 billion in cash and cash equivalents remaining.  Even *assuming* that Sears Holdings, Kmart Holding and the Real Estate Transferors were to use *all* of these funds for debt principal and interest payments (rather than continued operating losses, as actually occurred), these Debtors still would have required more than $1.2 billion of *additional* free cash flow by 4Q 2019 and more than $460 million of that by 3Q 2018 in order to satisfy its debts.



316.    After the Seritage Transaction, Sears could not reasonably have been expected to have $460 million in free cash flow by 3Q 2018 (when the Second Lien Notes, among other debts, came due).  Indeed, assuming that Sears's cash flow from operations merely stayed flat after the transaction, rather than continuing to decline as they had over the preceding five years, Sears would have a cash balance of negative $1.1 billion—i.e., it would be out of cash—by the end of FY 2016, less than 18 months later.

317.    In actuality, Sears ultimately experienced free cash flow of approximately *negative* $2.4 billion in FY 2015, *negative* $1.5 billion in FY 2016 and *negative* $1.9 billion in FY 2017.

Even with non-ordinary-course sales of Sears's core assets, after the Seritage Transaction, Sears could not reasonably have funded these debt principal and interest payments.  Not coincidentally, 3Q 2018 is when the Debtors ultimately filed for bankruptcy, with liabilities exceeding $11.34 billion as of August 4, 2018.

318.    In light of Sears's declining financial performance over the preceding years and the numerous adverse qualitative trends, as detailed above, there was no good-faith basis to assume that Sears could achieve the required levels of liquidity and cash flow to remain in business and pay its debts as they came due following Seritage.  In the four immediately prior fiscal years, 2011–2014, Sears had failed to generate *any* cash flow from operations or *any* earnings to cover interest expenses.  In the immediately prior year, FY 2014, Sears had *negative* free cash flow of $1.7 billion and *negative* EBITDAP of approximately $750 million.  And in the four immediately prior fiscal years, 2011–2014, Sears had suffered a cumulative net loss of approximately $7 billion.

319.    In its solvency opinion, Duff & Phelps opined on Sears Holdings's ability to pay its debts as they came due, and, unsurprisingly, concluded that Sears Holdings would be able to do so.    But, Duff & Phelps's cash-flow analysis was fundamentally flawed because, among other things, it relied upon the same overly optimistic, bad-faith projections of future performance from management as it had in connection with its DCF and multiple analyses.    Specifically, Duff & Phelps was provided with projections for FYs 2015–2017 from management, and Duff & Phelps then extended these projections into five- and ten-year projections (the "2015 Solvency Projections").

| Seritage Solvency Projections - Provided by Sears to D&P | | | |
|---|---|---|---|
| | **FY15** | **FY16** | **FY17** |
| Revenue | $ 28,085 | $ 29,149 | $ 29,617 |
| Gross Margin | $  9,780 | $ 10,184 | $ 10,401 |
| EBITDAP | $     316 | $     573 | $     771 |
| EBITDAP Margin | 1.1% | 2.0% | 2.6% |

320.    The 2015 Solvency Projections were unrealistic and unattainable.  As it had in 2014

in connection with the Lands' End Spin-off, in the base case, Duff & Phelps assumed that revenue,

gross margin, EBITDARP and EBITDAP would begin to **_increase_** rather than continue to **_decrease_**

(and, in the case of EBITDAP, would turn **_positive_** instead of remaining **_negative_**).   Sears's

projections that its performance would reverse suddenly in FY 2015—just as Sears had projected

incorrectly, if not fraudulently, the year before (FY 2014), the year before that (FY 2013), the year

before that (FY 2012) and the year before that (FY 2011)—had no good-faith basis.



321.    Duff & Phelps performed a "sensitivity" analysis in which it modeled Sears's cash

flow based on lower projections.  But, even in the sensitivity case, Duff & Phelps assumed that

Sears's revenue decline would slow and then within one year begin to grow.  Duff & Phelps also

assumed that Sears's EBITDAP and EBITDAP margin would increase immediately and within

one year turn positive (rather than remain negative and continue to decrease as had been the historical trend).  In other words, even the "sensitivity" case assumed a dramatic and immediate turnaround in Sears's profitability.



322.    As detailed above, these assumptions were utterly unreasonable and unrealistic; they were inconsistent with Sears's historical financial performance, with the initiatives included within Sears's FY 2015 Annual Plan and with the prevailing conditions affecting Sears's operating performance.  There is no legitimate basis on which any of the Defendants could have reasonably relied on these forecasts.

323.    It also is worth noting that the sensitivies Duff & Phelps applied to management's forecasts in connection with evaluating capital adequacy for its Seritage solvency opinion were considerably less aggressive to the downside than the sensitivies it had applied when evaluating capital adequacy for its Lands' End solvency opinion.  For the Lands' End Spin-off, Duff & Phelps used a cumulative variance of 12.4% for revenue and 69.4% for EBITDAP.  However, for the Seritage Transaction, Duff & Phelps reduced the cumulative variance for revenue to 3.7% and the

cumulative variance for EBITDAP to 40.8%, notwithstanding that Sears had continued to burn cash since the Lands' End Spin-off and posted materially worse EBTIDAP. The result was that the so-called sensitivity analysis purportedly showed Sears Holdings to have adequate capital. Had Duff & Phelps used the same sensitivities it had used for the Lands' End Spin-off, it would have shown Sears Holdings to fail the cash-flow test.

324.    It also should be noted that, Duff & Phelps's sensitivity case promised a turnaround of the business with revenue increasing to 1.5% (despite a decline of 5.7% in the prior year) and EBITDAP margins increasing to 2.3% (despite a margin of -1.8% in the prior year). If Duff & Phelps's sensitivity was adjusted for more reasonable forecasts, holding the last-twelve-months EBITDAP at the time constant through the following five years—a favorable assumption as compared to actual results—Sears would have been unable to maintain sufficient liquidity to continue operations in 2018, and, by 2019, would have negative liquidity of $1.5 billion even after Duff    &    Phelps's    favorable    assumption    of    refinancing    $2.5    billion.



($ in millions)    **Forecasted Liquidity**

Chart showing D&P Sensitivity Case Liquidity: FY15 $4,400; FY16 $3,895; FY17 $3,460; FY18 $3,274; FY19 $3,213. Adjusted D&P Sensitivity Case Liquidity: FY15 $3,892; FY16 $2,528; FY17 $1,091; FY18 $(220); FY19 $(1,474).

— D&P Sensitivity Case Liquidity    — Adjusted D&P Sensitivity Case Liquidity

| ($ in millions) | FY15 | FY16 | FY17 | FY18 | FY19 |
|---|---|---|---|---|---|
| D&P Sensitivity Case Liquidity | $ 4,400 | $ 3,895 | $ 3,460 | $ 3,274 | $ 3,213 |
| D&P EBITDAP Forecasts | - | 351 | 494 | 617 | 685 |
| Adjusted D&P EBITDAP Forecasts | (508) | (508) | (508) | (508) | (508) |
| *Incremental Impact on Liquidity* | *(508)* | *(859)* | *(1,002)* | *(1,125)* | *(1,193)* |
| Cummulative Impact on Liquidity | $ (508) | $ (1,367) | $ (2,369) | $ (3,494) | $ (4,687) |
| Adjusted D&P Sensitivity Case Liquidity | $ 3,892 | $ 2,528 | $ 1,091 | $ (220) | $ (1,474) |

Note: Liquidity is calculated as excess cash (cash balance above minimum $300 million requirement assumption per D&P analysis) and revolver availability

325.  This supports a finding that Sears Holdings, as well as Kmart Holding and the Real Estate Transferors, were insolvent on a cash-flow basis prior to and/or as a consequence of the Seritage Transaction.

326.  As noted, Sears Holdings and several Real Estate Transferors—Sears Roebuck, Kmart and Sears Development—were co-obligors or guarantors for much of Sears's debt, including under the First Lien Credit Agreement, the Second Lien Notes and the Secured Short-Term Loan (total outstanding = $2.5 billion).  Sears Development also was a co-obligor, along with Sears Holdings, under the Secured Short-Term Loan (total outstanding = $200 million). Additionally, Kmart Holding and each of the Real Estate Transferors also were jointly and severally liable with Sears Holdings for Sears's pension liabilities (on the order of $2.3 billion) as members of a "controlled group."  Because Sears Holdings was insolvent and, thus, unable to pay these massive joint obligations, Kmart Holding and the Real Estate Transferors also were insolvent on a cash-flow basis.

327.  Duff & Phelps did not consider the cash-flow solvency of Sears Roebuck or Kmart and did not consider the solvency of Kmart Holding or the Real Estate Transferors besides Sears Roebuck and Kmart on either a balance-sheet or cash-flow basis.

9.   **Sears Holdings, Kmart Holding and the Real Estate Transferors Had Unreasonably Small Capital at the Time of the Seritage Transaction**

328.   In addition, Sears Holdings, Kmart Holding and the Real Estate Transferors had unreasonably small capital—and, in fact, negative capital—after the Seritage Transaction.

329.   Lampert himself acknowledged Sears's near-insolvent state by telling the Sears Holdings Board that, without the Seritage Transaction, "management would be operated more in 'liquidation mode' than 'operating mode.'"

330.   As detailed above, Sears's multi-year performance history leading up to the Seritage Transaction demonstrated that it was unable to generate sufficient profits to sustain operations.   Indeed, Sears could not generate *any* profits and could only temporarily stave off complete collapse by selling core assets and incurring further secured debt that it would be unable to generate sufficient cash flow to repay.

331.   Duff & Phelps determined that Sears could pay its debts as they became due and had sufficient capital adequacy at the end of the projection period (2019), including servicing of debt obligations under management's projections as well as what Duff & Phelps considered a "reasonable" downside sensitivity.   But Duff & Phelps's conclusions were only possible because of the highly inflated management projections it used in its analysis, which were provided by Sears management; indeed, even the sensitivity case was predicated upon a large improvement in Sears's financial performance.

332.   What Duff & Phelps should have done based on Sears's proven inability to come anywhere close to meeting its forecasts or turn around its business was to perform a sensitivity analysis assuming that historical results would continue into the future.   That analysis would show that Sears's liquidity would run out shortly after the transaction—i.e., in as little as one year and certainly within three years—thereby, demonstrating that Sears would be left with unreasonably

small capital.  Prior to and/or as a consequence of the Seritage Transaction, Sears Holdings, Kmart

Holding and the Real Estate Transferors, each of whom were liable for billions of dollars of Sears's

debt, lacked adequate capital.

### 10.    The Culpable Parties Acted with Actual Fraudulent Intent

333.    The Seritage Transaction was approved by a Sears Holdings Board that included

Lampert, Mnuchin, Tisch, Alvarez and Kamlani.  These Culpable Parties had the actual intent to

hinder, delay and/or defraud Sears Holdings's, Kmart Holding's and the Real Estate Transferors'

creditors in approving the Seritage Transaction.  This intent can be inferred from the traditional

"badges of fraud."

334.    *First*, the transfer was to insiders.  The Controlling Insider Shareholders owned

approximately 75% of Sears Holdings's stock and, thus, personally received approximately 75%

of the Seritage Rights.  In total, the Controlling Insider Shareholders received Seritage Rights

worth at least hundreds of millions of dollars (and likely far more due to the additional value of

the exchange agreements between Lampert, the ESL Shareholders and Fairholme Capital, on the

one hand, and Seritage, on the other).  In Sears Holdings Board meetings, the Conflicted Insiders

plainly expressed their intent that the Seritage Rights convey value to themselves and other Sears

Holdings shareholders

335.    The Sale-and-Lease-Back transaction was then entered into with a new entity,

Seritage, controlled by and for the benefit of the Controlling Insider Shareholders.  Moreover,

Lampert, the ESL Shareholders and Fairholme Capital also enjoyed a side agreement that allowed

them to exchange their excess subscription rights plus cash for special controlling interests in

Seritage.  As the sole limited partners of the Seritage Operating Partnership, Lampert and ESL

were granted the ability to veto any "change in control" (such as a merger, consolidation,

conversion or other combination).  Lampert became the chairman of Seritage's board of trustees, and Thomas Steinberg, a long-time investor in ESL, became another trustee.

336.  ***Second***, Sears Holdings received no consideration for the Seritage Rights distributed and Sears Holdings, Kmart Holding and the Real Estate Transferors received inadequate consideration for the Sale-and-Lease-Back.

337.  ***Third***, the transfer was unusual and not in the ordinary course of business.  The transaction sold Sears's crown jewels, putting its most profitable stores at risk of being "recaptured" and leased to its competitors.

338.  ***Fourth***, as noted above, Sears was insolvent or became insolvent under both the balance-sheet and cash-flow tests, and lacked adequate capital to operate its business.

339.  ***Fifth***, Lampert, the ESL Shareholders and Fairholme Capital also intended to use the proceeds of the transaction to repurchase debt held by themselves.  Some of the proceeds of the Seritage Transaction were used for an all-cash tender offer of Sears Holdings's Secured Short-Term Loan—$200 million of which was held by Lampert and the ESL Shareholders—at near par (99 cents on the dollar).

340.  ***Sixth***, the Controlling Insider Shareholders (through their ownership and control of Seritage) maintained possession and control of the transferred real estate assets.

341.  ***Seventh***, the Culpable Parties monitored the trading price of the Seritage Rights closely and were well aware that the Seritage Rights were trading at levels suggesting that the $2.58 billion purchase price was grossly inadequate, yet consummated the Sale-and-Lease-Back step without taking any steps to modify the terms for the protection of Sears and its creditors.

342.  ***Eighth***, the Culpable Parties premised the solvency opinion used to greenlight the Seritage Transaction upon a set of financial projections that they knew were pure fantasy and

unachievable, and purposely provided those projections to others in order to obtain favorable opinions.  In the five full years prior to the Seritage Transaction from 2010 through 2014, Sears missed its annual EBITDAP forecasts by approximately $1.5 billion per year on average.  By June 2015, around the time of the Seritage Transaction, Sears was lagging far behind the projections for 2015 contained in its Annual Plan ($456 million).  Sears missed its February monthly EBITDAP forecast by $33 million (expected to lose $75 million but actually lost $108 million) and its March monthly EBITDAP forecast by $65 million (expected to make $41 million but actually lost $24 million).  Based on these figures for the first few months of 2015, the Culpable Parties knew at the time of the Seritage Transaction that the hoped-for turnaround was (once again) not materializing and, yet, they continued to push a highly aggressive set of financial projections premised on that turnaround.

343.    *Ninth*, the Culpable Parties knew the purchase price for the real estate was based on flawed appraisals that understated the fair value of such assets by hundreds of millions of dollars.

344.    Notably, prior to the transaction, the Culpable Parties also were aware of analyst reports and financial journalism that opined that the transaction was unfair to Sears.  In the words of Evercore's analyst, Sears's strategy was to "[p]ut 250 of the best stores in the REIT, get $2B in cash and hope that this is sufficient to fund the business for 2 years to get past fraudulent conveyance statutes."

## 11.    The Release Entered into in the Seritage Derivative Litigation Was a Fraudulent Transfer

345.    In May and June 2015, before the Seritage Transaction closed, shareholders of Sears Holdings filed four derivative lawsuits in the Delaware Court of Chancery in connection with the proposed transaction.  These lawsuits, which were consolidated, asserted direct and

derivative claims for breach of fiduciary duties of care, loyalty and good faith against Lampert, ESL and other directors of Sears Holdings and aiding and abetting breach of fiduciary duty against Seritage, Fairholme Capital and Fairholme Funds (the "Seritage Derivative Litigation" and the defendants therein, the "Seritage Derivative Defendants").

346.    In the Seritage Derivative Litigation, the same two law firms represented both the individual Seritage Derivative Defendants (other than Lampert) and nominal defendant Sears Holdings.   This dual representation created clear and indefensible conflicts of interest:   The individual Seritage Derivative Defendants were accused of serious wrongdoing and self-dealing, namely, breaching the fiduciary duties of care, loyalty and good faith that they owed to Sears Holdings and its shareholders—misconduct alleged by the Seritage Derivative Litigation plaintiffs to have caused at least hundreds of millions of dollars in damages.[32]  In other words, the interests of Sears Holdings and the individual Seritage Derivative Defendants were not aligned but *antagonistic*.  One of the firms also was conflicted by virtue of having represented both Sears and Seritage in connection with the Seritage Transaction itself.  It does not appear that Sears Holdings ever authorized the dual representation.   Unsurprisingly, the terms of the Seritage Release (as defined and discussed herein), were grossly unfair to Sears Holdings and extremely favorable to the individual Seritage Derivative Defendants.

347.    On February 8, 2017, after minimal discovery had taken place and mediation had occurred, but before the Seritage Derivative Defendants filed any responsive pleadings or the parties exchanged any expert reports, the parties entered into a Stipulation and Agreement of Settlement, Compromise and Release (the "Seritage Release").  Under the Seritage Release, Sears

---

[32]    Advisors to the plaintiffs in the Seritage Derivative Litigation analyzed 130 of the properties sold to Seritage and estimated that C&W undervalued these properties alone by between $307 and $842 million, which, if extrapolated to include the entire portfolio of properties would have been much greater.

Holdings—acting solely through the derivative shareholder plaintiffs—purported to release all existing causes of action that had been or could have been brought against Lampert, other directors, ESL, Seritage, Fairholme Capital and Fairholme Funds in connection with the Seritage Transaction in exchange for a promise to pay $40 million to Sears Holdings.  As part of the settlement, the Seritage Derivative Defendants also agreed to pay the plaintiffs' lawyers $6 million in attorney's fees, an amount the Chancery Court (defined herein) reduced after ruling it was unjustified.  On information and belief, the Fairholme Defendants did not pay any part of the $40 million settlement amount and, therefore, did not provide any consideration in exchange for the Seritage Release.

348.    In entering into the Seritage Release, Sears Holdings was represented by the same counsel as the directors of the Sears Holdings Board who received the release, a clear and indefensible conflict of interest under established law.  No one represented the interests of Sears Holdings or its creditors.  The plaintiffs to the action claimed to represent the interests of Sears Holdings shareholders but, at best, represented only the interests of shareholders who did not participate in the Seritage Rights Offering—less than 3% of Sears Holdings shareholders—and, worse yet, pursued their own pecuniary interests in obtaining attorney's fees from the Seritage Derivative Defendants.  Sears Holdings, which received a nuisance value settlement amount and purportedly agreed to the Seritage Release, was controlled by the Seritage Derivative Defendants and their counsel.  Neither the settlement amount nor the form of the settlement and release was agreed to or authorized by an unconflicted Sears fiduciary—counsel to the directors signed the release on behalf of both the directors and Sears Holdings.  As such, the Seritage Release is not binding.

349.    Sears Holdings signed the Seritage Release in violation of its own corporate governance rules, which further shows that the individual Seritage Derivative Defendants

exercised complete control over the Seritage Derivative Litigation to the exclusion (and detriment) of Sears Holdings.  Sears Holdings never obtained approval of the Seritage Release by the Sears Holdings Board.  In order for Sears Holdings to obtain that approval, it also would have been required to obtain the approval of the RPT Committee because the terms of the Seritage Release amounted to a related-party transaction.  Even if Sears Holdings had sought the RPT Committee's approval, however, the RPT Committee could not have approved the Seritage Release without violating the RPT Approval Policy because each of its members—Kamlani, Kunkler and Reese— was a defendant in the Seritage Derivative Litigation and, as such, a party to the Seritage Release. Thus, the RPT Committee could not have approved the Seritage Release unless it had consisted temporarily of unconflicted officers.  Plainly, the decision to sign the Seritage Release was completely *ultra vires*, and it shows that the only "intent" of Sears Holdings in signing the Seritage Release was the individual Seritage Derivative Defendants' intent to obtain a complete release from liability for grossly inadequate consideration.

350.    On May 9, 2017, after holding a fairness hearing, the Delaware Court of Chancery (the "Chancery Court") entered a judgment (the "Seritage Judgment") adopting and approving the Seritage Release.

351.    During the hearing, the Chancery Court noted that 97.3% of Sears Holdings's unaffiliated shareholders participated in the Seritage Rights Offering.  Thus, for 97.3% of the non-insider shareholders plaintiffs, the settlement reflected nothing more than moving money from one pocket to the other.  The only shareholders who actually benefitted by the settlement were the 2.7% of Sears Holdings shareholders who did not participate in the Seritage Rights Offering and, therefore, were not Seritage shareholders.

352.    The impact of the transaction on Sears as opposed to Sears Holdings's shareholders

arose at the fairness hearing on the Seritage Release.  At one point, counsel for the plaintiffs noted

that "the case was litigated on the premise that Sears, the corporation, was shorted in the sale of

these properties," but the Chancery Court interrupted to point out that the corporation "exists for

the benefit of its investors," i.e., its shareholders, 97.3% of whom had participated and, thus,

"weren't shorted because they were on the other side."  But then the Chancery Court observed that

its conclusion was true "unless you're worried about . . . creditors."  In so observing, the Chancery

Court was directly noting the significant difference in perspective of shareholders and creditors

vis-à-vis the Seritage Transaction.  The Chancery Court elaborated on this in its ruling approving

the Seritage Release, once again noting that the settlement was only being judged from the

perspective of equity holders, not the corporation or its creditors:

> [I]f there was 100% identical ownership between Sears and the new entity, then it
> largely would not matter at what price the properties were transferred because to
> the extent the equityholders were harmed on the sell side, they would benefit on the
> buy side . . . . ***You might envision that other corporate constituencies would suffer
> harm, such as creditors or employees or any type of contract claimants, but those
> are not the type of people, the type of claimants that equity protects.***

353.    To the extent the Seritage Release may be deemed to have released any of the claims

asserted herein, the Seritage Release should be avoided as an actual or constructive fraudulent

transfer.  As of February 8, 2017, Sears Holdings was insolvent, lacked adequate capital and

intended to incur debts beyond its ability to pay, and the claims asserted herein, including claims

for breach of fiduciary duty and aiding and abetting breach of fiduciary duty, are worth far more

than the Seritage Derivative Defendants agreed to pay—and they knew it.  Additionally, the

individual Seritage Derivative Defendants caused their counsel to purportedly sign the Seritage

Release on behalf of Sears Holdings in violation of Sears Holdings's own corporate governance

rules, which shows that the only "intent" of Sears Holdings in signing the Seritage Release was

the intent of the individual Seritage Derivative Defendants to hinder, delay and/or defraud Sears

Holdings's creditors by obtaining a release from all liability in exchange for grossly inadequate

consideration.  Moreover, Sears Holdings's lack of effective representation (i.e., its representation

by the same law firms that were representing defendants accused of serious charges of self-dealing

that damaged Sears Holdings and its creditors) underscores the fraud that gave rise to the Seritage

Release.

354.    Even assuming, *arguendo*, the Seritage Release is binding as a contractual matter,

and assuming further that it is not avoided as a constructive or fraudulent transfer, on its face, the

Seritage Release only released causes of action (i) belonging to Sears Holdings and (ii) that were

brought or could have been brought at that time in the Seritage Derivative Litigation.  In other

words, under the terms of the Seritage Release, (i) direct and indirect subsidiaries of Sears

Holdings did not release any causes of action against the parties to the Seritage Release and (ii)

the released causes of action did not include any causes of action belonging to the estate of Sears

Holdings arising under the Bankruptcy Code.

**C.**    **The Culpable Parties Caused the Debtors to Enter the Related-Party Financings and Pay "Interest" and "Fees" with Actual Fraudulent Intent**

355.    Between April 2016 and September 2018—after outside lending institutions had

realized Sears was destined for bankruptcy and begun refusing to loan it money—Lampert, the

ESL Financers and others "loaned" upwards of $4.2 billion to Sears primarily to protect the value

of their investments in Seritage and other spin-offs, which depended upon the short-term survival

of Sears as a going-concern.  On information and belief, they also sought to sustain Sears as a

going-concern for the following reasons:  (i) to increase opportunities for subsequent asset-

stripping, for example, through additional spin-offs; (ii) to delay a bankruptcy filing in order to

increase their chances of outrunning the statute of limitations for fraudulent transfers; (iii) to reduce

competition for an eventual bid on Sears's assets, for which ESL could now credit bid billions of dollars of purported secured claims and (iv) to guarantee the payment of interest on prior related-party debt.

356.    While the Related-Party Financings were denominated debt transactions, in actuality they were equity contributions.  Lampert, the ESL Defendants and others made great efforts to disguise their equity contributions as loans and received more than $400 million in "interest payments" and "fees" as well as $518 million in principal payments pursuant to the terms of the so-called loans.  All of these equity contributions, which are referred to herein as the "Related-Party Financings," along with the ensuing payment of "interest" and "fees," occurred while the Debtors were insolvent, lacked adequate capital and were unable to pay their debts as they were to come due.  In other words, Lampert, the ESL Financers and others extracted from Sears more than $400 million in unlawful dividends and wrongfully collateralized valuable assets, which exacerbated Sears's operating losses—all past the time when Sears should have filed for bankruptcy protection.

357.    The Related-Party Financings, as dressed in the accoutrement of loans, are listed

on the following chart:

| Transaction | Original Date of Financing[33] | Amount | Main Collateral | Lenders |
|---|---|---|---|---|
| 2016 Term Loan Facility | 4/8/2016 | $750 | Domestic inventory, credit card and pharmacy receivables | JPP, LLC, JPP II, LLC, Company Domestic Pension Plan |
| 2016 Secured Loan Facility | 4/8/2016 | 500 | 21 real properties | JPP, LLC, JPP II, LLC, Cascade Investment LLC |
| Second Lien Credit Agreement | 9/1/2016 | 300 | Inventory, receivables and other related assets | JPP, LLC, JPP II, LLC |
| First Amendment to Second Lien Credit Agreement (re: New Line of Credit Facility) | 7/7/2017 | 500 | Inventory, receivables and other related assets | JPP, LLC, JPP II, LLC, Berkowitz, Fairholme Capital and Tisch[34] |
| Third Amendment to Second Lien Credit Agreement (re: Incremental LOC Facility) | 2/7/2018 | 100 | Inventory, receivables and other related assets | JPP, LLC, JPP II, LLC |
| Letter of Credit Facility | 12/28/2016 | 200 | Domestic inventory, credit card and pharmacy receivables and certain real estate | JPP, LLC, JPP II, LLC, Cyrus L/C Financers |
| Letter of Credit Facility Incremental Commitments | 8/3/2017 | 71 | Domestic inventory, credit card and pharmacy receivables and certain real estate | JPP, LLC, JPP II, LLC |
| 2017 Secured Loan Facility | 1/3/2017 | 500 | 69 real properties | JPP, LLC, JPP II, LLC |
| First Amendment to 2017 Secured Loan Facility (re: First Incremental Loan) | 10/28/2017 | 200 | 1L: 76 real properties (Original TL and Incremental TL) 2L: 16 real properties (Incremental TL Only) | JPP, LLC, JPP II, LLC |
| Second Amendment to 2017 Secured Loan Facility (re: Second Incremental Loan) | 3/8/2018 | 100 | 76 real properties | JPP, LLC, JPP II, LLC |
| 2018 Term Loan Facility | 1/4/2018 | 100 | Ground leases and unencumbered IP except Kenmore and DieHard brands | JPP, LLC, JPP II, LLC, Cyrus 2018 Term Loan Financers |
| Amendments to 2018 Term Loan Facility (re: Incremental Borrowings) | 1/29/2018 | 150 | Ground leases and unencumbered IP except Kenmore and DieHard brands | JPP, LLC, JPP II, LLC |
| Mezzanine Loan Facilities | 3/14/2018 | 384 | Equity of SRC O.P. LLC (parent of entities that own the 138 real properties securing the Secured Loan Facilities) | JPP, LLC, JPP II, LLC |
| Mezzanine Loan Facilities Amendment (re: Additional Loans) | 6/29/2018 | 129 | Equity of SRC O.P. LLC (parent of entities that own the 138 real properties securing the Secured Loan Facilities) | JPP, LLC, JPP II, LLC |
| FILO Loan Facility | 3/21/2018 | 125 | Domestic inventory, credit card and pharmacy receivables | JPP, LLC, JPP II, LLC, BS 2018 |
| Consolidated Secured Loan Facility Note B | 6/4/2018 | 93 | 69 real properties | JPP, LLC, JPP II, LLC |
| Consolidated Secured Loan Facility Amendment (re: Additional Note B Loans) | 9/12/2018 | 38 | 20 real properties (in addition to the 68 of the original real properties) | JPP, LLC, JPP II, LLC |

358.    Lampert, ESL and other Culpable Parties made the Related-Party Financings—and

caused Sears to enter into such transactions—in order to prolong the survival of Sears as a going

---

[33]    Certain of the Related-Party Financings were amended at times in ways that increased the amount of financing and added lenders.

[34]    Berkowitz individually loaned $20 million on the Second Lien Credit Agreement pursuant to that Line of Credit Lender Joinder Agreement, dated July 13, 2017. Berkowitz committed an additional $5 million through Fairholme Capital pursuant to that Line of Credit Lender Joinder Agreement, dated July 17, 2017. Tisch individually committed $20 million pursuant to that First Amendment to the Second Lien Credit Agreement.

concern primarily as a means to their self-serving ends respecting Seritage and their own financial gain. In doing so, Lampert, the Related-Party Financers and the Other Financers caused substantial harm to Sears and its true, third-party creditors.

359.   By nature of Lampert's control over the ESL Financers, each of the Related-Party Financings involved self-dealing between Sears and a controlling shareholder. As a result, the directors, officers and controlling shareholders had a duty to ensure that the financings were entirely fair. But the Related-Party Financings were not entirely fair for the reasons alleged herein. Moreover, the defendants' misconduct occurred while Sears was hemorrhaging cash with operating losses of at least $1.978 billion in FY 2016 and $430 million in FY 2017.

360.   While the Culpable Parties continued to saddle Sears with unnecessary "debt," Sears's businesses showed no signs of recovery. In March 2016, Sears disclosed "substantial doubt" as to its ability to continue as a going concern. Consequently, the cost of vendor insurance spiked, which resulted in vendors pulling their contracts with Sears or demanding stricter payment terms. Sears's vendors previously had benefited from Lampert, who invested in vendor insurance contracts worth $93.3 million in 2012, $234 million in 2013 and $80 million in 2014, according to filings with the SEC. Sears's regulatory filings show no investment by Lampert in vendor insurance contracts since 2015. Instead, Sears promised to pay some suppliers within 15 days, as opposed to the typical industry payment standard of 90 days.

361.   Not only was Sears struggling to stock its shelves, but SYW—the sole driver of Lampert's alleged transformation of Sears—also was continuing to be a nonstarter. Despite the years-long steady decline in SYW membership (and, accordingly, spending by SYW members), Lampert proclaimed it as the redeeming feature of Sears's transformation. Seven years after

rolling out SYW, Lampert stated at the 2016 annual meeting, "Our reputation will change when we get [SYW] to matter."

362.     Instead of exploring alternative uses for Sears's remaining assets, such as joint ventures or sales to third parties or evaluating whether it was time to file for bankruptcy protection or sell or liquidate the businesses, the Culpable Parties pledged Sears's real properties, intellectual property and receivables as collateral on the Related-Party Financings.  The Culpable Parties effectively transferred these assets to themselves and related entities while failing to generate greater value for Sears and, by doing so, caused substantial injury to Sears and its creditors.

363.     In light of the conflicts posed by the Conflicted Insiders' investments in Seritage and the reality of the surrounding circumstances and improper motives, the Related-Party Financings effectively harmed Sears and its creditors.

### 1.    The Related-Party Financings Were Equity Contributions, Not Loans, Despite the Defendants' Attempts to Paper Them as Such

364.     Lampert, ESL and other insiders at Sears took deliberate measures to give the Related-Party Financings the appearance of loans.  Despite their best efforts, however, the unmistakable truth is that the Related-Party Financings were equity contributions made by insiders to Sears for improper purposes.  That the Related-Party Financings were equity contributions and not loans is borne out by the following circumstances.

365.     *First*, the insiders exerted substantial control over Sears at the time of the Related-Party Financings.  At the time each of the Related-Party Financings were obtained, Lampert, the ESL Shareholders, Fairholme Capital and Tisch were controlling shareholders of Sears.  Additionally, Lampert was the CEO and Chairman of the Sears Holdings Board, Tisch was a member of the Sears Holdings Board and Fairholme Capital's interests were represented by Alvarez's and Berkowitz's membership on the Sears Holdings Board.  Despite recusing himself

from votes to approve the Related-Party Financings, Lampert nonetheless exerted significant and undue influence over the voting process by, among other things, telling voting directors that he would vote to approve certain financings if he were able.  Moreover, in clear violation of the RPT Approval Policy, Alvarez—a conflicted insider—did not recuse himself from voting on the Related-Party Financings but instead simply reminded the other members of the Sears Holdings Board of his affiliation with Fairholme Capital before voting.  Similarly, there was no practice of Berkowitz or Tisch recusing themselves despite their conflicts.

366.    *Second*, Sears was not adequately capitalized when it entered into the Related-Party Financings, which is evidenced by the multiple analyses created and relied upon by Sears (and described in detail herein) that showed continuous, steep year-over-year declines in Sears's operating metrics.  Throughout the period in which the Related-Party Financings took place, Sears could not continue outside of bankruptcy without financing to fund billions of dollars in operating losses.

367.    *Third*, Sears could not obtain financing from outside lending institutions on the same terms as the Related-Party Financings because the terms ESL could offer were "not acceptable" to outside lenders.  As early as 2012, banks expressed to Sears's management that Sears's consistent failure to meet its annual plans had "resulted in a loss of credibility."  Because Sears's actual performance continued to fall short of its annual plan targets, it follows that Sears never restored its credibility in the view of banks.  Moreover, ESL infused over $1 billion of its "debt" after FY 2016—that is, after Sears Holdings had disclosed in its Form 10-K that "substantial doubt exists related to the Company's ability to continue as a going concern."  Following this disclosure, it is unlikely that outside lending institutions would have provided any large financing to Sears, much less $1 billion, and certainly not on the terms ESL offered.  Additionally,

Schriesheim stated that Sears preferred to obtain financing from ESL over outside lenders because ESL closed deals on a "more expeditious basis" and did not insist on the execution of certain documents that are ordinarily required to consummate deals as large as the Related-Party Financings.

368.   **Fourth**, the insiders were familiar enough with Sears's businesses to know that Sears could not repay the Related-Party Financings.   Notwithstanding any ostensible collateral, Sears's repayment of the Related-Party Financings was completely contingent upon the (unlikely) success of their business operations.

369.   **Fifth**, Lampert and ESL—with the assistance of key members of Sears's management, including Schriesheim, Riecker and Huckins—executed the Related-Party Financings in furtherance of their scheme to protect the value of Seritage, as described in detail herein.   In short, the Related-Party Financings contributed barely enough cash to Sears to keep it afloat just long enough to permit Seritage to stand on its own.

370.   It is significant not only that Lampert, ESL and others needed Sears to receive cash infusions to keep afloat, but also that Sears needed the cash infusions *from Lampert, ESL and others*.   For the reasons explained above, Lampert, ESL and others knew that in order to realize their intended benefit from the Seritage Transaction, other spin-offs and other self-interested transactions, they had to pump equity into Sears.

**2.      The Controlling Insider Shareholders Proposed the Related-Party Financings for Their Own Benefit**

371.   From 2016 to 2018, Lampert and ESL owned approximately 50% of Sears Holdings stock; Fairholme Capital held between 15% and 30% and Tisch held between 3% and 4%. Between July 16, 2015 and September 30, 2019, Lampert and the ESL Shareholders held between 9.8% and 5.6% of Seritage stock as well as a 45% stake directly in the Seritage Operating

Partnership. Between December 31, 2015 and December 31, 2017, Fairholme Capital and Berkowitz held between 18% and 31% of Seritage stock. On information and belief, Tisch also owned Seritage stock at the time when the Related-Party Financings occurred.

372. Each of the Related-Party Financings was an insider transaction with the ESL Defendants standing on three sides of the transaction through Lampert, who acted as "lender," controlling shareholder and financial beneficiary of the lease payments Sears was making to Seritage. Through his role as Chairman of the Sears Holdings Board and as CEO, Lampert was able to exercise a high degree of control over Sears Holdings, and the Directors failed to serve as effective controls on Lampert's and the ESL Defendants' self-dealing, which allowed Lampert to orchestrate each of the Related-Party Financings.

373. Even though Lampert knew that filing for bankruptcy was Sears's only viable option, he prolonged filing for as long as it took to protect his long-term investments because a Sears bankruptcy would result in Seritage's stock tanking.

374. Indeed, the value of the Seritage equity held by certain of the Culpable Parties— including certain Controlling Insider Shareholders, Directors and Officers—depended upon Sears remaining outside of bankruptcy and making its lease payments for the initial few years following the Seritage Transaction. Seritage's sole source of revenue is rental income, and for several years after Seritage's formation, it relied heavily on Sears to provide that income. As Seritage itself stated in its Form 10-Q for the quarterly period ended June 30, 2015, "Sears Holdings is the lessee of a substantial majority of our properties and accounts for a substantial majority of our revenues." Consequently, the entire business of Seritage would have been imperiled had an automatic stay prevented Seritage from collecting critical rental income from Sears in 2016 or 2017. Seritage, which had borrowed $1.2 billion in connection with its formation, needed time to reduce its

dependence on Sears by recapturing and redeveloping Sears stores for more profitable uses. Lampert and ESL, who controlled both Seritage and Sears, as well as other directors and officers of Sears who profited personally from the Seritage Transaction, were fully aware of this and would not allow Sears to file for bankruptcy protection until Seritage was self-sufficient. Largely for this reason, Lampert, ESL and others designed and executed the Related-Party Financings, which contributed barely sufficient cash to Sears to keep it afloat just long enough to permit Seritage to stand on its own, as illustrated in the below chart.



375.    The numbers substantiate this. As of October 2015, rental payments by Sears represented 77.5% of the total net income generated by Seritage, and so a Sears bankruptcy would have been disastrous for Seritage. Over time, however, that number gradually decreased as properties were recaptured and redeveloped, dropping to 76% by the end of 2015, 64.9% by the end of 2016 and 47.8% by the end of 2017. Seritage reported that the portion of revenue attributable to Sears was down to 39.9% as of September 30, 2018—half of what it had been at

Seritage's formation[35]—and stated in an August 2018 presentation to its board of trustees that the

number was projected to fall to 27.1% by the end of 2018.

376.     Then, only after Seritage had sufficiently reduced its exposure to Sears, there came

an end to the previously steady flow of financing from Lampert and ESL to Sears.  Seritage's own

public filings reflect this.  For its entire existence through June 30, 2018, Seritage stated that it had

a "substantial dependence on Sears Holdings Corporation."  But by the second half of 2018, that

was no longer the case, and as a result, Seritage removed the "substantial dependence" language

from its September 30, 2018 disclosure and instead referred simply to its "significant exposure to

Sears Holdings."

377.     In view of all of this, the financial health of Sears naturally was of major concern

to Seritage.  Seritage stated this concern—multiple times and in stark terms—in its Form 10-Q for

the quarterly period ended June 30, 2015.  For example:

> a.  The bankruptcy or insolvency of any of our tenants, particularly Sears Holdings, could result in the termination of such tenant's lease and material losses to us. A tenant bankruptcy or insolvency could diminish the rental revenue we receive from that property . . . .  In particular, a bankruptcy or insolvency of Sears Holdings, which is our primary tenant, could result in a loss of a substantial portion of our rental revenue and materially and adversely affect us.

> b.  Sears Holdings leases a substantial majority of our properties.  Bankruptcy laws afford certain protections to tenants that also may affect the Master Lease or JV Master Leases. . . .  For this and other reasons, a Sears Holdings bankruptcy could materially and adversely affect us.

> c.  Sears Holdings is the lessee of a substantial majority of our properties and accounts for a substantial majority of our revenues. . . .  The inability or unwillingness of Sears Holdings to meet its rent obligations and other obligations under the Master Lease could materially adversely affect our business . . . .

---

[35]     These percentages represent rental income attributable to Sears "[o]n an annual basis, and taking into account all signed leases, including those which ha[d] not yet commenced rental payments."  In other words, the percentages reflect a forward-looking approach and, thus, capture the way Seritage viewed its future business operations at relevant times.

     d.   Some of the factors that could negatively affect the market price of our common shares or result in fluctuations in the price or trading volume of our common shares include . . . adverse performance by Sears Holdings, our primary tenant.

378.    Seritage's extensive efforts to monitor Sears are evidence that it understood how dependent it was on Sears during that time and how critical it was that Sears continue to survive as a going concern.  The possibility of Sears entering bankruptcy weighed heavily on Seritage— and Lampert, ESL and other interested directors and officers were well aware of the significant ramifications that would follow if ESL failed to continue to prop up Sears until Seritage could stand on its own.

379.    The Culpable Parties knew that Sears was going to file for bankruptcy at the time the Related-Party Financings were executed and would be unable to repay these debts except through foreclosure on the assets being pledged to secure the alleged "loans."  For example, ESL infused over $1 billion of "debt" ***after*** Sears Holdings's disclosed in its Form 10-K that "substantial doubt exists related to the Company's ability to continue as a going concern."  Viewed in this light, it is clear that the Related-Party Financings were equity contributions designed, in large part, to protect the value of Seritage and were ***not*** in the best interest of Sears or its creditors.

380.    On information and belief, Lampert, ESL and others likewise were motivated to contribute equity to Sears in order to protect their other investments that depended on Sears remaining outside of bankruptcy, including Lands' End, which to this day maintains a significant number of Lands' End shops at Sears; and SHO, which depends heavily on Sears for its back office.

**3.    The Directors Breached Their Fiduciary Duties When They Approved the Related-Party Financings**

381.    Four of the Conflicted Directors—Lampert, Tisch, Berkowitz and Alvarez—stood on both sides of several of the Related-Party Financings as members of the Sears Holdings Board

and investors on certain Related-Party Financings or investors in certain of the Related-Party Financers. Lampert was CEO, director and controlling shareholder of Sears Holdings and owner, chairman and CEO of ESL, with complete control over ESL and the ESL Financers' investment decisions at the time each of the Related-Party Financings was entered into. Tisch was a member of the Sears Holdings Board when he individually invested $20 million in connection with the Second Lien Credit Agreement and was an investor in ESL and BS 2018 at the time when BS 2018 participated in the FILO Loan Facility. Fairholme Capital and Berkowitz are lenders under the Second Lien Credit Agreement, which was approved by a Sears Holdings Board that included Berkowitz and Alvarez. Additionally, Lampert, Tisch, Berkowitz and Alvarez were conflicted, irrespective of their affiliation with the Related-Party Financers, because the purpose of the Related-Party Financings was to protect the value of their investments in Seritage. These directors therefore had the motive and opportunity to cause Sears Holdings and the other Related-Party Financings Borrowers to enter into the Related-Party Financings.

382. Because each of the Related-Party Financings was an insider transaction, the RPT Committee was obligated to review the transactions and make informed recommendations to the full Sears Holdings Board, and the Conflicted Directors should never have been allowed to participate in discussions related to the Related-Party Financings as Lampert did, nor should they have been allowed to vote as Tisch, Berkowitz and Alvarez did.

383. The RPT Committee's review of the Related-Party Financings failed to ensure the entire fairness of the Related-Party Financings and failed to protect the interests of Sears and its creditors.

384. The Directors' review was intentionally hollow in nature and often conducted in an extremely expedited manner. For example, at least several of the Related-Party Financings were

148

approved not at a formal meeting of the Sears Holdings Board but by the Directors signing a Unanimous Written Consent in Lieu of a Formal Board Meeting.  These include the following:  (i) the FILO Loan Facility; (ii) the Third Amendment to the Second Lien Credit Agreement; (iii) the Consolidated Secured Loan Facility Note B and (iv) the Mezzanine Loan Facilities.

385.    The RPT Committee often was asked to approve these transactions on an expedited basis and in circumstances where failure to approve the transaction would result in Sears running out of cash, being unable to meet ordinary course obligations, defaulting on loan covenants (which would allow certain creditors to exercise their "cash dominion" rights) or other similarly dire consequences.

386.    For example, a December 29, 2016 email from Riecker to the Sears Holdings Board requested approval for a Related-Party Financing in excess of $320 million by January 3, 2017— only *three* business days later.  Riecker warned that, without the loan, Sears would be out of cash (and overdrawn by $24 million) by January 3.

387.    As a result, the RPT Committee had little opportunity to consider meaningfully the fairness of the transactions or to consider alternative sources of funding.

388.    In many instances, no "market check"—that is, a process by which the RPT Committee or Centerview would solicit competing proposals for third-party loans—was conducted.  Moreover, the market checks that were conducted were often flawed because the third parties were not provided sufficient time to conduct due diligence.  Remarking on Centerview's process for conducting due diligence, Mark Puntus stated in his interview:  "we did this on a fairly accelerated timeframe.  Typically, it was under some pressure, covenant pressure or liquidity pressure" and that "we knew with ESL . . . we always needed to work very quickly."  As an

example, he stated that the Directors would "just call up Centerview on a Monday and by the following Friday, had to advise the company as to their views on the transaction."

389.    The members of the RPT Committee were keenly aware of Sears's worsening performance and knew that the financial projections were baseless.  For example, in a March 23, 2016 email, Schriesheim noted to the Sears Holdings Board, including the Members of the RPT Committee, that Mark Puntus of Centerview requested doing diligence on a "real operating plan." It follows that the members of the Sears Holdings Board had reason to doubt the credibility of the information provided to them and, thus, to the extent they actually analyzed projections in connection with their consideration of the Related-Party Financings, their assessment was flawed.

390.    In an August 19, 2016 email to Reese, Schriesheim wrote, ". . . I think you and the board are owed the courtesy of some level of reconciliation or explanation comparing what was forecasted . . . with our forecasted capital needs today."

391.    The RPT Committee not only failed to hire advisors to opine on Sears's solvency at the time of the Related-Party Financings but also failed to maintain entity-by-entity financials. These failures made it impossible for the RPT Committee to even consider the solvency of the other Related-Party Financings Borrowers or the Additional Subsidiary Guarantors on the 2018 Term Loan Facility before causing Sears Holdings and the other Related-Party Borrowers and Additional Subsidiary Guarantors on the 2018 Term Loan Facility to enter into the Related-Party Financings—transactions that unfairly required the Related-Party Borrowers to incur significant "secured debt" obligations and the Additional Subsidiary Guarantors on the 2018 Term Loan Facility to incur obligations and pledge assets as collateral.

392.    Sears had no internal plans reflecting the aggregate amount of additional financing it expected to need in order to turn around its operations or to survive long enough to do so.

Although Lampert and the members of the RPT Committee knew that the Related-Party Financings being requested and approved would not be sufficient to meet Sears's long-term liquidity needs (as repeatedly reflected in Centerview's presentations to the RPT Committee), they took no action to attempt to obtain a comprehensive third-party financing solution capable of meeting Sears's long-term liquidity needs.

393.    On March 4, 2016, Schriesheim provided an overview of a lender call to the Sears Holdings Board, explaining that they received pushback from an investment advisor who believed the situation was "nothing more than a liquidation."  Similarly, in December 2016, Jason Hollar, Sears's VP of Finance, explained to Kamlani that they needed to discuss with Lampert why they were not investing in Sears Auto Center, because "even if we sell the business, demonstrating a strategy in which we can offset the REIT losses would be of value to a potential buyer in terms of validating future cash flows . . . of course, if we are going down a liquidation strategy, then we should cut all of this off and harvest the business."  Evercore previously had observed that Sears's strategy was to "[p]ut 250 of the best stores in the [Seritage] REIT, get $2B in cash and hope that this is sufficient to fund the business for 2 years to get past fraudulent conveyance statutes."

394.    The Culpable Parties also knew there was no hope that Sears's businesses would recover.  In August 2017, Munjal wrote to Naren Sinha, "[a]ll the so called improvements are nothing but closing stores and SG&A for Corp/Call Centers."  Shortly after the 2018 Term Loan Facility was obtained, a consultant from Teneo expressed concerns to Naren Sinha that "we are missing a business plan . . . I don't feel we have a concrete set of actions in March/April that will have any chance of achieving the improved performance and momentum we need in those months."

395.     Despite years of poor financial performance, an inability to conduct solvency analyses and a lack of a business plan, the RPT Committee blindly approved each of the Related-Party Financings.

**4.      The Officers Engaged in Self-Dealing and Failed to Provide Meaningful Oversight When They Engineered the Related-Party Financings**

396.     The Officers repeatedly facilitated the Related-Party Financings by creating fanciful, unrealistic financial projections.  Historically, these baseless projections were the foundation upon which advisors valued Sears.  However, on information and belief, no advisors were hired to value Sears in connection with any of the Related-Party Financings.  Therefore, the Members of the RPT Committee cannot claim to have relied upon different advice or information when considering whether to recommend the Related-Party Financings for approval.  To the extent the Officers and Directors internally evaluated financial projections, they knew that these projections were false and, thus, that no good-faith reliance could be placed on such projections.

397.     The Officers also were responsible, with Lampert spearheading the effort, for implementing the transactions and presenting them to the Sears Holdings Board for consideration. As alleged herein, these transactions typically were presented to the Sears Holdings Board at times when Sears Holdings would be unable to pay vendors and other debts without financing, thus requiring that financing transactions be approved and closed on an expedited basis.

398.     The Officers also served as directors of each of the Related-Party Financing Borrowers and, certain of the Officers served as directors of the Additional Subsidiary Guarantors that became obligated on the 2018 Term Loan Facility, yet they never conducted any fairness analysis on behalf of those entities, nor were they able to conduct solvency analyses because they failed to maintain entity-by-entity financials.

399.    The Officers knew that Sears would be unable to repay these "loans," which would hurt Sears in the long run, and yet they advocated them to the Sears Holdings Board in order to protect their own investments in Seritage.

400.    Each of the Officers invested in Seritage and therefore had the motive and opportunity to cause the Related-Party Financings in order to protect their investments in Seritage. Schriesheim made significant profits based upon his participation in the Seritage Rights Offering and monitored the trading price of the rights on a daily basis.  Two years after the Seritage Transaction, Schriesheim reflected on his investment in Seritage in an email to Riecker, noting that he had sold his shares at about $45 per share after purchasing them at the $29.58 offering price (a 52% gain).  Schriesheim went on to describe the tremendous upside in the Seritage Transaction, commenting that he "[knew] the math pretty well" and that he had "always felt like [Seritage] was positioned well in [the] market."   Riecker and Huckins also made significant profits by participating in the Seritage Rights Offering, monitored the trading price on a daily basis and knew through communications with Schriesheim that the market was valuing Seritage at $600 million greater than the purchase price Sears Holdings had established for the transaction.

**5.      The Additional Subsidiary Guarantors on the 2018 Term Loan Facility Received No Consideration in Exchange for Obligations Incurred and Liens Granted Pursuant to the 2018 Term Loan Facility**

401.    The Related-Party Financings were improper for other reasons.  For example, Sears Brands owned almost all of the intangible assets and intellectual-property assets that were pledged under the 2018 Term Loan Facility, ***even though*** Sears Brands was not an obligor on the debt that was paid down with proceeds from the 2018 Term Loan Facility.  These intangible assets and intellectual property had substantial value.  Thus, Sears Brands did not receive any consideration in exchange for its incurrence of the obligations and granting of liens on its assets in connection with the 2018 Term Loan Facility.

153

402.     Similarly, Sears Development is the leaseholder of one of the pledged real estate assets under the 2018 Term Loan Facility, *even though* Sears Development was not an obligor on the debt that was paid down with proceeds of the 2018 Term Loan Facility.

403.     Moreover, certain of Sears Holdings's other subsidiaries were named as guarantors on the 2018 Term Loan Facility despite not being borrowers or guarantors on the debt paid off with the proceeds from this "loan."

404.     As with each of the other Related-Party Financings, on information and belief, the Culpable Parties made no effort to look at alternative uses for the assets pledged as collateral on the 2018 Term Loan Facility, such as joint ventures or sales, which opportunity to otherwise monetize these assets could have been for more value than they had as collateral.  The fact that the Additional Subsidiary Guarantors on the 2018 Term Loan Facility received no consideration for the guarantees they issued or assets they pledged makes these guarantees even more egregious.

405.     As such, the Additional Subsidiary Guarantors on the 2018 Term Loan Facility are entitled to the difference between what they received in exchange for the obligations incurred in connection with the 2018 Term Loan Facility and the value they could have otherwise obtained had they not been caused to pledge collateral.

**6.      The Related-Party Financings Borrowers Were Insolvent at the Time of the Related-Party Financings and When Payments Were Made On Account Thereof**

406.     Following the Seritage Transaction, Sears's financial results continued to deteriorate.  The Debtors involved in the Seritage Transaction remained insolvent following the Seritage Transaction through and including the Petition Date.

407.     According to Sears's own published financial statements, at the end of FY 2014, Sears already was insolvent on a balance-sheet basis, and going forward, its insolvency only

increased on a balance-sheet basis.  By the beginning of FY 2017, Sears was $3.8 billion insolvent

on a balance-sheet basis.

| $ in millions | 1/31/2015 | 1/30/2016 | 1/28/2017 | 2/3/2018 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current Assets | $ 5,863 | $ 6,045 | $ 4,996 | $ 3,812 |
| Property and Equipment, Net | 4,449 | 2,631 | 2,240 | 1,729 |
| Goodwill | 269 | 269 | 269 | 269 |
| Trade Names and Other Intangible Assets | 2,097 | 1,909 | 1,521 | 1,168 |
| Other Assets | 507 | 483 | 336 | 284 |
| Non-Current Assets of Discontinued Operations | - | - | - | - |
| **Total Assets** | $ 13,185 | $ 11,337 | $ 9,362 | $ 7,262 |
| | | | | |
| **Liabilities** | | | | |
| Current Liabilities | $ 5,595 | $ 5,438 | $ 4,681 | $ 4,915 |
| Long-Term Liabilities | 8,535 | 7,855 | 8,505 | 6,070 |
| **Total Liabilities** | $ 14,130 | $ 13,293 | $ 13,186 | $ 10,985 |
| | | | | |
| **Total Equity** | $ (945) | $ (1,956) | $ (3,824) | $ (3,723) |
| | | | | |
| **Total Liabilities & Equity** | $ 13,185 | $ 11,337 | $ 9,362 | $ 7,262 |

408.    Independent of published financial statements, the Debtors were insolvent on a

balance-sheet basis from 2015 to 2018, assessing the assets at fair value, even under a sum-of-the-

parts analysis.

409.    Between 2015 and 2017, Sears failed to generate any cash flow from operations,

resulting in a cumulative cash shortfall from operations over the period of roughly $5.4 billion.

Sears also failed to generate sufficient EBIT to cover interest expenses during the same time

period.  These results were not surprising as Sears suffered losses in prior years.  To fund

operational shortfalls, Sears had to use existing cash, cash from the sale of assets or new "debt."

410.    In light of these numbers, Sears could not have climbed out of insolvency at any

point in time following the Seritage Transaction.  Thus, Sears remained insolvent at the times when

the Related-Party Financings were obtained and when payments were made on account thereof.

411.    Moreover, Sears failed to keep entity-by-entity financials and instead kept consolidated ledgers, which prevented the Culpable Parties from being able to evaluate the solvency of the other Related-Party Financings Borrowers or the Additional Subsidiary Guarantors on the 2018 Term Loan Facility before causing them to enter into the Related-Party Financings. Sears's failure to maintain entity-by-entity financials also makes it impossible to evaluate the relevant entities' insolvency in hindsight.   For that reason, the insolvency of each of the other Related-Party Financings Borrowers and the Additional Subsidiary Guarantors on the 2018 Term Loan Facility must be inferred from the insolvency of Sears Holdings.

412.    Despite years of declining financial performance, mounting operating losses and a stalemate on investments in Sears's businesses, the Culpable Parties kept Sears on life support just long enough to realize the value of their investment in Seritage, while collateralizing Sears's remaining assets for their own benefit.   The collateral on each of the Related-Party Financings included valuable assets such as real property, intellectual property and receivables.   The Culpable Parties made no effort to explore alternative uses for these assets such as joint ventures or sales. The failure to consider alternative uses, coupled with years of saddling Sears with unnecessary "debt," caused substantial harm to Sears and its creditors.

**Inapplicability of Certain Market Evidence to Solvency Considerations**

A.    **Valuations Based on Contemporary Market Evidence Are Unreliable for Evaluating Sears's Solvency**

413.    While contemporaneous market prices are often proffered as evidence of the fair market value of publicly traded companies, such evidence is patently unreliable in the context of Sears.  For example, Sears Holdings's public equity float was subject to aggressive manipulations at various times by insiders who took advantage of their controlling positions, both as investors and directors.   Sears's public debt was also largely held by insiders and by hedge funds whose

156

motivation to hold Sears's debt may have resulted from the payoffs they would receive from their bets on Sears credit default swaps. Sears's financial statements also were filled with misleading disclosures and omitted material information. The reason Sears Holdings's shares traded positive is due to Lampert's history of stripping assets free of creditors' claims and sharing the proceeds with minority shareholders while he and the other Controlling Insider Shareholders took the lion's share.

414.    As alleged at greater length below, the only probative piece of market evidence respecting the Debtors' value is the sale of Sears to Transform, a market transaction that followed a full and robust sales process. That transaction price supports a finding that Sears was insolvent on a balance-sheet basis as far back as the Seritage Transaction, and, at a minimum, precludes reliance on Sears Holdings's stock or bond prices as evidence of solvency or enterprise value.

**B.    Historical Share Prices Reflected Market Manipulations by Sears Insiders**

415.    *First*, the trading price of Sears Holdings's stock was not reliable, because Sears Holdings shares were held largely by insiders. The overwhelming concentration of Sears Holdings stock ownership by Sears insiders—primarily Lampert, the ESL Shareholders and Fairholme Capital—caused activity and manipulations by those insiders to have an outsized impact on share prices, thereby rendering that share price unreliable.

416.    Between March 2014 and October 2018, Lampert, ESL and affiliated entities held approximately 50% of all shares. During the same period, individuals and entities affiliated with Fairholme Capital held between 15% and 30% and Tisch held between 3% and 4% of all shares. Collectively, these insiders' holdings accounted for the substantial majority of all issued shares, including approximately 75% of the shares at the time of the Lands' End Spin-off and 80% at the time of the Seritage Transaction.

417.    The unusually high concentration of shares in the hands of Sears insiders created an anemic public float comprising, at times, less than 25% of all issued shares.  As a result of the imbalance in equity ownership, Sears Holdings's stock was thinly traded, and the market for public shares of Sears Holdings became vulnerable to actions and manipulations carried out by Lampert and ESL.

418.    For example, just one week after Sears Holdings disclosed in its 2016 Form 10-K, filed March 21, 2017, that it had  "substantial doubt" as to Sears's ability to continue operating as a going concern—a disclosure which, along with poor financial performance results, immediately precipitated a 13% drop in share price—Sears Holdings's stock had fully recovered and reached its highest trading prices in months.  The surge in share prices in late March 2017 does not reflect the market's assessment of Sears's fair market value; rather, shortly after the filing, Lampert and Berkowitz, together with their funds, purchased approximately 1.42 million shares of Sears Holdings stock, constituting almost 18% of all share volume on the three days that followed the filing.  News of these massive purchases (disclosed in public filings) pushed the stock price back up.  In other words, not only did the purchases immediately support the stock price, but Lampert and Berkowitz also had used their outsized influence to dictate the market's pricing of Sears Holdings shares.

419.    Moreover, ESL and Fairholme Capital were infusing equity, not because they were unaware of Sears's inevitable demise, but because they also held debt that was repaid and continued to collect interest and fees from Sears, and because the new equity facilitated the success of Seritage.

C.   **The Trading Prices of Sears's Securities Were Inflated by a Market Belief that ESL and Lampert Would Always Provide Additional Capital**

420.    The trading prices of Sears's securities were manipulated insofar as they reflected an implicit, and ultimately incorrect, belief that Lampert and ESL were committed to providing liquidity support to delay bankruptcy notwithstanding Sears's actual performance.   This expectation is evidenced, quantifiably, by the fact that Sears's 8% unsecured notes provided yield-to-maturity rates that were far lower than similarly-rated bonds, meaning that the market required substantially less of a return for Sears's bonds than for comparable securities.[36]  In Kamlani's own words, "I can't attribute it to anyone specifically, but it was a general sort of feeling that many market participants . . . were not worried . . . Eddie will cut a check."  Riecker also confirmed the expectation of liquidity support, stating, "[w]e believed we could extend loans with ESL. . . ESL always had an interest in ensuring the company continued."  "Mr. Lampert works with a series of options and keeps his optionality open for a long period of time," Mr. Riecker said.

D.   **Sears Holdings's Stock Price Was Inflated Because Market Participants Knew ESL and Lampert Were Seeking to Siphon Off Value from the Company to Shareholders**

421.    Sears Holdings's stock price also was artificially inflated by virtue of Lampert's and ESL's spin-offs of Sears's most valuable assets commencing in 2011.  As discussed herein, the Orchard, SHO, Sears Canada, Lands' End and Seritage transactions were engineered so that Sears Holdings's shareholders either would receive equity in the newly spun-off entities or would be given the opportunity to participate in lucrative rights offerings.  The assets extracted from Sears through these transactions were transferred for zero or insufficient consideration to Sears.  All owners of the newly spun-off entities, including the minority public shareholders in Sears

---

[36]    During the periods observed (4/8/15 through 9/2/15 for CCC- and 9/3/15 through 10/5/15 for CCC), indexes of CCC- and CCC bonds provided yields to maturity on average of 23.34% and 15.07%, respectively.  During the same periods, Sears' yield to maturity averaged 9.85% and 7.49%, respectively, a difference of 13.48% and 7.58%.

Holdings, received an instant value windfall in the form of undervalued assets unburdened by debt. These spin-offs and sales thus resulted in the transfer of value from Sears to Sears Holdings's shareholders at the expense of the Debtors' creditors.

422.    These asset distributions were common knowledge to the public.  For example, a Credit Suisse analysis correctly concluded in February 2012 after the SHO rights offering was announced that Lampert was stripping valuable assets for the benefit of shareholders even as the Sears business itself continued to hemorrhage cash.  Thus, there was an expectation of additional value transfers from Sears to Sears Holdings's shareholders that drove positive value in Sears Holdings's stock price.

**E.    Sears's Securities Did Not Trade in an Efficient Market on Account of Material Misrepresentations and Omissions by the Company**

423.    The trading prices of Sears's securities were also influenced by misleading public disclosures and omissions of material information by the company.  These material misrepresentations and omissions undermined the efficiency of the market for Sears's securities, especially regarding the Seritage Transaction.

424.    *First*, Sears Holdings made repeated, misleading statements and disclosed inaccurate information in its financial disclosures concerning the value of its goodwill, trade names and other intangible assets.  In connection with the businesses Sears had acquired, Sears was required to record for financial reporting purposes the business assets it acquired, including trade names, at fair value, and the excess amount of the purchase price over any identifiable assets as goodwill and, as of January 30, 2016, had a gross carrying amount of $2.2 billion.  Sears was further obligated to periodically test for impairment of the goodwill and intangible assets.  The intangible assets are considered impaired if their fair value dips below the amount Sears carries these assets on its balance sheet.  Fair value is dependent on projected revenues (trade names) or

projected cash flows (goodwill).  As discussed herein, Sears has proven a pattern of creating and relying on inaccurate internal forecasts of its businesses' operating performance.  Here, Sears Holdings retained E&Y to perform annual valuations of intangibles for purposes of financial reporting, but E&Y relied on management's projections without verification or independent testing.  Even using management's unrealistic projections, E&Y concluded (and Sears Holdings reported) that intangible assets were impaired by $180 million in 2015.  Of course, impairment charges would have been even higher had realistic projections been used.

425.    ***Second***, Sears Holdings materially misled the public by disclosing in both its 2014 10-K, filed on March 17, 2015, and its 2015 10-K, filed on March 26, 2016, that a newly-adopted FASB accounting standard would not "have a ***material impact*** on the Company's consolidated financial position, results of operations, cash flows or disclosures."   The new accounting standard, which became effective in the fourth quarter of 2016, required management to assess whether there are conditions or events that raise substantial doubt about the entity's ability to continue as a going concern within one year after the financial statements are issued.  If substantial doubt existed, management would be required to make additional disclosures regarding mitigation plans.

426.    Internally, however, Sears had made the opposite assessment in March 2015.  At that time, Sears management concluded that low levels of free cash flow created substantial doubt about the company's ability to continue as a going concern for FY 2015 ***even after*** using management's demonstrably unrealistic financial assumptions, which were not supportable under applicable GAAP and SEC standards.   The action plan that Sears created to mitigate that substantial doubt relied crucially on the Seritage Transaction.   Nonetheless, Sears Holdings

materially misled investors by making the disclosure that the new requirement would have no material impact on Sears's financial statements in both its 2014 and 2015 10-Ks.

427.     Predictably, following the effective date of the new FASB accounting standard in 2017 Sears Holdings disclosed in its 2016 10-K, filed March 21, 2017, that substantial doubt existed relating to the company's ability to continue as a going concern.   Specifically, Sears Holdings disclosed that:

> Our historical operating results indicate substantial doubt exists related to the Company's ability to continue as a going concern. We believe that the actions discussed above are probable of occurring and mitigating the substantial doubt raised by our historical operating results and satisfying our estimated liquidity needs 12 months from the issuance of the financial statements.

In other words, after assuring the market that the new standard would not cause a "material effect," on two separate occasions in March 2015 and March 2016, Sears Holdings announced it had "substantial doubt" relating to Sears's "ability to continue as a going concern" in March 2017. Sears Holdings's shares declined by 13% immediately following the filing of the 2016 10-K.

428.     Clearly, Sears's adoption of the new accounting standard did in fact have a material effect on Sears Holdings's disclosures.  This belies the Sears Holdings's disclosure in the 2014 and 2015 10-Ks regarding the impact of the accounting standard, which therefore constituted material misrepresentations to the market, given Sears's obvious history of poor performance and proven inability to execute a turnaround.  The effect of the new standard was material and Sears management already knew that in March 2015, but withheld it from investors.

429.     Moreover, although GAAP requires the "substantial doubt" analysis to be prepared on a quarterly basis, Sears Holdings did not make the required disclosures for the first, second and third quarters for 2017, or for the first and second quarters of 2018.  By failing to assess whether management had "substantial doubt" as to the company's ability to continue as a going

concern during these quarterly periods, Sears Holdings continued to withhold material information

from the public, thus further undermining the efficiency of the market for Sears Holdings's stock.

430.    ***Third***, Sears Holdings omitted material disclosures regarding the Seritage

Transaction.  As a general matter, the scarce information available about the Seritage Transaction

(such as the list of properties conveyed and the total appraised amount) was provided only in

***Seritage*** filings, not Sears Holdings filings.  And material information such as how Sears picked

which properties to sell, those stores' profitability and the fair market values of the properties were

not disclosed in ***either*** Seritage or Sears Holdings's filings.  The only fair market value disclosures

made by Seritage were based on the related-party pricing between Seritage and Sears Holdings

developed by C&W that was deeply flawed and not subject to any arm's length negotiations.

431.    Additionally, the public disclosures did not discuss the value—or rather the

burden—of the recapture and termination rights to Sears and did not disclose valuations of these

rights as estimated by its advisors.  Since Sears would have to pay a significant termination fee to

close properties after the Seritage Transaction occurred, it was material for investors to know the

profitability levels and trends of the stores conveyed to Seritage.  Since Seritage was likely to

recapture the most valuable properties first, it was material for investors to know the fair market

values and the profitability levels and trends for the stores on the sold properties.  Sears Holdings

did not disclose any of this information in its filings.  The purported market rents paid by Sears

incorporated a purported discount for the recapture rights.  Since that discount would further

increase Seritage's incentives to remarket the stores quickly and evict Sears, it was material for

investors to be aware of the discount, yet neither Sears nor Seritage disclosed this arrangement.

432.    In fact, Sears Holdings misled investors to view the recapture rights merely as

***rights*** rather than Seritage's ***plans*** to evict Sears from its profitable stores immediately.  After the

transaction closed, final filings reference a recapture plan document that appeared to describe preliminary maps and diagrams for spaces to be recaptured for each store sold to Seritage by Sears. Although the recapture plan documents are referenced, the underlying plan documents were not disclosed.

433.     In reality, the stores were recaptured with great speed far beyond what was expressed or implied by the public disclosures.  For example, the Duff & Phelps Fairness Opinion was publicly disclosed in Seritage's registration statement.   In the Seritage Valuation Analysis contained within it, Duff & Phelps performed a DCF valuation of rent that Sears would pay to Seritage that did not contemplate any recaptures at all, instead assuming increases in revenue based solely on increases in the rental rates Sears would pay.  And in the Fairness Opinion issued by Duff & Phelps in connection with the Seritage Transaction, Duff & Phelps assumed 5.5–11 stores would be recaptured per year, when in reality the number proved to be approximately 21 stores per year.

**F.      A Retrojection Analysis Based on the Sale to Transform Demonstrates that the Market Had Overvalued Sears Holdings's Equity for Several Years**

434.     For all of the reasons discussed herein, the trading prices of Sears's securities are unreliable to assess Sears's actual value.  There is one piece of market evidence, however, that is a credible assessment of market value:   the sales process run by the Debtors commencing in October 2018 and concluding in the February 2019 sale of assets to Transform under section 363 of the Bankruptcy Code.  That sales process was, as found by the Bankruptcy Court, full, complete and designed to achieve the maximum value for the Debtors' assets.  Indeed, on several occasions, the Debtors rejected the total consideration offered by Transform and attempted to, instead, pivot to an orderly liquidation.  The Bankruptcy Court specifically approved of the sale to Transform, finding it the most value-maximizing alternative available to the Debtors.  Nevertheless, William Murphy, the Debtors' financial advisor, declared that the Debtors expected to be unable to pay over

$4 billion in general unsecured claims or over $6 billion if non-ESL guarantee claims and ESL's

deficiency claims are included.[37]   Thus, at or around the Petition Date, the Debtors were insolvent

by billions of dollars, i.e., the amount of claims they are expecting to be unable to pay even after

a "value maximizing" sale of assets to Transform.

435.     Sears Holdings's implied Petition Date insolvency of approximately $6 billion as

determined in an open market, arm's length transaction is a significant indictment of the integrity

of the trading price of Sears's securities in the period leading up to the Debtors' bankruptcy filings.

For example, in summer of 2017, a bit more than a year before the Debtors filed for bankruptcy,

Sears had a total market capitalization of nearly $1 billion.   But Sears's underlying business was

essentially the same at that time as it was as of the Petition Date, having suffered years of

performance declines and continuing to pursue the same failed business strategy.[38]   It is

inconceivable that Sears's total enterprise value could have declined by more $6 billion during that

15-month period.   The simple explanation is that Sears was insolvent years before the Petition

Date, and its equity trading price was unreliable and substantially inflated.

**Sears Files for Bankruptcy**

436.     On October 15, 2018, Sears Holdings and most of its direct and indirect subsidiaries

filed for bankruptcy protection under chapter 11 of the Bankruptcy Code.

437.     On October 15, 2019, the Court entered the Confirmation Order confirming *the*

*Modified Second Amended Joint Chapter 11 Plan of Sears Holdings Corporation and Its Affiliated*

---

[37]     William Murphy's Declaration [ECF No. 5149] forecasts aggregate recoveries of $230 million for outstanding general unsecured claims of $4.3 billion, PBGC's priority interest, non-ESL guarantee claims of $419 million and ESL deficiency claims of $1.8 billion.   Claims amounts assume the Debtors prevail on all outstanding APA disputes and may increase if Transform prevails on some or all of the disputed issues, or if Transform refuses or is unable to honor outcomes ruled in favor of the Debtors.

[38]     For example, Sears's revenues per store were roughly flat on a last-twelve-months basis in the years leading up to its bankruptcy filing.   And Sears's last-twelve-months EBITDA actually saw modest improvements over the two years prior to bankruptcy, though it remained hundreds of millions of dollars negative.

*Debtors* [Docket No. 5293] (the "Plan").  The Confirmation Order granted joint standing between the Debtors and the Creditors' Committee to pursue the claims and causes of action set forth in this First Amended Complaint with the oversight of designees selected by the Debtors and Creditors' Committee, each of whom will become the initial board members of the liquidating trust to be established under the Plan upon the effective date (the "Effective Date").  Upon the occurrence of the Effective Date, the liquidating trust will succeed the Debtor Plaintiffs and the Creditors' Committee as the plaintiff in this Adversary Proceeding under the administration and oversight of the liquidating trust board.

## Count 1[39]
### Avoidance of the Lands' End Spin-off as an Actual Fraudulent Transfer
### Against the Controlling Insider Shareholders and John and Jane Does
### (11 U.S.C. §§ 544(b), 550(a)(1)–(2) and 1107(a); 13 L.P.R.A. §§ 1117.01 and 6010.06;
### 28 U.S.C. § 3304(a)–(b); NY DCL § 276;
### 6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(1))

438.     Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

439.     The Lands' End Spin-off resulted in transfers of interests in the property of Sears Holdings and Sears Roebuck.  Specifically, 100% of the stock of Lands' End was transferred from Sears Roebuck to Sears Holdings and then from Sears Holdings to Sears Holdings's shareholders, including Lampert, the ESL Shareholders, Fairholme Capital and Tisch (the "Lands' End Transfers").  The transferred property was worth at least $1 billion.

440.     Sears Holdings and Sears Roebuck made the Lands' End Transfers to and for the benefit of Sears Holdings's shareholders, including Lampert, the ESL Shareholders, Fairholme Capital and Tisch.

441.     The Lands' End Transfers were made with an actual intent to hinder, delay and/or defraud Sears Holdings's and Sears Roebuck's creditors, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the Lands' End Transfers.

442.     As a result of the Lands' End Transfers, Sears Holdings, Sears Roebuck and the creditors of Sears Holdings and Sears Roebuck have been harmed.

443.     Under sections 544(b), 550 and 1107(a) of the Bankruptcy Code, Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee may avoid any transfer of an interest of

---

[39]     A table identifying the claims and parties in these Counts is attached hereto as Exhibit A.

Sears Holdings and Sears Roebuck in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  One or more creditors of Sears Holdings and Sears Roebuck, including but not limited to PBGC and Department of Treasury of Puerto Rico, hold allowed or allowable claims under section 502 of the Bankruptcy Code and, as such, could avoid the Lands' End Transfers under applicable non-bankruptcy law.

444.   The Lands' End Transfers should be avoided as actual fraudulent transfers under sections 544 and 550 of the Bankruptcy Code, section 1117 of the Internal Revenue Code for a New Puerto Rico, section 3304 of the Fair Debt Collection Practices Act and applicable state law.

445.   By virtue of the foregoing, Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee are entitled to a judgment against each of the Controlling Insider Shareholders and John and Jane Does in the amount of the value of the Lands' End Transfer(s) they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives and other compensation they received, directly or indirectly, in connection with, among other things, the Lands' End Spin-off.

## Count 2
**Avoidance of the Lands' End Spin-off as a Constructive Fraudulent Transfer
Against the Controlling Insider Shareholders and John and Jane Does
(11 U.S.C. §§ 544(b), 550(a)(1)–(2) and 1107(a); 13 L.P.R.A. §§ 1117.01 and 6010.06;
28 U.S.C. § 3304(a)–(b); NY DCL §§ 273, 274 and 275;
6 Del. C. §§ 1304(a)(2) and 1305(a); 740 Ill. Comp. Stat. 160/5(a)(2) and 160/6(a))**

446.   Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

447.   The Lands' End Transfers were transfers of interests in the property of Sears Holdings and Sears Roebuck—namely, 100% of the stock of Lands' End that was transferred from Sears Roebuck to Sears Holdings and then to Sears Holdings's shareholders—made to and for the

benefit of Sears Holdings's shareholders, including Lampert, the ESL Shareholders, Fairholme Capital and Tisch.

448.     The Lands' End Transfers were made for no consideration, without fair consideration or for less than reasonably equivalent value.

449.     The Lands' End Transfers were made at a time when Sears Holdings and Sears Roebuck had unreasonably small capital and/or at a time when Sears Holdings and Sears Roebuck intended to incur or believed they would incur debts beyond their ability to pay as such debts matured.

450.     Under sections 544(b), 550 and 1107(a) of the Bankruptcy Code, Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee may avoid any transfer of an interest of Sears Holdings and Sears Roebuck in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  One or more creditors of Sears Holdings and Sears Roebuck, including but not limited to PBGC and Department of Treasury of Puerto Rico, hold allowed or allowable claims under section 502 of the Bankruptcy Code and, as such, could avoid the Lands' End Transfers under applicable non-bankruptcy law.

451.     The Lands' End Transfers should be avoided as constructive fraudulent transfers under sections 544 and 550 of the Bankruptcy Code, section 1117 of the Internal Revenue Code for a New Puerto Rico, section 3304 of the Fair Debt Collection Practices Act and applicable state law.

452.     By virtue of the foregoing, Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee are entitled to a judgment against each of the Controlling Insider Shareholders and John and Jane Does in the amount of the value of the Lands' End Transfer(s) they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives and

169

other compensation they received, directly or indirectly, in connection with the Lands' End Spin-off.

### Count 3
### Recovery of the Lands' End Illegal Dividend
### Against the Controlling Insider Shareholders, the Directors (Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Tisch and Reese) of Sears Holdings and John and Jane Does
### (8 Del C. §§ 170–174 and Delaware Common Law)

453.    Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

454.    At the time when the Lands' End Spin-off was approved, the Sears Holding Board included Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Tisch and Reese.  These Directors approved and directed the payment of a dividend of Lands' End shares (the "Lands' End Dividend") by Sears Holdings to its shareholders.  The value of the Lands' End Dividend was at least $1 billion.

455.    The Lands' End Dividend was received by Sears Holdings's shareholders, including Lampert, the ESL Shareholders, Fairholme Capital and Tisch.

456.    At the time of the Lands' End Dividend, Sears Holdings did not have a capital surplus to pay the Lands' End Dividend.  As a result, the Lands' End Dividend was illegal under Delaware law.

457.    The Directors are jointly and severally liable for the full amount of the Lands' End Dividend, which was declared and paid while they were directors of Sears Holdings.  None of the Directors dissented from the Lands' End Dividend.

458.    The Controlling Insider Shareholders—Lampert, the ESL Shareholders, Fairholme Capital and Tisch—also are liable for the portions of the Lands' End Dividend they received because they had knowledge of facts indicating that the Lands' End Dividend was unlawful.

459.    By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee are entitled to (a) a judgment against each of the Directors in the full amount of the value of the Lands' End Dividend and (b) a judgment against each of the Controlling Insider Shareholders and John and Jane Does in the amount of the value of the Lands' End Dividend they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives and other compensation they received, directly or indirectly, in connection with the Lands' End Dividend.

### Count 4
**Unjust Enrichment Relating to the Lands' End Spin-off Against the Controlling Insider Shareholders, the Conflicted Directors (Lampert, Alvarez, Mnuchin and Tisch) of Sears Holdings and John and Jane Does**

460.    Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

461.    Without justification, the Controlling Insider Shareholders—Lampert, the ESL Shareholders, Fairholme Capital and Tisch—and the Conflicted Directors—Lampert, Alvarez, Mnuchin and Tisch—have retained cash, credit and other things of value that rightly belong to Sears Holdings, Sears Roebuck and their creditors by virtue of their wrongful acts and omissions, and through the wrongful receipt of payments and distributions relating to the Lands' End Spin-off.  Retention of those proceeds by the Controlling Insider Shareholders and Conflicted Directors violates fundamental principles of justice, equity and good conscience.

462.    The Controlling Insider Shareholders and Conflicted Directors have been enriched unjustly by abusing their insider positions at Sears Holdings to direct and facilitate a self-dealing scheme to enrich themselves unfairly and unjustly and to the substantial detriment of Sears Holdings and Sears Roebuck by, among other things, causing Sears Holdings and Sears Roebuck to enter into the Lands' End Spin-off and extracting hundreds of millions of dollars through stock

ownership and investment fees earned through Lands' End stock received for no consideration, while removing one of Sears's few profitable business segments.

463.    The Controlling Insider Shareholders and Conflicted Directors therefore are liable to Sears Holdings and Sears Roebuck for unjust enrichment.

464.    Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee seek restitution from the Controlling Insider Shareholders and the Conflicted Directors and an order of this Court disgorging all payments, transfers, credit, profits, fees, benefits, incentives and other things of value obtained by the Controlling Insider Shareholders as a result of their wrongful conduct and breaches of fiduciary duty.

465.    By virtue of the foregoing, Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee are entitled to a judgment against each of the Controlling Insider Shareholders and Conflicted Directors and John and Jane Does in the amount of the value of the Lands' End Dividend they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives and other compensation they received, directly or indirectly, in connection with the Lands' End Spin-off.

## **Count 5**
**Breach of Fiduciary Duty Against the Controlling Insider Shareholders and John and Jane Does in Connection with the Lands' End Spin-off**

466.    Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

467.    The Controlling Insider Shareholders—Lampert, the ESL Shareholders, Fairholme Capital and Tisch—owed a fiduciary duty to Sears Holdings because, as a control group, they owned a majority and/or controlling interest of Sears Holdings and exercised coordinated control over the business affairs of Sears Holdings.  Independently, Lampert and the ESL Shareholders

owed fiduciary duties to Sears Holdings because, as a control group, they owned a majority and/or controlling interest of Sears Holdings and exercised coordinated control over the business affairs of Sears Holdings. Lampert and the ESL Shareholders independently had the same duties and committed the same breaches of such duties as outlined herein, and caused the damages alleged herein.

468.   As controlling shareholders of Sears Holdings, Lampert, the ESL Shareholders, Fairholme Capital and Tisch owed Sears Holdings fiduciary duties of loyalty, care and good faith.

469.   As controlling shareholders of Sears Holdings, Lampert, the ESL Shareholders, Fairholme Capital and Tisch were obligated by their duty of loyalty, but failed and refused to put Sears Holdings's interests ahead of their own individual interests.

470.   As controlling shareholders of Sears Holdings, Lampert, the ESL Shareholders, Fairholme Capital and Tisch were obligated by their duty of care but failed and refused to use the amount of care that an ordinarily careful and prudent person would exercise in similar circumstances and to consider all material information reasonably available to them.

471.   As controlling shareholders of Sears Holdings, Lampert, the ESL Shareholders, Fairholme Capital and Tisch were obligated by their duty of good faith but failed and refused to act in the face of a known duty to act.

472.   These duties required the Controlling Insider Shareholders at all times to act faithfully on behalf of Sears Holdings and to conduct themselves in a manner they reasonably believed to be in the best interests of Sears Holdings.

473.   The Controlling Insider Shareholders were the primary beneficiaries of the Lands' End Spin-off and directly received financial benefits from the Lands' End Spin-off in the form of assets that were removed from the reach of Sears's creditors, and, which yielded profits in the

months and years following the Lands' End Spin-off through a rise in share price.  Due to their

position as owners of both Sears Holdings and Lands' End, Lampert, the ESL Shareholders,

Fairholme Capital and Tisch were interested in the Lands' End Spin-off, and, thus, breached their

fiduciary duties of loyalty, good faith and care to Sears Holdings when they engaged in acts of

self-dealing in the Lands' End Spin-off.

474.    By nature of their control over Sears Holdings, the Controlling Insider Shareholders

were able to and in fact did cause Sears Holdings to enter into the Lands' End Spin-off for their

own benefit.

475.    As a result of their self-dealing, the Controlling Insider Shareholders benefited from

the Lands' End Spin-off to the detriment of Sears Holdings and its creditors.  The Defendants on

this Count 5 have the burden of proving that the Lands' End Spin-off was entirely fair to Sears

Holdings.

476.    As a result of these breaches, Sears Holdings received no consideration for the

Lands' End Spin-off and has been damaged substantially as a direct and proximate result of these

breaches of fiduciary duty.

477.    Sears Holdings has been substantially damaged as a direct and proximate result of

the breach of fiduciary duty by the Controlling Insider Shareholders.

478.    As a result of these breaches, the Controlling Insider Shareholders received

monetary and other benefits at the expense of Sears Holdings.  Tisch received indirect monetary

benefits at the expense of Sears Holdings through their investments in ESL.  Moreover, because

the Lands' End Spin-off left Sears Holdings with unreasonably small capital and/or occurred at a

time when Sears Holdings and Sears Roebuck intended or believed that they would incur debts

beyond their ability to pay as they matured, Lampert, the ESL Shareholders, Fairholme Capital

and Tisch received additional benefits not shared by all stakeholders, namely Sears Holdings's creditors.

479.    As a direct and proximate result of the acts and omissions of the Controlling Insider Shareholders, Sears Holdings paid (and the Controlling Insider Shareholders received) illegal dividends and suffered other injury.  The Controlling Insider Shareholders are liable to Sears Holdings to compensate for these and other results of their breaches of fiduciary duties.

480.    By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee are entitled to a judgment against each of the Controlling Insider Shareholders and John and Jane Does in an amount to be determined at trial, including but not limited to the amount of harm incurred by Sears Holdings as a result of the Lands' End Spin-off.

### Count 6
**Breach of Fiduciary Duty Against the Directors (Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Tisch and Reese) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings and John and Jane Does in Connection with the Lands' End Spin-off**

481.    Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

482.    At the time the Lands' End Spin-off was approved, the Directors—Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Tisch and Reese—served as members of the Sears Holdings Board, and they all voted to approve the transaction.  As directors of Sears Holdings, the Directors owed fiduciary duties of loyalty, care and good faith to Sears Holdings.

483.    As officers, the Officers owed fiduciary duties of loyalty, care and good faith to Sears Holdings.

484.    As directors and officers of Sears Holdings, the Directors and Officers were obligated by their duty of loyalty but failed and refused to place Sears Holdings's interests above any interest possessed by the Directors or Officers that was not shared by the corporation generally.

485.    As directors and officers of Sears Holdings, the Directors and Officers were obligated by their duty of care but failed and refused to exercise the amount of care that an ordinarily careful and prudent person would exercise in similar circumstances and to consider all material information reasonably available to them.

486.    As directors and officers of Sears Holdings, the Directors and Officers were obligated by their duty of good faith not to intentionally fail to act in the face of a known duty to act, but they failed and refused to act in the face of a known duty to act.

487.    The Members of the RPT Committee—Reese and Kunkler—only examined the transaction for fairness as between independent shareholders and ESL and the other insiders participating in the transaction (not vis-à-vis Sears Holdings itself) and then recommended the transaction for approval to the full Sears Holdings Board.  A majority of the Directors—namely, Alvarez, Lampert, Mnuchin and Tisch—were interested in the Lands' End Spin-off due to their direct affiliation with ESL and/or Fairholme Capital, both of which were major participants in the Lands' End Spin-off and stood to benefit thereby.  Nonetheless, none of the Directors, including Lampert, abstained from voting and instead led Sears Holdings to undertake the transaction.

488.    The Officers were integral in planning, negotiating and executing the Lands' End Spin-off, with Schriesheim presenting details of the Lands' End Spin-off to the Sears Holdings Board for approval.  Schriesheim produced his Officer's Certificate certifying Sears Holdings's financial health following the Lands' End Spin-off based on the same flawed projections, despite his intimate knowledge of Sears's past performance and significant financial challenges and the

folly of the new projections.  The Officers interacted closely with Duff & Phelps in connection with its solvency opinions.  The Officers were closely involved in the development of the unachievable three-year financial projections provided to Duff & Phelps and endorsed those projections in conversations with Duff & Phelps.  Schriesheim had primary responsibility for preparing Sears's purely aspirational annual budgets and financial forecasts that left significant gaps for "go-gets" and "unidentified initiatives."

489.   The Directors, acting both individually and collectively, breached their duties of loyalty, care and good faith by, among other things:

a.   Acting in their own interests by approving the Lands' End Spin-off, despite its inside nature, and even though they knew, or were reckless or grossly negligent in not knowing, that Sears Holdings was inadequately capitalized and unable to pay its debts as they came due at the time of and/or as a consequence of the transaction;

b.   Approving and consummating the Lands' End Spin-off despite the enormous injury it would inflict on Sears Holdings;

c.   Unjustly profiting from the Lands' End Spin-off due to their direct receipt of Lands' End equity or through their interests in ESL and/or Fairholme Capital, both of which were major participants in the Lands' End Spin-off and stood to benefit thereby;

d.   Failing to assess whether the Lands' End Spin-off was fair from the perspective of Sears Holdings or its creditors;

e.   Failing to retain advisors to consider meaningfully whether the Lands' End Spin-off was fair to Sears Holdings or its creditors;

f.   Relying on the entirely unrealistic financial projections underlying Duff & Phelps's solvency opinion, which projections the Directors knew or were reckless or grossly negligent in not knowing were purely aspirational and completely unachievable having also been members of the Sears Holdings Board during multiple years in which Sears missed annual financial forecasts by enormous margins or that Sears was already lagging significantly behind its annual projections around the time of the Lands' End Spin-off;

g.   Failing to consider all material facts reasonably available and completely and willfully or recklessly ignoring the duties they owed to Sears Holdings and all

of its creditors and instead rubber-stamping the Lands' End Spin-off at the direction of Lampert; and

h. Entering into the Lands' End Spin-off for a purpose other than a genuine effort to advance the welfare of Sears Holdings, specifically, to profit from the Lands' End Spin-off.

490.    The Officers breached their fiduciary duties of loyalty, care and good faith to Sears Holdings by, among other things:

a. Creating, circulating and defending unrealistic and unachievable projections, notwithstanding that they knew, or were reckless or grossly negligent in not knowing, that Sears would have to outperform its own prior performance vastly in order to meet the projections;

b. Designing and consummating the Lands' End Spin-off despite the enormous injury it would inflict on Sears Holdings and its creditors;

c. Engaging in self-dealing by engineering the Lands' End Spin-off for the benefit of entities other than Sears; and

d. Unjustly profiting from the Lands' End Spin-off due to their direct receipt of Lands' End equity.

491.    These breaches are in no way cleansed or otherwise mitigated by the actions of the RPT Committee because the RPT Committee failed to function effectively for at least the following reasons:

a. The RPT Committee relied upon patently unrealistic, bad-faith financial projections when it reviewed the Lands' End Spin-off;

b. The financial projections relied upon by the RPT Committee were provided to it by the Officers, each of whom had personal financial interests in the approval of the Lands' End Spin-off;

c. The RPT Committee failed to conduct a sale process or otherwise attempt to obtain the best price for Lands' End; specifically, the RPT Committee failed to consider alternative transactions even though Sears had received an unsolicited, higher-value indication of interest from an unaffiliated third party; and

d. The RPT Committee simply took Riecker's word that the Lands' End Spin-off's resulting dividend would be "comparable" to that resulting from an alternative transaction with an unaffiliated third party, without conducting any diligence to ascertain the truth of that claim.

178

492.     In essence, the RPT Committee was a rubberstamp that acquiesced in the Lands'
End Spin-off without conducting either a sale process to obtain the best price for Lands' End or
any other form of meaningful diligence.  The Defendants on this Count 6 have the burden of
proving that the Lands' End Spin-off was entirely fair to Sears Holdings.

493.     Sears Holdings has been substantially damaged as a direct and proximate result of
the breach of fiduciary duty by the Directors and Officers.

494.     By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee
are entitled to a judgment against each of the Directors, the Officers and John and Jane Does in an
amount to be determined at trial, including but not limited to the amount of harm incurred by Sears
Holdings as a result of the Lands' End Spin-off.

### Count 7
**Breach of Fiduciary Duty Against the Directors (Riecker) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Roebuck and John and Jane Does in Connection with the Lands' End Spin-off**

495.     Plaintiffs Sears Roebuck and the Creditors' Committee repeat and reallege each and
every allegation set forth in the entirety of this First Amended Complaint as though fully set forth
herein.

496.     As officers, Lampert, Schriesheim, Riecker and Huckins owed fiduciary duties of
loyalty, care and good faith to Sears Roebuck.  Riecker also owed fiduciary duties of care, loyalty
and good faith to Sears Roebuck, as the sole director of Sears Roebuck.  These duties required
Lampert, Schriesheim, Riecker and Huckins at all times to act faithfully on behalf of Sears
Roebuck and to conduct themselves in a manner they reasonably believed to be in the best interests
of Sears Roebuck.

497.    The Officers were involved in engineering the Lands' End Spin-off.  In addition,
Riecker ultimately was responsible for approving the Lands' End Spin-off as the sole director of
Sears Roebuck.

498.    As alleged herein, Sears Roebuck did not receive any value in exchange for the
transfer of Lands' End stock in the Lands' End Spin-off.  Moreover, Riecker's approval of the
Lands' End Spin-off left Sears Roebuck with unreasonably small capital and/or left Sears Roebuck
unable to pay its debts as they matured.  In approving the Lands' End Spin-off, Riecker disregarded
his fiduciary duty to Sears Roebuck and instead acted in the interests of the Controlling Insider
Shareholders, who were the ultimate beneficiaries of the transaction.

499.    Sears Roebuck has been damaged substantially as a direct and proximate result of
the breaches of fiduciary duty by Lampert, Schriesheim, Riecker and Huckins.

500.    By virtue of the foregoing, Plaintiffs Sears Roebuck and the Creditors' Committee
are entitled to a judgment against Lampert, Schriesheim, Riecker, Huckins and John and Jane Does
in an amount to be determined at trial, including but not limited to the amount of harm incurred by
Sears Roebuck as a result of the Lands' End Spin-off.

## Count 8
**Aiding and Abetting Breach of Fiduciary Duty Against the Controlling Insider
Shareholders, the Directors (Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Tisch and
Reese), the Officers (Lampert, Schriesheim, Riecker and Huckins) and John and Jane Does
in Connection with the Lands' End Spin-off**

501.    Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee repeat and
reallege each and every allegation set forth in the entirety of this First Amended Complaint as
though fully set forth herein.

502.    As alleged in Counts 5 and 6, the Controlling Insider Shareholders, the Directors
and Officers breached their fiduciary duties to Sears Holdings when they engaged in acts of self-
dealing in proposing, engineering and ultimately approving the Lands' End Spin-off.  As alleged

in Count 7, the Officers breached their fiduciary duties to Sears Roebuck when they engineered the Lands' End Spin-off as officers of Sears Roebuck.  Riecker also breached his fiduciary duty to Sears Roebuck when he approved the Lands' End Spin-off as the sole director of Sears Roebuck.

503.    Each of the Controlling Insider Shareholders, the Directors and Officers of Sears Holdings aided and abetted the breaches of fiduciary duty of the Officers of Sears Roebuck by knowingly participating in their breaches of fiduciary duty.  The Officers of Sears Roebuck aided and abetted the breaches of fiduciary duty of the Controlling Insider Shareholders, the Directors and Officers of Sears Holdings by knowingly participating in their breaches of fiduciary duty.

504.    The Controlling Insider Shareholders, the Directors and Officers were knowledgeable about and were involved in the material aspects of the Lands' End Spin-off, and engaged in acts of self-dealing in proposing, engineering and ultimately approving the Lands' End Spin-off for their own benefit.

505.    As a result of these breaches, the Controlling Insider Shareholders and certain Officers received monetary and other benefits at the expense of Sears Holdings.  Lampert, Mnuchin and Tisch received indirect monetary benefits at the expense of Sears Holdings through their investments in ESL.

506.    In addition, as alleged herein, Sears Holdings and Sears Roebuck did not receive reasonably equivalent value in exchange for the transfer of Lands' End stock in the Lands' End Spin-off.

507.    By virtue of the foregoing, Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee are entitled to a judgment against each of the Controlling Insider Shareholders, the Directors and Officers of Sears Holdings, the Officers of Sears Roebuck and

John and Jane Does in an amount to be determined at trial, including but not limited to the amount

of harm incurred by Sears Holdings and Sears Roebuck as a result of the Lands' End Spin-off.

## Count 9
### Aiding and Abetting Breach of Fiduciary Duty Against Duff & Phelps and John and Jane Does in Connection with the Lands' End Spin-off

508.    Plaintiffs Sears Holdings, Sears Roebuck and the Creditors' Committee repeat and

reallege each and every allegation set forth in the entirety of this First Amended Complaint as

though fully set forth herein.

509.    As described herein, the Controlling Insider Shareholders, Directors and Officers

of Sears Holdings owed fiduciary duties of good faith, care and loyalty to Sears Holdings and

breached those duties.

510.    As described herein, as officers of Sears Roebuck, Lampert, Schriesheim, Riecker

and Huckins owed fiduciary duties of good faith, care and loyalty to Sears Roebuck and breached

those duties.  Moreover, as the sole director of Sears Roebuck, Riecker owed fiduciary duties of

good faith, care and loyalty to Sears Roebuck and breached those duties.

511.    Duff & Phelps knew that the Controlling Insider Shareholders, Directors and

Officers of Sears Holdings and the Officers of Sears Roebuck had these fiduciary duties and were

breaching these fiduciary duties, as alleged herein.

512.    Duff & Phelps knew that the Controlling Insider Shareholders, Directors and

Officers of Sears Holdings and the Officers of Sears Roebuck could not consummate the Lands'

End Spin-off without its participation.  Duff & Phelps knew that Sears Holdings and Sears

Roebuck would require a solvency opinion to move forward with that transaction, and that failure

to obtain a solvency opinion would doom the transaction.

513.    Duff & Phelps aided and abetted the breaches of fiduciary duty and was an active

and knowing participant in those breaches of fiduciary duty by, among other things:

182

a. Issuing a solvency opinion in connection with the consummation of the Lands'
End Spin-off despite knowing there were serious flaws and inaccuracies in
management's projections;

b. Failing to raise concerns regarding the credibility of management's projections
and the Duff & Phelps solvency opinions to the Sears Holdings Board, despite
years of Sears Holdings's failure to meet projections; and

c. Knowing that Sears Holdings and Sears Roebuck would proceed with the
Lands' End Spin-off only if they could obtain a solvency opinion and
nevertheless providing the solvency opinion despite grave doubts regarding the
accuracy and reliability of the projections upon which the solvency opinion was
premised.

514.    Sears Holdings and Sears Roebuck have been damaged substantially as a direct and
proximate result of Duff & Phelps's aiding and abetting breaches of fiduciary duty set forth fully
herein.  The Controlling Insider Shareholders, Directors, and Officers of Sears Holdings and the
Officers of Sears Roebuck could not have consummated the Lands' End Spin-off without the
approval and participation of Duff & Phelps.

515.    By virtue of the foregoing, Plaintiffs Sears Holdings, Sears Roebuck and the
Creditors' Committee are entitled to a judgment against Duff & Phelps and John and Jane Does in
an amount to be determined at trial.

### Count 10
**Avoidance of the Seritage Rights Transfers as Actual Fraudulent Transfers**
**Against the Controlling Insider Shareholders, the Conflicted Directors (Lampert, Alvarez,**
**Mnuchin and Tisch) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears**
**Holdings and John and Jane Does**
**(11 U.S.C. §§ 544(b), 550(a)(1)–(2) and 1107(a); NY DCL § 276;**
**6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(1))**

516.    Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each
and every allegation set forth in the entirety of this First Amended Complaint as though fully set
forth herein.

517.    The Seritage Rights Offering resulted in transfers of interests in the property of Sears Holdings—namely, the Seritage Rights—to Sears Holdings's shareholders.  The transferred rights were worth at least several hundred millions of dollars.

518.    Sears Holdings transferred the Seritage Rights to and for the benefit of Sears Holdings's shareholders, including the Controlling Insider Shareholders, the Conflicted Directors and the Officers.

519.    The Seritage Rights were transferred with an actual intent to hinder, delay and/or defraud Sears Holdings's creditors, to the detriment and harm of such creditors.  Such intent can be inferred from, among other things, the traditional badges of fraud surrounding the Seritage Rights Offering and from the intent of the transferees.

520.    Lampert's intent to hinder, delay and/or defraud the creditors of Sears Holdings can be imputed to Sears Holdings.  Lampert and the ESL Defendants were the largest transferees of the Seritage Rights Offering.  As CEO, Chairman of the Sears Holdings Board and controlling shareholder of Sears Holdings with the ability to remove other board members, Lampert was able to exercise an inordinate amount of influence over other members of the Sears Holdings Board. Lampert expressed his desire that the board members approve the Seritage Transaction and warned that the failure to close the transaction would lead to "liquidation mode" and require management to close and sell additional stores.

521.    The intent of the Controlling Insider Shareholders, the remaining Conflicted Directors and the Officers to hinder, delay and/or defraud Sears Holdings's creditors also can be imputed to Sears Holdings.  Each of these individuals was a beneficiary of the Seritage Rights Offering, either by participating personally or by holding interests in an entity that was participating directly.  These individuals were instrumental in designing, implementing and/or

approving the transaction, and they did so with the knowledge that they would benefit therefrom at the expense of Sears Holdings.

522.   As a result of the Seritage Rights Offering, Sears Holdings and its creditors have been harmed.

523.   Under sections 544(b), 550 and 1107(a) of the Bankruptcy Code, Plaintiffs Sears Holdings and the Creditors' Committee may avoid any transfer of an interest of Sears Holdings in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  One or more creditors of Sears Holdings hold allowed or allowable claims under section 502 of the Bankruptcy Code and, as such, could avoid the Seritage Rights Offering under applicable non-bankruptcy law.

524.   The Seritage Rights Offering should be avoided as an actual fraudulent transfer under sections 544 and 550 of the Bankruptcy Code and applicable state law.

525.   By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee are entitled to a judgment against each of the Controlling Insider Shareholders, the Conflicted Directors, the Officers and John and Jane Does in the amount of the value of the Seritage Rights they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives and other compensation they received, directly or indirectly, in connection with the Seritage Transaction.

**Count 11**
**Avoidance of the Seritage Rights Transfers as Constructive Fraudulent Transfers**
**Against the Controlling Insider Shareholders, the Conflicted Directors (Lampert, Alvarez,**
**Mnuchin and Tisch) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears**
**Holdings and John and Jane Does**
**(11 U.S.C. §§ 544(b), 550(a)(1)–(2) and 1107(a); NY DCL §§ 273, 274 and 275;**
**6 Del. C. §§ 1304(a)(2) and 1305(a); 740 Ill. Comp. Stat. 160/5(a)(2) and 160/6(a))**

526.    Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

527.    The Seritage Rights Offering resulted in transfers of interests in the property of Sears Holdings made to and for the benefit of Sears Holdings's shareholders, including the Controlling Insider Shareholders, the Conflicted Directors and the Officers.

528.    The Seritage Rights were transferred for no consideration, without fair consideration or for less than reasonably equivalent value.

529.    The Seritage Rights were transferred (a) when Sears Holdings was insolvent, (b) when Sears Holdings had unreasonably small capital and/or (c) when Sears Holdings intended to incur or believed it would incur debts beyond its ability to pay as they matured.

530.    Under sections 544(b), 550 and 1107(a) of the Bankruptcy Code, Plaintiffs Sears Holdings and the Creditors' Committee may avoid any transfer of an interest of Sears Holdings in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  One or more creditors of Sears Holdings hold allowed or allowable claims under section 502 of the Bankruptcy Code and, as such, could avoid the Seritage Rights Transfers under applicable non-bankruptcy law.

531.    The Seritage Rights Offering should be avoided as a constructive fraudulent transfer under sections 544 and 550 of the Bankruptcy Code and applicable state law.

186

532.   By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee are entitled to a judgment against each of the Controlling Insider Shareholders, the Conflicted Directors, the Officers and John and Jane Does in the amount of the value of the Seritage Rights they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives and other compensation they received, directly or indirectly, in connection with the Seritage Transaction.

### Count 12
**Recovery of the Seritage Illegal Dividend**
**Against the Controlling Insider Shareholders, the Directors (Lampert, Mnuchin, Tisch, Alvarez, Kamlani, Kunkler, DePodesta and Reese) of Sears Holdings and John and Jane Does**
**(8 Del. C. §§ 170–174 and Delaware Common Law)**

533.   Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

534.   At the time when the Seritage Transaction was approved, the Sears Holdings Board included Lampert, Mnuchin, Tisch, Alvarez, Kamlani, Kunkler, DePodesta and Reese.  These Directors approved and directed the payment of a dividend in the form of a distribution of the Seritage Rights (the "Seritage Dividend") by Sears Holdings to its shareholders.  Indeed, prior to the Petition Date, counsel to Sears Holdings, the Directors, Lampert and ESL specifically referred to the distribution of the Seritage Rights as "akin to a dividend."  The value of the Seritage Dividend was at least several hundred millions of dollars.

535.   The Seritage Dividend was received by Sears Holdings's shareholders, including the Controlling Insider Shareholders.

536.   At the time of the Seritage Dividend, Sears Holdings's liabilities exceeded its assets and Sears Holdings had no net profits in that fiscal year or in the preceding fiscal year.  In addition,

the Debtors were insolvent and did not have a capital surplus.  As a result, the Seritage Dividend

was illegal under Delaware law.

537.    The Directors are jointly and severally liable for the full amount of the Seritage

Dividend, which was declared and paid while they were directors of Sears Holdings.  None of the

Directors dissented from the Seritage Dividend.

538.    The Controlling Insider Shareholders and Directors also are liable for the portion

of the Seritage Dividend each received because they had knowledge of facts indicating that the

Seritage Dividend was unlawful.

539.    By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee

are entitled to a judgment against each of the Controlling Insider Shareholders and the Directors

in (a) a judgment against each of the Directors in the full amount of the value of the Seritage

Dividend and (b) the amount of the Seritage Dividend each of the Controlling Insider Shareholders,

the Directors and John and Jane Does received, directly or indirectly, and any other payments,

profits, fees, benefits, incentives and other compensation they received, directly or indirectly, in

connection with the Seritage Transaction.

## Count 13
### Avoidance of the Seritage Real Estate Transfers as Actual Fraudulent Transfers Against the Seritage Defendants and John and Jane Does
### (11 U.S.C. §§ 544(b), 550(a)(1)–(2) and 1107(a); NY DCL § 276; 6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(1))

540.    Plaintiffs Sears Holdings, Kmart Holding, the Real Estate Transferors and the

Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this

First Amended Complaint as though fully set forth herein.

541.    The Seritage Transaction resulted in transfers of interests in the property of the Real

Estate Transferors—namely, title to 266 parcels of real estate—to the Seritage Defendants, and

incurrence of new, unfavorable contractual obligations for the Sears Holdings subsidiaries that

were tenants under the Sale-and-Lease-Back.  The transferred property, together with the terms of

the Sale-and-Lease-Back, was worth at least hundreds of millions of dollars more than the purchase

price of $2.58 billion.

542.    The Real Estate Transferors, at the direction of Sears Holdings and Kmart Holding,

made the Seritage Real Estate Transfers to and for the benefit of the Seritage Defendants.  The

multiple preparatory transactions that Sears Roebuck and Kmart (and their subsidiaries) entered

into in order to facilitate the ultimate sale of KMT Mezz, SRC Mezz and SPS Portfolio Holdings

LLC to Seritage were either for no consideration or for inadequate consideration.  Additionally,

those transactions, along with the Seritage Real Estate Transfers, were all part of a single scheme

to transfer the subject properties out of Sears and out of the reach of Sears's creditors.

543.    The Seritage Real Estate Transfers were made with an actual intent to hinder, delay

and/or defraud Sears Holdings's, Kmart Holding's and the Real Estate Transferors' creditors, to

the detriment and harm of such creditors.  Such intent can be inferred from, among other things,

the traditional badges of fraud surrounding the Seritage Real Estate Transfers and the intent of the

persons with beneficial interests in the Seritage Defendants.

544.    As a result of the Seritage Real Estate Transfers, Sears Holdings, Kmart Holding

and the Real Estate Transferors and each of their creditors have been harmed.

545.    Under sections 544(b), 550 and 1107(a) of the Bankruptcy Code, Plaintiffs Sears

Holdings, Kmart Holding, the Real Estate Transferors and the Creditors' Committee may avoid

any transfer of an interest of Sears Holdings, Kmart Holding and the Real Estate Transferors in

property that is voidable under applicable non-bankruptcy law by any creditor holding an

unsecured, allowable claim.  One or more creditors of Sears Holdings, Kmart Holding and the Real

Estate Transferors hold allowed or allowable claims under section 502 of the Bankruptcy Code

and, as such, could avoid the Seritage Real Estate Transfers and the obligations under the Sale-and-Lease-Back under applicable non-bankruptcy law.

546.    The Seritage Real Estate Transfers should be avoided as actual fraudulent transfers under sections 544 and 550 of the Bankruptcy Code and applicable state law.

547.    By virtue of the foregoing and in lieu of an order directing the return of the transferred properties, which is impractical at this time, Plaintiffs Sears Holdings, Kmart Holding, the Real Estate Transferors and the Creditors' Committee are entitled to a judgment against the Seritage Defendants and John and Jane Does in the amount by which the Seritage Defendants underpaid for the transferred property and the highly favorable terms of the Sale-and-Lease-Back transaction.

### Count 14
**Avoidance of the Seritage Real Estate Transfers as Constructive Fraudulent Transfers
Against the Seritage Defendants and John and Jane Does
(11 U.S.C. §§ 544(b) 550(a)(1)–(2) and 1107(a); NY DCL §§ 273, 274 and 275;
6 Del. C. §§ 1304(a)(2) and 1305(a); 740 Ill. Comp. Stat. 160/5(a)(2) and 160/6(a))**

548.    Plaintiffs Sears Holdings, Kmart Holding, the Real Estate Transferors and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

549.    The Seritage Real Estate Transfers and acceptance of the unfair lease terms were made for no consideration, without fair consideration or for less than reasonably equivalent value.

550.    The Seritage Real Estate Transfers and obligations incurred under the Sale-and-Lease-Back were made (a) when Sears Holdings, Kmart Holding and the Real Estate Transferors were insolvent, (b) at a time when Sears Holdings, Kmart Holding and the Real Estate Transferors had unreasonably small capital and/or (c) at a time when Sears Holdings, Kmart Holding and the Real Estate Transferors intended to incur or believed they would incur debts beyond their ability to pay as they matured.

551.    Under sections 544(b), 550 and 1107(a) of the Bankruptcy Code, Plaintiffs Sears Holdings, Kmart Holding, the Real Estate Transferors and the Creditors' Committee may avoid any transfer of an interest of Sears Holdings, Kmart Holding and the Real Estate Transferors in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  One or more creditors of Sears Holdings, Kmart Holding or the Real Estate Transferors hold allowed or allowable claims under section 502 of the Bankruptcy Code and, as such, could avoid the Seritage Real Estate Transfers and the obligations under the Sale-and-Lease-Back under applicable non-bankruptcy law.

552.    The Seritage Real Estate Transfers should be avoided as constructive fraudulent transfers under sections 544 and 550 of the Bankruptcy Code and applicable state law.

553.    By virtue of the foregoing and in lieu of an order directing the return of the transferred properties, which is impractical at this time, Plaintiffs Sears Holdings, Kmart Holding, the Real Estate Transferors and the Creditors' Committee are entitled to a judgment against the Seritage Defendants and John and Jane Does in the amount by which the Seritage Defendants underpaid for the transferred property and the highly favorable terms of the Sale-and-Lease-Back transaction.

**Count 15**
**Avoidance of the Seritage Release as an Actual Fraudulent Transfer**
**Against the Seritage Derivative Defendants (Lampert, Mnuchin, Tisch, Alvarez, Reese,**
**Kamlani, Kunkler, DePodesta, ESL, the Fairholme Defendants and Seritage)**
**(11 U.S.C. §§ 544(b), 548(a)(1)(A), 550(a)(1)–(2) and 1107(a); NY DCL § 276;**
**6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(1))**

554.    Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

555.    The Seritage Release was a purported transfer of interests in the property of Sears

Holdings—namely, certain causes of action against the Seritage Derivative Defendants—made to

and for the benefit of the Seritage Derivative Defendants.  These causes of action included serious

charges of wrongdoing and self-dealing against the Seritage Derivative Defendants, including for

their breaches of the fiduciary duties of care, loyalty and good faith that they owed to Sears

Holdings.  To the extent the Seritage Release allegedly encompasses any of the claims asserted in

this First Amended Complaint, these causes of action were worth considerably more than the $40

million received by Sears Holdings in exchange for the purported Seritage Release because they

could have led to the recovery of substantially greater damages resulting from the Seritage Rights

Offering and the Seritage Real Estate Transfers (collectively, at least hundreds of millions of

dollars).

556.    Settling the claims for $40 million was an intentional act to hinder, delay and/or

defraud Sears Holdings's creditors by denying them the opportunity to be made whole for these

breaches.  Such intent can be inferred from, among other things, the traditional badges of fraud

surrounding the Seritage Release and the intent of the Seritage Derivative Defendants.

557.    This intentional fraudulent transfer was made possible, in part, by egregious

corporate governance irregularities—or, more aptly, the complete absence of corporate

governance—at Sears Holdings.  In connection with the Seritage Derivative Litigation and the

Seritage Release, two law firms represented both the individual director defendants Alvarez,

DePodesta, Kamlani, Kunkler, Mnuchin, Reese and Tisch as well as the nominal defendant—but,

in actuality, the plaintiff—Sears Holdings.  This dual representation was a conflict of interest and

constituted a violation of Rules 1.7 and 1.13 of the Delaware Lawyers' Rules of Professional

Conduct because the allegations in the Seritage Derivative Litigation involved serious charges of

wrongdoing and self-dealing against the director defendants for the breaches of the fiduciary duties of loyalty, care and good faith they owed to Sears Holdings.  This conflict was exacerbated by one of the law firm's representation of Sears Holdings in connection with the Seritage Transaction itself.  Due to the law firms' conflicts of interest in their representation of Sears Holdings and certain director defendants, Sears Holdings was not adequately represented and Sears Holdings's creditors were not represented at all in connection with the Seritage Derivative Litigation and the Seritage Release.

558.    The Seritage Release was signed in 2017, nearly two years after the Seritage Transaction had closed and at a time when Sears was insolvent by billions of dollars and a bankruptcy filing was imminent.  No independent lawyer or fiduciary for Sears Holdings negotiated or approved the Seritage Release or the underlying settlement.  Under these circumstances, the individual Seritage Derivative Defendants attempted to exploit the opportunity to settle the claims against them for a mere $40 million in order to avoid the much greater liability they now face from the Debtors and their creditors in a bankruptcy.  Sears Holdings, fully controlled by the self-dealing wrongdoers and represented by their same counsel, wrongfully acquiesced in the Seritage Release by allowing said counsel to sign the Seritage Release on behalf of the Seritage Derivative Defendants and Sears Holdings.

559.    Under sections 544(b), 548, 550 and 1107(a) of the Bankruptcy Code, Plaintiffs Sears Holdings and the Creditors' Committee may avoid any transfer of an interest of Sears Holdings in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  One or more creditors of Sears Holdings hold allowed or allowable claims under section 502 of the Bankruptcy Code and, as such, could avoid the Seritage Release under applicable non-bankruptcy law.

560.    The Seritage Release should be avoided as an actual fraudulent transfer under sections 544, 548 and 550 of the Bankruptcy Code and applicable state law.

561.    By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee are entitled to a judgment against the Seritage Derivative Defendants avoiding the Seritage Release.

## Count 16
**Avoidance of the Seritage Release as a Constructive Fraudulent Transfer
Against the Seritage Derivative Defendants (Lampert, Mnuchin, Tisch, Alvarez, Reese,
Kamlani, Kunkler, DePodesta, ESL, the Fairholme Defendants and Seritage)
(11 U.S.C. §§ 544(b), 548(a)(1)(B), 550(a)(1)–(2) and 1107(a); NY DCL §§ 273, 274 and 275;
6 Del. C. §§ 1304(a)(2) and 1305(a); 740 Ill. Comp. Stat. 160/5(a)(2) and 160/6(a))**

562.    Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

563.    The Seritage Release was a transfer of interests in the property of Sears Holdings—namely, certain causes of action against the Seritage Derivative Defendants—made to and for the benefit of the Seritage Derivative Defendants.

564.    The Seritage Release was made for less than reasonably equivalent value.

565.    The Seritage Release was made (a) when Sears Holdings was insolvent, (b) when Sears Holdings had unreasonably small capital and/or (c) at a time when Sears Holdings intended to incur or believed it would incur debts beyond its ability to pay as they matured.

566.    Under sections 544(b), 548, 550 and 1107(a) of the Bankruptcy Code, Plaintiffs Sears Holdings and the Creditors' Committee may avoid any transfer of an interest of Sears Holdings in property that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  One or more creditors of Sears Holdings hold allowed or allowable

claims under section 502 of the Bankruptcy Code and, as such, could avoid the Seritage Release
under applicable non-bankruptcy law.

567.    The Seritage Release should be avoided as a constructive fraudulent transfer under
sections 544 and 550 of the Bankruptcy Code and applicable state law.

568.    By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee
are entitled to a judgment against the Seritage Derivative Defendants avoiding the Seritage
Release.

### Count 17
**Declaratory Judgment that the Seritage Release is Null and Void or Otherwise
Unenforceable Against the Seritage Derivative Defendants (Lampert, Mnuchin, Tisch,
Alvarez, Reese, Kamlani, Kunkler, DePodesta, ESL, the Fairholme Defendants and
Seritage)**

569.    Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each
and every allegation set forth in the entirety of this First Amended Complaint as though fully set
forth herein.

570.    The execution of the Seritage Release was marred by fraud, self-dealing, a lack of
proper corporate formalities and safeguards, conflicted counsel who simultaneously purported to
represent the Seritage Derivative Defendants and the effective plaintiff and the absence of an
independent fiduciary and independent counsel for Sears Holdings.   Sears Holdings never
consented to or authorized the Seritage Release, and no valid contract was formed.

571.    The Seritage Release is the product of fraud, deceit, duress, coercion, unfair dealing
and undue influence on the part of the Seritage Derivative Defendants as evidenced by the
traditional badges of fraud surrounding the Seritage Release; the conflicted dual representation by
the law firms of both Sears Holdings and certain of the Seritage Derivative Defendants; the grossly
inadequate consideration provided for the Seritage Release and the unconscionable conduct of the

Seritage Derivative Defendants in exercising unfairly superior bargaining power in arriving at the

Seritage Release.

572.    The shareholder plaintiffs in the Seritage Derivative Litigation did not function as

and do not qualify as fiduciaries of Sears Holdings and were not authorized by Sears Holdings to

negotiate a settlement or release on its behalf.  Alternatively, the Seritage Release is the product of

mistake by the shareholder plaintiffs in the Seritage Derivative Litigation with regard to the injury

suffered by Sears Holdings.

573.    By virtue of the foregoing, the Seritage Release is null and void under applicable

law.

574.    On information and belief, the Seritage Derivative Defendants contend that the

Seritage Release is valid and enforceable.

575.    An actual, substantial and justiciable controversy exists regarding the validity or

enforceability of the Seritage Release.

576.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment

that the Seritage Release is null and void and/or otherwise unenforceable against Sears Holdings

and the Creditors' Committee.

### Count 18
**Breach of Fiduciary Duty Against the Controlling Insider Shareholders
and John and Jane Does in Connection with the Seritage Transaction**

577.    Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each

and every allegation set forth in the entirety of this First Amended Complaint as though fully set

forth herein.

578.    The Controlling Insider Shareholders—Lampert, the ESL Shareholders, Fairholme

Capital and Tisch—owed fiduciary duties to Sears Holdings because, as a control group, they

owned a majority and/or controlling interest of Sears Holdings and exercised coordinated control

196

over the business affairs of Sears Holdings.  Independently, Lampert and the ESL Shareholders owed fiduciary duties to Sears Holdings because, as a control group, they owned a majority and/or controlling interest of Sears Holdings and exercised coordinated control over the business affairs of Sears Holdings.  Lampert and the ESL Shareholders independently had the same duties and committed the same breaches of such duties as outlined herein, and caused the damages alleged herein.

579.    As controlling shareholders of Sears Holdings, Lampert, the ESL Shareholders, Fairholme Capital and Tisch owed Sears Holdings fiduciary duties of loyalty, care and good faith.

580.    As controlling shareholders of Sears Holdings, Lampert, the ESL Shareholders, Fairholme Capital and Tisch were obligated by their duty of loyalty, but failed and refused to put Sears Holdings's interests ahead of their own individual interests.

581.    As controlling shareholders of Sears Holdings, Lampert, the ESL Shareholders, Fairholme Capital and Tisch were obligated by their duty of care, but failed and refused to use the amount of care that an ordinarily careful and prudent person would exercise in similar circumstances and to consider all material information reasonably available.

582.    As controlling shareholders of Sears Holdings, Lampert, the ESL Shareholders, Fairholme Capital and Tisch were obligated by their duty of good faith to act in the face of a known duty to act but failed and refused to do so.

583.    The Controlling Insider Shareholders were the primary beneficiaries of the Seritage Transaction and directly received financial benefits from the Seritage Transaction, which yielded profits in the months and years following the Seritage Transaction through dividends and a rise in share price.  Due to their position as owners of both Sears Holdings and Seritage, the Controlling Insider Shareholders were interested in the Seritage Transaction, and, thus, breached their fiduciary

duties of loyalty, good faith and care when they engaged in acts of self-dealing in the Seritage Transaction.

584.    By nature of their control over Sears Holdings, the Controlling Insider Shareholders were able to and, in fact, did cause Sears Holdings to enter into the Seritage Transaction for their own benefit.

585.    As a result of their self-dealing, the Controlling Insider Shareholders, including Lampert, the ESL Shareholders, Fairholme Capital and Tisch, benefited from the Seritage Transaction to the detriment of Sears Holdings and its creditors.  The Defendants on this Count 18 have the burden of proving that the Seritage Transaction was entirely fair to Sears Holdings.

586.    As a result of these breaches, Sears Holdings received no consideration for the Seritage Rights and transferred the real estate for grossly inadequate consideration.

587.    Sears Holdings has been substantially damaged as a direct and proximate result of the breaches of fiduciary duty by the Controlling Insider Shareholders.

588.    By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee are entitled to judgment against each of the Controlling Insider Shareholders and John and Jane Does in an amount to be determined at trial, including but not limited to the amount of harm incurred by Sears Holdings as a result of the Seritage Transaction.

### Count 19
**Breach of Fiduciary Duty Against the Directors (Lampert, Mnuchin, Tisch, Alvarez, Kamlani, Kunkler, DePodesta and Reese) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings and John and Jane Does in Connection with the Seritage Transaction**

589.    Plaintiff Sears Holdings and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

590.    At the time when the Seritage Transaction was approved, the Sears Holding Board included Lampert, Mnuchin, Tisch, Alvarez, Kamlani, Kunkler, DePodesta and Reese.  These Directors owed fiduciary duties of loyalty, care and good faith when they approved the Seritage Transaction.

591.    At the time when the Seritage Transaction was approved, Lampert, Schriesheim, Riecker and Huckins were officers of Sears Holdings.

592.    As directors and officers of Sears Holdings, the Directors and Officers were obligated by their duty of loyalty, but failed and refused to place Sears Holdings's interests above any interest possessed by the Directors or Officers that was not shared by the corporation generally.

593.    As directors and officers of Sears Holdings, the Directors and Officers were obligated by their duty of care, but failed and refused to exercise the amount of care that an ordinarily careful and prudent person would exercise in similar circumstances and to consider all material information reasonably available.

594.    As directors and officers of Sears Holdings, the Directors and Officers were obligated by their duty of good faith not to intentionally fail to act in the face of a known duty to act.

595.    The Members of the RPT Committee—Kamlani, Reese and Kunkler—only examined the transaction for fairness vis-à-vis ESL, Fairholme Capital and the other insiders participating in the transaction (not vis-à-vis Sears Holdings itself), and then the full Sears Holdings Board approved the overall transaction.  A majority of the Conflicted Directors—namely, Alvarez, Lampert, Mnuchin and Tisch—were interested in the Seritage Transaction due to their direct affiliation with ESL and/or Fairholme Capital, both of which were major participants in the

Seritage Transaction and stood to benefit thereby. Lampert abstained from voting but participated in the board discussions and lobbied for Sears Holdings to undertake the transaction.

596.    The Officers—Lampert, Schriesheim, Riecker and Huckins—were integrally involved in planning, negotiating and executing the Seritage Transaction, with Lampert and Schriesheim presenting many details of the Seritage Transaction to the Sears Holdings Board for approval. Each was a member of the Non-Core Committee where the Seritage Transaction was conceived and planned. Each interacted closely with Duff & Phelps in connection with its solvency opinions. Each was closely involved in the development of the unachievable three-year financial projections provided to Duff & Phelps and endorsed those projections in conversations with Duff & Phelps. Schriesheim in particular had primary responsibility for preparing Sears Holdings's purely aspirational annual budgets and financial forecasts that left significant gaps for "go-gets" and "unidentified initiatives." Each monitored the trading price of the Seritage Rights closely and knew that the market valued the transaction significantly higher than Sears Holdings had. While holding positions as officers of Sears, each of the Officers participated in the Seritage Rights Offering, thus profiting from the Seritage Transaction. Moreover, Riecker was integrally involved in planning, negotiating and executing the Seritage Transaction on both sides of the deal—serving as both an officer of Sears and as the sole Trustee and as President and Treasurer of Seritage Growth Properties during the time period when the Seritage Transaction was being negotiated and approving the Seritage Rights Offering on behalf of Seritage.

597.    The Directors, acting both individually and collectively, breached their duties of care and loyalty by, among other things:

      a.   Acting in their own interests by approving the Seritage Transaction, despite its inside nature, and even though they knew, or were reckless or grossly negligent in not knowing, that Sears Holdings was insolvent, inadequately capitalized and unable to pay its debts as they came due as a consequence of the transaction;

b.  Approving and consummating the Seritage Transaction despite the enormous injury it would inflict on Sears Holdings;

c.  Unjustly profiting from the Seritage Transaction due to their interests in ESL and/or Fairholme Capital, both of which were major participants in the Seritage Transaction and stood to benefit thereby, or through their ownership interest in Seritage (or the ownership interest of firms with which they were affiliated);

d.  Unjustly profiting from the Seritage Transaction due to their receipt of rights to purchase Seritage equity interests at below fair value;

e.  Failing to assess whether the Seritage Transaction was fair from the perspective of Sears Holdings or its creditors;

f.  Failing to retain advisors to consider meaningfully whether the transaction was fair to Sears Holdings or its creditors, including the purchase price of the underlying real estate assets;

g.  Relying on the entirely unrealistic financial projections informing Duff & Phelps's solvency opinion, which the Directors knew or were reckless or grossly negligent in not knowing that these financial projections were purely aspirational and totally unachievable having also been members of the Sears Holdings Board during multiple years in which Sears missed annual financial forecasts by gross margins or that Sears was already lagging significantly behind its annual projections for 2015 around the time of the Seritage Transaction;

h.  Relying on the deficient C&W appraisals, which substantially undervalued the property transferred in the Seritage Transaction;

i.  Failing to consider all material facts reasonably available and completely and willfully or recklessly ignoring the duties they owed to Sears Holdings and all of its creditors and instead rubber-stamping the Seritage Transaction at the direction of Lampert; and

j.  Entering into the Seritage Transaction for a purpose other than a genuine effort to advance the welfare of Sears, specifically, to profit from the Seritage Transaction.

598.  The Officers, acting both individually and collectively, failed to exercise the necessary care and breached their fiduciary duties of loyalty, care and good faith by, among other things:

a.  Creating, circulating and defending unrealistic and unachievable projections, notwithstanding that they knew, or were reckless or grossly negligent in not

knowing, that Sears Holdings would vastly have to outperform its own prior performance in order to meet the projections;

b.   Designing and consummating the Seritage Transaction despite the enormous injury it would inflict on Sears and Sears Holdings's creditors; and

c.   Engaging in self-dealing by causing Sears Holdings to enter into the Seritage Transaction to its own detriment while personally benefitting from their participation in the Seritage Rights Offering.

599.    These breaches are in no way cleansed or otherwise mitigated by the actions of the RPT Committee because the RPT Committee failed to function effectively for at least the following reasons:

a.   The RPT Committee relied upon patently unrealistic, bad-faith financial projections, which were provided by the Officers, each of whom had personal financial interests in approval of the Seritage Transaction, when it considered the Seritage Transaction;

b.   The RPT Committee failed to consult an independent financial advisors or real estate appraisal firm in connection with its consideration of the Seritage Transaction;

c.   The RPT Committee failed to consider alternative transactions; and

d.   The RPT Committee failed to meaningfully consider the Seritage Transaction as their mandate was limited to a review of Lampert's and the ESL Shareholders' equity ownership in Seritage, and, thus, did not cover any of the other critical aspects of the transaction, including the price of the Seritage Rights Offering, the value of the real estate conveyed, the one-sided terms of the Master Leases or the Debtors' insolvency.

600.    In essence, the RPT Committee was a rubberstamp that acquiesced in the Seritage Transaction without considering the fairness of the transaction to the Debtors or their creditors in any meaningful way.  The Defendants on this Count 19 therefore have the burden of proving that the Seritage Transaction was entirely fair to Sears Holdings.

601.    As a result of these breaches, Sears Holdings received no consideration for the Seritage Rights and transferred the real estate for grossly inadequate consideration.

602.     Sears Holdings has been substantially damaged as a direct and proximate result of the breach of fiduciary duty by the Directors and Officers.

603.     By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee are entitled to a judgment against each of the Directors, the Officers and John and Jane Does in an amount to be determined at trial, including but not limited to the amount of harm incurred by Sears Holdings as a result of the Seritage Transaction.

### Count 20
**Breach of Fiduciary Duty Against the Directors (Schriesheim, Riecker, Huckins, Munjal and Rodney) and Officers (Lampert, Schriesheim, Riecker, Huckins and Meerschaert) of the Real Estate Transferors and John and Jane Does in Connection with the Seritage Transaction**

604.     Plaintiffs the Real Estate Transferors and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

605.     As directors of the Real Estate Transferors (the "Real Estate Transferor Directors"), Schriesheim, Riecker, Huckins, Munjal and Rodney owed fiduciary duties of care and loyalty to the entities they served.   In addition, as officers of the Real Estate Transferors, Lampert, Schriesheim, Riecker and Huckins also owed fiduciary duties of loyalty, care and good faith to the Real Estate Transferors.

606.     Riecker, as the sole director of Sears Roebuck, owed fiduciary duties of care and loyalty to Sears Roebuck.

607.     Schriesheim, Huckins and Riecker, as directors of Kmart, owed fiduciary duties of care, good faith and loyalty to Kmart.

608.     Riecker, as the sole director of Sears Development, owed fiduciary duties of care and loyalty to Sears Development.

609.    Munjal and Rodney, as directors of Sears Roebuck de Puerto Rico owed fiduciary duties of care and loyalty to Sears Roebuck de Puerto Rico.

610.    Meerschaert owed fiduciary duties of care and loyalty to both Kmart and Sears Roebuck in his capacity as a senior officer of both companies.

611.    As alleged herein, each of the Real Estate Transferors were insolvent at the time of the Seritage Transaction.

612.    As previously alleged, Riecker was integrally involved in planning, negotiating and executing the Seritage Transaction on both sides of the deal, serving as the sole Trustee and as President and Treasurer of Seritage Growth Properties, while also approving the transaction in his capacity as the sole director of Sears Roebuck—directing that Sears Roebuck transfer 162 properties to Seritage—and as the sole director of Sears Development—directing that Sears Development transfer a property to Seritage.

613.    As directors of Kmart, Schriesheim, Riecker and Huckins were integrally involved in planning, negotiating and executing the Seritage Transaction, with Schriesheim presenting many details of the Seritage Transaction to the Sears Holdings Board for approval.  Each was a member of the Non-Core Committee where the Seritage Transaction was conceived and planned.  Each interacted closely with Duff & Phelps in connection with its solvency opinions.  Each was closely involved in the development of the unachievable three-year financial projections provided to Duff & Phelps and endorsed those projections in conversations with Duff & Phelps.  Schriesheim in particular had primary responsibility for preparing Sears Holdings's purely aspirational annual budgets and financial forecasts that left significant gaps for "go-gets" and "unidentified initiatives."  Each monitored the trading price of the Seritage Rights closely and knew that the market valued the transaction significantly higher than Sears Holdings had.  And, of course, each

approved the Seritage Transaction in their capacity as a director of Kmart, directing that Kmart transfer 64 separate properties to Seritage.

614.    As a senior officer of Sears Roebuck and Kmart, Meerschaert approved the transfer of an additional three properties by Sears Roebuck to Seritage and the transfer of an additional six properties by Kmart to Seritage.  Meerschaert approved the transfers without performing any independent analysis of fairness of the purchase price paid to Sears Roebuck and Kmart for the properties—or any other sort of analysis to confirm that Sears Roebuck and Seritage were receiving fair consideration.

615.    Munjal and Rodney approved the Seritage Transaction in their capacity as directors of Sears Roebuck de Puerto Rico, directing that Sears Roebuck de Puerto Rico transfer two separate properties to Seritage.  Munjal and Rodney approved the sale of these two properties to Seritage without performing any independent analysis of the fairness of the purchase price paid to Sears Roebuck de Puerto Rico—or any other sort of analysis to confirm that Sears Roebuck de Puerto Rico was receiving fair consideration.

616.    The Directors and Officers of the Real Estate Transferors abdicated and violated their fiduciary duty to the Real Estate Transferors in connection with the Seritage Transaction.  The Directors and Officers of the Real Estate Transferors never considered the impact of the Seritage Transaction on the Real Estate Transferors or their creditors.

617.    Rather, the Directors and Officers of the Real Estate Transferors disregarded their fiduciary duties entirely and instead acted solely in the interests of themselves and the other beneficiaries of the Seritage Transaction, designing and consummating the Seritage Transaction despite the enormous injury it would inflict on the Real Estate Transferors and their creditors.  The

Directors and Officers of the Real Estate Transferors' abandonment of their obligation to safeguard the interests of the Real Estate Transferors constitutes a breach of the duty of care.

618.    The Directors and Officers of the Real Estate Transferors also breached their duty of loyalty, including their duty to act in good faith, in connection with the Seritage Transaction. The interests of the Directors' and Officers of the Real Estate Transferors were not aligned with those of the Real Estate Transferors or their creditors.  The Directors of the Real Estate Transferors (aside from Rodney) and the Officers were Sears Holdings shareholders eligible to participate in the Seritage Rights Offering and, thus, had a financial interest in maximizing the value of Seritage. By virtue of his position, Rodney also likely held shares in Sears Holdings.  Moreover, Riecker served as sole Trustee, President and Treasurer of Seritage.  Thus, the Directors and Officers of the Real Estate Transferors stood on both sides of the Seritage Transaction and have the burden of demonstrating the entire fairness of the Seritage Transaction to the Real Estate Transferors.  They cannot meet this burden.

619.    The Seritage Transaction yielded profits for its equity owners in the months and years following the Seritage Transaction through dividends and a rise in share price.  Through their ownership in Seritage, the Directors and Officers of the Real Estate Transferors were eligible to profit personally from the Seritage Transaction; Lampert and Schriesheim definitively did so, and on information and belief, other Real Estate Transferor Directors did as well.

620.    By reason of the foregoing actions, Directors and Officers of the Real Estate Transferors engaged in self-dealing, did not act in good faith and breached their fiduciary duty.

621.    The Real Estate Transferors have been substantially damaged as a direct and proximate result of the breach of fiduciary duty by Directors and Officers of the Real Estate Transferors.

19-08250-rdd   Doc 52   Filed 11/25/19   Entered 11/25/19 20:22:20   Main Document
Pg 221 of 279

622.     By virtue of the foregoing, Plaintiffs the Real Estate Transferors and the Creditors'

Committee are entitled to a judgment against each of their respective Real Estate Transferor

Director(s), the Officers of the Real Estate Transferors and John and Jane Does in an amount to be

determined at trial, including but not limited to the amount of harm incurred by the Real Estate

Transferors as a result of the Seritage Transaction.

**Count 21**
**Aiding and Abetting Breach of Fiduciary Duty Against the Controlling Insider
Shareholders, the Directors (Lampert, Mnuchin, Tisch, Alvarez, Kamlani, Kunkler,
DePodesta and Reese) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears
Holdings, the Directors (Schriesheim, Riecker, Huckins, Munjal and Rodney) and Officers
(Lampert, Schriesheim, Riecker, Huckins and Meerschaert) of the Real Estate Transferors
and John and Jane Does in Connection with the Seritage Transaction**

623.     Plaintiffs Sears Holdings, the Real Estate Transferors and the Creditors' Committee

repeat and reallege each and every allegation set forth in the entirety of this First Amended

Complaint as though fully set forth herein.

624.     As alleged in Counts 18 and 19, the Controlling Insider Shareholders, Directors and

Officers breached their fiduciary duties to Sears Holdings when they approved and profited from

the Seritage Transaction.

625.     As alleged in Count 20, Directors and Officers of the Real Estate Transferors

breached their fiduciary duties to the Real Estate Transferors when they approved the Seritage

Transaction.

626.     The Controlling Insider Shareholders, Directors and Officers of Sears Holdings and

the Directors and Officers of the Real Estate Transferors aided and abetted the others' breaches of

fiduciary duty by knowingly participating in and facilitating the breaches of fiduciary duty.

627.     The Controlling Insider Shareholders, Directors and Officers were knowledgeable

about and were involved in all material aspects of the Seritage Transaction, directing and approving

the transaction for their own benefit.

207

628.    The Controlling Insider Shareholders, Directors and Officers of Sears Holdings and the Directors and Officers of the Real Estate Transferors benefited from each other's acts and omissions.    The Directors approved the Seritage Transaction, and the Real Estate Transferor Directors and Meerschaert caused the actual transfer of many of the underlying properties from the Real Estate Transferors to Seritage.    The Controlling Insider Shareholders, Directors and Officers of Sears Holdings and the Directors and Officers of the Real Estate Transferors understood each of these aspects of the transaction and needed each of the Directors and Officers to undertake these actions in order to effectuate the overall transaction.    Thus, the scheme they engineered necessarily required that the Directors and Officers of Sears Holdings and the Directors and Officers of the Real Estate Transferors breach their fiduciary duties.

629.    Sears Holdings and the Real Estate Transferors have been damaged substantially as a direct and proximate result of the actions of the Controlling Insider Shareholders, Directors and Officers of Sears Holdings and Directors and Officers of the Real Estate Transferors.

630.    By virtue of the foregoing, Plaintiffs Sears Holdings, the Real Estate Transferors and the Creditors' Committee are entitled to judgment against each of the Controlling Insider Shareholders, the Directors and Officers of Sears Holdings and Directors, the Officers of the Real Estate Transferors and John and Jane Does in an amount to be determined at trial, including but not limited to the amount of harm incurred by Sears Holdings and the Real Estate Transferors as a result of the Seritage Transaction.

**Count 22**
**Unjust Enrichment Against the Controlling Insider Shareholders, the Conflicted Directors**
**(Lampert, Alvarez, Mnuchin and Tisch) and Officers (Lampert, Schriesheim, Riecker and**
**Huckins) of Sears Holdings, the Directors (Schriesheim, Riecker, Huckins, Munjal and**
**Rodney) and Officers (Lampert, Schriesheim, Riecker, Huckins and Meerschaert) of the**
**Real Estate Transferors, the Seritage Defendants and John and Jane Does**
**Relating to the Seritage Transaction**

631.    Plaintiffs Sears Holdings, the Real Estate Transferors and the Creditors' Committee

repeat and reallege each and every allegation set forth in the entirety of this First Amended

Complaint as though fully set forth herein.

632.    Without justification, the Controlling Insider Shareholders, the Conflicted

Directors, the Real Estate Transferor Directors, the Officers and the Seritage Defendants have

retained cash, credit and other things of value that rightly belongs to Sears Holdings, the Real

Estate Transferors and their creditors.  The Defendants on this Count 22 were enriched by virtue

of their wrongful acts and omissions and, directly or indirectly, through the receipt of transfers,

payments, distributions and receipt of other things of value related to the Seritage Transaction,

which enrichment directly harmed Sears Holdings and the Real Estate Transferors.  Retention of

those proceeds by the Defendants on this Count 22 violates fundamental principles of justice,

equity and good conscience.

633.    As a result of the fraudulent Seritage Transaction, the Controlling Insider

Shareholders and the Seritage Defendants obtained full ownership of 235 of Sears's most valuable

properties for hundreds of millions of dollars less than the fair market value of those properties.

The Seritage Defendants accordingly were unjustly enriched to the substantial detriment of Sears

Holdings, Kmart Holding and the Real Estate Transferors and their creditors.

634.    Moreover, as a result of the fraudulent Seritage Transaction, the Controlling Insider

Shareholders, the Conflicted Directors, the Real Estate Transferor Directors and the Officers were

unjustly enriched by their participation in the Seritage Rights Offering.  The Controlling Insider

Shareholders, the Conflicted Directors, the Real Estate Transferor Directors and the Officers accordingly were unjustly enriched to the substantial detriment of Sears Holdings, Sears Roebuck, Sears Development, Sears Roebuck de Puerto Rico, Kmart and Kmart of Washington and their creditors.

635.    The Controlling Insider Shareholders, the Conflicted Directors, the Real Estate Transferor Directors and the Officers have been unjustly enriched by abusing their insider positions at Sears Holdings to direct and facilitate a self-dealing scheme to enrich themselves unfairly and unjustly and to the substantial detriment of Sears Holdings, Sears Roebuck, Sears Development, Sears Roebuck de Puerto Rico, Kmart, Kmart of Washington and all of their creditors by, among other things, causing Sears Holdings, Sears Roebuck, Sears Development, Sears Roebuck de Puerto Rico Kmart and Kmart of Washington to enter into the Seritage Transaction and extracting hundreds of millions of dollars through receipt of the Seritage Rights at an artificially low price for no consideration and subsequently receiving stock ownership, dividends and investment fees earned through Seritage stock purchased in the Seritage Rights Offering, while removing from Sears Roebuck, Sears Development, Sears Roebuck de Puerto Rico, Kmart and Kmart of Washington some of their best real estate assets for a price that was hundreds of millions of dollars short of reasonably equivalent value.

636.    The Seritage Defendants have been unjustly enriched by receiving the real estate transfers in the Seritage Transaction for less than reasonably equivalent value.

637.    The Defendants on this Count 22 therefore are liable to Sears Holdings, Sears Roebuck, Sears Development, Sears Roebuck de Puerto Rico, Kmart and Kmart of Washington for unjust enrichment.

638.    Sears Holdings, Sears Roebuck, Sears Development, Sears Roebuck de Puerto Rico, Kmart and Kmart of Washington seek restitution from the Defendants on this Count 22 and an order of this Court disgorging all payments, transfers, credits, profits, fees, benefits, incentives and other things of value obtained by the Defendants on this Count 22 as a result of their wrongful conduct and breaches of fiduciary duty.

639.    By virtue of the foregoing, Plaintiffs Sears Holdings, the Real Estate Transferors and the Creditors' Committee are entitled to a judgment against each of the Controlling Insider Shareholders, the Conflicted Directors, the Real Estate Transferor Directors, the Officers and John and Jane Does in the amount of the value of the Seritage Rights they received, directly or indirectly, and any other payments, transfers, credits, profits, fees, benefits, incentives and other compensation they received in connection with the Seritage Transaction.  With respect to the Seritage Defendants, by virtue of the foregoing and in lieu of disgorgement of the transferred property, which is impractical at this time, such Plaintiffs are entitled to a judgment against the Seritage Defendants in the amount by which the transferred property was undervalued in the Seritage Transaction, together with interest accruing thereon.

### Count 23
**Aiding and Abetting Breach of Fiduciary Duty Against Duff & Phelps, C&W and John and Jane Does in Connection with the Seritage Transaction**

640.    Plaintiffs Sears Holdings, the Real Estate Transferors and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

641.    As described herein, the Controlling Insider Shareholders, Directors and Officers of Sears Holdings owed fiduciary duties of good faith, care and loyalty to Sears Holdings and breached those duties.

642.    As described herein, the Real Estate Transferor Directors, Lampert and Meerschaert owed fiduciary duties of good faith, care and loyalty to the Real Estate Transferors and breached those duties.

643.    The Controlling Insider Shareholders, Directors and Officers of Sears Holdings, the Real Estate Transferor Directors, Lampert and Meerschaert, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care and loyalty as set forth fully herein.

644.    The Advisor Defendants knew that the Controlling Insider Shareholders, Directors and Officers of Sears Holdings and the Real Estate Transferor Directors, Lampert and Meerschaert had these fiduciary duties as alleged herein and that the Controlling Insider Shareholders, Directors and Officers of Sears Holdings and the Real Estate Transferor Directors, Lampert and Meerschaert were breaching their fiduciary duties, as alleged herein.

645.    The Advisor Defendants knew that the Controlling Insider Shareholders, Directors and Officers of Sears Holdings, the Real Estate Transferor Directors, Lampert and Meerschaert could not consummate the Seritage Transaction without their participation.  In the case of Duff & Phelps, it knew that Sears Holdings and its subsidiaries would require a solvency and fairness opinion to move forward with that transaction, and that the failure to obtain such opinions would doom the transaction.  In the case of C&W, it knew that its appraisals would determine the sale price that Seritage would pay to Sears for the transferred real estate and, in turn, the Seritage Rights price.

646.    Duff & Phelps aided and abetted the breaches of fiduciary duty and was an active and knowing participant in those breaches of fiduciary duty by, among other things:

    a.  Participating in meetings of the Sears Holdings Board that were designed to push the Seritage Transaction forward;

b. Issuing a solvency opinion in connection with the consummation of the Seritage Transaction despite knowing there were serious flaws and inaccuracies in management's projections;

c. Failing to raise concerns regarding the credibility of management's projections and the Duff & Phelps solvency opinions to the Sears Holdings Board, despite years of Sears's failure to meet projections;

d. Issuing a fairness opinion that repackaged and blessed C&W's appraisal work without verifying its accuracy or quality;

e. Knowing that Sears Holdings and the Real Estate Transferors would proceed with the Seritage Transaction only if they could obtain a solvency opinion and nevertheless providing that solvency opinion despite grave doubts regarding the accuracy and reliability of the projections upon which the solvency opinion was premised; and

f. Knowing that Sears Holdings and the Real Estate Transferors would be more likely to proceed with the Seritage Transaction if they could obtain a fairness opinion corroborating C&W's appraisal work but then producing a fairness opinion that (i) relied on revenue figures that were taken directly from C&W's deficient appraisal work, thereby rendering the fairness opinion derivative of C&W's appraisal work and useless as an independent check of that work, and (ii) failed to adequately capture the significant value of Seritage's recapture and redevelopment rights, thereby undervaluing Seritage and disregarding the material underpayment to Sears Holdings and the Real Estate Transferors.

647.   C&W colluded in or aided and abetted the breaches of fiduciary duty and was an active and knowing participant in those breaches of fiduciary duty by, among other things:

a. Participating in meetings of the Sears Holdings Board that were designed to push the Seritage Transaction forward;

b. Preparing the appraisals that formed the basis for the Seritage Transaction;

c. Presenting and defending those appraisals to Duff & Phelps and the Sears Holdings Board despite knowledge that the appraisals:   (1) deviated significantly from industry standard appraisal methodology and (2) significantly undervalued the subject properties;

d. Knowing that Sears Holdings and the Real Estate Transferors required the appraisals to set the pricing for the Seritage Transaction and nevertheless failing to perform those appraisals in accordance with professional standards; and

e. Failing to apprise Sears Holdings of the onerous lease terms that should have factored into the appraisals.

213

648.    Plaintiffs Sears Holdings, the Real Estate Transferors and the Creditors' Committee have been damaged substantially as a direct and proximate result of the Advisor Defendants' aiding and abetting breaches of fiduciary duty set forth fully herein.    The Controlling Insider Shareholders, Directors and Officers of Sears Holdings, the Real Estate Transferor Directors, Lampert and Meerschaert could not have consummated the Seritage Transaction without the approval and participation of the Advisor Defendants.

649.    By virtue of the foregoing, Plaintiffs Sears Holdings, the Real Estate Transferors, Lampert and the Creditors' Committee are entitled to judgments against the Advisor Defendants and John and Jane Does in an amount to be determined at trial.

## Count 24
**Avoidance and Recovery of Any Payments Made by the Related-Party Financings Borrowers on Each of the Related-Party Financings as Actual Fraudulent Transfers Against the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the Related-Party Financers (the ESL Financers, Tisch, BS 2018, Berkowitz and Fairholme Capital), Cascade and John and Jane Does**
**(11 U.S.C. §§ 544(b), 548(a)(1)(A), 550(a)(1)–(2) and 1107(a); NY DCL § 276;**
**6 Del. C. § 1304(a)(1); 740 Ill. Comp. Stat. 160/5(a)(1))**

650.    Plaintiffs the Related-Party Financings Borrowers[40] and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

651.    Each of the subject payments made on account of the Related-Party Financings was made within two years of the Petition Date.

652.    Each of the Related-Party Financers and Other Financers was the initial transferee of the payments made by Sears Holdings and, on information and belief, the other Related-Party

---

[40]    Plaintiffs in Counts 24 and 25 are the Related-Party Financings Borrowers.  Each of the Related-Party Financings Borrowers are Debtors and include Sears Holdings, Sears Roebuck, SRAC, Kmart, Kmart of Washington, Kmart of Illinois, Big Beaver, Innovel, MaxServ, Sears Development, Management Corp., SHC Desert Springs and Troy Coolidge.

Financings Borrowers on account of each of the Related-Party Financings.  On information and belief, the ESL Defendants, Cyrus Defendants and Fairholme Defendants were subsequent transferees of those fraudulent transfers.

653.    All payments made pursuant to each of the Related-Party Financings were transfers of the Related-Party Financings Borrowers' property made to and for the benefit of the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, Related-Party Financers and Cascade.

654.    Each of the Related-Party Financings was an insider transaction that involved self-dealing, was not entirely fair to each of the Related-Party Financings Borrowers and should never have been entered into.  At the time each of the Related-Party Financings was obtained, each of the Related-Party Financings Borrowers was insolvent, had unreasonably small capital and/or was unable to pay its debts when they became due.  The only purpose, or alternatively, the predominant purpose, for the loans was to enable Sears to make lease payments to Seritage to ensure Seritage's value and profitability until Seritage could succeed without Sears.  Under these circumstances, the Related-Party Financings should not be deemed to have provided value.  Even assuming, arguendo, that the Related-Party Financings are deemed to have provided value, an intent to hinder, delay and/or defraud is shown because each of the Related-Party Financings Borrowers did not receive reasonably equivalent value, and, to the extent any value was given, it was not provided in good faith.

655.    Each of the Related-Party Financings was or should be deemed an equity contribution, rather than debt transaction, such that the Related-Party Financings Borrowers can avoid any payments made in connection therewith as improper dividends or equity transfers.

656.   All payments made pursuant to each of the Related-Party Financings were transfers of the Related-Party Financings Borrowers' property made to and for the benefit of the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the other Related-Party Financers and Cascade with the actual intent to hinder, delay and/or defraud the Related-Party Financings Borrowers and their applicable creditors.

657.   The Related-Party Financings Borrowers were forced to make payments pursuant to their alleged contractual obligations under the terms of the Related-Party Financings.  The incurrence of each of the obligations pursuant to the Related-Party Financings was made with the intent to hinder, delay and/or defraud the Related-Party Financings Borrowers and their creditors, as were each of the payments made in connection therewith, as indicated by the following traditional badges of fraud, several of which make clear that the Related-Party Financings also were equity contributions, not debt, which itself strongly indicates actual fraudulent intent:

    a.   Related-Party Financers include affiliates of Sears Holdings's controlling shareholders and directors and Seritage's controlling shareholders and directors;

    b.   Each of the Related-Party Financings was made or directed by the ESL Defendants through Lampert, who exercised undue influence over and control of Sears Holdings in his roles as an insider;

    c.   Lampert and the other Defendants who caused the Related-Party Financings Borrowers to incur the alleged obligations and to make subsequent fraudulent payments in connection therewith, obtained and maintained control of the funds they provided to the Related-Party Financings Borrowers and the subsequent payments of "interest" and "fees" to the Financers and subsequent rent payments to Seritage;

    d.   Specifically, from 2016 to 2018, the ESL Defendants received from Sears Holdings and, on information and belief, the other Related-Party Financings Borrowers at least $450 million in cash "interest" and "fees";

    e.   The Related-Party Financings and ensuing payment of "interest" and "fees" were undertaken at a time when the Related-Party Financings Borrowers were insolvent, had unreasonably small capital and were unable to pay debts which they had or intended to incur;

f.   The Related-Party Financings were not made in the regular course of business as is evidenced by the fact that the terms of each of the Related-Party Financings were not negotiated between the parties but rather were established unilaterally by Lampert;

g.   The transactions were closed hastily and without the same standards of due diligence when compared to third-party financings and the Directors failed both to vet the Related-Party Financings adequately or conduct market checks in each instance;

h.   The Related-Party Financings were equity contributions, not loans, and, insofar as the transacting parties attempted to dress the Related-Party Financings as loans, it constitutes evidence of their intent to hinder, delay and/or defraud Sears Holdings and its creditors;

i.   The Related-Party Financings were made in order to protect the Controlling Insider Shareholders' investments in Seritage, which relied on Sears to make lease payments and would undoubtedly be negatively impacted by Sears's bankruptcy filing;

j.   The Related-Party Financings were part of the Controlling Insider Shareholders' insider scheme to purchase Sears's remaining assets for their own benefit and to the substantial detriment of Sears and its creditors;

k.   These were not arm's length transactions and, as such, did not reflect financing terms that could have been obtained from outside lending institutions. During the period from 2016 to 2018, the Debtors were unable to obtain financing in any meaningful amount from sources other than ESL (or at a minimum without ESL's significant involvement) and, therefore, the Debtors were forced to enter into these Related-Party Financings with the Related-Party Financers and the Other Financers;

l.   During this period, Sears's financial performance continually declined, and Sears became completely reliant upon ESL to fund its operations. In fact, this was Sears's preferred way of funding because it was able to get the necessary money without any of the procedures of soliciting and negotiating with third party financers. Sears Holdings sought capital from ESL because the terms ESL could offer were "not acceptable" to outside lenders. Meanwhile, ESL—as an insider with control over Sears—was fully aware of Sears's declining performance and these inevitable chapter 11 cases. ESL used Sears's dependence on ESL to gain liens on Sears's remaining unencumbered assets. The Related-Party Financings amounted to an attempt by Lampert, ESL and other insiders to encumber Sears's capital assets in anticipation of these chapter 11 cases and ultimately to credit bid for such assets, and would have been deemed equity, but for the Sale Order; and

217

m. Critically, there was no plan or expectation that the Related-Party Financings would be repaid on any schedule, and when the loans were entered into, the Debtors were not adequately capitalized and were unable to service the resulting "debt."

658.    As a result of their abuse of power, Lampert and the ESL Defendants caused the Related-Party Financings Borrowers to pay "interest" and "fees" on the Related-Party Financings with an actual intent to hinder, delay and/or defraud the Related-Party Financings Borrowers and their creditors, to the detriment and harm of such creditors. They knew or were reckless or grossly negligent in not knowing that the Related-Party Financings were unnecessary, would result in ill-advised obligations and/or otherwise were unfair to the Related-Party Financings Borrowers and their creditors. These insiders therefore acted in bad faith and were motivated by interests other than to provide value to Sears, and, thus, had the motive and opportunity to commit fraud.

659.    As a result of the Related-Party Financings Borrowers entering into the Related-Party Financings, the Related-Party Financings Borrowers and their creditors have been harmed.

660.    Under sections 544(b), 548, 550 and 1107(a) of the Bankruptcy Code, Plaintiffs the Related-Party Financings Borrowers and the Creditors' Committee may avoid any transfer of an interest of the Related-Party Financings Borrowers that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. One or more creditors of the Related-Party Financings Borrowers hold allowed or allowable unsecured claims under section 502 of the Bankruptcy Code and, as such, could avoid the "interest" and "fees" made on account of the Related-Party Financings under applicable non-bankruptcy law.

661.    The "interest" and "fees" made on account of the Related-Party Financings should be avoided as actual fraudulent conveyances, and any payments made by Plaintiffs on each of the Related-Party Financings should be recovered pursuant to sections 544, 548 and 550 of the Bankruptcy Code and applicable state law, including but not limited to the fraudulent transfer and

fraudulent conveyance laws codified in 740 Ill. Com. Stat. Ann. 160/1, et seq. of the Illinois

Compiled Statutes.[41]

662.     By virtue of the foregoing, Plaintiffs the Related-Party Financings Borrowers and

the Creditors' Committee are entitled to a judgment against each of the ESL Defendants, the Cyrus

Defendants, the Fairholme Defendants, the other Related-Party Financers, Cascade and John and

Jane Does in the amount of "interest" payments and "fees" they received, directly or indirectly, in

connection with each of the Related-Party Financings.

### Count 25
**Avoidance and Recovery of Any Payments Made by the Related-Party Financings
Borrowers on Each of the Related-Party Financings as Constructive Fraudulent Transfers
Against the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the
Related-Party Financers (the ESL Financers, Tisch, BS 2018, Berkowitz and Fairholme
Capital), Cascade and John and Jane Does
(11 U.S.C. §§ 544(b), 548(a)(1)(B) and 550(a)(1)–(2) and 1107(a); NY DCL §§ 273, 274 and
275; 6 Del. C. §§ 1304(a)(2) and 1305(a);740 Ill. Comp. Stat. 160/5(a)(2) and 160/6(a))**

663.     Plaintiffs the Related-Party Financings Borrowers and the Creditors' Committee

repeat and reallege each and every allegation set forth in the entirety of this First Amended

Complaint as though fully set forth herein.

664.     As alleged herein, the Related-Party Financings Borrowers were unjustifiably

required to pay "interest" and other "fees" under the terms of each of the Related-Party Financings;

all payments made pursuant to each of the Related-Party Financings were transfers of the

applicable Related-Party Financings Borrowers' property made to and for the benefit of the ESL

Defendants, the Cyrus Defendants, the Fairholme Defendants, the other Related-Party Financers

and Cascade for no consideration or for less than reasonably equivalent value.

---

[41] Even though claims for avoidance of the Related-Party Financings were released under the terms of the
Asset Purchase Agreement entered into between the Debtors and ESL in connection with the February sale of the
Debtors' assets, this does not preclude the Court from finding that the Related-Party Financings were entered into with
actual intent to hinder, delay and/or defraud creditors, and therefore, that any payments of "interest" or "fees" are
recoverable as fraudulent transfers.

665.    Moreover, the payments made on each of the Related-Party Financings were paid (a) when the Related-Party Financings Borrowers were insolvent, (b) at a time when the Related-Party Financings Borrowers had unreasonably small capital and/or (c) at a time when the Related-Party Financings Borrowers intended to incur or believed they would incur debts beyond their ability to pay as they matured.

666.    As a result of the Related-Party Financings Borrowers entering into the Related-Party Financings, the Related-Party Financings Borrowers and their creditors have been harmed.

667.    Under sections 544(b), 548, 550 and 1107(a) of the Bankruptcy Code, Plaintiffs the Related-Party Financings Borrowers and the Creditors' Committee may avoid any transfer of an interest of the Related-Party Borrowers that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  One or more creditors of the Related-Party Financings Borrowers hold allowed or allowable unsecured claims under section 502 of the Bankruptcy Code and, as such, could avoid the "interest" and "fees" made on account of the Related-Party Financings under applicable non-bankruptcy law.

668.    The "interest" and "fees" made on account of the Related-Party Financings should be avoided as constructive fraudulent conveyances, and any payments made by the Related-Party Financings Borrowers under each of the Related-Party Financings should be avoided under sections 544 and 550 of the Bankruptcy Code and applicable state law, including but not limited to the fraudulent transfer and fraudulent conveyance laws codified in 740 Ill. Com. Stat. Ann. 160/1, *et seq.* of the Illinois Compiled Statutes. [42]

---

[42] Even though claims for avoidance of the Related-Party Financings were released under the terms of the Asset Purchase Agreement entered into between the Debtors and ESL in connection with the February sale of the Debtors' assets, this does not preclude the Court from finding that the Related-Party Financings Borrowers were insolvent, were rendered insolvent by and/or lacked sufficient capital to pay debts as they came due when they obtained the Related-Party Financings, **and** that the Related-Party Financings Borrowers received less than reasonably

669.    By virtue of the foregoing, Plaintiffs the Related-Party Financings Borrowers and the Creditors' Committee are entitled to a judgment against each of the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the other Related-Party Financers, Cascade and John and Jane Does in the amount of "interest" payments and "fees" they received, directly or indirectly, in connection with each of the Related-Party Financings.

## Count 26
**Avoidance and Recovery of the Obligations Incurred and the Liens Granted by the Additional Subsidiary Guarantors on the 2018 Term Loan Facility as Constructive Fraudulent Transfers Against the ESL Financers, the Cyrus 2018 Term Loan Financers and John and Jane Does**
**(11 U.S.C. §§ 544(b); 548(a)(1)(B), 550(a)(1)–(2) and 1107(a); NY DCL §§ 273, 274 and 275; 6 Del. C. §§ 1304(a)(2) and 1305(a); 740 Ill. Comp. Stat. 160/5(a)(2) and 160/6(a))**

670.    Plaintiffs the Additional Subsidiary Guarantors on the 2018 Term Loan Facility[43] and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

671.    The 2018 Term Loan Facility is one of the Related-Party Financings.  It was entered into within two years of the Petition Date.

672.    The Additional Subsidiary Guarantors on the 2018 Term Loan Facility received no consideration for the obligations they incurred pursuant to the terms of the 2018 Term Loan Facility.  Moreover, the Additional Subsidiary Guarantors on the 2018 Term Loan Facility pledged numerous valuable assets as collateral for the 2018 Term Loan Facility.  Had those obligations not been wrongfully incurred and those assets not been wrongfully pledged as collateral, the

---

equivalent value in exchange for payments of "interest" and "fees," which transfers of value otherwise could have been used for the benefit of creditors.

[43]    Plaintiffs in this Count 26 are the Additional Subsidiary Guarantors on the 2018 Term Loan Facility.  The Additional Subsidiary Guarantors on the 2018 Term Loan Facility are Debtors and include Sears Development, Sears Brands, Sears Brands Business Unit and STI Merchandising.

Additional-Subsidiary Guarantors on the 2018 Term Loan Facility could have otherwise monetized those assets and generated value that could have been used to satisfy creditors.

673.    The ESL Financers and the Cyrus 2018 Term Loan Financers are lenders on the 2018 Term Loan Facility, and, thus, recipients of the liens granted in connection with the 2018 Term Loan Facility.

674.    All obligations incurred and liens granted pursuant to the 2018 Term Loan Facility benefited the ESL Financers and the Cyrus 2018 Term Loan Financers to the detriment of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility.

675.    Each of the Related-Party Financings, including the 2018 Term Loan Facility, was made or directed by the ESL Defendants, through Lampert, who exercised undue influence over and control of Sears in his roles as an insider, orchestrated each of the Related-Party Financings and caused the Related-Party Financings Borrowers to enter into each of the Related-Party Financings for the benefit of the Related-Party Financers and the Other Financers, and, indirectly, for the benefit of Lampert and other insiders and to the detriment of the Related-Party Financings Borrowers and the Additional Subsidiary Guarantors on the 2018 Term Loan Facility.  The terms of each of the Related-Party Financings were not negotiated between the parties but rather were established unilaterally by Lampert and the other members of the Sears Holdings Board.

676.    Moreover, the Additional Subsidiary Guarantors on the 2018 Term Loan Facility were required by the terms of the Related-Party Financings to pledge collateral, in exchange for which they did not receive any value.  The guarantors on the 2018 Term Loan Facility included all of the guarantors on the First Lien Credit Agreement as well as "additional subsidiary guarantors" that were not otherwise borrowers or guarantors under the First Lien Credit Agreement, including Plaintiffs Sears Brands Business Unit, Sears Brands, Sears Development and STI Merchandising.

These Additional Subsidiary Guarantors on the 2018 Term Loan Facility pledged certain IP and intangible assets in connection with the 2018 Term Loan Facility, but, on information and belief, none of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility received any benefit or value in exchange for committing collateral and incurring obligations under the 2018 Term Loan Facility.

677.    For these reasons, the incurrence of obligations and the granting of liens pursuant to the 2018 Term Loan Facility were made for no consideration, without fair consideration or for less than reasonably equivalent value.

678.    These obligations were incurred (a) when the Additional-Subsidiary Guarantors on the 2018 Term Loan Facility were insolvent, (b) at a time when the Additional-Subsidiary Guarantors on the 2018 Term Loan Facility had unreasonably small capital and/or (c) at a time when the Additional-Subsidiary Guarantors on the 2018 Term Loan Facility intended to incur or believed they would incur debts beyond their ability to pay as they matured.

679.    As a result of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility pledging collateral in connection with the 2018 Term Loan Facility, the Additional-Subsidiary Guarantors on the 2018 Term Loan Facility and their creditors have been harmed.

680.    Under sections 544(b), 548, 550 and 1107(a) of the Bankruptcy Code, Plaintiffs the Additional Subsidiary Guarantors on the 2018 Term Loan Facility and the Creditors' Committee may avoid any granting of liens and incurrence of obligations by the Additional Subsidiary Guarantors on the 2018 Term Loan Facility that are voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.  One or more creditors of the Additional-Subsidiary Guarantors on the 2018 Term Loan Facility hold allowed or allowable unsecured claims

223

under section 502 of the Bankruptcy Code and, as such, could avoid the pledges of collateral made

on account of the Related-Party Financings under applicable non-bankruptcy law.

681.    The pledges of collateral made in connection with the 2018 Term Loan Facility

should be avoided as constructive fraudulent conveyances under sections 544, 548 and 550 of the

Bankruptcy Code and applicable state law, including but not limited to the fraudulent transfer and

fraudulent conveyance laws codified in 740 Ill. Com. Stat. Ann. 160/1, *et seq.* of the Illinois

Compiled Statutes.[44]

682.    By virtue of the foregoing and in lieu of actual avoidance, which is impractical at

this time, Plaintiffs the Additional Subsidiary Guarantors on the 2018 Term Loan Facility and the

Creditors' Committee are entitled to a judgment against the ESL Financers, the Cyrus 2018 Term

Loan Financers and John and Jane Does in the amount by which the assets pledged as collateral in

connection with the 2018 Term Loan Facility lost value by nature of their having been

collateralized, and damages in an amount to be determined at trial.

---

[44]    Even though claims for avoidance of the 2018 Term Loan Facility were released under the terms of the Asset Purchase Agreement entered into between the Debtors and ESL in connection with the February sale of the Debtors' assets, this does not preclude the Court from finding that the Additional-Subsidiary Guarantors were insolvent, were rendered insolvent by and/or lacked sufficient capital to pay debts as they came due when they obtained the 2018 Term Loan Facility, *and* that the Additional-Subsidiary Guarantors received less than reasonably equivalent value in exchange for pledging collateral, which transfer of value otherwise could have been monetized for the benefit of creditors.

**Count 27**
**Unjust Enrichment Relating to the Related-Party Financings**
**Against the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the**
**Related-Party Financers (the ESL Financers, Tisch, BS 2018, Berkowitz and Fairholme**
**Capital), Cascade, the Controlling Insider Shareholders, the Conflicted Directors**
**(Lampert, Alvarez, Berkowitz, Kamlani, Mnuchin and Tisch) of Sears Holdings**
**and John and Jane Does**

683.    Plaintiffs the Related-Party Financings Borrowers and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

684.    Without justification, the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the other Related-Party Financers, Cascade, the Controlling Insider Shareholders—Lampert, the ESL Shareholders, Fairholme Capital and Tisch—and the Conflicted Directors—Lampert, Alvarez, Berkowitz, Kamlani, Mnuchin and Tisch—have retained cash, credit and other things of value that rightly belong to the Related-Party Financings Borrowers and their creditors. The Defendants on this Count 27 were enriched by virtue of their wrongful acts and omissions and through the wrongful receipt of payments and distributions relating to the Related-Party Financings, which enrichment directly caused harm to the Related-Party Financings Borrowers. Retention of those proceeds by the Defendants on this Count 27 violates fundamental principles of justice, equity and good conscience.

685.    The ESL Defendants, Berkowitz, Fairholme Capital (through its founder and president, Berkowitz, who contemporaneously was employed by Fairholme Capital and a member of the Sears Holdings Board), Tisch and BS 2018 (through its investor and manager, Tisch, who contemporaneously was an investor in ESL and a member of the Sears Holdings Board) have been unjustly enriched by abusing their insider positions at Sears Holdings to direct and facilitate a self-dealing scheme to enrich themselves unfairly and unjustly.

686.    The ESL Financers are lenders on each of the Related-Party Financings and, thus, received "interest payments" and other "fees" on each of the loans totaling at least $450 million. On information and belief, the other ESL Defendants are subsequent transferees of those payments. As alleged herein, the ESL Defendants are insiders due to their control by Lampert, who at all relevant times was a director of Sears Holdings, Chairman of the Sears Holdings Board and CEO of Sears.  Lampert crafted each of the Related-Party Financings to and for ESL's benefit rather than for the best interests of Sears Holdings.

687.    Berkowitz was a member of the Sears Holdings Board when he individually invested $20 million in the Second Lien Credit Facility and, on information and belief, was paid "interest" and "fees" by Sears Holdings and the other Related-Party Financings Borrowers.

688.    Fairholme Capital participated in the Second Lien Credit Facility and, on information and belief, was paid "interest" and "fees" by Sears Holdings and the other Related-Party Financings Borrowers.  Upon information and belief, Fairholme Funds is a subsequent transferee of the "interest" and "fees" paid on account of the Related-Party Financings.

689.    Tisch was a controlling shareholder and member of the Sears Holdings Board when he individually invested $20 million in connection with the Second Lien Credit Facility and, on information and belief, was paid "interest" and "fees" by Sears Holdings and the other Related-Party Financings Borrowers.

690.    BS 2018 is a lender on the FILO Loan Facility, which closed on March 21, 2018. On information and belief, BS 2018 received "interest payments" and "fees" from the Related-Party Financings Borrowers in connection with the FILO Loan Facility.  Tisch is an investor in BS 2018 and at all relevant times was a member of the Sears Holdings Board and, thus, was responsible for approving the FILO Loan Facility.

226

691.    Cascade and the Cyrus Defendants also have unjustly retained cash, credit and other things of value that rightly belongs to the Related-Party Financings Borrowers and their creditors by virtue of their wrongful acts through the wrongful receipt of payments and distributions relating to the Related-Party Financings.  Cascade is a lender on the 2016 Secured Loan Facility and, thus, a recipient of "interest payments" and "fees" made on account thereof.  The Cyrus Financers are lenders on the Letter of Credit Facility and 2018 Term Loan Facility and, thus, received "interest payments" and "fees" made on account thereof; and, on information and belief, the Cyrus Defendants are subsequent transferees of those payments.

692.    Each of the Conflicted Directors either were individual lenders on certain of the Related-Party Financings or were affiliated with the Related-Party Financers, and, as such, stood to benefit from these transactions.

693.    The Defendants on this Count 27 therefore are liable to the Related-Party Financings Borrowers for unjust enrichment.

694.    Plaintiffs seek restitution from the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the other Related-Party Financers, Cascade, the Controlling Insider Shareholders and the Conflicted Directors and an order of this Court disgorging all payments, transfers, credit, profits, fees, benefits, incentives and other things of value obtained by the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the other Related-Party Financers, Cascade, the Controlling Insider Shareholders and the Conflicted Directors as a result of their wrongful conduct and breaches of fiduciary duty.

695.    By virtue of the foregoing, Plaintiffs the Related-Party Financings Borrowers and the Creditors' Committee are entitled to a judgment against each of the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the other Related-Party Financers, Cascade, the

Controlling Insider Shareholders, the Conflicted Directors and John and Jane Does in the amount of the "interest" and "fees" they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives and other compensation they received, directly or indirectly, in connection with each of the Related-Party Financings.

**<u>Count 28</u>**
**Breach of Fiduciary Duty Against the Controlling Insider Shareholders**
**and John and Jane Does in Connection with the Related-Party Financings**

696.     Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

697.     The Controlling Insider Shareholders—Lampert, the ESL Shareholders, Fairholme Capital and Tisch—owed fiduciary duties to Sears Holdings because, as a control group, they owned a majority and/or controlling interest of Sears Holdings and exercised control over the business affairs of Sears Holdings.

698.     As controlling shareholders of Sears Holdings, Lampert, the ESL Shareholders, Fairholme Capital and Tisch owed Sears Holdings fiduciary duties of loyalty, care and good faith.

699.     As controlling shareholders of Sears Holdings, Lampert, the ESL Shareholders, Fairholme Capital and Tisch were obligated by their duty of loyalty, but failed and refused to put Sears Holdings's interests ahead of their own individual interests.

700.     As controlling shareholders of Sears Holdings, Lampert, the ESL Shareholders, Fairholme Capital and Tisch were obligated by their duty of care, but failed and refused to use the amount of care an ordinarily careful and prudent person would exercise in similar circumstances and to consider all material information reasonably available.

701.    As controlling shareholders of Sears Holdings, Lampert, the ESL Shareholders, Fairholme Capital and Tisch were obligated by their duty of good faith, but failed and refused not to intentionally fail to act in the face of a known duty to act.

702.    Lampert, the ESL Shareholders, Fairholme Capital and Tisch owned shares in Sears Holdings prior to and following each of the Related-Party Financings and at the times when payments were made to the Related-Party Financers and the Other Financers in connection with the Related-Party Financings.  Tisch also owned shares in ESL at the times when payments were made to the ESL Financers in connection with the Related-Party Financings.  Lampert, the ESL Shareholders, Fairholme Capital and Tisch are all affiliated with the Related-Party Financers and received financial benefits from payments made to the Related-Party Financers in connection with the Related-Party Financings.  Moreover, the primary motive behind the Related-Party Financings was to sustain Sears as a going concern just long enough to protect the value of Seritage, in which Lampert, the ESL Shareholders, Fairholme Capital and Tisch all had investments.  Due to these financial incentives, Lampert, the ESL Shareholders, Fairholme Capital and Tisch were interested in the Related-Party Financings and, thus, breached their fiduciary duties of loyalty, good faith and care when they engaged in acts of self-dealing in the Related-Party Financings.

703.    ESL is entirely controlled by Lampert, who served as director, Chairman of the Sears Holdings Board and CEO of Sears at all relevant times.  On information and belief, Lampert designed the Related-Party Financings and presented their terms to the Directors and Officers. Lampert and the ESL Shareholders also initially owned approximately 44% of the Seritage Operating Partnership directly and approximately 2% of the Operating Partnership indirectly through their ownership of Seritage Class A shares, and as of September 2019, they owned approximately 6% of Seritage Class A shares, which (directly or through subsidiaries) holds title

to the Seritage real estate assets, and, thus, benefited materially from the rent payments made to and other rights extended to Seritage.

704.    Fairholme Capital was a controlling shareholder of Sears Holdings.  Alvarez, a director of Fairholme Capital's parent company, was a member of the Sears Holdings Board at the time when the 2016 Term Loan Facility, 2016 Secured Loan Facility, Second Lien Credit Agreement, Letter of Credit Facility and 2017 Secured Loan Facility were obtained.  Berkowitz, Fairholme Capital's founder and President, was a member of the Sears Holdings Board at the time when the 2016 Term Loan Facility, 2016 Secured Loan Facility, Second Lien Credit Agreement, Letter of Credit Facility and 2017 Secured Loan Facility were obtained.  Fairholme Capital and Berkowitz also participated in the Second Lien Credit Agreement, loaning an aggregate $25 million to Sears Holdings and other Related-Party Financings Borrowers.  Between December 31, 2015 and March 16, 2018, Fairholme Capital (together with Berkowitz, Fairholme Capital's founder and Chief Investment Officer and President of Fairholme Capital's parent company) held between 13% and 5% of Seritage stock.  On information and belief, Fairholme Capital and Berkowitz held Seritage shares at the time when each of the Related-Party Financings occurred.

705.    Tisch owned or controlled between 3% and 4% from 2016 to 2018 when the Related-Party Financings were obtained.  Tisch was a Sears Holdings shareholder, member of the Sears Holdings Board and manager of BS 2018 at the time when BS 2018 participated in the FILO Loan Facility.  Tisch individually loaned $20 million under the Second Lien Credit Agreement.  On information and belief, Tisch also held shares in Seritage when each of the Related-Party Financings occurred.

706. By nature of their control over Sears Holdings, the Controlling Insider Shareholders were able to and in fact did cause Sears Holdings to enter into the Related-Party Financings, for their own benefit.

707. As a result of their self-dealing, the Controlling Insider Shareholders received monetary and other benefits at the expense of Sears Holdings and its creditors. The Defendants on this Count 29 have the burden of proving that the Related-Party Financings were entirely fair to Sears Holdings.

708. As a direct and proximate result of the Controlling Insider Shareholders' acts and omissions, the Related-Party Financings Borrowers unjustifiably paid "interest" and "fees" and needlessly suffered operating losses and other injury for this and other reasons. Moreover, as a direct and proximate result of the Controlling Insider Shareholders' acts and omissions, Sears Holdings's faux indebtedness increased as its assets were wasted by the wrongful prolonging of its businesses. The Controlling Insider Shareholders are liable to Sears Holdings to compensate for these and other results of their breaches of fiduciary duties.

709. By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee are entitled to a judgment against each of the Controlling Insider Shareholders and John and Jane Does in the amount of "interest" and "fees" they received, directly or indirectly, and any other payments, profits, fees, benefits, incentives and other compensation they received, directly or indirectly, in connection with each of the Related-Party Financings, plus the amount in which assets were wasted because of the Controlling Insider Shareholders' failure to maximize value, as well as the amount by which Sears Holdings's insolvency increased as a result of the incurrence of additional debt that would not have been incurred but for the Controlling Insider Shareholders' breaches.

**Count 29**

**Breach of Fiduciary Duty Against the Conflicted Directors (Lampert, Alvarez, Berkowitz, Kamlani, Mnuchin and Tisch) of Sears Holdings and John and Jane Does in Connection with the Related-Party Financings**

710.    Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

711.    The Conflicted Directors owed a fiduciary duty to Sears Holdings as directors of Sears Holdings.

712.    As directors of Sears Holdings, the Conflicted Directors owed Sears Holdings fiduciary duties of loyalty, care and good faith when they approved the Related-Party Financings.

713.    As a director of Sears Holdings, each Conflicted Director was obligated by his or her duty of loyalty to place Sears Holdings's interests above any interest possessed by the Conflicted Director that was not shared by the corporation generally.

714.    As a director of Sears Holdings, each Conflicted Director was obligated by his or her duty of care, but failed and refused to exercise the amount of care that an ordinarily careful and prudent person would exercise in similar circumstances, and to consider all material information reasonably available.

715.    As a director of Sears Holdings, each Conflicted Director was obligated by his or her duty of good faith, but failed and refused not to intentionally fail to act in the face of a known duty to act.

716.    The Conflicted Directors—Lampert, Tisch, Mnuchin, Kamlani, Alvarez and Berkowitz—acted individually as Related-Party Financers or were otherwise affiliated with the Related-Party Financers and, thus, stood to benefit from the Sears Holdings Board's approval of the Related-Party Financings, and due to these financial incentives, were interested in the Related-

Party Financings.  Lampert was a member of the Sears Holdings Board at all relevant times and, though he recused himself from voting, he nonetheless advocated and lobbied for board approval of the Related-Party Financings, directly contravening the RPT Approval Policy.  Kamlani was a member of the Sears Holdings Board at all relevant times and approved each of the Related-Party Financings.  Tisch was a member of the Sears Holdings Board at all relevant times and approved each of the Related-Party Financings, including the Second Lien Credit Agreement, which he participated in as a lender, and the FILO Loan Facility, which BS 2018 participated in as a lender. Alvarez was a member of the Sears Holdings Board from December 2013 to May 2017 and approved all of the Related-Party Financings that occurred during that time, including the Second Lien Credit Agreement, which Fairholme Capital participated in as a lender.  Berkowitz was a member of the Sears Holdings Board from February 2016 to October 2017 and approved all of the Related-Party Financings that occurred during that time, including the Second Lien Credit Agreement, which he participated in as a lender.  Mnuchin was a director from March 2005 to December 2, 2016 and approved all of the Related-Party Financings that occurred during that time. The Conflicted Directors also personally owned or were affiliated with entities that owned operating or equity interests in Seritage, and, thus, stood to benefit from approval of the Related-Party Financings, as the proceeds of the Related-Party Financings made it possible for Sears to pay rent to Seritage.

717.    The Conflicted Directors, acting both individually and collectively, breached their respective duties of loyalty and good faith, by, among other things:

    a.  Acting in their own interests by approving and/or lobbying for the Related-Party Financings even though they knew, or were reckless or grossly negligent in not knowing, that Sears Holdings was or would be rendered insolvent, inadequately capitalized and unable to pay its debts as they came due;

    b.  Causing Sears Holdings and the other Related-Party Financings Borrowers to incur upward of $4.2 billion in "debt" and pay more than $400 million in

"interest" and "fees" to the Related-Party Financers over a period in which Sears incurred approximately $5 billion in net losses;

c. Failing to consider meaningfully whether the transactions were fair from the perspective of Sears Holdings or its creditors, especially in light of their inside nature—an analysis they were required to perform as independent directors serving on the RPT Committee;

d. Participating in discussions related to the Related-Party Financings and voting despite their conflicts, in direct contravention of the RPT Approval Policy, which provided that no director shall participate in any discussion or approval of a related-party transaction for which he or she is a related party;

e. Failing to assess whether the transactions were truly capable of addressing Sears Holdings's massive liquidity problems, which was the stated purpose of the Related-Party Financings;

f. Failing to retain advisors to opine on fairness or solvency and instead rubber-stamping the Related-Party Financings at the direction of Lampert;

g. Relying on patently unreasonable financial projections, despite knowing or being reckless or grossly negligent in not knowing, that those projections already, at the time of each Related-Party Financings, had a long history of failing to materialize by shocking margins and were created at the direction of insiders such as Lampert and provided by the Officers, each of whom had a financial interest in the transactions;

h. Relying on inadequate business plans that assumed Sears would make a miraculous turnaround, despite the secular decline of the retail industry and the steady decline of Sears's own performance;

i. Failing to review or even maintain entity-by-entity financials, which would have enabled them to assess whether the Related-Party Financings Borrowers and Guarantors were solvent at the time they entered into each of the Related-Party Financings, as well as when they made payments in connection therewith;

j. Unjustly profiting from the Related-Party Financings by receiving "interest payments" and other "fees" from the Related-Party Financings Borrowers in connection with the Related-Party Financings; and

k. Entering into the Related-Party Financings for purposes other than a genuine effort to advance the welfare of Sears, including but not limited to protecting the investments of certain insiders such as Lampert and ESL, and the value of Seritage, which depended on Sears remaining outside of bankruptcy and continuing to make rent payments to Seritage for the initial few years after the Seritage Transaction.

718.    Accordingly, the Conflicted Directors, acting both individually and collectively, engaged in self-dealing and/or did not act in good faith, thereby breaching their fiduciary duties to Sears Holdings.

719.    The Conflicted Directors' breaches are in no way cleansed or otherwise mitigated by the actions of the RPT Committee because the RPT Committee failed to function effectively for the reasons highlighted elsewhere herein, including in Count 31.

720.    In essence, the RPT Committee was a rubberstamp that acquiesced in the Related-Party Financings based on its cursory review of insufficient, flawed information.  The Conflicted Directors have the burden of proving that the Related-Party Financings were entirely fair to Sears and other affected Debtors.

721.    As a direct and proximate result of the Conflicted Directors' acts and omissions, the Related-Party Financings Borrowers unjustifiably paid "interest" and "fees" and needlessly suffered operating losses and other injury for this and other reasons.  Moreover, as a direct and proximate result of the Conflicted Directors' acts and omissions, Sears Holdings's faux indebtedness increased as its assets were wasted by the wrongful prolonging of its businesses.  The Conflicted Directors are liable to Sears Holdings to compensate for these and other results of their breaches of fiduciary duties.

722.    By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee are entitled to a judgment against each of the Conflicted Directors and John and Jane Does for monetary damages, including but not limited to the payment of all "interest" and "fees" on account of the Related-Party Financings, plus the amount in which assets were wasted because of the Conflicted Directors' failure to maximize value as well as the amount by which Sears Holdings's

insolvency increased as a result of the incurrence of additional "debt" that would not have been incurred but for the Conflicted Directors' breaches.

### Count 30
**Breach of Fiduciary Duty Against the Members of the RPT Committee (Reese, DePodesta and Kunkler) of Sears Holdings and John and Jane Does in Connection with the Related-Party Financings**

723.    Plaintiffs Sears Holdings and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

724.    The Members of the RPT Committee owed fiduciary duties to Sears Holdings in their capacity as directors of Sears Holdings.  Specifically, the Members of the RPT Committee owed Sears Holdings duties of care, loyalty and good faith.

725.    As a director of Sears Holdings, each Director of the RPT Committee was obligated by his or her duty of care to exercise the same amount of care an ordinarily careful and prudent person would exercise in similar circumstances, and to consider all material information reasonably available.

726.    As a director of Sears Holdings, each Director of the RPT Committee was obligated by his or her duty of loyalty to place Sears Holdings's interests above any interest possessed by the Director of the RPT Committee that was not shared by the corporation generally.

727.    As a director of Sears Holdings, each Director of the RPT Committee was obligated by his or her duty of good faith not to intentionally fail to act in the face of a known duty to act.

728.    By failing to maintain entity-by-entity financials, hire advisors to opine on solvency before and after each financing transaction and consider meaningfully the fairness of the transactions to Sears Holdings, the Members of the RPT Committee consciously failed to exercise

oversight over internal compliance activity, and knew, or were reckless or grossly negligent in not knowing, that they were not discharging their fiduciary duties.

729.    Moreover, the Members of the RPT Committee, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of loyalty, care and good faith, by, among other things:

a.    Recommending the Related-Party Financings as members of the RPT Committee to the Sears Holdings Board for approval, despite their insider natures, and even though they knew, or were reckless or grossly negligent in not knowing, that Sears Holdings was insolvent, inadequately capitalized and unable to pay its debts as they came due;

b.    Failing to consider meaningfully whether the transactions were fair from the perspective of Sears Holdings or its creditors, especially in light of their inside nature—an analysis they were required to perform as independent directors serving on the RPT Committee;

c.    Allowing Lampert and other Conflicted Directors to participate in discussions related to the Related-Party Financings and vote despite their conflicts, in direct contravention of the RPT Approval Policy, which provided that no director shall participate in any discussion or approval of a related-party transaction for which he or she is a related party;

d.    Failing to assess whether the transactions were truly capable of addressing Sears Holdings's massive liquidity problems, which was the stated purpose of the Related-Party Financings;

e.    Failing to retain advisors to opine on fairness or solvency and instead rubber-stamping the Related-Party Financings at the direction of Lampert;

f.    Causing Sears Holdings and the other Related-Party Financings Borrowers to incur upward of $4.2 billion in "debt" and pay more than $450 million in "interest" and "fees" to the Related-Party Financers by voting to approve the Related-Party Financings;

g.    Relying on patently unreasonable financial projections, despite knowing or being reckless or grossly negligent in not knowing, that those projections already, at the time of each Related-Party Financings, had a long history of failing to materialize by shocking margins and were created at the direction of insiders such as Lampert and provided by the Officers, each of whom had a financial interest in the transactions;

237

h.   Relying on inadequate business plans that assumed Sears would make a miraculous turnaround, despite the secular decline of the retail industry and the steady decline of Sears's own performance;

i.   Failing to review or even maintain entity-by-entity financials, which would have enabled them to assess whether the Related-Party Financings Borrowers and Guarantors were solvent at the time they entered into each of the Related-Party Financings, as well as when they made payments in connection therewith;

j.   Reviewing the Related-Party Financings on an expedited basis, which prevented the RPT Committee from considering all material facts reasonably available, deliberating with one another and consulting experts and/or advisors; and

k.   Approving the Related-Party Financings for purposes other than a genuine effort to advance the welfare of Sears, including but not limited to the improper motive to protect the investments of certain insiders such as Lampert and ESL, and to protect the value of Seritage, which depended on Sears remaining outside of bankruptcy for the initial few years after the Seritage Transaction and continuing to make rent payments to Seritage for the initial few years after the Seritage Transaction.

730.   The Members of the RPT Committee are not entitled to the protection of the business judgment rule for the breach of their fiduciary duties because their decisions to approve the Related-Party Financings are explained only by bad faith or gross negligence.

731.   Accordingly, the Members of the RPT Committee, acting both individually and collectively, did not act in good faith or with requisite care, thereby breaching their fiduciary duties to Sears Holdings.

732.   As a direct and proximate result of the Members of the RPT Committee's acts and omissions, the Related-Party Financings Borrowers unjustifiably paid "interest" and "fees" and needlessly suffered operating losses and other injury for this and other reasons.  Moreover, as a direct and proximate result of the Members of the RPT Committee's acts and omissions, Sears Holdings's faux indebtedness increased as its assets were wasted by the wrongful prolonging of its businesses.  The Members of the RPT Committee are liable to Sears Holdings to compensate for these and other results of their breaches of fiduciary duties.

733.    By virtue of the foregoing, Plaintiffs Sears Holdings and the Creditors' Committee are entitled to a judgment against each of the Members of the RPT Committee and John and Jane Does for monetary damages, including but not limited to the payment of "interest" and "fees" on account of the Related-Party Financings, plus the amount in which assets were wasted because of the Members of the RPT Committee's failure to maximize value as well as the amount by which Sears Holdings's insolvency increased as a result of the incurrence of additional "debt" that would not have been incurred but for the Members of the RPT Committee's breaches.

<u>**Count 31**</u>
**Breach of Fiduciary Duty Against the Officers (Lampert, Schriesheim, Riecker and Huckins) of the Related-Party Financings Borrowers, the Directors (Schriesheim, Riecker and Huckins) of Certain of the Related-Party Financings Borrowers and John and Jane Does in Connection with the Related-Party Financings**

734.    Plaintiffs the Related-Party Financings Borrowers and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

735.    As officers of Sears and directors of certain Related-Party Financings Borrowers, Lampert, Schriesheim, Riecker and Huckins owed the Related-Party Financings Borrowers fiduciary duties of loyalty, care and good faith.

736.    Schriesheim served as CFO of Sears during the time when the 2016 Term Loan Facility, 2016 Secured Loan Facility and Second Lien Credit Agreement were obtained.

737.    Huckins served as Vice President, Treasurer of Sears during the time when the 2016 Term Loan Facility, 2016 Secured Loan Facility and Second Lien Credit Agreement were obtained.

738.    Riecker served as (i) Controller & Chief Accounting Officer of Sears during the time when the Second Lien Credit Agreement was obtained; (ii) Controller & Head of Capital Markets of Sears during the time when the Letter of Credit Facility and 2017 Secured Loan Facility were obtained; and (iii) as CFO of Sears during the times when the Second Lien Credit Agreement,

2018 Term Loan Facility, Mezzanine Loan Facilities, FILO Loan Facility, Consolidated Secured

Notes and accompanying amendments thereto were obtained.

739.    In addition to their roles as officers of Sears, Schriesheim, Riecker and Huckins

each served as directors of various Related-Party Financings Borrowers (other than Sears

Holdings), and, therefore, also owed fiduciary duties of loyalty, care and good faith to those

entities.

740.    Lampert, Schriesheim, Riecker and Huckins participated in the Seritage Rights

Offering and, thus, stood to profit from the Related-Party Financings, which were intended to keep

Sears afloat so that Sears could continue to make lease payments to Seritage.

741.    As an officer of Sears and a director of certain Related-Party Financings Borrowers,

each of the Officers was obligated by his duty of loyalty to place Sears's interests, including the

Related-Party Financings Borrowers' interests, above any interest possessed by the Officers that

was not aligned with the corporation generally.

742.    As an officer of Sears and a director of certain Related-Party Financings Borrowers,

each Officer was obligated by his duty of care to exercise the amount of care which an ordinarily

careful and prudent person would exercise in similar circumstances, and to consider all material

information reasonably available.

743.    As an officer of Sears and a director of certain Related-Party Financings Borrowers,

each Officer was obligated by his duty of good faith not to intentionally fail to act in the face of a

known duty to act.

744.    The Officers, acting both individually and collectively, breached their fiduciary

duties of loyalty, care and good faith, by, among other things:

      a.  Facilitating Sears Holdings's Board Approval of the Related-Party Financings,
          despite their personal interests in the transactions and even though they knew

or were reckless or grossly negligent in not knowing that the Related-Party Financings Borrowers were insolvent;

b. Creating, circulating, defending and inducing the Sears Holdings Board to rely on unrealistic and unachievable projections, notwithstanding that they knew, or were reckless or grossly negligent in not knowing, that Sears would vastly have to outperform its own prior performance in order to meet the projections;

c. Relying on inadequate business plans that assumed Sears would make a miraculous turnaround, despite the secular decline of the retail industry and the steady decline of Sears's own performance;

d. Failing to assess whether the transactions were truly capable of addressing the Related-Party Financings Borrowers' massive liquidity problems, which was the stated purpose of the Related-Party Financings;

e. Failing to recommend that the Related-Party Financings Borrowers obtain solvency opinions or other independent advice to assess the fairness to any borrower or guarantor of any of the Related-Party Financings;

f. Failing to review or even maintain entity-by-entity financials, which would have enabled them to assess whether the Related-Party Financings Borrowers and Guarantors were solvent at the time they entered into each of the Related-Party Financings, as well as when they made payments in connection therewith; and

g. Engaging in self-dealing by advocating for the Related-Party Financings for a purpose other than a genuine effort to advance the welfare of Sears, specifically, to protect their own investments in and to protect the value of Seritage, which depended on Sears remaining outside of bankruptcy for the initial few years after the Seritage Transaction.

745. As directors of certain Related-Party Financings Borrowers, Lampert, Schriesheim, Riecker and Huckins, acting both individually and collectively, breached their fiduciary duties of loyalty, care and good faith, by, among other things:

a. Blindly signing off on each of the Related-Party Financings as directors of each of the other Related-Party Financing Borrowers without providing any meaningful oversight over those entities;

b. Acting in their own interests by approving the Related-Party Financings, even though they knew, or were reckless or grossly negligent in not knowing, that Sears, and, thus, the other Related-Party Financings Borrowers, were insolvent, inadequately capitalized and unable to pay its debts as they came due, by entering into the transactions;

    c.   Causing the other Related-Party Financings Borrowers to incur upward of $4.2 billion in "debt" and pay more than $450 million in "interest" and "fees" to the Related-Party Financers and the Other Financers;

    d.   Failing to obtain solvency opinions or to assess the fairness to any borrower or guarantor of any of the Related-Party Financings;

    e.   Failing to consider meaningfully whether the transactions were fair from the perspective of the Related-Party Financings Borrowers or their creditors, especially in light of their inside nature;

    f.   Failing to maintain entity-by-entity financials, which would have enabled them to assess whether the other Related-Party Financings Borrowers were solvent at the time they entered into each of the Related-Party Financings, as well as when they made payments in connection therewith; and

    g.   Engaging in self-dealing by approving the Related-Party Financings for a purpose other than a genuine effort to advance the welfare of the other Related-Party Financings Borrowers, specifically, to protect their investments in Seritage, which depended on Sears remaining outside of bankruptcy for the initial few years after the Seritage Transaction, for their own interests and those of certain insiders such as Lampert and ESL.

746.    Lampert, Schriesheim, Riecker and Huckins are not entitled to the protection of the business judgment rule for breach of their fiduciary duties because they failed to act in good faith and instead acted in their own interests and/or in the interests of entities other than Sears Holdings. The Defendants on this Count 31 have the burden of proving that the Related-Party Financings was entirely fair to the Related-Party Financings Borrowers.

747.    Accordingly, Lampert, Schriesheim, Riecker and Huckins, acting both individually and collectively, engaged in self-dealing, failed to act in good faith and breached their respective fiduciary duties.

748.    As a direct and proximate result of Lampert's, Schriesheim's, Riecker's and Huckins's acts and omissions, the Related-Party Financings Borrowers unjustifiably paid "interest" and "fees" and needlessly suffered operating losses and other injury for this and other reasons. Moreover, as a direct and proximate result of Lampert's, Schriesheim's, Riecker's and

Huckins's acts and omissions, the Related-Party Financings Borrowers' faux indebtedness increased as its assets were wasted by the wrongful prolonging of its businesses. Lampert, Schriesheim, Riecker and Huckins are liable to the Related-Party Financings Borrowers to compensate for these and other results of their breaches of fiduciary duties.

749.   By virtue of the foregoing, Plaintiffs the Related-Party Financings Borrowers and the Creditors' Committee are entitled to a judgment against Lampert, Schriesheim, Riecker, Huckins and John and Jane Does for monetary damages, including but not limited to the payment of "interest" and "fees" on account of the Related-Party Financings, plus the amount in which assets were wasted because of Schriesheim's, Riecker's and Huckins's failure to maximize value, as well as the amount by which the Related-Party Financings Borrowers' insolvency increased as a result of the incurrence of additional "debt" that would not have been incurred but for Schriesheim's, Riecker's and Huckins's breaches.

### Count 32
**Breach of Fiduciary Duty Against the Directors (Riecker, Meerschaert and Jordan) and Officers (Lampert and Riecker) of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility and John and Jane Does**

750.   Plaintiffs the Additional Subsidiary Guarantors on the 2018 Term Loan Facility and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

751.   As directors, Riecker, Meerschaert and Jordan (the "Additional Subsidiary Guarantor Directors") owed fiduciary duties of loyalty, care and good faith to the Additional Subsidiary Guarantors on the 2018 Term Loan Facility. As officers, Lampert and Riecker also owed fiduciary duties of loyalty, care and good faith to the Additional Subsidiary Guarantors on the 2018 Term Loan Facility.

752.    Riecker, Jordan and Meerschaert owed fiduciary duties as directors of Sears
Development, when they approved the 2018 Term Loan Facility.  Riecker owed fiduciary duties
as a director of Sears Brands when he approved the 2018 Term Loan Facility.  Riecker and
Meerschaert owed fiduciary duties as directors of Sears Brands Business Unit when they approved
the 2018 Term Loan Facility.

753.    These fiduciary duties of loyalty, care and good faith required the Additional
Subsidiary Guarantor Directors, Lampert and Riecker at all times to act faithfully on behalf of the
Additional Subsidiary Guarantors on the 2018 Term Loan Facility, to conduct themselves in a
manner they reasonably believed to be in the best interests of the Additional Subsidiary Guarantors
on the 2018 Term Loan Facility, to put the interests of the Additional Subsidiary Guarantors on the
2018 Term Loan Facility ahead of their own individual interests and to make decisions in good
faith and in a prudent manner on behalf of the Additional Subsidiary Guarantors on the 2018 Term
Loan Facility.

754.    The Additional Subsidiary Guarantor Directors breached their fiduciary duties
when they forced the Additional Subsidiary Guarantors on the 2018 Term Loan Facility to incur
obligations and pledge collateral in connection with the 2018 Term Loan Facility, for which the
Additional Subsidiary Guarantors on the 2018 Term Loan Facility received no consideration.
Lampert and Riecker breached their fiduciary duties when they engineered the 2018 Term Loan
Facility, which caused the Additional Subsidiary Guarantors on the 2018 Term Loan Facility to
incur obligations and pledge collateral for which they received no consideration.

755.    The Additional Subsidiary Directors, Lampert and Riecker are or were members of
Sears's senior management team and/or employees of the finance department.  Lampert served as
CEO of Sears and was member of the Sears Holdings Board at the time when the 2018 Term Loan

Facility occurred, and, thus, was intimately familiar with the terms of the loans as alleged herein.

Riecker served as both CFO of Sears and a director of each of the Additional Subsidiary Guarantors

and, thus, is intimately familiar with the terms of the loans as alleged herein.   The Additional

Subsidiary Guarantor Directors, Lampert and Riecker, therefore, knew or were reckless or grossly

negligent in not knowing the truth about the declining financial health of Sears, and yet failed to

act in Sears's best interests.

756.    The Additional Subsidiary Guarantors on the 2018 Term Loan Facility pledged

ground leases and unencumbered IP assets.  The proceeds of the 2018 Term Loan Facility, in part,

were used to pay down first lien debt.  The Additional Subsidiary Guarantors on the 2018 Term

Loan Facility, however, were not guarantors on the first lien debt for which the proceeds of 2018

Term Loan Facility were used to pay down, and, thus, received no value in exchange for incurring

obligations and pledging collateral.

757.    Moreover, the incurrence of obligations and collateralization of assets on account

of the 2018 Term Loan Facility occurred (a) when the Additional-Subsidiary Guarantors on the

2018 Term Loan Facility were insolvent, (b) at a time when the Additional-Subsidiary Guarantors

on the 2018 Term Loan Facility had unreasonably small capital and/or (c) when the Additional-

Subsidiary Guarantors on the 2018 Term Loan Facility intended to incur or believed it would incur

debts beyond its ability to pay as they matured.

758.    Accordingly, the Additional Subsidiary Guarantor Directors, Lampert and Riecker

breached their duties of good faith and loyalty when they acted in direct contravention of the

corporate welfare of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility, thus

demonstrating a conscious disregard for their duties.

759.    The Additional Subsidiary Guarantors, Lampert and Riecker are not entitled to the protection of the business judgment rule for breach of their fiduciary duties because they failed to act in good faith and instead acted in their own interests and/or in the interests of entities other than the Additional Subsidiary Guarantors on the 2018 Term Loan Facility.  The Defendants on this Count 32 have the burden of proving that the Related-Party Financings was entirely fair to the Related-Party Financings Borrowers.

760.    As a direct and proximate result of the Additional Subsidiary Guarantor Directors', Lampert's and Riecker's acts and omissions, the assets pledged as collateral by the Additional Subsidiary Guarantors on the 2018 Term Loan Facility lost value.  Moreover, as a direct and proximate result of the Additional Subsidiary Guarantor Directors', Lampert's and Riecker's acts and omissions, the Additional Subsidiary Guarantors on the 2018 Term Loan Facility's faux indebtedness increased as its assets were wasted by the wrongful prolonging of its businesses.  The Additional Subsidiary Guarantor Directors, Lampert and Riecker are liable to compensate the Additional Subsidiary Guarantors on the 2018 Term Loan Facility for these and other results of their breaches of fiduciary duties.

761.    By virtue of the foregoing, Plaintiffs the Additional Subsidiary Guarantors on the 2018 Term Loan Facility and the Creditors' Committee are entitled to a judgment against each of the Additional Subsidiary Guarantor Directors, Lampert, Riecker and John and Jane Does for monetary damages, including but not limited to the value of the collateral pledged on account of the 2018 Term Loan Facility and damages in an amount to be determined at trial.

## Count 33

**Aiding and Abetting Breach of Fiduciary Duty Against the Controlling Insider Shareholders, the Directors (Lampert, Alvarez, Berkowitz, Kamlani, Mnuchin, Tisch, Reese, DePodesta, Kunkler, Schriesheim, Riecker and Huckins) and Officers (Lampert, Schriesheim, Riecker and Huckins) of the Related-Party Financings Borrowers, the Directors (Riecker, Meerschaert and Jordan) and Officers (Lampert and Riecker) of the Additional Subsidiary Guarantor Directors and John and Jane Does in Connection with the Related-Party Financings**

762.    Plaintiffs the Related-Party Financings Borrowers, the Additional Subsidiary Guarantors on the 2018 Term Loan Facility and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

763.    Each of the Controlling Insider Shareholders and Directors breached their fiduciary duties to Sears Holdings by causing Sears Holdings to enter into the Related-Party Financings, which caused Sears Holdings to wrongfully pay hundreds of millions of dollars in "interest" and "fees" and unnecessarily incur additional "debt," while wasting their assets and funding billions of dollars in operating losses.

764.    The Officers breached their fiduciary duties to the Related-Party Financings Borrowers in their capacity as senior officers of Sears by facilitating the Related-Party Financings, which caused the Related-Party Financings Borrowers to wrongfully pay hundreds of millions of dollars in "interest" and "fees," while wasting their assets and funding billions of dollars in operating losses.  Schriesheim, Riecker and Huckins, in their capacity as directors of certain Related-Party Financings Borrowers other than Sears Holdings, breached their fiduciary duties to these Related-Party Financings Borrowers by causing them to enter into the Related-Party Financings and, thus, wrongfully pay hundreds of millions of dollars in "interest" and "fees," while wasting their assets and funding billions of dollars in operating losses.

765.     Similarly, in their capacity as directors of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility, the Additional Subsidiary Guarantor Directors (Riecker, Meerschaert and Jordan) and Officers (Lampert and Riecker), breached their duties to the Additional Subsidiary-Guarantors on the 2018 Term Loan Facility by causing the Additional Subsidiary Guarantors on the 2018 Term Loan Facility to pledge collateral in connection with the 2018 Term Loan Facility, for which they received no consideration and which caused the collateral to lose value.

766.     Each of the Controlling Insider Shareholders, Directors and Officers of the Related-Party Financings Borrowers and the Directors and Officers of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility aided and abetted the others' breach of fiduciary duties by knowingly participating in the breaches of fiduciary duties relating to the Related-Party Financings.

767.     The Controlling Insider Shareholders, Directors and Officers of the Related-Party Financings Borrowers and the Directors and Officers of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility were knowledgeable about and were involved in all material aspects of each of the Related-Party Financings, directing and approving each transaction for their own benefit.

768.     As a direct and proximate result of the Controlling Insider Shareholders', Directors' and Officers' acts and omissions, the Related-Party Financings Borrowers were made to increase their faux indebtedness and unjustifiably pay "interest" and "fees," and the Additional Subsidiary Guarantors on the 2018 Term Loan Facility were made to incur obligations and pledge assets for no consideration.  The waste of assets and billions of dollars in operating losses resulting from

these breaches caused substantial damage to the Related-Party Financings Borrowers and Additional Subsidiary Guarantors.

769.    . The Controlling Insider Shareholders, Directors and Officers of the Related-Party Financings Borrowers and the Directors and Officers of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility are liable to the Related-Party Financings Borrowers and the Additional Subsidiary Guarantors on the 2018 Term Loan Facility to compensate for these and other results of their aiding and abetting these breaches of fiduciary duty.

770.    By virtue of the foregoing, Plaintiffs the Related-Party Financings Borrowers, the Additional Subsidiary Guarantors on the 2018 Term Loan Facility and the Creditors' Committee are entitled to a judgment against each of the Controlling Insider Shareholders, the Directors and Officers of the Related-Party Financings Borrowers, the Directors and Officers of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility and John and Jane Does for monetary damages, including but not limited to the value of the "interest" and "fees" paid on account of the Related-Party Financings, plus the amount by which the Related-Party Financings Borrowers' and the Additional Subsidiary Guarantors on the 2018 Term Loan Facility's insolvency increased as a result of the incurrence of additional "debt" and/or obligations that would not have been incurred but for the aiding and abetting of breaches of fiduciary duty and damages in an amount to be determined at trial.

### Count 34
**Disallowance of Lampert's, the ESL Defendants', Cascade's, the Cyrus Defendants', Tisch's, BS 2018's, the Fairholme Defendants', Berkowitz's, the Seritage Defendants' and John and Jane Does' Claims Not Subject to the APA**
**(11 U.S.C. § 502(d))**

771.    Plaintiffs Sears Holdings, each Sears entity that is an obligor on any debt held by the Defendants and the Creditors' Committee repeat and reallege each and every allegation set forth in the entirety of this First Amended Complaint as though fully set forth herein.

772.    As set forth in Count 1, the Lands' End Transfers are avoidable as actual fraudulent transfers because (a) the Lands' End Transfers were made with an actual intent to hinder, delay and/or defraud Sears Holdings's creditors, to the detriment and harm of such creditors, and (b) as a result of the Lands' End Transfers, Sears Holdings and Sears Roebuck and their creditors have been harmed.

773.    As set forth in Count 2, the Lands' End Transfers are avoidable as constructive fraudulent transfers because (a) the Lands' End Transfers were made for no consideration, without fair consideration or for less than reasonably equivalent value; and (b) the Lands' End Transfers were made (i) at a time when Sears Holdings and Sears Roebuck had unreasonably small capital, (ii) at a time when Sears Holdings and Sears Roebuck were unable to pay their debts as they came due or intended to incur or reasonably should have believed they would incur debts beyond their ability to pay.

774.    As set forth in Count 10, the Seritage Rights Transfers are avoidable as actual fraudulent transfers because (a) the Seritage Rights Transfers were made with an actual intent to hinder, delay and/or defraud Sears Holdings's creditors, to the detriment and harm of such creditors; and (b) as a result of the Seritage Rights Transfers, Sears Holdings's creditors have been harmed.

775.    As set forth in Count 11, the Seritage Rights Transfers are avoidable as constructive fraudulent transfers because (a) the Seritage Rights Transfers were made for no consideration, without fair consideration or for less than reasonably equivalent value; and (b) the Seritage Rights Transfers were made (i) when Sears Holdings was insolvent, (ii) at a time when Sears Holdings had unreasonably small capital, (iii) when Sears Holdings was unable to pay its debts when they

250

came due or intended to incur or reasonably should have believed it would incur debts beyond its ability to pay.

776.    As set forth herein, Sears Holdings made the Lands' End Transfers and Seritage Rights Transfers to and for the benefit of Sears Holdings's shareholders, including Lampert and the ESL Defendants.  The ESL Defendants also were initial transferees of the Lands' End Transfers and the Seritage Rights Transfers.

777.    As set forth in Count 13, the Seritage Real Estate Transfers are avoidable as actual fraudulent transfers because (a) the Seritage Real Estate Transfers were made with an actual intent to hinder, delay and/or defraud Sears Holdings's and the Real Estate Transferors' creditors, to the detriment and harm of such creditors; and (b) as a result of the Seritage Real Estate Transfers, Sears Holdings and its creditors and the Real Estate Transferors and their creditors have been harmed.

778.    As set forth in Count 14, the Seritage Real Estate Transfers are avoidable as constructive fraudulent transfers because (a) the Seritage Real Estate Transfers were made for no consideration, without fair consideration or for less than reasonably equivalent value; and (b) the Seritage Real Estate Transfers were made (i) when Sears Holdings, Kmart Holding and the Real Estate Transferors were insolvent, (ii) at a time when Sears Holdings, Kmart Holding and the Real Estate Transferors had unreasonably small capital and/or (iii) when Sears Holdings, Kmart Holding and the Real Estate Transferors were unable to pay their debts as they came due or intended to incur or reasonably should have believed that they would incur debts beyond their ability to pay.

779.    As set forth herein, Sears Holdings and the Real Estate Transferors made the Seritage Real Estate Transfers to and for the benefit of the Seritage Defendants, the Controlling

Insider Shareholders and Berkowitz.  The Seritage Defendants also were the initial transferees of the Seritage Real Estate Transfers.

780.   As set forth in Count 24, payments made pursuant to the Related-Party Financings are avoidable as actual fraudulent transfers because (a) the Related-Party Financings and payments in connection therewith were made with an actual intent to hinder, delay and/or defraud Sears Holdings's creditors, to the detriment and harm of such creditors; and (b) as a result of the Related-Party Financings payments, Sears Holdings's creditors have been harmed.

781.   As set forth in Counts 25 and 26, payments made pursuant to the Related-Party Financings are avoidable as constructive fraudulent transfers because (a) the Related-Party Financings payments were made for no consideration, without fair consideration or for less than reasonably equivalent value; and (b) the Related-Party Financings payments were made (i) when the Related-Party Financings Borrowers and the Additional Subsidiary Guarantors on the 2018 Term Loan Facility were insolvent, (ii) at a time when the Related-Party Financings Borrowers and the Additional Subsidiary Guarantors on the 2018 Term Loan Facility had unreasonably small capital and/or (iii) when the Related-Party Financings Borrowers and the Additional Subsidiary Guarantors on the 2018 Term Loan Facility were unable to pay debts as they came due or intended to incur or reasonably should have believed they would incur debts beyond their ability to pay.

782.   As set forth herein, Sears Holdings entered into the Related-Party Financings to and for the benefit of the Related-Party Financers and the Other Financers.  The Related-Party Financers, the Other Financers and the Seritage Defendants also were the parties for whose benefits the obligations resulting from the Related-Party Financings were incurred.

783.   Lampert, the ESL Defendants, Cascade, the Cyrus Defendants, Tisch, BS 2018, the Fairholme Defendants, Berkowitz, the Seritage Defendants and John and Jane Does have not

returned to the Debtors' estates the property transferred (or the value of the property transferred)

in the Lands' End Transfers, Seritage Rights and Real Estate Transfers and/or the Related-Party

Financings.  Pursuant to section 502(d) of the Bankruptcy Code, any and all claims assertable by

or on behalf of Lampert, the ESL Defendants, Cascade, the Cyrus Defendants, Tisch, BS 2018, the

Fairholme Defendants, Berkowitz or the Seritage Defendants against the Debtors' estates, other

than those previously allowed by the Court,[45] must be disallowed until such time as Lampert, the

ESL Defendants, Cascade, the Cyrus Defendants, Tisch, BS 2018, the Fairholme Defendants and

the Seritage Defendants return to the Debtors' estates the value of the property transferred in the

Lands' End Spin-off, the Seritage Transaction and/or the Related-Party Financings.

## Count 35
### Equitable Subordination Against Lampert, the ESL Defendants, the Fairholme Defendants, Berkowitz, Tisch, the Seritage Defendants and John and Jane Does
### (11 U.S.C. § 510(c))

784.    Plaintiffs Sears Holdings, each Sears entity that is an obligor on any debt held by

Lampert, the ESL Defendants, the Fairholme Defendants, Berkowitz, Tisch, the Seritage

Defendants and the Creditors' Committee repeat and reallege each and every allegation set forth

in the entirety of this First Amended Complaint as though fully set forth herein.

785.    Lampert, as CEO of Sears and Chairman of the Sears Holdings Board, the ESL

Defendants, the Fairholme Defendants, Berkowitz, and Tisch abused their position of trust and

---

[45]    For the avoidance of doubt, Plaintiffs do not seek to disallow the "ESL Claims" released by the Debtors (the "ESL Released Claims") pursuant to the *Order (I) Approving the Asset Purchase Agreement Among Sellers And Buyer, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts, and Leases in Connection Therewith and (IV) Granting Related Relief* [ECF No. 2507] ("[E]ach Debtor . . . covenants that it shall not seek to disallow, subordinate, recharacterize, avoid, challenge, dispute or collaterally attack the ESL Claims, provided however that the assertion of any Claim other than a Released Estate Claim shall not be deemed to violate this Section 9.13(a)(ii)").  On information and belief, claims held by Lampert and the ESL Defendants other than the ESL Released Claims include, but are not limited to, claims that arise under that certain Second Supplemental Indenture, dated as of March 20, 2018, to that certain Indenture, dated as of November 21, 2014 (as amended, supplemented or otherwise modified), between Sears Holdings and Computershare Trust Company, N.A., as trustee (the "ESL PIK Toggle Notes Claims").

insider status by engaging in grossly inequitable conduct.  Lampert's, the ESL Defendants', the Fairholme Defendants', Berkowitz's and Tisch's misconduct, including breaches of fiduciary duties, enriched Lampert, the ESL Defendants, the Fairholme Defendants, Berkowitz and Tisch at the expense of all the Debtor Plaintiffs to this action and their creditors.  The Seritage Defendants received the fraudulently transferred real estate in the Seritage Transaction at the expense of all the Debtor Plaintiffs to this action and their creditors.  The Controlling Insider Shareholders exercised control over the Seritage Defendants, including by knowingly causing the Seritage Defendants to take title to the transferred real estate for far less than reasonably equivalent value and to obtain at Sears's expense unfair and onerous terms in the Master Leases, and their conduct should be imputed to the Seritage Defendants for purposes of equitable subordination of the Seritage Defendants' claims.

786.   As set forth in the entirety of this First Amended Adversary Complaint, the inequitable conduct of Lampert, the ESL Defendants, the Fairholme Defendants, Berkowitz, Tisch and the Seritage Defendants resulted in injury to the Debtor Plaintiffs to this action and their unsecured creditors and conferred an unfair advantage on Lampert, the ESL Defendants, the Fairholme Defendants, Berkowitz, Tisch and the Seritage Defendants as set forth herein.  As a result, any claims assertable by or on behalf of Lampert, the ESL Defendants, the Fairholme Defendants, Berkowitz, Tisch, the Seritage Defendants and John and Jane Does, other than the ESL Released Claims, including, but not limited to, the ESL PIK Toggle Notes Claims, should be equitably subordinated to the claims of all other unsecured creditors.  Equitable subordination of such claims is consistent with the provisions of the Bankruptcy Code.

### Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment and grant the

following relief to the extent consistent with the Plan:

a. a judgment against the Controlling Insider Shareholders finding and declaring that the Lands' End Transfers and the Seritage Rights Transfers constitute actual and constructive fraudulent transfers;

b. a judgment against the Conflicted Directors (Lampert, Alvarez, Mnuchin, and Tisch) of Sears Holdings and the Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings that the Seritage Rights Transfers constitute actual and constructive fraudulent transfers

c. a judgment against the Seritage Defendants finding and declaring that the Seritage Real Estate Transfers constitute actual and constructive fraudulent transfers;

d. a judgment against the Seritage Derivative Defendants finding and declaring that the Seritage Release constitutes an actual and constructive fraudulent transfer or otherwise is null and void;

e. a declaratory judgment that the Seritage Release is null and void;

f. a judgment against the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the Related-Party Financers (the ESL Financers, Tisch, BS 2018, Berkowitz and Fairholme Capital) and Cascade finding and declaring that the payments made by the Related-Party Financings Borrowers on each of the Related-Party Financings were actual and constructive fraudulent transfers;

g. a judgment against the ESL Financers and the Cyrus 2018 Term Loan Financers finding and declaring that the obligations incurred and the collateral pledged by the Additional Subsidiary Guarantors on the 2018 Term Loan Facility were constructive fraudulent transfers;

h. avoidance of all fraudulent transfers described herein;

i. recovery of the property fraudulently transferred, or compensatory damages in an amount to be determined at trial for the value thereof, from the initial and subsequent transferees;

j. recovery against the ESL Financers and the Cyrus 2018 Term Loan Financers in the amount by which the assets pledged as collateral by the Additional Subsidiary Guarantors on the 2018 Term Loan Facility lost value by virtue of having being been unnecessarily collateralized;

255

k. a judgment against the Controlling Insider Shareholders and the Directors (Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Kamlani, Tisch and Reese) of Sears Holdings finding and declaring that the Lands' End Dividend and the Seritage Dividend were illegal dividends (in the case of Kamlani, only as to the Seritage Dividend);

l. compensatory damages in an amount to be determined at trial from the Directors (Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Kamlani, Tisch and Reese) of Sears Holdings for the full amount of the Lands' End Dividend and Seritage Dividend approved under their tenures as directors (in the case of Kamlani, only as to the Seritage Dividend) and from the Controlling Insider Shareholders for the amounts of the Lands' End Dividend and Seritage Dividend that each received;

m. a judgment against the Controlling Insider Shareholders, the Directors (Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Tisch and Reese) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings, the Directors (Riecker) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Roebuck and Duff & Phelps finding and declaring that the Controlling Insider Shareholders, the Directors (Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Tisch and Reese) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings, the Directors (Riecker) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Roebuck and Duff & Phelps breached their fiduciary duties and/or aided and abetted the breaches of fiduciary duty of others with respect to the Lands' End Spin-off;

n. compensatory damages in an amount to be determined at trial from the Controlling Insider Shareholders, the Directors (Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Tisch and Reese) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings, the Directors (Riecker) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Roebuck and Duff & Phelps for their breaches of fiduciary duty and/or aiding and abetting of breaches of fiduciary duty in connection with the Lands' End Spin-off;

o. disgorgement from the Controlling Insider Shareholders and Conflicted Directors (Lampert, Alvarez, Mnuchin and Tisch) of Sears Holdings of their ill-gotten gains from their wrongful conduct in connection with the Lands' End Spin-off;

p. a judgment against the Controlling Insider Shareholders, the Directors (Lampert, Mnuchin, Tisch, Alvarez, Kamlani, Kunkler, DePodesta and Reese) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings, the Directors (Schriesheim, Riecker, Huckins, Munjal and Rodney) and Officers (Lampert, Schriesheim, Riecker, Huckins and Meerschaert) of the Real Estate Transferors and the Advisor Defendants finding and declaring that the Controlling Insider Shareholders, the Directors (Lampert, Mnuchin, Tisch, Alvarez, Kamlani, Kunkler, DePodesta and Reese) and Officers (Lampert,

Schriesheim, Riecker and Huckins) of Sears Holdings, the Directors (Schriesheim, Riecker, Huckins, Munjal and Rodney) and Officers (Lampert, Schriesheim, Riecker, Huckins and Meerschaert) of the Real Estate Transferors and the Advisor Defendants breached their fiduciary duties and/or aided and abetted the breaches of fiduciary duty of others with respect to the Seritage Transaction;

q. compensatory damages in an amount to be determined at trial from the Controlling Insider Shareholders, the Directors (Lampert, Mnuchin, Tisch, Alvarez, Kamlani, Kunkler, DePodesta and Reese) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings, the Directors (Schriesheim, Riecker, Huckins, Munjal and Rodney) and Officers (Lampert, Schriesheim, Riecker, Huckins and Meerschaert) of the Real Estate Transferors and the Advisor Defendants for their breaches of their fiduciary duties and/or aiding and abetting breaches of fiduciary duty in connection with the Seritage Transaction;

r. disgorgement from the Controlling Insider Shareholders, the Conflicted Directors (Lampert, Alvarez, Mnuchin and Tisch) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings, the Directors (Schriesheim, Riecker, Huckins, Munjal and Rodney) and Officers (Lampert, Schriesheim, Riecker, Huckins and Meerschaert) of the Real Estate Transferors and the Seritage Defendants of their ill-gotten gains from their wrongful conduct in connection with the Seritage Transaction;

s. a judgment against the Controlling Insider Shareholders, the Conflicted Directors (Lampert, Alvarez, Berkowitz, Kamlani, Mnuchin, and Tisch) of Sears Holdings, the Members of the RPT Committee (Reese, Kunkler, and DePodesta) of Sears Holdings, the Directors of Certain of the Related-Party Financings Borrowers (Schriesheim, Riecker and Huckins), the Officers of the Related-Party Financings Borrowers (Lampert, Schriesheim, Riecker and Huckins) and the Directors (Riecker, Meerschaert and Jordan) and Officers (Lampert and Riecker) of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility finding and declaring that the Controlling Insider Shareholders, the Conflicted Directors (Lampert, Alvarez, Berkowitz, Kamlani, Mnuchin, and Tisch) of Sears Holdings, the Members of the RPT Committee (Reese, Kunkler, and DePodesta) of Sears Holdings, the Directors of Certain of the Related-Party Financings Borrowers (Schriesheim, Riecker and Huckins), the Officers of the Related-Party Financings Borrowers (Lampert, Schriesheim, Riecker and Huckins) and the Directors (Riecker, Meerschaert and Jordan) and Officers (Lampert and Riecker) of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility breached their fiduciary duties and/or aided and abetted the breaches of fiduciary duty of others with respect to the Related-Party Financings;

t. compensatory damages in an amount to be determined at trial from the Controlling Insider Shareholders, the Conflicted Directors (Lampert, Alvarez,

Berkowitz, Kamlani, Mnuchin, and Tisch) of Sears Holdings, the Members of the RPT Committee (Reese, Kunkler, and DePodesta) of Sears Holdings, the Directors of Certain of the Related-Party Financings Borrowers (Schriesheim, Riecker and Huckins), the Officers of the Related-Party Financings Borrowers (Lampert, Schriesheim, Riecker and Huckins) and the Directors (Riecker, Meerschaert and Jordan) and Officers (Lampert and Riecker) of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility for their breaches of their fiduciary duties and/or aiding and abetting of breaches of fiduciary duty in connection with the Related-Party Financings;

u. disgorgement from the ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the Related-Party Financers (the ESL Financers, Tisch, BS 2018, Berkowitz and Fairholme Capital), Cascade, the Controlling Insider Shareholders and the Conflicted Directors (Lampert, Alvarez, Berkowitz, Kamlani, Mnuchin and Tisch) of Sears Holdings of their ill-gotten gains from their wrongful conduct in connection with the Related-Party Financings;

v. disallowance of any claims assertable by or on behalf of Lampert, the ESL Defendants, Cascade, the Cyrus Defendants, Tisch, BS 2018, the Fairholme Defendants, Berkowitz and/or the Seritage Defendants, other than the ESL Released Claims, until such time as Lampert, the ESL Defendants, Cascade, the Cyrus Defendants, Tisch, BS 2018, the Fairholme Defendants, Berkowitz and the Seritage Defendants return to the Debtors' estates the property or value of the property fraudulently transferred in the Lands' End Spin-off, Seritage Transaction and/or the Related-Party Financings;

w. equitable subordination of any claims assertable by or on behalf of Lampert, the ESL Defendants, the Fairholme Defendants, Berkowitz, Tisch and/or the Seritage Defendants, other than the ESL Released Claims, to the claims of all other unsecured creditors;

x. punitive and exemplary damages for all intentional wrongdoing described herein;

y. pre- and post-judgment interest to the maximum extent permitted by law;

z. reasonable attorneys' fees, costs and expenses incurred in this action; and

aa. any further relief as the Court deems just, proper or equitable under the circumstances.

Dated: November 25, 2019
New York, New York

By: _/s/ Ira S. Dizengoff_____
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Part
New York, New York
Tel:  (212) 872-1000
Fax:  (212) 872-1002
Ira S. Dizengoff
David M. Zensky
Philip C. Dublin
*Counsel to the Official Committee of Unsecured*
*Creditors of Sears Holdings Corporation, et al.,*
*acting on behalf of the Debtors' Estates*
*(as to all Defendants except the Cyrus Defendants)*


By: _/s/ Sean E. O'Donnell_____
HERRICK, FEINSTEIN LLP
2 Park Ave
New York, New York
Tel:  (212) 592-1400
Fax: (212) 592-1500
Sean E. O'Donnell
Christopher W. Carty
Steven B. Smith
*Counsel to the Official Committee of Unsecured*
*Creditors of Sears Holdings Corporation, et al.,*
*acting on behalf of the Debtors' Estates*
*(as to Defendants Cyrus Defendants)*

**EXHIBIT A**

*Sears Holdings Corp., et al.  v. Lampert, et al.*, Case No. 19-08250 (RDD) (Bankr. S.D.N.Y.)
**Summary of Counts in First Amended Adversary Complaint**

| COUNTS ARISING FROM THE LANDS' END SPIN-OFF | | | |
|---|---|---|---|
| <u>Count</u> | <u>Claim</u> | <u>Plaintiffs</u> | <u>Defendant(s)</u> |
| 1 | Avoidance as an Actual Fraudulent Transfer | Sears Holdings, Sears Roebuck and the Creditors' Committee | The Controlling Insider Shareholders |
| 2 | Avoidance as a Constructive Fraudulent Transfer | Sears Holdings, Sears Roebuck and the Creditors' Committee | The Controlling Insider Shareholders |
| 3 | Recovery of Illegal Dividend | Sears Holdings and the Creditors' Committee | The Controlling Insider Shareholders and the Directors (Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Tisch and Reese) of Sears Holdings |
| 4 | Unjust Enrichment | Sears Holdings, Sears Roebuck and the Creditors' Committee | The Controlling Insider Shareholders and the Conflicted Directors (Lampert, Alvarez, Mnuchin and Tisch) of Sears Holdings |
| 5 | Breach of Fiduciary Duty | Sears Holdings and the Creditors' Committee | The Controlling Insider Shareholders |
| 6 | Breach of Fiduciary Duty | Sears Holdings and the Creditors' Committee | The Directors (Alvarez, DePodesta, Kunkler, Lampert, Mnuchin, Tisch and Reese) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings |
| 7 | Breach of Fiduciary Duty | Sears Roebuck and the Creditors' Committee | The Directors (Riecker) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Roebuck |
| 8 | Aiding and Abetting Breach of Fiduciary Duty | Sears Holdings, Sears Roebuck and the Creditors' Committee | Each of the Defendants to Counts 5-7 |
| 9 | Aiding and Abetting Breach of Fiduciary Duty | Sears Holdings, Sears Roebuck and the Creditors' Committee | Duff & Phelps |

| COUNTS ARISING FROM THE SERITAGE TRANSACTION | | | |
|---|---|---|---|
| Count | Claim | Plaintiffs | Defendant(s) |
| 10 | Avoidance of the Seritage Rights Transfers as Actual Fraudulent Transfers | Sears Holdings and the Creditors' Committee | The Controlling Insider Shareholders, the Conflicted Directors (Lampert, Alvarez, Mnuchin and Tisch) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings |
| 11 | Avoidance of the Seritage Rights Transfers as Constructive Fraudulent Transfers | Sears Holdings and the Creditors' Committee | The Controlling Insider Shareholders, the Conflicted Directors (Lampert, Alvarez, Mnuchin and Tisch) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings |
| 12 | Recovery of Illegal Dividend relating to the Seritage Rights Transfers | Sears Holdings and the Creditors' Committee | The Controlling Insider Shareholders and the Directors (Lampert, Mnuchin, Tisch, Alvarez, Kamlani, Kunkler, DePodesta and Reese) of Sears Holdings |
| 13 | Avoidance of the Seritage Real Estate Transfers as Actual Fraudulent Transfers | Sears Holdings, Kmart Holding, the Real Estate Transferors and the Creditors' Committee | The Seritage Defendants |
| 14 | Avoidance of the Seritage Real Estate Transfers as Constructive Fraudulent Transfers | Sears Holdings, Kmart Holding, the Real Estate Transferors and the Creditors' Committee | The Seritage Defendants |
| 15 | Avoidance of the Seritage Release as an Actual Fraudulent Transfer | Sears Holdings and the Creditors' Committee | The Seritage Derivative Defendants (Lampert, Mnuchin, Tisch, Alvarez, Reese, Kamlani, Kunkler, DePodesta, ESL, the Fairholme Defendants and Seritage) |
| 16 | Avoidance of the Seritage Release as a Constructive Fraudulent Transfer | Sears Holdings and the Creditors' Committee | The Seritage Derivative Defendants (Lampert, Mnuchin, Tisch, Alvarez, Reese, Kamlani, Kunkler, DePodesta, ESL, the Fairholme Defendants and Seritage) |
| 17 | Declaratory Judgment that the Seritage Release Is Null and Void | Sears Holdings and the Creditors' Committee | The Seritage Derivative Defendants (Lampert, Mnuchin, Tisch, Alvarez, Reese, Kamlani, Kunkler, DePodesta, ESL, the Fairholme Defendants and Seritage) |

2

| 18 | Breach of Fiduciary Duty | Sears Holdings and the Creditors' Committee | The Controlling Insider Shareholders |
|---|---|---|---|
| 19 | Breach of Fiduciary Duty | Sears Holdings and the Creditors' Committee | The Directors (Lampert, Mnuchin, Tisch, Alvarez, Kamlani, Kunkler, DePodesta and Reese) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings |
| 20 | Breach of Fiduciary Duty | The Real Estate Transferors and the Creditors' Committee | The Directors (Schriesheim, Riecker, Huckins, Munjal and Rodney) and Officers (Lampert, Schriesheim, Riecker, Huckins and Meerschaert) of the Real Estate Transferors |
| 21 | Aiding and Abetting Breach of Fiduciary Duty | Sears Holdings, the Real Estate Transferors and the Creditors' Committee | Each of the Defendants to Counts 18–20 |
| 22 | Unjust Enrichment | Sears Holdings, the Real Estate Transferors and the Creditors' Committee | The Controlling Insider Shareholders, the Conflicted Directors (Lampert, Alvarez, Mnuchin and Tisch) and Officers (Lampert, Schriesheim, Riecker and Huckins) of Sears Holdings, the Directors (Schriesheim, Riecker, Huckins, Munjal and Rodney) and Officers (Lampert, Schriesheim, Riecker, Huckins and Meerschaert) of the Real Estate Transferors and the Seritage Defendants |
| 23 | Aiding and Abetting Breach of Fiduciary Duty | Sears Holdings, the Real Estate Transferors and the Creditors' Committee | Duff & Phelps and C&W |

3

| COUNTS ARISING FROM THE RELATED-PARTY FINANCINGS | | | |
|---|---|---|---|
| <u>Count</u> | <u>Claim</u> | <u>Plaintiffs</u> | <u>Defendant(s)</u> |
| 24 | Avoidance and Recovery of Any Payments Made on the Related-Party Financings as Actual Fraudulent Transfers | The Related-Party Financings Borrowers and the Creditors' Committee | The ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the Related-Party Financers (the ESL Financers, Tisch, BS 2018, Berkowitz and Fairholme Capital) and Cascade |
| 25 | Avoidance and Recovery of Any Payments Made on the Related-Party Financings as Constructive Fraudulent Transfers | The Related-Party Financings Borrowers and the Creditors' Committee | The ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the Related-Party Financers (ESL Financers, Tisch, BS 2018, Berkowitz and Fairholme Capital) and Cascade |
| 26 | Avoidance and Recovery of the Obligations Incurred and the Liens Granted by the Additional Subsidiary Guarantors on the 2018 Term Loan Facility as Constructive Fraudulent Transfers | The Additional Subsidiary Guarantors on the 2018 Term Loan Facility and the Creditors' Committee | The ESL Financers and the Cyrus 2018 Term Loan Financers |
| 27 | Unjust Enrichment Relating to the Related-Party Financings | The Related-Party Financings Borrowers and the Creditors' Committee | The ESL Defendants, the Cyrus Defendants, the Fairholme Defendants, the Related-Party Financers (the ESL Financers, Tisch, BS 2018, Berkowitz and Fairholme Capital), Cascade, the Controlling Insider Shareholders and the Conflicted Directors (Lampert, Alvarez, Berkowitz, Kamlani, Mnuchin and Tisch) of Sears Holdings |
| 28 | Breach of Fiduciary Duty in Connection with the Related-Party Financings | Sears Holdings and the Creditors' Committee | The Controlling Insider Shareholders |
| 29 | Breach of Fiduciary Duty in Connection with the Related-Party Financings | Sears Holdings and the Creditors' Committee | The Conflicted Directors (Lampert, Alvarez, Berkowitz, Kamlani, Mnuchin, and Tisch) of Sears Holdings |
| 30 | Breach of Fiduciary Duty in Connection with the Related-Party Financings | Sears Holdings and the Creditors' Committee | The Members of the RPT Committee (Reese, Kunkler, and DePodesta) of Sears Holdings |

| 31 | Breach of Fiduciary Duty in Connection with the Related-Party Financings | The Related-Party Financings Borrowers and the Creditors' Committee | Directors of Certain of the Related-Party Financings Borrowers (Schriesheim, Riecker and Huckins) and Officers of the Related-Party Financings Borrowers (Lampert, Schriesheim, Riecker and Huckins) |
| 32 | Breach of Fiduciary Duty in Connection with the 2018 Term Loan Facility | The Additional Subsidiary Guarantors on the 2018 Term Loan Facility and the Creditors' Committee | The Directors (Riecker, Meerschaert and Jordan) and Officers (Lampert and Riecker) of the Additional Subsidiary Guarantors on the 2018 Term Loan Facility |
| 33 | Aiding and Abetting Breach of Fiduciary Duty in Connection with the Related-Party Financings | Sears Holdings, the Related-Party Financings Borrowers, the Additional Subsidiary Guarantors on the 2018 Term Loan Facility and the Creditors' Committee | Each of the Defendants to Counts 28-32 |

| COUNTS RELATED TO CLAIMS ADJUDICATION PROCESS | | | |
|---|---|---|---|
| Count | Claim | Plaintiffs | Defendant(s) |
| 34 | Disallowance of Claims Not Subject to the APA | Sears Holdings; each Sears entity that is an obligor on any debt held by the Defendants; and the Creditors' Committee | Lampert, the ESL Defendants, Cascade, the Cyrus Defendants, Tisch, BS 2018, the Fairholme Defendants, Berkowitz and the Seritage Defendants |
| 35 | Equitable Subordination | Sears Holdings; each Sears entity that is an obligor on any debt held by Lampert, the ESL Defendants, Fairholme or Berkowitz; and the Creditors' Committee | Lampert, the ESL Defendants, the Fairholme Defendants, Berkowitz, Tisch and the Seritage Defendants |

6