**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
|  |  |
|---|---|
| In re: | :    Chapter 11 |
|  | : |
| SEARS HOLDINGS CORPORATION, *et al.*, | :    Case No. 18-23538 (RDD) |
|  | : |
|      Debtors. | :    Jointly Administered |
|  | : |

------------------------------------------------------------------x
|  |  |
|---|---|
| SEARS HOLDINGS CORPORATION, *et al.*, | : |
|  | : |
|    Plaintiffs, | : |
|  | :    Adversary Proceeding |
| v. | : |
|  | :    Case No. 19-08250 (RDD) |
| Edward Scott Lampert, *et al.*, | : |
|  | : |
|      Defendants. | : |

------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## THE ESL DEFENDANTS' MOTION TO DISMISS REGARDING
## <u>THE FIRST AMENDED COMPLAINT</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................... 1

STATEMENT OF FACTS ............................................... 2

    A.    The 2014 Lands' End Spin-Off.................................. 4

    B.    The 2015 Seritage Transaction ................................ 5

    C.    The 2016-2018 Loans By The ESL Lenders And Third Party Financers To Sears................................................................ 8

ARGUMENT ............................................................ 10

I.    PLAINTIFFS' BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING, UNJUST ENRICHMENT, AND ILLEGAL DIVIDEND CLAIMS CONCERNING THE SERITAGE TRANSACTION, AND THEIR FRAUDULENT TRANSFER AND UNJUST ENRICHMENT CLAIMS RELATING TO THE SERITAGE RIGHTS OFFERING, SHOULD BE DISMISSED ..................................................... 10

    A.    Counts 12 And 18-22 Are Barred Under Settled Principles of *Res Judicata*, And Counts 15-17 Seek Relief That This Court Cannot Grant And That Would Be Meaningless In Any Event ............................. 11

    B.    Counts 10-11, As Well As Counts 12 And 22, Should Be Dismissed Because The Subscription Rights In Seritage Were Not Sears' Property........... 12

        1.    The Distribution of the Seritage Rights Did Not Entail the Transfer of Any Property of Sears................................... 13

        2.    Counts 10 and 11 Seeking to Avoid the Supposed "Transfer" of the Seritage Rights as Fraudulent Conveyances Are Barred by Section 546(e)'s Safe Harbor........................................ 19

        3.    Count 22 Is Also Precluded by Section 546(e) to the Extent That It Seeks to Undo the Distribution of the Seritage Rights to, and to Recover Their Value from, the ESL Defendants and Other Sears Shareholders ......................................... 26

II.    PLAINTIFFS' CLAIMS DIRECTED AT THE ESL DEFENDANTS RELATING TO THE 2016-2018 LOANS SHOULD BE DISMISSED .......................... 27

    A.    Counts 24-25, 27-29, 31, And 33 Are Improperly Premised Upon Recharacterization Of Debt As Equity And Should Be Dismissed.................... 28

        1.    Claims Based on Recharacterization Are Barred by the APA............... 29

        2.    Plaintiffs Do Not Remotely Plead Facts Sufficient to Justify Recharacterization ...................................... 33

    B.    Counts 24-25, 27-29, 31, And 33 Also Improperly Rely Upon A Legally Insufficient Theory Of Deepening Insolvency And Should Be Dismissed ......... 40

C.      Plaintiffs Allege No Other Facts To Support Their Claims Against The 2016-2018 Loans ...................................................................... 42

D.      Plaintiffs' Claims Against the ESL Defendants Relating To The 2016-18 Loans Fail As A Matter Of Law............................................... 45

        1.      Plaintiffs' Claims for Constructive Fraudulent Transfer and Unjust Enrichment (Counts 25 and 27) Fail ...................................... 45

        2.      Plaintiffs' Claims for Intentional Fraudulent Transfer and Breach of Fiduciary Duty (Counts 24, 28-29, 31, and 33) Fail.............................. 47

E.      Count 26 Should Also Be Dismissed................................................... 50

III.    PLAINTIFFS' CLAIMS FOR BREACH OF FIDUCIARY DUTY AND AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY SHOULD BE DISMISSED FOR SEVERAL ADDITIONAL REASONS ........................................... 52

A.      Counts 5-6, 8, And 18-21, As Brought By Sears Holdings, Are Time-Barred ............................................................................................ 52

B.      Sears Holdings' Certificate Of Incorporation Exculpates Mr. Lampert For Breaches Of The Duty Of Care.................................................. 55

C.      Counts 7, 20, And 31-32, As Brought By Sears Entities Other Than Sears Holdings, Fail To State A Claim Against Mr. Lampert Because He Did Not Owe A Duty To Those Subsidiaries.................................................. 56

IV.     PLAINTIFFS' CLAIMS FOR UNJUST ENRICHMENT SHOULD BE DISMISSED FOR INDEPENDENT REASONS .......................................... 58

A.      Counts 4, 22, And 27 Should Be Dismissed Because Written Contracts Govern Each Of The Transactions That Plaintiffs Challenge............................ 58

B.      Counts 4, 22, And 27 Also Should Be Dismissed Because Plaintiffs Allege An Adequate Remedy At Law ......................................................... 59

V.      PLAINTIFFS' CLAIM FOR RECOVERY OF A SUPPOSEDLY ILLEGAL DIVIDEND WITH RESPECT TO THE LANDS' END SPIN-OFF SHOULD BE DISMISSED BECAUSE PLAINTIFFS DO NOT DISPUTE THAT THE TRANSACTION LEFT SEARS BALANCE-SHEET SOLVENT .............................. 61

VI.     PLAINTIFFS' CLAIM FOR DISALLOWANCE SHOULD BE DISMISSED IN SUBSTANTIAL PART, AND THEIR CLAIM FOR EQUITABLE SUBORDINATION SHOULD BE DISMISSED IN ITS ENTIRETY ........................ 64

A.      Plaintiffs' Claim For Disallowance Should Be Dismissed In Substantial Part ............................................................................................ 65

B.      Plaintiffs' Claim For Equitable Subordination Should Be Dismissed In Its Entirety...................................................................................... 67

VII.    CRK PARTNERS, LLC IS A CANCELLED DELAWARE ENTITY THAT CANNOT BE SUED................................................................................. 70

CONCLUSION .................................................................................................. 71

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life
     Assurance Co.*,
     96 F. Supp. 3d 182 (S.D.N.Y. 2015) .................................................................. 58

*In re Adelphia Communications Corp.*,
     365 B.R. 24 (Bankr. S.D.N.Y. 2007) ....................................................33, 35, 40

*Adelphia Recovery Trust v. Bank of America, N.A.*,
     390 B.R. 80 (S.D.N.Y. 2008) ............................................................................ 69

*In re Aéropostale, Inc.*,
     555 B.R. 369 (Bankr. S.D.N.Y. 2016) ............................................................... 37

*Allied Irish Banks, P.L.C. v. Bank of America, N.A.*,
     2006 WL 278138 (S.D.N.Y. Feb. 2, 2006) ........................................................ 53

*Allstate Insurance Co. v. Countrywide Financial Corp.*,
     842 F. Supp. 2d 1216 (C.D. Cal. 2012) ............................................................. 48

*In re Alternate Fuels, Inc.*,
     789 F.3d 1139 (10th Cir. 2015) ...................................................................34, 39

*American Casualty Co. of Reading, PA v. Lee Brands, Inc.*,
     2010 WL 743839 (S.D.N.Y. Mar. 3, 2010) ....................................................... 70

*In re Ampal-American Israel Corp.*,
     543 B.R. 464 (Bankr. S.D.N.Y. 2016) ............................................................... 55

*In re AMR Corp.*,
     562 B.R. 20 (Bankr. S.D.N.Y. 2016) ................................................................. 68

*AP Services LLP v. Silva*,
     483 B.R. 63 (S.D.N.Y. 2012) ............................................................................ 27

*Ashcroft v. Iqbal*,
     556 U.S. 662 (2009) ....................................................................................47, 63

*In re AutoStyle Plastics, Inc.*,
     269 F.3d 726 (6th Cir. 2001) ........................................................................33, 69

*Aviall, Inc. v. Ryder System Inc.*,
913 F. Supp. 826 (S.D.N.Y.1996), *aff'd* 110 F.3d 892 (2d Cir. 1997) ................................. 57

*Barbara v. MarineMax, Inc.*,
2012 WL 6025604 (E.D.N.Y. Dec. 4, 2012) ..................................................... 53

*BBS Norwalk One, Inc. v. Raccolta, Inc.*,
60 F. Supp. 2d 123 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1321 (2d Cir. 2000) ......................... 54

*Bear, Stearns Securities Corp. v. Gredd*,
275 B.R. 190 (S.D.N.Y. 2002) ............................................................... 15

*Begier v. IRS*,
496 U.S. 53 (1990) ......................................................................... 15

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................... 47, 63

*In re Bernard L. Madoff Investment Securities LLC*,
773 F.3d 411 (2d Cir. 2014) ........................................................... 22, 23

*Bernstein v. Crazy Eddie, Inc.*,
702 F. Supp. 962 (E.D.N.Y. 1988), *vacated in part on other grounds sub nom.*
*In re Crazy Eddie Securities Litigation*, 714 F. Supp. 1285 (1989) ................................ 53

*In re Bevill, Bresler & Schulman Asset Management Corp.*,
878 F.2d 742 (3d Cir. 1989) ................................................................ 20

*In re BH S & B Holdings LLC*,
420 B.R. 112 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 807 F. Supp. 2d 199
(S.D.N.Y. 2011) ................................................................. 33, 36, 37

*Buckley v. Deloitte & Touche USA LLP*,
2007 WL 1491403 (S.D.N.Y. May 22, 2007) ..................................................... 53

*In re Bullion Reserve of North America*,
922 F.2d 544 (9th Cir. 1991) ............................................................... 16

*In re Centennial Textiles, Inc.*,
220 B.R. 165 (Bankr. S.D.N.Y. 1998) ........................................................ 17

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ........................................................... 13, 36

*In re Chase & Sanborn Corp.*,
813 F.2d 1177 (11th Cir. 1987) ............................................................. 16

iv

*In re Circle Y of Yoakum, Texas,*
354 B.R. 349 (Bankr. D. Del. 2006)....................................................................... 53

*Clark v. Nevis Capital Management, LLC,*
2005 WL 488641 (S.D.N.Y. Mar. 2, 2005)........................................................... 53

*Contemporary Industries Corp. v. Frost,*
564 F.3d 981 (8th Cir. 2009), *overruled in part on other grounds by Merit
Management Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018) ............................ 27

*Continuing Creditors' Committee of Star Telecommunications Inc. v. Edgecomb,*
385 F. Supp. 2d 449 (D. Del. 2004)...................................................................... 56

*Coral Petroleum, Inc. v. Banque Paribas-London,*
797 F.2d 1351 (5th Cir. 1986) .............................................................................. 16

*Crescent Resources Litigation Trust v. Duke Energy Corp.,*
500 B.R. 464 (W.D. Tex. 2013)........................................................................21, 23

*In re Direct Response Media, Inc.,*
466 B.R. 626 (Bankr. D. Del. 2012)..................................................................... 46

*In re Dornier Aviation (North America), Inc.,*
453 F.3d 225 (4th Cir. 2006) ...........................................................................34, 39

*In re Dreier LLP,*
429 B.R. 112 (Bankr. S.D.N.Y. 2010)................................................................. 15

*In re Emerald Casino, Inc.,*
2015 WL 1843271 (N.D. Ill. Apr. 21, 2015), *aff'd in part, vacated in part*, 867
F.3d 743 (7th Cir. 2017)..................................................................................34, 39

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.,*
651 F.3d 329 (2d Cir. 2011)............................................................................20, 21

*In re Eugenia,*
649 F. Supp. 2d 105 (S.D.N.Y. 2008), *aff'd sub nom. Eugenia VI Venture
Holdings, Ltd. v. Glaser*, 370 F. App'x 197 (2d Cir. 2010) ...........................................41, 42

*Federal Treasury Enterprise Sojuzplodoimport v. Spirits International N.V.,*
400 F. App'x 611 (2d Cir. 2010) ......................................................................... 60

*Fehribach v. Ernst & Young LLP,*
493 F.3d 905 (7th Cir. 2007)............................................................................... 41

*In re Finley, Kumble,*
130 F.3d 52 (2d Cir. 1997)................................................................................... 16

*In re Global Service Group, LLC*,
  316 B.R. 451 (Bankr. S.D.N.Y. 2004).............................................................. 42

*Granfinanciera, S.A. v. Nordberg*,
  492 U.S. 33 .....................................................................................59, 60

*In re Grumman Olson Industries, Inc.*,
  329 B.R. 411 (Bankr. S.D.N.Y. 2005).............................................................. 48

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999)....................................................................................... 17

*H.S.W. Enterprises, Inc. v. Woo Lae Oak, Inc.*,
  171 F. Supp. 2d 135 (S.D.N.Y. 2001)............................................................. 53

*In re Healthco International, Inc.*,
  195 B.R. 971 (Bankr. D. Mass. 1996)........................................................62, 64

*In re Hechinger Investment Co.*,
  274 B.R. 71 (D. Del. 2002) ............................................................................ 27

*In re HH Liquidation, LLC*,
  590 B.R. 211 (Bankr. D. Del. 2018)................................................................ 39

*In re Hydrogen, L.L.C.*,
  431 B.R. 337 (Bankr. S.D.N.Y. 2010)...............................................2, 42, 57, 58

*In re Incomnet, Inc.*,
  463 F.3d 1064 (9th Cir. 2006) ....................................................................... 16

*International Audiotext Network, Inc. v. American Telephone & Telagraph Co.*,
  62 F.3d 69 (2d Cir. 1995)............................................................................... 36

*In re Iridium Operating LLC*,
  373 B.R. 283 (Bankr. S.D.N.Y. 2007).............................................................. 63

*In re Jeffrey Bigelow Design Group*,
  956 F.2d 479 (4th Cir. 1992).......................................................................... 49

*RSL Communications PLC ex rel. Jervis v. Bildirici*,
  2006 WL 2689869 (S.D.N.Y. Sept. 14, 2006)................................................... 57

*In re Kingsley*,
  518 F.3d 874 (11th Cir. 2008) ....................................................................... 17

*Korea Trade Insurance Corp. v. Neema Clothing, Ltd.*,
  2015 WL 363569 (S.D.N.Y. Jan. 28, 2015)...................................................... 46

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991) ................................................................ 70

*Kwon v. Yun*,
   2008 WL 190058 (S.D.N.Y. Jan. 22, 2008) ......................................... 70

*In re Lenexa Hotel, L.P.*,
   2018 WL 1115199 (Bankr. D. Kan. Feb. 26, 2018) ............................ 39

*Liu Yao-Yi v. Wilmington Trust Co.*,
   301 F. Supp. 3d 403 (W.D.N.Y. 2017) ................................................ 54

*Lum v. Bank of America*,
   361 F.3d 217 (3d Cir. 2004) ................................................................ 36

*In re Lyondell Chemical Co.*,
   544 B.R. 75 (Bankr. S.D.N.Y. 2016) ............................................*passim*

*In re Lyondell Chemical Co.*,
   567 B.R. 55 (Bankr. S.D.N.Y. 2017), *aff'd* 585 B.R. 41 (S.D.N.Y. 2018) ......................... 50

*MacDraw, Inc. v. CIT Group Equipment Financing, Inc.*,
   157 F.3d 956 (2d Cir. 1998) ................................................................ 58

*In re Marshall*,
   550 F.3d 1251 (10th Cir. 2008) ........................................................... 16

*In re Mervyn's Holdings, LLC*,
   426 B.R. 488 (Bankr. D. Del. 2010) .................................................... 53

*MF Global Holdings Ltd v. PricewaterhouseCoopers LLP*,
   43 F. Supp. 3d 309 (S.D.N.Y. 2014) ................................................... 68

*In re Mid-Illini Hardwoods, LLC*,
   576 B.R. 598 (Bankr. C.D. Ill. 2017) .................................................. 46

*In re Moll Industries, Inc.*,
   454 B.R. 574 (Bankr. D. Del. 2011) .................................................... 39

*In re Montgomery*,
   983 F.2d 1389 (6th Cir. 1993) ............................................................. 16

*In re Musicland Holding Corp.*,
   398 B.R. 761 (Bankr. S.D.N.Y. 2008) ..................................... 31, 33, 37

*In re National Forge Co.*,
   344 B.R. 340 (W.D. Pa. 2006) ............................................................. 21

*In re Navidea Biopharmaceuticals Litigation*,
　　2019 WL 7187111 (S.D.N.Y. Dec. 26, 2019)....................................... 53

*Newbro v. Freed*,
　　409 F. Supp. 2d 386 (S.D.N.Y. 2006), *aff'd*, 2007 WL 642941 (2d Cir. Feb.
　　27, 2007)........................................................................................ 60

*Orr v. Kinderhill Corp.*,
　　991 F.2d 31 (2d Cir. 1993)............................................................... 21

*In re Our Alchemy, LLC*,
　　2019 WL 4447535 (Bankr. D. Del. Sept. 16, 2019).........................31, 37, 41

*In re Parmalat Securities Litigation*,
　　501 F. Supp. 2d 560 (S.D.N.Y. 2007), *aff'd sub nom. Pappas v. Bank of
　　America Corp.*, 309 F. App'x 536 (2d Cir. 2009) ............................... 63

*Pereira v. Farace*,
　　413 F.3d 330 (2d Cir. 2005)..........................................................55, 56, 63

*In re Personal Communication Devices, LLC*,
　　528 B.R. 229 (Bankr. E.D.N.Y. 2015) ............................................ 37

*Price v. L'Oreal USA, Inc.*,
　　2017 WL 4480887 (S.D.N.Y. Oct. 5, 2017)..................................... 60

*In re Radnor Holdings Corp.*,
　　353 B.R. 820 (Bankr. D. Del. 2006)...............................................39, 41

*In re Refco, Inc. Securities Litigation*,
　　2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009) ................................ 48

*In re Ritz Camera & Image, L.L.C.*,
　　2014 WL 432192 (Bankr. D. Del. Feb. 4, 2014)............................. 60

*In re RSL Com Primecall, Inc.*,
　　2003 WL 22989669 (Bankr. S.D.N.Y. Dec. 11, 2003)..................... 49

*In re S.W. Bach & Co.*,
　　435 B.R. 866 (Bankr. S.D.N.Y. 2010)............................................ 17

*In re Sabine Oil & Gas Corp.*,
　　547 B.R. 503 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016) .............. 33

*In re SGK Ventures, LLC*,
　　2017 WL 2683686 (N.D. Ill. June 20, 2017)................................... 39

*Steinberg v. Sherman*,
   2008 WL 1968297 (S.D.N.Y. May 2, 2008)....................................................... 60

*In re Stillwater Asset Backed Offshore Fund Ltd.*,
   559 B.R. 563 (Bankr. S.D.N.Y. 2016).............................................................. 59

*In re Straightline Investments, Inc.*,
   525 F.3d 870 (9th Cir. 2008)......................................................................... 17

*In re SubMicron Systems Corp.*,
   432 F.3d 448 (3d Cir. 2006)......................................................................34, 39

*In re Ticketplanet.com*,
   313 B.R. 46 (Bankr. S.D.N.Y. 2004) .............................................................. 52

*In re TOUSA, Inc.*,
   444 B.R. 613 (S.D. Fla. 2011), *aff'd in part, rev'd in part*, 680 F.3d 1298
   (11th Cir. 2012).......................................................................................... 16

*In re Tribune Co. Fraudulent Conveyance Litigation*,
   2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019)................................................2, 25

*In re Tribune Co. Fraudulent Conveyance Litigation*,
   946 F.3d 66 (2d Cir. 2019), *pet. for rehearing or rehearing en banc denied*,
   ECF No. 13-3992 (2d Cir. Feb. 6, 2020).................................................24, 25, 26

*In re Tronox Inc.*,
   429 B.R. 73 (Bankr. S.D.N.Y. 2010) .........................................................48, 59

*U.S. Bank National Ass'n v. Verizon Communications Inc.*,
   892 F. Supp. 2d 805 (N.D. Tex. 2012), *aff'd*, 761 F.3d 409 (5th Cir. 2014)...................27, 62

*In re Verestar, Inc.*,
   343 B.R. 444 (Bankr. S.D.N.Y. 2006).............................................................. 56

*In re White Metal Rolling and Stamping Corp.*,
   222 B.R. 417 (Bankr. S.D.N.Y. 1998).............................................................. 48

*In re Yoga Smoga, Inc.*,
   2016 WL 8943849 (Bankr. S.D.N.Y. Dec. 20, 2016)......................................34, 39

**State Cases**

*Bodell v. General Gas & Electric Corp.*,
   132 A. 442 (Del. Ch. 1926), *aff'd*, 140 A. 264 (Del. 1927) ................................. 18

*Casita, L.P. v. Glaser*,
   26 Misc. 3d 1240(A), 2010 WL 1049291 (N.Y. Sup. Ct. Mar. 16, 2010).......................... 53

*In re Dean Witter Partnership Litigation*,
  1998 WL 442456 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999)...................... 54

*In re Ezcorp Inc. Consulting Agreement Derivative Litigation*,
  2016 WL 301245 (Del. Ch. Jan. 25, 2016)......................................................... 55

*Fotta v. Morgan*,
  2016 WL 775032 (Del. Ch. Feb. 29, 2016) ........................................................ 62

*Frederick Hsu Living Trust v. ODN Holding Corp.*,
  2017 WL 1437308 (Del. Ch. Apr. 14, 2017)...................................................... 55

*Fulweiler v. Spruance*,
  222 A.2d 555 (Del. 1966)........................................................................ 17

*Georgia Malone & Co. v. Rieder*,
  973 N.E.2d 743 (N.Y. 2012) ................................................................46, 58

*Gordon v. Credno*,
  102 A.D.3d 584 (N.Y. Sup. Ct. 2013).............................................................. 53

*HPI Health Care Service, Inc. v. Mt. Vernon Hospital, Inc.*,
  545 N.E.2d 672 (Ill. 1989) ..................................................................... 47

*In re IAC/InterActive Corp.*,
  948 A.2d 471 (Del. Ch. 2008) ................................................................... 17

*Interventure 77 Hudson LLC v. Halengren*,
  2018 WL 2234878 (N.Y. Sup. Ct. May 16, 2018), *aff'd Interventure 77
  Hudson LLC v. Falcon Real Estate Inv. Co.*, 172 A.D.3d 481 (N.Y. App. Div.
  2019)......................................................................................... 53

*JPMorgan Chase Bank, N.A. v. Ballard*,
  213 A.3d 1211 (Del. Ch. 2019)................................................................... 18

*Klang v. Smith's Food & Drug Centers, Inc.*,
  702 A.2d 150 (Del. 1997).....................................................................18, 62

*Manzo v. Rite Aid Corp.*,
  2002 WL 31926606 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003)................. 55

*Marine Midland Bank v. Murkoff*,
  120 A.D.2d 122 (N.Y. App. Div. 1986)........................................................... 15

*Matthew v. Laudamiel*,
  2012 WL 605589 (Del. Ch. Feb. 21, 2012) ....................................................... 70

*Metro Communication Corp. BVI v. Advanced Mobilecomm Technologies Inc.*,
  854 A.2d 121 (Del. Ch. 2004) ........................................................................ 70

*Muzak Corp. v. Hotel Taft Corp.*,
  133 N.E.2d 688 (N.Y. 1956) ........................................................................... 68

*Nemec v. Shrader*,
  991 A.2d 1120 (Del. 2010) .............................................................................. 46

*Nesby v. Country Mutual Insurance Co.*,
  805 N.E.2d 241 (Ill. App. Ct. 2004) ............................................................... 58

*North American Catholic Educational Programming Foundation, Inc. v.*
  *Gheewalla*,
  30 A.2d 92 (Del. 2007) .................................................................................... 41

*Norton v. K-Sea Transportation Partners L.P.*,
  67 A.3d 354 (Del. 2013) .................................................................................. 31

*Potter v. Arrington*,
  11 Misc. 3d 962 (N.Y. Sup. Ct. 2006) ............................................................. 53

*Quadrant Structured Products Co. v. Vertin*,
  115 A.3d 535 (Del. Ch. 2015) ......................................................................... 41

*Season Comfort Corp. v. Ben A. Borenstein Co.*,
  655 N.E.2d 1065 (Ill. App. Ct. 1995) ............................................................. 60

*Seiden v. Kaneko*,
  2015 WL 7289338 (Del. Ch. Nov. 3, 2015) .................................................... 55

*In re Sirius XM Shareholder Litigation*,
  2013 WL 5411268 (Del. Ch. Sept. 27, 2013) ................................................. 55

*SV Investment Partners, LLC v. Thoughtworks, Inc.*,
  2010 WL 11418154 (Del. Ch. Nov. 10, 2010)............................................62, 63

*Trenwick American Litigation Trust v. Ernst & Young, L.L.P.*,
  906 A.2d 168 (Del. Ch. 2006), *aff'd sub nom. Trenwick American Litigation*
  *Trust v. Billett*, 931 A.2d 438 (Del. 2007) ................................................41, 58

*Verizon Directories Corp. v. Continuum Health Partners, Inc.*,
  74 A.D.3d 416 (N.Y. App. Div. 2010) .............................................................. 53

*Vichi v. Koninklijke Philips Electronics N.V.*,
  62 A.3d 26 (Del. Ch. 2012) ............................................................................. 58

## Federal Statutes

11 U.S.C. § 101 .................................................................................................20, 23, 25

11 U.S.C. § 108 .................................................................................................. 54

11 U.S.C. § 502 .................................................................................................65, 66

11 U.S.C. § 510 .................................................................................................68, 69, 70

11 U.S.C. § 541 .................................................................................................. 15

11 U.S.C. § 544 .................................................................................................*passim*

11 U.S.C. § 546 .................................................................................................*passim*

11 U.S.C. § 548 .................................................................................................45, 46, 48

11 U.S.C. § 550 .................................................................................................. 51

11 U.S.C. § 741 .................................................................................................20, 22

26 U.S.C. § 542 .................................................................................................. 14

26 U.S.C. § 856 .................................................................................................. 14

## State Statutes

740 Ill. Comp. Stat. 160/5 ................................................................................ 46

740 Ill. Comp. Stat. 160/6 ................................................................................ 46

Del. Code Ann. Title 6, § 18-803 ..................................................................... 70

Del. Code Ann. Title 6, § 1304 ......................................................................... 46

Del Code Ann. Title 6, § 1305 ........................................................................... 46

Del. Code Ann. Title 8, § 102 ........................................................................... 55

Del. Code Ann. Title 8, § 154 ........................................................................... 61

Del. Code Ann. Title 8, § 170 ...........................................................................61, 62

Del. Code Ann. Title 10, § 8106 ....................................................................... 54

N.Y. Debt. & Cred. Law § 272 .......................................................................... 46

## Rules

Del. Ch. R. 23.1 ........................................................................................... 8

Fed. R. Bankr. P. 7008 ................................................................................. 1

Fed. R. Bankr. P. 7009 ................................................................................. 1

Fed. R. Bankr. P. 7012 ................................................................................. 1

Fed. R. Civ. P. 8 ....................................................................................... 1, 47

Fed. R. Civ. P. 9 ...................................................................................*passim*

Fed. R. Civ. P. 12 ................................................................................1, 2, 13

N.Y. C.P.L.R. § 202 .................................................................................... 53

## Other Authorities

Barbara Black, *Corporate Dividends and Stock Repurchases* § 1:1 (2019) ............................... 17

David Drexler et al., 1 *Delaware Corporation Law and Practice* § 20.01 (2018) ..................... 17

Lands' End Spin-Off Left Sears Holdings and Sears Roebuck Insolvent *on a Cash-Flow Basis*" .............................................................................................. 63

R. Franklin Balotti et al., 1 *Del. L. of Corp. & Bus. Org.* § 5.17 (3d ed. 2019) .......................... 18

Restatement (Third) of Restitution & Unjust Enrichment § 48 (2011) ...................................... 59

Restatement (Third) of Agency §§ 3.14, 3.16, 8.06 ................................................ 26

Tom Zanki, *Sears Plans to Form REIT with $2.5B Property Sales* (Apr. 1, 2015), https://www.law360.com/articles/638154/sears-plans-to-form-reit-with-2-5b-property-sales ........................................................................................... 7

Edward S. Lampert ("Lampert"), ESL Investments, Inc., and the ESL-Related Parties[1] (collectively, "ESL" and, with Mr. Lampert, the "ESL Defendants") respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 8, 9(b), and 12(b)(6) as incorporated in Fed. R. Bankr. P. 7008, 7009, and 7012(b), to dismiss Counts 3-8, 10-12, 15-22, 24-29, 31-33, and 35 in their entirety, Count 34 in substantial part, and all claims against CRK Partners, LLC, in the First Amended Complaint filed by the Official Committee of Unsecured Creditors of Sears Holdings Corporation (the "Creditors' Committee"), on behalf of Plaintiffs Sears Holdings Corporation, et al.[2] (collectively, the "Plaintiffs" or "Sears").

## PRELIMINARY STATEMENT

The First Amended Complaint concerns three sets of transactions: (1) Sears' April 2014 spin-off of Lands' End (the "Lands' End Spin-Off"); (2) its July 2015 sale-and-lease-back transaction with Seritage involving some 266 store locations (the "Seritage Transaction"); and (3) a series of secured loans that Sears obtained from 2016 to 2018 in part from ESL, but also in part from unaffiliated third parties (the "2016-2018 Loans"). Notwithstanding that seemingly limited focus, the First Amended Complaint asserts 35 counts (compared to the "mere" 12 counts pled by Plaintiffs' prior counsel in the original complaint filed in this Adversary Proceeding), spans nearly 260 pages of text spread over 786 paragraphs, and pleads claims against some 53 different defendants (plus 500 "John and Jane Does"). This approach of throwing every imaginable claim

---

[1]      As referenced herein, the ESL-Related Parties are RBS Partners LP, SPE Master I LP, ESL Partners LP, SPE I Partners LP, RBS Investment Management LLC, ESL Institutional Partners LP, ESL Investors LLC, JPP LLC, and JPP II LLC. As discussed *infra* at Argument § VII, CRK Partners, LLC was cancelled on June 1, 2018 and is not subject to suit.

[2]      As referenced herein, "Plaintiffs" and "Sears" refer to Sears Holdings Corporation ("Sears Holdings"), Kmart Holding Corporation, Sears, Roebuck and Co., Sears Development Co., Sears, Roebuck de Puerto Rico, Inc., Kmart Corporation, Kmart of Washington, LLC, Sears, Roebuck Acceptance Corp., Big Beaver of Florida Development, LLC, Innovel Solutions, Inc., Sears Brands, LLC, Sears Holdings Management Corp., Sears Brands Business Unit Corp., SHC Desert Springs, LLC, STI Merchandising, Inc., Troy Coolidge No. 13, LLC, and the Creditors' Committee.

against the wall to see what sticks will lead to extraordinary delay, time, and cost for the parties and the Court. This motion to dismiss, and the others filed today, are designed to eliminate claims that plainly cannot survive as a matter of law and thereby render this sprawling case at least somewhat manageable, so that the facts can be developed and the truth can be revealed on the core matters at issue. The motions do not seek the dismissal of every claim in the First Amended Complaint. In particular, they do not seek the dismissal of the intentional and constructive fraudulent transfer claims concerning either the Lands' End Spin-Off or the sale of the real estate to Seritage in the Seritage Transaction. To be clear, the ESL Defendants firmly believe that those claims are meritless, but they recognize that the Court will need to hear evidence to so conclude. For now, the ESL Defendants simply seek to narrow the First Amended Complaint so that the evidence can ultimately be presented and considered, without getting buried in an avalanche of legally insufficient theories and claims.

## STATEMENT OF FACTS[3]

After Kmart filed for bankruptcy in 2002, Mr. Lampert and ESL purchased much of its debt and agreed to convert that debt into equity, enabling the company to emerge from bankruptcy the following year.[4] When Kmart, now revitalized, merged in 2005 with Sears Roebuck, in which Mr. Lampert and ESL had also invested, certain ESL Defendants (the "ESL Shareholders")

---

[3]     This recitation of facts is, for purposes of this motion only, drawn from the First Amended Complaint, the exhibits attached thereto and the documents referenced therein, the record of the proceedings in the Debtors' bankruptcy cases and this adversary proceeding, or from other public records. *See In re Hydrogen, L.L.C.*, 431 B.R. 337, 345 (Bankr. S.D.N.Y. 2010). On a Rule 12(b)(6) motion, the Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference," any "documents that are integral to the complaint" (meaning documents where "the complaint relies heavily upon its terms and effect"), and any "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 1771786, at *5 (S.D.N.Y. Apr. 23, 2019) (internal quotation marks omitted). The Court "may also take judicial notice of relevant matters of public record." *Id.* (internal quotation marks omitted).

[4]     First Amended Complaint ("FAC") ¶ 88.

became 39% owners of the new parent company, Sears Holdings, as well.[5]  From the time of the merger, Mr. Lampert served as Chairman of the Sears Holdings board of directors (though he did not become an officer of Sears Holdings until 2013).[6]  Over the next several years, Mr. Lampert and other ESL Defendants continued to invest in Sears Holdings, acquiring a majority of its equity by August 2008.[7]

Sears Holdings experienced strong growth following the combination of the legacy Sears and Kmart businesses.[8]  Though its strong financial performance slowed following the financial crisis in 2008, it continued to generate operating, pre-tax, and net income through 2010 and positive EBIDTA through 2012.[9]  The challenges that all brick-and-mortar retailers then began to face impacted Sears as well.  In an effort to right-size the company and return it to profitability by reducing its operating expenses and focusing on its core assets and operations,[10] the board of directors of Sears Holdings (the "Sears Holdings Board"), and separately a subcommittee consisting entirely of independent directors established for the purpose of reviewing and considering whether to approve transactions involving related parties such as the ESL Defendants (the "RPT Subcommittee"),[11] voted to undertake several transactions, two of which the Plaintiffs challenge here:  the Lands' End Spin-Off and the Seritage Transaction.[12]

---

[5]    *Id.* ¶ 89.

[6]    *Id.*; *see also id.* ¶ 91.

[7]    *Id.* ¶ 90.

[8]    *Id.* ¶ 114.

[9]    *Id.* ¶¶ 116-119.

[10]   *Id.* ¶ 123.

[11]   *Id.* ¶¶ 7 n.5, 17, 193, 382.

[12]   *Id.* ¶¶ 193, 227, 333, 487, 595.

In addition, from 2016 until shortly before its Chapter 11 filing in 2018, Sears obtained financing from, among others, certain of the ESL Defendants. In particular, the Sears Holdings Board and the RPT Subcommittee approved a series of loans provided by two of the ESL Defendants (JPP LLC and JPP II LLC, together the "ESL Lenders") joined by other, unrelated third-party financers as lenders.[13] Plaintiffs challenge 17 of these loan transactions as well.

## A.    The 2014 Lands' End Spin-Off

Lands' End, Inc. ("Lands' End") is a multi-channel retailer of casual clothing, accessories, and home products.[14] Sears acquired Lands' End in 2002, long before the ESL Shareholders became the largest stockholders in Sears.[15] In addition to offering Lands' End products in Sears stores, Sears owned a number of independent Lands' End stores.[16]

After a decade-long unsuccessful attempt to integrate Lands' End into Sears, to maximize each company's independent value,[17] Sears considered options for separating Lands' End from Sears, including via a possible sponsored levered spin to Leonard Green & Partners and the Tommy Hilfiger investment group.[18] Ultimately, in March 2014, the RPT Subcommittee— comprised at the time of independent directors Ann Reese and William Kunkler[19]—and then the full Sears Holdings Board approved a spin-off of Lands' End to Sears' shareholders.[20] Although

---

[13]    *Id.* ¶¶ 355-357, 365, 383-385, 387, 395.

[14]    *Id.* ¶ 198.

[15]    *Id.*

[16]    *Id.* ¶ 121.

[17]    In its filings with the SEC, Sears stated that the separation of Lands' End from Sears would simplify operational flexibility for both companies while allowing for the implementation of business-appropriate capital structure, focusing management structures, and allowing for increased investor choice. *See* Levine Decl. Ex. 7 (Lands' End, Inc. Information Statement, dated March 18, 2014 ("Lands' End Information Statement"), Ex. 99.1 to Lands' End, Inc., SEC Form 8-K (Apr. 8, 2014)), at 8-9.

[18]    FAC ¶¶ 200-202.

[19]    *Id.* ¶¶ 7 n.5, 487.

[20]    *Id.* ¶¶ 8, 203-204, 227, 439, 487.

Plaintiffs blithely state that Sears "received no consideration in the spin-off,"[21] they acknowledge that, in fact, Lands' End entered into a senior secured term loan facility to obtain the necessary financing to pay Sears a $500 million dividend in anticipation of the spin-off.[22]

In connection with the transaction, the Sears Holdings Board considered a solvency opinion from Duff & Phelps LLC ("<u>Duff & Phelps</u>"), concluding that both Lands' End and Sears were solvent and would remain so following the spin.[23] The Sears Holdings Board and RPT Subcommittee also received legal advice in connection with the transaction from (among others) Wachtell, Lipton, Rosen & Katz ("<u>Wachtell</u>"), Simpson Thacher & Bartlett, and Richards, Layton & Finger.[24]

## B.    The 2015 Seritage Transaction

Following the Lands' End Spin-Off, in late 2014, the Sears Holdings Board began exploring a transaction designed to access value in Sears' real estate portfolio to provide additional liquidity to the company while still allowing it to continue in its stores.[25] In November 2014, Sears publicly announced that it was considering a potential sale-and-lease-back transaction, in which certain Sears store locations would be sold to a newly-formed real estate investment trust company ("<u>REIT</u>") and then leased back.[26] The REIT, Seritage Growth Properties ("<u>Seritage</u>"),[27] would be

---

[21] *Id.* ¶ 230.

[22] *Id.* ¶¶ 206-207; Levine Decl. Ex. 7 (Lands' End Information Statement), at 52; Levine Decl. Ex. 9 (Lands' End, Inc. Press Release, dated April 4, 2014, Ex. 99.2 to Lands' End, Inc., SEC Form 8-K (Apr. 8, 2014)).

[23] FAC ¶¶ 81, 158, 214; Levine Decl. Ex. 10 (Separation and Distribution Agreement between Sears Holdings Corp. and Lands' End, Inc., dated April 4, 2014, Ex. 2.1 to Lands' End, Inc., SEC Form 8-K (Apr. 8, 2014)), at 21.

[24] Levine Decl. Ex. 7 (Lands' End Information Statement), at 14; Levine Decl. Ex. 8 (ABL Credit Agreement, dated April 4, 2014, Ex. 4.1 to Lands' End Inc., Form 8-K (Apr. 8, 2014)), at 107.

[25] FAC ¶¶ 243, 246.

[26] *Id.* ¶ 247; Levine Decl. Ex. 12 (Sears Holdings Corp. Current Report, dated November 4, 2014, SEC Form 8-K (Nov. 7, 2014)).

[27] FAC ¶ 253.

owned initially by those Sears shareholders that subscribed for shares in Seritage. Under the transaction, which closed in July 2015 (*i.e.*, roughly nine months after the public announcement), Sears sold its interests in 266 parcels of real property—235 fully owned properties and 50% interests in joint ventures between Sears and mall owners holding 31 additional properties (the "Joint Ventures")—to Seritage in exchange for approximately $2.7 billion. [28] The property appraisals that set the sale price were conducted by industry leader Cushman & Wakefield.[29] Seritage then leased 224 of those properties back to Sears at below-market rents and on other terms that allowed Sears to right-size the footprint of its stores and terminate leases as needed.[30]

To finance the purchase of the real properties from Sears, Seritage issued debt and raised equity. [31] To raise equity, Seritage issued subscription rights (the "Seritage Rights") and forwarded those rights to Sears for distribution to Sears' shareholders.[32] Each Seritage Right entitled its holder to purchase one half share of Seritage common stock for $29.58 per share. [33] In order to reach Sears' shareholders, Seritage passed the Seritage Rights through Sears. [34] Specifically, the governing contract (the "Seritage Subscription Agreement") provided for Seritage, on June 8, 2015, to deliver the subscription rights to Sears, which in turn was obligated that same day to deliver them to a subscription agent—Computershare Trust Company, N.A. ("Computershare")—

---

[28]     *Id.* ¶¶ 2, 10, 12, 237-238, 274-275.

[29]     *Id.* ¶¶ 237, 240, 261, 275.

[30]     *Id.* ¶¶ 237, 278-279; *see also* Levine Decl. Ex. 17 (Master Lease between Seritage subsidiaries and Sears subsidiaries, dated July 7, 2015 ("Master Lease"), Ex. 10.3 to Seritage Growth Properties, SEC Form 8-K (July 10, 2015)), at 1.

[31]     *See* Levine Decl. Ex. 15 (Prospectus of Seritage Growth Properties, dated June 9, 2015 ("Seritage Prospectus"), Seritage Growth Properties, SEC Form 424B3 (June 10, 2015)), at 5.

[32]     FAC ¶¶ 2, 10-11, 236, 253-254.

[33]     *Id.* ¶ 253.

[34]     *Id.* ¶¶ 236, 253-254.

which then distributed them to Sears' shareholders.[35] Each Sears shareholder had a few weeks,

until July 2, 2015, to exercise the Seritage Rights, which traded in the interim on the New York

Stock Exchange.[36] Under the Seritage Subscription Agreement, a sufficient subscription so that

Seritage could pay the purchase price was a condition precedent to the sale and lease-back of the

real estate.[37] The Seritage Rights offering (the "Rights Offering") was, in fact, adequately

subscribed, and as a result, the Seritage Transaction closed on July 7, 2015.[38]

In connection with the Seritage Transaction, Sears again retained Duff & Phelps to conduct

fairness and solvency analyses, which were considered by the Sears Holdings Board.[39] Duff &

Phelps opined that Sears was solvent and would remain so following the Seritage Transaction.[40]

The Sears Holdings Board also received advice from Deloitte & Touche LLP on the structure of

the deal,[41] and from Wachtell, which advised the full Sears Holdings Board.[42] Ultimately, the

Seritage Transaction was approved by the Sears Holdings Board,[43] and separately by the RPT

Subcommittee.[44]

---

[35]    *Id.* ¶¶ 253-254; *see also* Levine Decl. Ex. 14 (Subscription, Distribution and Purchase and Sale Agreement between Sears Holdings Corporation and Seritage Growth Properties, dated June 8, 2015 ("Seritage Subscription Agreement"), Ex. 2.1 to Seritage Growth Properties, Am. No. 5 to SEC Form S-11 (June 9, 2015)) §§ 2.2, 3.1(d); Levine Decl. Ex. 15 (Seritage Prospectus), at 169.

[36]    FAC ¶ 255; Levine Decl. Ex. 15 (Seritage Prospectus), at 26, 28.

[37]    Levine Decl. Ex. 14 (Seritage Subscription Agreement) §§ 3.3, 3.4.

[38]    FAC ¶ 274.

[39]    *Id.* ¶¶ 240, 302.

[40]    *Id.*

[41]    *See* Levine Decl. Ex. 15 (Seritage Prospectus), at 214, F-2, F-7, F-12.

[42]    *See id.* at 51, 195; Tom Zanki, *Sears Plans to Form REIT with $2.5B Property Sales*, Law360 (Apr. 1, 2015), https://www.law360.com/articles/638154/sears-plans-to-form-reit-with-2-5b-property-sales.

[43]    FAC ¶¶ 240, 333.

[44]    *Id.* ¶¶ 7 n.5, 299, 600.

Before the Seritage Transaction closed, a number of Sears shareholders brought breach of fiduciary duty claims against Mr. Lampert, ESL, and others in the Delaware Court of Chancery derivatively on behalf of Sears, challenging the terms of the transaction (the "Delaware Derivative Action").[45] One of the nation's foremost mediators, Hon. Layn Phillips, mediated the dispute to a successful settlement.[46] As part of the settlement, Sears (by and through its shareholders) released all claims it brought or could have brought against Mr. Lampert, ESL, Seritage, Fairholme, and other Sears directors and officers relating to the Seritage Transaction, in exchange for the payment by the defendants of $40 million to Sears.[47] As required under applicable law, the settlement and release took effect only upon their approval by the Delaware Court of Chancery.[48] That Court's Final Order and Judgment (the "Final Order and Judgment") "incorporate[d]" the settlement, including the release of all claims Sears could have asserted arising out of any aspect of the Seritage Transaction and "forever … barred and enjoined [Sears] from commencing, instituting or prosecuting" any such claims.[49]

### C.    The 2016-2018 Loans By The ESL Lenders And Third Party Financers To Sears

Between 2016 and 2018, the ESL Lenders and other disinterested, third party lenders, including Cyrus Capital Partners LP ("Cyrus") and Cascade Investments, LLC ("Cascade"), loaned Sears billions of dollars across numerous financing transactions. In an effort to mold reality

---

[45]    *Id.* ¶ 345.

[46]    *See* Levine Decl. Ex. 2 (Stipulation and Agreement of Settlement, Compromise and Release ("Settlement Agreement"), *In re Sears Holdings Corp. Stockholder & Derivative Litig.*, No. 11081-VCL (Del. Ch. Feb. 8, 2017)), at 6-7.

[47]    *Id.* at 12-13, 16-18.

[48]    *See* Levine Decl. Ex. 4 (Final Order and Judgment ("Final Order and Judgment"), *In re Sears Holdings Corp. Stockholder & Derivative Litig.*, No. 11081-VCL (Del. Ch. May 9, 2017)), at 3-9; Levine Decl. Ex. 2 (Settlement Agreement), at 17, 20; *see also* Del. Ch. R. 23.1(c) (shareholder derivative action "shall not be dismissed or compromised without the approval of the Court").

[49]    Levine Decl. Ex. 4 (Final Order and Judgment), at 4-5.

to fit their narrative, Plaintiffs pick and choose 17 of these loans to challenge in the First Amended Complaint (the 2016-2018 Loans)[50]—several of which were not independent financing transactions at all, but rather were one of several amendments to, or restatements of, an underlying credit facility.

Many of the 2016-2018 Loans (and the loan families of which they were a part) involved third party lenders. For instance, under the 2016 Secured Loan Facility, Sears borrowed $250 million from Cascade and $250 million from the ESL Lenders, secured by first-priority liens on 21 parcels of real property.[51] Various Cyrus entities were similarly involved as lenders in the Letter of Credit Facility and the 2018 Term Loan Facility.[52] And the First Amended Complaint conveniently ignores the involvement of other third party lenders in other families of loans, such as a $200 million loan from UBS AG, Stamford Branch, secured by mortgages on the same real properties that collateralized the Mezzanine Loan Facilities for which the ESL Lenders were the lenders, and issued on the same day as the Mezzanine Loan Facilities.[53]

All of the 2016-2018 Loans were documented as debt and backed by substantial credit agreements and other loan documents.[54] The terms of those credit agreements were followed, including the timely payment of interest and fees.[55] As alleged in the First Amended Complaint,

---

[50]     FAC ¶ 357.

[51]     *See id.* ¶¶ 65, 357, 691; Levine Decl. Ex. 19 (Loan Agreement, dated April 8, 2016, Ex. 10.1 to Sears Holdings Corp., SEC Form 8-K (Apr. 12, 2016)) § 1.1(a).

[52]     *See* FAC ¶¶ 66, 357, 691; Levine Decl. Ex. 25 (Amendment to Term Loan Credit Agreement, dated January 29, 2018, Ex. 10.1 to Sears Holdings Corp. Current Report, SEC Form 8-K (Feb. 1, 2018)).

[53]     *See, e.g.*, FAC ¶ 357; Levine Decl. Ex. 26 (Mezzanine Loan Agreement, dated March 14, 2018, Ex. 10.92 to Sears Holdings Corp. Annual Report, SEC Form 10-K (Mar. 23, 2018)); Levine Decl. Ex. 27 (UCC Financing Statement (Mar. 16, 2018)); Levine Decl. Ex. 28 (Credit Agreement, dated March 14, 2018, Ex. 10.91 to Sears Holdings Corp. Annual Report, SEC Form 10-K (Mar. 23, 2018)).

[54]     *See, e.g.*, sources cited *supra* nn.160-161.

[55]     *See* FAC ¶¶ 16, 356.

Plaintiffs paid more than $400 million in interest and fees—and repaid $518 million in principal—in connection with the 2016-2018 Loans.[56]

All of the 2016-2018 Loans were also secured, though the collateral varied depending on the particular facility—inventory, credit card receivables, pharmacy receivables, cash, real estate, ground leases, or unencumbered intellectual property.[57] The grants of these liens were properly perfected.[58]

Finally, all of the 2016-2018 Loans were approved by the Sears Holdings Board and, separately, by the RPT Subcommittee, comprised at the time of Ann Reese, William Kunkler, and Paul DePodesta.[59] In approving the 2016-2018 Loans, the RPT Subcommittee relied upon the professional financial and investment-banking advice of Centerview Partners ("Centerview") and the legal advice of Weil, Gotshal & Manges ("Weil Gotshal").[60]

## ARGUMENT

### I.    PLAINTIFFS' BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING, UNJUST ENRICHMENT, AND ILLEGAL DIVIDEND CLAIMS CONCERNING THE SERITAGE TRANSACTION, AND THEIR FRAUDULENT TRANSFER AND UNJUST ENRICHMENT CLAIMS RELATING TO THE SERITAGE RIGHTS OFFERING, SHOULD BE DISMISSED

Plaintiffs bring 14 claims relating to a single transaction—Sears' sale in 2015 of 266 parcels of real estate (or of Sears' interest in those parcels to the extent they were owned by Joint Ventures) to a newly-formed REIT, Seritage, for some $2.7 billion and the lease of the majority of those properties back to Sears. Plaintiffs allege that the value of the real estate exceeded the

---

[56]    *Id.* ¶¶ 3, 16, 196-197, 356.

[57]    *Id.* ¶ 357.

[58]    *Id.* ¶¶ 15-16, 357, 391; *see, e.g.*, Levine Decl. Ex. 27 (UCC Financing Statement (Mar. 16, 2018)).

[59]    *See id.* ¶¶ 7 & n.5, 57-59, 193.

[60]    *Id.* ¶ 392; Levine Decl. Ex. 23 (Amended and Restated Loan Agreement, dated May 22, 2017, Ex. 99.1 to Sears Holdings Corp., SEC Form 8-K (May 24, 2017)); Levine Decl. Ex. 22 (Press Release, Ex. 99.1 to Sears Holdings Corp., SEC Form 8-K (Jan. 4, 2017)).

sale price by "hundreds of millions of dollars,"[61] even though, by Plaintiffs' own admission, that sale price reflected the contemporaneous appraisals of the real estate by one of the nation's leading real estate valuation firms, Cushman & Wakefield.[62]  Plaintiffs also allege that Sears was insolvent at the time or was rendered so by the transaction.[63]  Based on these factual assertions, Plaintiffs bring the traditional claims that creditors or bankruptcy estates commonly assert—claims to avoid the transfer of the real estate as fraudulent conveyances (Counts 13 and 14).  The ESL Defendants understand that because the resolution of those claims may turn on disputed issues of fact, co-defendant Seritage—the recipient of that real estate transfer and the defendant on those claims—is not seeking the dismissal of those claims at the pleading stage as legally insufficient (though it, and its largest equity holders, the ESL Shareholders, are confident that Plaintiffs' factual allegations are false and look forward to so establishing).  But Plaintiffs have also asserted a veritable kitchen sink of other claims relating to the Seritage Transaction, and those other claims are legally insufficient and can and should be resolved now.

### A.    Counts 12 And 18-22 Are Barred Under Settled Principles of *Res Judicata*, And Counts 15-17 Seek Relief That This Court Cannot Grant And That Would Be Meaningless In Any Event

In addition to seeking to avoid, as fraudulent conveyances, the transfer by Sears to Seritage of the real estate in the Seritage Transaction, and the supposed transfer by Sears to the ESL Defendants and certain other defendants of the Seritage Rights, Plaintiffs bring a series of state-law claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, and illegal dividend (Counts 12 and 18-22).  Plaintiffs bring these latter claims standing in the shoes of Sears, not its creditors.  But these very claims were released by Sears, in

---

[61]    FAC ¶¶ 2, 12, 235, 237, 263, 276, 289, 343, 541, 633.

[62]    *Id.* ¶¶ 12, 237, 240, 275.

[63]    *Id.* ¶¶ 10, 238, 301, 313.

exchange for $40 million, to resolve the Delaware Derivative Action, and the Delaware Court of Chancery entered a Final Order and Judgment permanently enjoining Sears from any further prosecution of the claims. Plaintiffs' assertion of those claims here is barred by the well-established law of *res judicata*. And Plaintiffs' companion claims to avoid the contractual release as a fraudulent transfer or to declare it "null and void" (Counts 15-17) likewise fail because they ask this Court to do something it cannot do—reconsider and reverse the Final Order and Judgment of the Delaware Court of Chancery. In any event, these claims seek relief that would be meaningless because the avoidance or voiding of the contractual release, even if legally possible, could not and would not alter the state court's judgment barring any further prosecution of the released claims.

Because these points apply not merely to the ESL Defendants, and because they address not merely whether Plaintiffs have failed to state a claim, but rather whether Plaintiffs can act in flagrant disregard of a final order and judgment of a court of competent jurisdiction, the ESL Defendants have joined with other affected defendants in a separate joint brief on these issues. Rather than repeat the arguments made in that brief—Defendants' Joint Motion to Dismiss Counts 12 and 15-22 of the First Amended Complaint, filed contemporaneously herewith—the ESL Defendants incorporate those arguments here. Counts 12 and 15-22 should be dismissed for the reasons set forth therein.

### B. Counts 10-11, As Well As Counts 12 And 22, Should Be Dismissed Because The Subscription Rights In Seritage Were Not Sears' Property

Plaintiffs also assert two sets of fraudulent transfer claims under Section 544 of the Bankruptcy Code relating to the Seritage Transaction: (1) claims to avoid the transfer by Sears (or Sears' subsidiaries) of real property to Seritage (Counts 13 and 14), and (2) claims to avoid the supposed transfer to Sears' shareholders of rights issued by Seritage to purchase shares in the

newly-formed Seritage REIT (Counts 10 and 11). While the former claims have no basis in fact—the evidence will show that Sears entered into the sale-and-lease-back transaction to monetize its real estate, which benefitted rather than defrauded its creditors, and that the transaction was for fair value and left Sears solvent—they are not the subject of this motion. The latter claims are, and they should be dismissed for two reasons: first, the property allegedly transferred, the Seritage Rights, never belonged to Sears; and second, even if the Seritage Rights were property of Sears, they were unquestionably securities, and their avoidance under Section 544 would be barred by the safe harbor set forth in Section 546(e) of the Bankruptcy Code for securities settlement payments and transfers in connection with securities contracts.

### 1. The Distribution of the Seritage Rights Did Not Entail the Transfer of Any Property of Sears

As Plaintiffs allege, in 2015 when the Seritage Transaction occurred, Seritage was a "newly created" REIT established for the purpose of the Seritage sale-and-lease-back transaction. [64] Seritage had no funds to pay Sears for the parcels of real estate—indeed, until the Seritage Transaction closed, and it obtained title to the real estate, it was not an operating company with assets and any day-to-day business—so it obtained financing from two sources: debt that it issued and equity that it raised. [65]

Seritage raised the equity by offering subscription rights to Sears' shareholders and conducting private placements. First, it issued 106,597,798 subscription rights, each of which entitled the holder to purchase one half share of Seritage common stock for each share of Sears

---

[64]    FAC ¶¶ 10, 253; *see also* Levine Decl. Ex. 14 (Seritage Subscription Agreement), at 1 ("Seritage has been organized for this purpose and has not engaged in activities except in preparation for the Transactions and the distribution of Seritage Common Shares …."). The Court may consider the Seritage Subscription Agreement because it is referenced in and integral to the complaint. *See* FAC ¶¶ 235 n.23, 253; *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153-54 (2d Cir. 2002) (on motion to dismiss under Rule 12(b)(6), courts may consider contracts that are "integral" to complaint).

[65]    *See* Levine Decl. Ex. 15 (Seritage Prospectus), at 5.

stock she held.[66]  Then, pursuant to a written agreement with Sears (the Seritage Subscription Agreement, dated June 8, 2015), it delivered these subscription rights to Sears, which in turn forwarded them through an agent to Sears' shareholders, pro rata.[67]  In particular, the Seritage Subscription Agreement required Sears to (1) deliver the rights to a subscription agent, Computershare, and (2) instruct the agent to distribute the rights to Sears' shareholders.[68]  Under the express terms of the contract, Sears could not have retained, exercised, or sold the subscription rights; nor could it have transferred the rights to its creditors or anyone else.[69]  Indeed, had Sears attempted to exercise the Seritage Rights for its own account, it would have not only breached the Seritage Subscription Agreement, but also potentially compromised Seritage's tax treatment as a REIT.[70]  And, of course, doing so would have defeated the entire purpose for which Seritage had issued the Seritage Rights—to raise cash *to pay Sears* for the real estate to be sold by Sears to Seritage.

The only discretion afforded Sears under the Seritage Subscription Agreement was to cancel the entire transaction—for example, if an insufficient number of Sears shareholders decided to exercise their Seritage Rights to provide Seritage the necessary funds to pay Sears for the real property.[71]  But in that event, Sears could not have retained the Seritage Rights.  Rather, the

---

[66]     Levine Decl. Ex. 14 (Seritage Subscription Agreement), at 1, 13; Levine Decl. Ex. 15 (Seritage Prospectus), at 10.

[67]     FAC ¶¶ 253-254; Levine Decl. Ex. 14 (Seritage Subscription Agreement), at 13; Levine Decl. Ex. 15 (Seritage Prospectus), at 1.

[68]     Levine Decl. Ex. 14 (Seritage Subscription Agreement) § 3.1(d) ("On or prior to the Distribution Date, SHC shall deliver to the Agent such number of Rights as is necessary to permit the distribution of one Right for each share of SHC Common Stock held by such Record Holders in the Distribution."); *see also id.* §§ 2.2, 3.1(b).

[69]     *Id.* § 2.2; Levine Decl. Ex. 15 (Seritage Prospectus), at 26.

[70]     To qualify as a REIT, Seritage needed to have at least 100 beneficial owners, and no more than 50% of its outstanding shares could have been owned by five or fewer entities. *See* 26 U.S.C. § 856(a)(5)-(6), (h)(1)(A); *see also id.* § 542(a)(2).

[71]     Section 9.2 of the Seritage Subscription Agreement allowed Sears to terminate the transaction "if the SHC Board determines, in its sole and absolute discretion, that (a) any of the conditions set forth in Section 3.3(a) have not been satisfied, (b) the Transaction is not in the best interest of SHC or the holders of SHC Common Stock or (c) that

Seritage Subscription Agreement would have "become void," and "the subscription rights [would have been] void, of no value and [would have] cease[d] to be exercisable for Seritage Growth common shares."[72]

For this reason, Plaintiffs' fraudulent transfer claims relating to the Seritage Rights fail as a matter of law.   Under Section 544, a bankruptcy estate may seek to avoid as a fraudulent conveyance a "transfer of an interest of the debtor in property."[73]  Only "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings" is subject to avoidance.[74]  "If the transfer did not involve property of the debtor under non-bankruptcy law, the trustee cannot avoid and recover the transfer or its value."[75]  This rule of law is dispositive.   Because Sears was contractually obligated to pass on the Seritage Rights, those rights were never Sears' property and cannot form the basis of a fraudulent transfer claim.

To be sure, for a moment, Sears possessed the Seritage Rights.   But, under the Bankruptcy Code, even property that a debtor possesses when it files for bankruptcy is not "property of the estate" if the debtor holds "only legal title and not an equitable interest."[76]  Similarly, unless the debtor had control or dominion over the property, the debtor's mere pre-petition possession of property does not mean that it owned or otherwise held any interest in the property sufficient to

---

market or other conditions are such that it is not advisable to consummate the Transaction."  Levine Decl. Ex. 14 (Seritage Subscription Agreement).

[72]     *Id.* § 9.2; Levine Decl. Ex. 15 (Seritage Prospectus), at 17.

[73]     11 U.S.C. § 544(b)(1).

[74]     *Begier v. IRS*, 496 U.S. 53, 58 (1990); *see also Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 196 (S.D.N.Y. 2002) ("[Section] 548(a)(1)(A) only permits a trustee to avoid a transfer of an interest of the debtor in property when, but for the transfer, such property interest would have been available to at least one of the debtor's creditors."); *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 130 (N.Y. App. Div. 1986) ("[T]he relief to which a defrauded creditor [is] entitled in an action to set aside a fraudulent conveyance [is] limited to that which could have been obtained had there been no conveyance.").

[75]     *In re Dreier LLP*, 429 B.R. 112, 125 (Bankr. S.D.N.Y. 2010).

[76]     11 U.S.C. § 541(d).

support a fraudulent transfer claim. [77]  Where a party receives property under a contractual

obligation to forward that property to a third party, it does not exercise sufficient dominion or

control over the property.[78]

The critical question is whether Sears had "the right to use the [property] however it

wished."[79]  It did not.  Rather, under the Seritage Subscription Agreement, it had "no discretion or

authority to do anything" other than to pass the Seritage Rights on to its shareholders or cancel the

transaction altogether, in which case the rights would become void and worthless.[80]  Simply put,

Sears was a "mere conduit" for the rights, "consistent with its contractual undertaking."[81]  And

because the issuance of the Seritage Rights did not entail a "transfer of an interest of the debtor in

property," Plaintiffs cannot sue to avoid the supposed "transfer" of those rights as a fraudulent

conveyance.

---

[77]     *See, e.g., In re Marshall*, 550 F.3d 1251, 1255 (10th Cir. 2008) ("[A] transfer of property will be a transfer of 'an interest of the debtor in property' if the debtor exercised dominion or control over the transferred property." (citation omitted)); *In re Chase & Sanborn Corp.*, 813 F.2d 1177, 1180 (11th Cir. 1987) (holding that even though the debtor corporation "had possession of the funds in controversy by virtue of [a] transfer to [its] account," the funds were not the debtor's property because the debtor did not have sufficient control over the funds); *see also In re Finley, Kumble*, 130 F.3d 52, 59 (2d Cir. 1997) (noting that, in analogous circumstances, every circuit court to address the issue "has squarely rejected a test that equates mere receipt with liability" where a party has not exercised "dominion and control" over the property).

[78]     *See Finley, Kumble*, 130 F.3d at 57 (a party that acts as a "mere conduit"—having possessed the property, but with "no discretion or authority to do anything else but" pass on the property to another entity—does not control it); *In re Bullion Reserve of N. Am.*, 922 F.2d 544, 549 (9th Cir. 1991) (defendant was not an initial transferee of funds received from the debtor because the defendant "was under a contractual duty" to use the funds to purchase stock and then "to pledge the stock immediately" to the debtor); *In re TOUSA, Inc.*, 444 B.R. 613, 646 (S.D. Fla. 2011) (debtors did not have a property interest in loan proceeds because the loan agreements themselves "directed that the proceeds … be used to satisfy" a settlement on behalf of the debtors' corporate parent), *aff'd in part, rev'd in part*, 680 F.3d 1298 (11th Cir. 2012); *In re Montgomery*, 983 F.2d 1389, 1395 (6th Cir. 1993) (under the earmarking doctrine, no preference claim lies where the debtor receives borrowed funds that "have been specifically earmarked by the lender for payment to a designated creditor" and uses the funds as earmarked); *Coral Petrol., Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1356 (5th Cir. 1986).

[79]     *In re Incomnet, Inc.*, 463 F.3d 1064, 1070 (9th Cir. 2006) (emphasis added).

[80]     *Finley, Kumble*, 130 F.3d at 59.

[81]     *Id.*

This result makes sense. Fraudulent transfer law is designed to ensure that a debtor does not deplete its estate, leaving the debtor unable to pay its creditors.[82] The goal of a fraudulent-transfer suit, therefore, is "to restore the estate to the financial condition that would have existed had the transfer never occurred."[83] Here, the asset that Sears owned before the Seritage Transaction was the 266 parcels of real estate, which are the subject of separate fraudulent transfer claims (Counts 13 and 14), and not the Seritage Rights. Sears had no ability to use those rights to pay its creditors, and Sears' transmission of those rights to its shareholders, as it was contractually required to do, did not deplete Sears to the detriment of its creditors.

For the same reason, Plaintiffs' suggestion that Sears' delivery of the Seritage Rights amounted to a "dividend" paid by Sears to its shareholders[84] is wrong as a matter of law. "[A] dividend is a distribution by a corporation to its shareholders of a share of the ***earnings*** of the corporation."[85] Thus, any "'property' distributed to stockholders must be ***property of the issuing corporation***" for the distribution to constitute a dividend.[86] Here, the Seritage Rights were issued by Seritage, not Sears, and the forwarding of those rights by Sears, as a mere conduit between Seritage and the Sears shareholders, did not entail a distribution of any Sears earnings.

This result, too, makes sense. As with fraudulent transfer law, the purpose of Delaware law barring the payment of a dividend when the company has no "surplus" is "to protect creditors

---

[82]    *See, e.g., Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 322 (1999); *In re S.W. Bach & Co.*, 435 B.R. 866, 875 (Bankr. S.D.N.Y. 2010).

[83]    *In re Kingsley*, 518 F.3d 874, 877 (11th Cir. 2008) (citation omitted); *see also In re Straightline Invs., Inc.*, 525 F.3d 870, 883 (9th Cir. 2008); *In re Centennial Textiles, Inc.*, 220 B.R. 165, 177 (Bankr. S.D.N.Y. 1998).

[84]    *See* FAC ¶¶ 235, 533-539.

[85]    *Fulweiler v. Spruance*, 222 A.2d 555, 558 (Del. 1966) (emphasis added); *see also In re IAC/InterActive Corp.*, 948 A.2d 471, 511 (Del. Ch. 2008).

[86]    David Drexler et al., 1 *Delaware Corporation Law and Practice* § 20.01 n.3 (2018) (emphasis added); *see* Barbara Black, *Corporate Dividends and Stock Repurchases* § 1:1 (2019) ("[N]ot every benefit given to stockholders is a dividend.").

of a corporation from distributions of corporate funds viewed as inappropriate because they undermine the ability of the corporation to repay its debts."[87] But the distribution of the Seritage Rights did not affect the interests of Sears' creditors because the rights were never available for Sears "to repay its debts" in the first place.[88] The asset available to Sears to pay its creditors was its real estate, not the Seritage Rights. Indeed, Plaintiffs admit that Sears passed the Seritage Rights to Sears' shareholders when Seritage was a mere shell, a month before Sears transferred the real estate to Seritage,[89] and thus any economic value reflected in the Seritage Rights during the interim "derived" entirely from the anticipated value of the real estate to be sold to Seritage.[90]

The distribution of the Seritage Rights did not, therefore, entail the payment of a dividend by Sears.[91] Plaintiffs' claim to recover the transmission of the Seritage Rights as an "illegal dividend" (Count 12) fails for this reason (along with those previously discussed in Section I(A) *supra*), as do the fraudulent transfer claims (Counts 10 and 11) directed at Sears' forwarding of the Seritage Rights from Seritage to Sears' shareholders.

---

[87]     *JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211, 1226 (Del. Ch. 2019); *see also Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150, 154 (Del. 1997).

[88]     *Ballard*, 213 A.3d at 1226.

[89]     *Compare* FAC ¶¶ 253-254 (Seritage "delivered" the Subscription Rights to Sears pursuant to the Subscription Agreement dated "June 8, 2015" and "[t]hat same day," Sears "distributed all of the Seritage Rights to its shareholders.") *with* FAC ¶ 274 ("On or about July 7, 2015, Sears and Seritage closed on the Sale-and-Lease-Back of 266 Sears stores ….").

[90]     *Id.* ¶ 261 ("It is critical to note that the exercise price of the Seritage Rights was derived directly from the valuation of the real estate performed by C&W …."); *see also id.* ¶ 236.

[91]     *See Bodell v. Gen. Gas & Elec. Corp.*, 132 A. 442, 450 (Del. Ch. 1926) (rejecting argument that issuance of a subscription right was a "declaration of a dividend"), *aff'd*, 140 A. 264 (Del. 1927); *accord* R. Franklin Balotti et al., 1 *Del. L. of Corp. & Bus. Org.* § 5.17 (3d ed. 2019) (noting that subscription rights distributed to shareholders "arguably would not constitute a dividend … because issuance of the rights will not constitute a return to the shareholders upon their investment or a reduction of either capital or surplus, and any profit that would accrue to the stockholder upon sale of the rights or options or of the stock after exercise is not taken out of the earnings of the company" (internal quotation marks omitted)).

2.    Counts 10 and 11 Seeking to Avoid the Supposed "Transfer" of the Seritage Rights as Fraudulent Conveyances Are Barred by Section 546(e)'s Safe Harbor

Plaintiffs' fraudulent-transfer claims to avoid any supposed "transfer" of the Seritage Rights (Counts 10 and 11) also fail because those claims are barred by Bankruptcy Code Section 546(e).  If there had been any doubt on this front, the Second Circuit's recent decision in the *Tribune* leveraged buy-out litigation, holding (again) that Section 546(e) would bar any fraudulent transfer claim under Section 544 against the shareholders there and preempt any state-law claims designed to achieve the same relief, removes it.

To fall within Section 546(e)'s safe harbor, two requirements must be met:  the transfers sought to be avoided must be (1) qualifying transfers, either "settlement payment[s]" or "transfer[s] … in connection with a securities contract," and (2) made "by or to (or for the benefit of)" a qualifying entity, including a "financial institution."[92]  Both requirements are satisfied here: (1) Sears' distribution to its shareholders of the Seritage Rights (to the extent they were "transfers" of "property" of Sears at all) were "settlement payments" and "transfers … in connection with a securities contract," and (2) these supposed "transfers" were made "by or to (or for the benefit of)" a qualifying entity because both Sears and its shareholders were "financial institutions" as defined under the Bankruptcy Code.

> a)    The "transfers" of the Seritage Rights were "settlement payments" and "transfers in connection with a securities contract"

> (i)    Settlement payments

The Bankruptcy Code defines a "settlement payment" to include a "preliminary," "interim," "partial" or "final" "settlement payment," or any "other similar payment commonly

---

[92]    *See* 11 U.S.C. § 546(e).

used in the securities trade."[93]  The Second Circuit has emphasized the "breadth" of this definition and construed a "settlement payment" to include essentially any "transfer of cash or securities made to complete [a] securities transaction."[94]  That broad definition is easily met here.  First, it is undisputed that the Seritage Rights were securities; the rights entitled Sears' shareholders to purchase stock in Seritage, they traded on the New York Stock Exchange, and Plaintiffs themselves describe them as "securities."[95]  Second, a "settlement payment" may consist of a "transfer of cash *or securities*," like the Seritage Rights distributed here.[96]  Third, that distribution complete[d] [a] securities transaction"—the distribution of the Seritage Rights—and, as discussed below, was also a necessary step in another, related securities transaction, the exercise by Sears' shareholders of those rights to purchase stock in Seritage, and hence was also a "preliminary settlement payment."[97]

The "transfer," of course, took the form of a "distribution," rather than a sale, of the Seritage Rights to Sears' shareholders.[98]  But a transfer may qualify as a "settlement payment" even if the transfer does not itself constitute the purchase or sale of a security.[99]  Here, the "transfer" of the Seritage Rights was not a stand-alone "distribution," but rather a necessary step in an integrated securities transaction involving the distribution of securities (the Seritage Rights) to Sears' shareholders to purchase stock in Seritage.  By those stock purchases, Seritage obtained

---

[93]     11 U.S.C. § 741(8).

[94]     *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334-37, 339 (2d Cir. 2011).

[95]     FAC ¶ 255; 11 U.S.C. § 101(49)(A)(ii), (xv).

[96]     *Enron*, 651 F.3d at 334 (emphasis added); *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 878 F.2d 742, 752-53 (3d Cir. 1989).

[97]     *Enron*, 651 F.3d at 334.

[98]     *See* FAC ¶ 254; Levine Decl. Ex. 14 (Seritage Subscription Agreement) §§ 2.2, 3.1(b), (d).

[99]     *Enron*, 651 F.3d at 336-38 (debtor's payments to redeem its debt securities were "settlement payments" even if the debtor did not "purchase" the securities).

cash from Sears' shareholders—cash that ended up at Sears when, as was contemplated from the start, Seritage used the cash to pay for the real estate. A purchase of stock for cash is, of course, a paradigmatic "securities transaction."[100] And the distribution of the Seritage Rights to Sears' shareholders was a "transfer of … securities made to complete" such a quintessential "securities transaction"[101]—and hence was a "settlement payment"—because that distribution had to occur for the shareholders to purchase the Seritage stock. Indeed, courts have held that similar "distributions" to shareholders that were made as part of an integrated securities transaction involving the debtor were "settlement payments" protected by Section 546(e).[102]

(ii)    Transfers in connection with a securities contract

While it is sufficient that the distribution of the Seritage Rights, if a "transfer" at all, was a "settlement payment," that distribution also falls comfortably within Section 546(e) on the independent ground that it was a "transfer made … in connection with a securities contract."

The Bankruptcy Code defines a "securities contract" broadly to include (among other things) any "contract for the purchase, sale, or loan of a security," any "option to purchase or sell any such security," "any option to enter into any agreement or transaction referred to in this subparagraph," and "any other agreement or transaction that is similar to an agreement or

---

[100]    *Id.* at 336-37.

[101]    *Id.* at 334.

[102]    *See, e.g., Crescent Res. Litig. Tr. v. Duke Energy Corp.*, 500 B.R. 464, 471-75 (W.D. Tex. 2013) (holding that $1.2 billion that debtor transferred to non-debtor parent company as a purported "one-way distribution or dividend" was a "settlement payment" protected by § 546(e) because the transfer was made to complete an integrated transaction to sell parent's equity-securities in the debtor to a third party; "Section 546(e) merely requires a payment be made to complete a securities transaction, it does not limit payment or receipt to particular parties to a multi-party transaction."); *In re Nat'l Forge Co.*, 344 B.R. 340, 346-51, 366 (W.D. Pa. 2006) (holding that subsidiary's transfer of cash to parent company could not be "viewed in isolation," as purportedly falling outside § 546(e), where transfer was part of "one integrated transaction" in which the parent transferred such cash to its stockholders to redeem their shares, and that the transfers were therefore "settlement payments" protected by § 546(e)); *see also Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("an allegedly fraudulent conveyance must be evaluated in context; [w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications"; "a single, integrated transaction" must be "viewed in its entirety" (internal quotation marks omitted)).

transaction referred to in this subparagraph."[103]  And, under "§546(e), a transfer is 'in connection

with' a securities contract" so long as it is in some way "'related to' or 'associated with' the

securities contract."[104]  "Section 546(e) sets a low bar for the required relationship between the

securities contract and the transfer sought to be avoided."[105]  The transfer itself need not "settle" a

securities transaction; § 546(e) "merely require[s] that the transfer have a connection to the

securities contract."[106]

That "low bar" is readily met here.  The Seritage Rights were a "securities contract"

because they were both an "option to purchase … [a] security" (the Seritage equity) and, once

exercised, a "contract for the purchase [or] sale … of a security."[107]  The prospectus for the

Seritage stock specified that "[e]ach subscription right is a contractual obligation of Seritage …

entitl[ing] the holder to purchase … Seritage Growth common shares," and that "[o]nce made,

subscriptions … are irrevocable" and subscribers "are not allowed to revoke or change the exercise

or request a refund of monies paid."[108]

Sears' distribution of the Seritage Rights to its shareholders was unquestionably "in

connection with" that securities contract.  After all, if Sears had not forwarded the Seritage Rights

to its shareholders, the shareholders would not have received, and could not have exercised, those

---

[103]     11 U.S.C. § 741(7)(A)(i), (vii), (ix).

[104]     *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 421 (2d Cir. 2014).

[105]     *Id.* at 422.

[106]     *Id.*

[107]     11 U.S.C. § 741(7).

[108]     Levine Decl. Ex. 15 (Seritage Prospectus), at 162, 171-172; *see also* Levine Decl. Ex. 14 (Seritage
Subscription Agreement) § 2.1 (the Seritage Rights grant "the right when exercised to purchase one Seritage Common
Share"); *id.* at 1 (providing that the Seritage Rights entitle Sears Holdings' shareholders "to purchase" the Seritage
shares and that Seritage will "sell such Seritage Common Shares pursuant to such Rights").

rights to purchase the Seritage shares. The transfer of the Seritage Rights thus was "related to" and "ha[d] a connection to" the securities contracts.[109]

> b) *The distribution of the Seritage Rights was made "by or to (or for the benefit of)" entities covered by § 546(e)*

The Bankruptcy Code defines a "financial institution" to include not merely a "commercial bank" or "trust company," but also a "customer" of such a bank or company that "is acting as agent" for its customer "in connection with a securities contract."[110] As the Second Circuit's recent decision in *Tribune* makes clear, Sears qualifies as a "financial institution" because (like the Tribune Company) it was a "customer" of Computershare—a "bank" and "trust company"—which acted as Sears' "agent" "in connection with a securities contract," *i.e.*, the subscription rights to acquire the Seritage shares.

Just as the Second Circuit concluded in *Tribune*, the facts regarding Computershare's role are evident from the face of the transaction documents. The prospectus for the exercise of the Seritage Rights provided that "[t]he subscription agent for this offering is Computershare Trust Company, N.A."[111] Computershare was obligated to distribute the Seritage Rights it received from Sears to Sears' shareholders.[112] Those shareholders who exercised the Seritage Rights were

---

[109]     *Madoff*, 773 F.3d at 421-22; *see also Crescent*, 500 B.R. at 475-76 ($1.2 billion "dividend" debtor transferred to non-debtor parent was a "transfer … in connection with a securities contract" to sell parent's equity securities in debtor).

[110]     11 U.S.C. § 101(22)(A).

[111]     Levine Decl. Ex. 15 (Seritage Prospectus), at 169; *id.* at 12, 30, 165, 170; *see also* Levine Decl. Ex. 13 (Subscription Agent Agreement Between Sears Holdings Corporation and Computershare Trust Company, N.A. and Computershare Inc., dated May 28, 2015 ("Subscription Agent Agreement")) § 1.1 (providing that Sears' "appoint[ed] Agent [defined as Computershare Trust Company, N.A. and Computershare Inc.] to act as subscription agent in connection with the Subscription Offer"). The Subscription Agent Agreement is expressly referenced in § 3.1(b) of the Seritage Subscription Agreement.

[112]     *See* Levine Decl. Ex. 13 (Subscription Agent Agreement) § 3.2; Levine Decl. Ex. 14 (Seritage Subscription Agreement) §§ 2.2, 3.1(d).

23

directed to submit their subscriptions to purchase Seritage shares, along with the cash purchase price, to Computershare.[113]  Seritage likewise delivered the Seritage shares to Computershare.[114]

To consummate the Seritage Rights Offering, Computershare was required to "hold [the] funds [paid by the Sears shareholders] in payment for [the Seritage] shares in escrow … pending completion of the rights offering"[115]; deem properly exercised Seritage Rights "accepted," subject to Sears' "written authorization," "instructions" and "right to reject any subscriptions … not properly submitted"[116]; allocate Seritage shares to fill over-subscription requests according to Sears' "instructions"[117]; "credit [shareholders'] account[s] … with the … Seritage Growth common shares that [they] purchased"[118]; and refund to Sears shareholders any payments for Seritage shares not accepted for subscription or allocated to them.[119]

On strikingly similar facts, the Second Circuit affirmed the grant of the defendants' motion to dismiss in *Tribune*.  It held that the debtor-transferor (Tribune) qualified, as a matter of law, as a "financial institution" under the Bankruptcy Code because it was a "customer" of the same bank and trust company that played an analogous role to the one played by Computershare here.[120]  The

---

[113]    *See* Levine Decl. Ex. 15 (Seritage Prospectus), at 18-19, 167-71; Levine Decl. Ex. 16 (Seritage Growth Properties Subscription Rights Certificate for Seritage Growth Properties Common Shares ("Subscription Rights Certificate"), Ex. 99.19 to Sears Holdings Corp., SEC Form 13D/A (June 16, 2015)), at 1-2 (instructing shareholders to make checks payable to Computershare and return subscriptions to Computershare).  The Subscription Rights Certificate is expressly referenced in the Seritage Prospectus (*see, e.g.*, Levine Decl. Ex. 15 (Seritage Prospectus), at 18-19).  *See also* Levine Decl. Ex. 13 (Subscription Agent Agreement) § 3.2.

[114]    *See* Levine Decl. Ex. 14 (Seritage Subscription Agreement) § 3.1(d).

[115]    Levine Decl. Ex. 15 (Seritage Prospectus), at 171.

[116]    *Id.*; Levine Decl. Ex. 13 (Subscription Agent Agreement) §§ 3.2(d)-(g), 6, 7.1, 7.3, 9.9, 11.3.

[117]    Levine Decl. Ex. 15 (Seritage Prospectus), at 168-69; Levine Decl. Ex. 13 (Subscription Agent Agreement) § 2.2.

[118]    Levine Decl. Ex. 15 (Seritage Prospectus), at 19; Levine Decl. Ex. 13 (Subscription Agent Agreement) §§ 5.1, 5.2.

[119]    Levine Decl. Ex. 15 (Seritage Prospectus), at 19, 21, 165.

[120]    *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 77-80 (2d Cir. 2019), *pet. for rehearing or rehearing en banc denied*, ECF No. 13-3992 (2d Cir. Feb. 6, 2020).

debtor, Tribune, had retained Computershare to act as depository for Tribune's tender offer to purchase its stock from its shareholders in its leveraged buyout.[121]   Much as in this case, Computershare stood in the middle of the transaction, accepting and holding the tendered shares on the debtor's behalf pending payment of the $8 billion purchase price to the tendering shareholders.[122]  Construing the definition of "financial institution" in Section 101(22)(A) of the Bankruptcy Code, the Second Circuit held that Tribune was a "financial institution" because each of the statutory elements was met: (i) Tribune was a "customer," (ii) of a "bank" (Computershare), (iii) that acted as Tribune's "agent," (iv) "in connection with a securities contract" (the tender offer).[123]

Precisely the same analysis applies here.  *First*, Computershare was a "bank" and "trust company."[124]  *Second*, Sears was Computershare's "customer" because Sears "bought Computershare's services by retaining Computershare to act as [subscription agent]" and Computershare "agreed to collect items for [Sears] by receiving the [Seritage Rights, the subscription payments, and the Seritage shares]" from the various parties.[125]  *Third*, Computershare acted as Sears' "agent," not a principal, in the Seritage Rights Offering.  Indeed, the Subscription Agreement expressly provided that Computershare would act "[a]s agent for the Company [Sears],"[126] and, just as in *Tribune*, Sears and Computershare agreed that Computershare would act subject to Sears' control.[127]  *Finally*, Computershare acted as Sears' agent "in

---

[121]    946 F.3d at 78-79.

[122]    *Id.*

[123]    In another Tribune-related case, Judge Cote reached the same conclusion for the same reasons.  *See In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 1771786, at *9-12 (S.D.N.Y. Apr. 23, 2019).

[124]    *Tribune*, 2019 WL 6971499, at *7.

[125]    *Id.*

[126]    Levine Decl. Ex. 13 (Subscription Agent Agreement) § 9.

[127]    *Tribune*, 946 F.3d at 79.

connection with a securities contract"—the Seritage Rights Offering—for the very purpose of which Sears retained Computershare.[128]

In short, the distribution of the Seritage Rights was made "by or to" a financial institution, and Section 546(e) accordingly bars Plaintiffs' claims under Section 544 to avoid that supposed "transfer" of Sears' "property."[129]

### 3. Count 22 Is Also Precluded by Section 546(e) to the Extent That It Seeks to Undo the Distribution of the Seritage Rights to, and to Recover Their Value from, the ESL Defendants and Other Sears Shareholders

In *Tribune*, the Second Circuit did not merely hold that Section 546(e) would have barred Tribune's bankruptcy estate from seeking to avoid the payments to the shareholders as fraudulent transfers under Section 544. It also held that Tribune's creditors could not seek to circumvent that rule through clever pleading. In particular, it held that Section 546(e) preempted any claims by Tribune's creditors under state law seeking effectively the same relief as a barred claim under federal law (Section 544) would seek. This same rule of law bars Plaintiffs' claims here to unwind the distribution of the Seritage Rights and recover their supposed value from the ESL Defendants and other Sears shareholders under state-law principles of unjust enrichment (Count 22).

---

[128]     *Id.* at 79-80. Although it suffices that Sears was a financial institution, § 546(e) bars Plaintiffs' claims for the independent reason that Sears' shareholders, including the ESL Defendants, also qualify as "financial institutions." Computershare was not only Sears' agent, but also the shareholders' agent—thus functioning as a dual agent. *See, e.g.*, Restatement (Third) of Agency §§ 3.14, 3.16, 8.06 (recognizing dual agency). Computershare acted as an agent, not as a principal, in distributing the Seritage Rights to Sears' shareholders, holding their subscriptions and cash pending completion of the Seritage Rights Offering, and making payments on their behalf to purchase the Seritage shares. Likewise, Sears' shareholders were Computershare's "customers," for whom Computershare "agreed to collect items" (the Seritage Rights, and upon submission of executed subscriptions and payments, the Seritage shares). Finally, Computershare's role as the shareholders' agent in connection with the offering for Seritage stock establishes that Computershare was acting "in connection with a securities contract."

[129]     Some or all of the ESL Defendants may have also been "financial participants" within the meaning of Section 546(e). The ESL Defendants reserve all rights to so argue at a later stage of this adversary proceeding.

Count 22 is a fraudulent-transfer claim in all but name.[130]  It is well-settled that plaintiffs

cannot circumvent the safe harbor by re-pleading their fraudulent transfer claims as "unjust

enrichment" claims.[131]

## II.    PLAINTIFFS' CLAIMS DIRECTED AT THE ESL DEFENDANTS RELATING TO THE 2016-2018 LOANS SHOULD BE DISMISSED

Plaintiffs' attack on what they call the "Related-Party Financings"[132]—the loans the ESL

Lenders and other third-party financers made to Sears between 2016 and 2018—is puzzling.  After

spending dozens upon dozens of pages criticizing Mr. Lampert and other ESL Defendants (as well

as Sears' other directors and officers) for allegedly transferring valuable assets *out* of Sears, they

pivot and criticize the same parties (along with a group of disinterested third-party financers) for

transferring $4.2 billion *into* Sears, allegedly at a time when no one else was willing to lend to the

company.  Plaintiffs struggle to come up with a motive for why the principal villains in their story,

the ESL Defendants, would lend so much money to Sears if their goal was really to bleed the

company dry, rather than to try to save it, and so they throw one unsupported theory after another

against the wall hoping something will stick.[133]

---

[130]    *See* FAC ¶ 635 (alleging that Mr. Lampert and the ESL Defendants were "unjustly enriched … *to the substantial detriment of Sears Holdings … and all of [its] creditors* by … extracting hundreds of millions of dollars through receipt of the Seritage Rights at an artificially low price for no consideration" (emphasis added)).

[131]    *See AP Servs. LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012) (holding that Section 546(e) preempted unjust enrichment claims); *accord Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009), *overruled in part on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018); *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 825 (N.D. Tex. 2012), *aff'd*, 761 F.3d 409 (5th Cir. 2014); *In re Hechinger Inv. Co.*, 274 B.R. 71, 96 (D. Del. 2002).

[132]    The term "Related-Party Financings" is a misnomer, as several of the parties financing the loans in question—including Cascade and Cyrus, whom Plaintiffs have sued as well—have no relation to ESL or to Sears.  The 17 financing transactions identified in the First Amended Complaint, *see* FAC ¶ 357, are referred to herein as the "2016-2018 Loans."

[133]    At the conclusion of the hearing on the sale of the Debtors' business assets to Transform Holdco LLC ("Transform"), the Court criticized the Creditors' Committee for presenting "two conflicting views of [Mr. Lampert], that he's somehow Jay Gould and Barney Fife at one and the same time." *See* Hr'g Tr. (Feb. 7, 2019) at 246:11-12, ECF No. 2886.  Plaintiffs repeat that same error here.

Plaintiffs' claims on the 2016-2018 Loans—10 in total compared to the single claim relating to these loans that Plaintiffs' predecessor counsel saw fit to assert—are internally inconsistent, legally flawed, and factually implausible. *First*, nearly all the claims are predicated on recharacterizing the loans as equity contributions. But that extraordinary relief is both (1) barred by the asset purchase agreement under which the ESL Lenders were permitted to credit-bid these secured loans in Sears' bankruptcy cases (the "<u>APA</u>") and this Court's order approving that sale (the "<u>Sale Order</u>") and (2) insufficiently pled and not remotely plausible under applicable law given Plaintiffs' own admissions that these financings had all the characteristics of debt (including periodic payments of interest, fixed maturity dates, pledges of collateral, and the like), and were provided not only by insiders, but also by unrelated third-party lenders such as Cascade and Cyrus. *Second*, having first argued that the financings were really equity, Plaintiffs do a complete about-face and say they really were debt that "deepened" Sears' insolvency. But, in addition to the palpable inconsistency between this theory and Plaintiffs' recharacterization theory, courts in Delaware and other states have repeatedly rejected "deepening insolvency" claims. *Finally*, with little ammunition left, Plaintiffs offer a handful of entirely conclusory assertions of fraud, often in passing and without pleading any supporting facts. These after-thought assertions do not pass muster under *Iqbal/Twombly*, let alone under Rule 9(b).

### A.    Counts 24-25, 27-29, 31, And 33 Are Improperly Premised Upon Recharacterization Of Debt As Equity And Should Be Dismissed

Plaintiffs' claims relating to the 2016-2018 Loans rely at virtually every turn on the proposition that that the loans made by the ESL Lenders, Fairholme, and other third-party financers should be recharacterized as equity investments. Plaintiffs thus begin their narrative with the heading "The Related-Party Financings Were Equity Contributions, Not Loans, Despite the

28

Defendants' Attempts to Paper Them as Such."[134]  They then repeat, over and over again, that while the financings had "the appearance of loans," they should be viewed as "equity contributions."[135]  In the counts directed at the 2016-2018 Loans, Plaintiffs likewise plead that "[e]ach of the Related-Party Financings was or should be deemed an equity contribution, rather than [a] debt transaction, such that the Related-Party Financing Borrowers can avoid any payments made in connection therewith as improper dividends or equity transfers."[136]  Throughout the First Amended Complaint, Plaintiffs go so far as to term the loans "faux indebtedness,"[137] and to put the words "interest" and "fees" in scare quotes (as if doing so somehow adds some legal or factual basis to their effort to recharacterize the loans as equity).[138]

Plaintiffs' theory fails for two independent reasons.  First, "any and all claims" based on any "equitable principles" of "recharacterization" were expressly released in the APA approved by this Court and incorporated into the terms of the Sale Order (the "APA Release").[139]  Second, even if the claims had not been released, Plaintiffs do not and could not plead the exceedingly rare circumstances required under settled law to recharacterize loans as equity investments.

### 1.    Claims Based on Recharacterization Are Barred by the APA

As this Court is aware, the APA includes a release provided by the Debtors' estates in favor of the ESL Defendants.  That release, contained in the original APA and then reiterated and clarified in an amendment to the APA, was heavily negotiated and the subject of extensive

---

[134]      FAC at 141.

[135]      Id. ¶ 364; see also, e.g., id. ¶ 356 ("While the Related-Party Financings were denominated debt transactions, in actuality they were equity contributions."); id. ¶¶ 3, 15-16, 379, 657.

[136]      Id. ¶ 655.

[137]      Id. ¶¶ 708, 721, 732, 748, 760, 768.

[138]      See, e.g., id. ¶¶ 356, 660, 661, 664.

[139]      Levine Decl. Ex. 30 (Asset Purchase Agreement between Transform Holdco LLC and Sears Holdings Corporation, dated as of January 17, 2019 ("APA"), Case No. 18-23538, ECF No. 2507-1, Ex. B (Feb. 8, 2019)).

discussions before this Court involving counsel for the Debtors and the Creditors' Committee.[140]

As finally approved by all the parties and the Court, the APA Release covers all "Released Estate

Claims," which are defined in the amendment to the APA as:

> *[A]ny and all Claims* and causes of action of the Debtors and their estates (i) against
> ESL arising under sections 363(k), 502(a) or 510(c) of the Bankruptcy Code,
> (ii) *against ESL arising under equitable principles of subordination or
> recharacterization,* (iii) against ESL challenging the allowance of the ESL Claims
> pursuant to Section 9.13(c); or (iv) against Buyer as a subsequent holder of any
> Claims in respect of the debt described on Exhibit G.[141]

Plaintiffs admit that this release would bar them from seeking to avoid the 2016-2018

Loans or to have the ESL Defendants' claims under those loans disallowed. But they assert that

the APA Release does not bar their attempt to recover the interest and fees paid on those loans

through the expedient of recharacterizing the loans as capital contributions and then avoiding the

payments, as intentional or constructive fraudulent transfers.[142]  That argument is too clever by

half.

The APA Release incorporated into the Sale Order was not merely of any claim to avoid

or disallow the principal balance of the underlying debt.  Nor was the release merely of any claim

seeking recharacterization of that debt as a remedy.  Rather, by its terms, the APA Release was of

"*any and all claims*" arising under any "*equitable principles* of subordination or

*recharacterization*."[143] If the parties had intended only for the Debtors and their estates to release

any right to seek to have the underlying debt claims by ESL disallowed, clause (iii) in the definition

---

[140]    *See* Hr'g Tr. (Feb. 4, 2019) at 30-45, ECF No. 2700; Hr'g Tr. (Feb. 6, 2019) at 112-116, ECF No. 2869; Hr'g
Tr. (Feb. 7, 2019) at 200-212, ECF No. 2886.

[141]    Levine Decl. Ex. 31 (Am. No. 1 to Asset Purchase Agreement between Transform Holdco LLC & Sears
Holdings Corporation, dated February 11, 2019 ("Am. No. 1 to APA"), Case No. 18-23538, ECF No. 2599, Ex. E
(Feb. 14, 2019)) § 1.45(e)(ii) (amending APA § 9.13) (emphasis added).

[142]    *See* FAC nn.41, 42, 44-45.

[143]    Levine Decl. Ex. 30 (APA) § 9.13(e)(ii) (emphasis added).

of "Released Estate Claims"—releasing all claims "against ESL challenging the allowance of the

ESL Claims"—would have sufficed.[144]  Yet the parties included clause (ii) as well.  Under the

basic rule of contract construction that no provision in a commercial agreement (let alone one this

carefully negotiated) should be read as redundant or unnecessary,[145] clause (ii) must be given

meaning.  And the only way to do so is to read clause (ii) to mean what it says:  the Debtors have

released "[a]ny and all claims," no matter what relief they seek, "arising under equitable principles

of subordination or recharacterization."[146]

       To be sure, the definition of "Released Estate Claims" also included a second sentence.

But that sentence does not save Plaintiffs' claims.  It specifies:

> For the avoidance of doubt, the Released Estate Claims do not include ... (b) any
> Claims or causes of action of the Debtors or their estates against ESL or any other
> Person **_not specifically described in the preceding sentence_**, including any Claims
> or causes of action (i) for constructive or actual fraudulent transfer under 11 U.S.C.
> 544(b), 548, or 550(a) or any applicable state or federal Law, for breach of fiduciary
> duty, or for illegal dividend under 8 Del. C. 170-174 or any other state Law
> (including, but not limited to, any Claims for damages or equitable relief (other than
> disallowance of the ESL Claims) in connection with the incurrence of any debt
> described on Exhibit G).[147]

By its terms, this second sentence saves only claims that are "not specifically described" in the

first sentence of the release.  But the claims Plaintiffs assert in Counts 24-33 are "specifically

described" in the first sentence of the release to the extent—and that extent is considerable— those

claims are based on the "recharacterization" of the 2016-2018 Loans as capital contributions.[148]

---

[144]     Levine Decl. Ex. 31 (Am. No. 1 to APA) § 1.45(e)(ii).

[145]     *See Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354 (Del. 2013) ("When interpreting contracts, we construe them as a whole and give effect to every provision if it is reasonably possible."); *see also* Levine Decl. Ex. 30 (APA) § 13.8 (providing that Delaware law governs the APA for most purposes).

[146]     Levine Decl. Ex. 31 (Am. No. 1 to APA) § 1.45(e)(ii).

[147]     Levine Decl. Ex. 31 (Am. No. 1 to APA) § 1.45(e)(ii) (emphasis added).

[148]     Recharacterization claims need not be styled as such; courts look to the substance of the claim, and whether a claim depends upon recharacterization as a factual premise. *See, e.g.*, *In re Our Alchemy, LLC*, 2019 WL 4447535, at *11-12 (Bankr. D. Del. Sept. 16, 2019) (dismissing unjust enrichment claim that "depend[]ed" on insufficiently pled recharacterization claim); *In re Musicland Holding Corp.*, 398 B.R. 761, 765 (Bankr. S.D.N.Y. 2008) (factual

(To the limited extent that Counts 24-33 have any other basis, they fail for additional reasons, discussed below).

Plaintiffs all but admit that their real complaint is with this Court for approving the APA and not allowing them, instead, to seek to recharacterize the 2016-2018 Loans as equity. In a moment of candor, Plaintiffs—now represented by the same counsel for the Creditors' Committee that objected vociferously to this Court's approval of the sale and the grant of any release to the ESL Defendants—lament that the 2016-2018 Loans "would have been deemed equity, but for the Sale Order."[149] But this Court did enter the Sale Order, and the Plaintiffs cannot now relitigate this Court's approval of the APA Release.

If there were any doubt that this is precisely what the Plaintiffs are seeking to do, it is resolved by the colloquy that occurred before this Court leading to the final negotiation of the APA Release and its approval by the Court. Counsel for the Creditors' Committee argued that, so long as it did not seek as a remedy to recharacterize or subordinate the debt, the estate should be able to assert damages claims against the ESL Defendants based on the premise that the 2016-2018 Loans should be deemed equity, not debt. This Court rejected the very concept of a recharacterization claim that sought such monetary relief.[150]

The Court should do the same again now and dismiss Plaintiffs' claims in Counts 24-33 because they depend on the premise that the 2016-2018 Loans are equity, not debt.

---

allegations of recharacterization claim, though "academic," were crucial to a fraudulent transfer claim).

[149]    FAC ¶ 657(l).

[150]    Hr'g Tr. (Feb. 7, 2019) at 62:3-63:7, ECF No. 2886.

2.    Plaintiffs Do Not Remotely Plead Facts Sufficient to Justify Recharacterization

Even if the APA Release did not bar the counts premised on equitable principles of recharacterization, Plaintiffs do not and cannot come anywhere close to alleging the extraordinary facts that would be required to recharacterize the 2016-2018 Loans as equity.

Courts in this district typically look to the Sixth Circuit's *AutoStyle* factors in determining whether to recharacterize debt as equity.[151]  Those factors are:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.[152]

For a complaint to survive a motion to dismiss, it must allege facts supporting a "meaningful subset" of these factors,[153] and courts regularly dismiss recharacterization claims brought by parties that do not allege sufficient facts to support such an extraordinary remedy.[154]  No single factor is dispositive, but courts assign greater weight to those factors that implicate the intent of

---

[151]    *See, e.g., In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 75 & n.216 (Bankr. S.D.N.Y. 2007) (dismissing fraudulent transfer claims and denying leave to replead when a "256-page complaint [that] set forth its claims in excruciating detail," failed to allege sufficient facts relevant to the *AutoStyle* factors; describing the legal standard as "so familiar to the bankruptcy community that the Court does not believe that the failure to allege [sufficient facts] resulted from error or oversight").

[152]    *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 749-50 (6th Cir. 2001).  Courts typically apply federal common law to the question of recharacterization even when the claim is not labeled as such.  *See Musicland*, 398 B.R. at 774.

[153]    *See, e.g., Adelphia Commc'ns*, 365 B.R. at 75; *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 566 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016).

[154]    *See, e.g., In re Lyondell Chem. Co.*, 544 B.R. 75, 94 (Bankr. S.D.N.Y. 2016) (granting motion to dismiss); *In re BH S & B Holdings LLC*, 420 B.R. 112, 157-59 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011) (same).

the parties, which can be discerned from the economic reality of the transactions, the actions of

the parties, and the way they documented the transactions.[155]

By contrast, courts have repeatedly held that allegations focused on the lender's status as

an "insider" of the borrower, or on the borrower's "financial distress," are insufficient as a matter

of law to warrant recharacterization. As the Fourth Circuit has explained, "a claimant's insider

status and a debtor's undercapitalization alone will normally be insufficient to support the

recharacterization of a claim. In many cases, an insider will be the only party willing to make a

loan to a struggling business, and recharacterization should not be used to discourage good-faith

loans."[156] Likewise, the Tenth Circuit has stressed that "placing too heavy an emphasis on

undercapitalization in our recharacterization analysis would create an 'unhealthy deterrent effect,'

causing business owners to fear that, should their 'rescue efforts' fail, a court will 'give

disproportionate weight to the poor capital condition of their failing companies and thus too

quickly refuse to treat their cash infusions as loans.'"[157] Courts in this district have adopted the

same approach.[158]

Given this body of settled law, Plaintiffs do not and cannot plead a plausible case for

recharacterization. The 2016-2018 Loans were secured loans, supported by perfected grants of

---

[155]    *See Lyondell*, 544 B.R. at 93 (citing *In re SubMicron Sys. Corp.*, 432 F.3d 448, 454 (3d Cir. 2006)).

[156]    *In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 234 (4th Cir. 2006).

[157]    *In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1152 (10th Cir. 2015) (citations omitted); *see also, e.g., In re Emerald Casino, Inc.*, 2015 WL 1843271, at *12 (N.D. Ill. Apr. 21, 2015), *aff'd in part, vacated in part*, 867 F.3d 743 (7th Cir. 2017).

[158]    *See, e.g., In re Yoga Smoga, Inc.*, 2016 WL 8943849, at *13 (Bankr. S.D.N.Y. Dec. 20, 2016) ("Of all the factors that courts have considered in this context, this is the one that has always made the least sense to me. The gist of the reasoning is this: if a loan would have been risky because there was too much of a chance that the loan would not be repaid in full, then the lender must really have intended to make an equity contribution, which would be even further down in the capital structure, and which would have an even lower chance of ever being recovered. That reasoning is backwards. If a company is in dire straits, common sense says that a person who provides additional money is more likely to want it to be considered debt, not equity, because even if the debt may not be repaid in full, at least it will stand higher in the capital structure. This is true regardless of whether the lender is an insider or an existing equity holder.").

collateral; they were provided not merely by insiders, but also by third-party lenders such as Cascade and Cyrus who owned no equity in Sears; they were documented entirely as debt, backed by substantial credit agreements and other debt documents; and the financings not only provided for the payment of periodic interest, but that interest was paid, as and when due. Plaintiffs do not allege any contrary facts; indeed, they admit all of these dispositive points. As Judge Gerber put it in dismissing a claim for recharacterization in *Adelphia Commc'ns*, "it is plain that if the Creditors' Committee had facts to support a claim, it knew how to allege them."[159] The same is true here. A brief review of the facts, as pled, so demonstrates.

**Debt Terms and Documents**. Plaintiffs acknowledge that the 2016-2018 Loans were "denominated debt transactions," that they were "paper[ed]" as debt, and that the credit agreements and other loan documents required Sears to pay "interest" and "fees," not "dividends."[160] The 2016-2018 Loans were evidenced by prototypical credit agreements and related debt documents that had all the terms expected for a secured loan and none of the terms expected for an equity investment. By way of example, the "Loan Agreement" (that was its name) for what Plaintiffs call the "2016 Secured Loan Facility" was a 56-page credit agreement (excluding signature pages and exhibits) that required the Sears borrowers to issue a promissory note; that specified a maturity date and, in the interim, mandated that the Sears borrowers pay interest on the first day of each month; and that included both affirmative and negative covenants, events of default, and all the

---

[159]     *Adelphia Commc'ns*, 365 B.R. at 75 n.216.

[160]     *See, e.g.*, FAC ¶ 16 (alleging payment of "interest" and "fees"), ¶ 356 (alleging payment of "interest," "fees" and "principal"), ¶ 356 ("[T]he Related-Party Financings were denominated debt transactions …."), ¶ 357 (stating the names given to each of the 2016-2018 Loans and acknowledging that they were "dressed in the accoutrement of loans"), ¶ 364 (admitting that the 2016-2018 Loans had "the appearance of loans"), ¶ 657 (stating that the payments were made pursuant to the "alleged" contractual obligations associated with the 2016-2018 Loans), at 141, heading 1 (admitting that the 2016-2018 were "[p]aper[ed] as "[l]oans").

other standard terms for a secured loan.[161]  The Loan Agreement nowhere provided for the lenders, which included Cascade, to receive equity in Sears.

These classic loan provisions alone make Plaintiffs' claims for recharacterization implausible.  Courts (including in this district) have deemed the names given to deal documents, while not necessarily dispositive, strong indicators of the type of financing the parties intended to effectuate.[162]  The terms of the transaction—interest rates, maturity dates, and repayment schedules—are powerful indications that the parties' intended to create a loan, not an equity investment.[163]

*Collateral.*  Plaintiffs admit that the 2016-2018 Loans were secured by liens on "Sears's most valuable remaining real estate, ground leases, inventory, receivables and intellectual property."[164]  As courts have held, the grant of security interests is a "strong indication of indebtedness."[165]

---

[161]    *See, e.g.*, Levine Decl. Ex. 19 (Loan Agreement, dated April 8, 2016, Ex. 10.1 to Sears Holdings Corp., SEC Form 8-K (Apr. 12, 2016)).  While Plaintiffs did not attach the credit agreements and associated deal documents to the First Amended Complaint, the Court can "comfortably" consider these documents because Plaintiffs have possession and knowledge of these documents and "because they are integral to" the First Amended Complaint.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153-54 (2d Cir. 2002); *accord Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (considering a challenged agreement where the complaint "relie[d] heavily upon its terms and effect"); *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (considering a credit agreement "to avoid [a] situation where a plaintiff with a legally deficient claim that is based on a particular document can avoid dismissal of that claim by failing to attach the relied upon document").

[162]    *See Lyondell*, 544 B.R. at 95 (stating that "this Court has never seen a revolver that was anything other than a loan").

[163]    *Id.* at 95-96; *see also BH S & B*, 420 B.R. at 158 ("The issuance of a stock certificate indicates an equity contribution; the issuance of a bond, debenture, or note is indicative of a bona fide indebtedness." (citation omitted)).

[164]    FAC ¶ 16; *see also id.* ¶ 15 ("The 'loans' were all secured."), ¶ 362 (acknowledging that the Sears borrowers "pledged Sears's real properties, intellectual property and receivables as collateral on the Related-Party Financings").

[165]    *BH S & B*, 420 B.R. at 158; *see also Lyondell*, 544 B.R. at 98 ("[T]he additional formality associated with secured loans, and the need to perfect their security interests, tends to make secured loans particularly difficult to recharacterize.").

*Third-Party Lenders*. Plaintiffs concede that several of the 2016-2018 Loans were funded, in part, by third parties such as Cascade and Cyrus.[166] Plaintiffs do not and cannot allege that Cascade or Cyrus owned stock in Sears or were otherwise insiders. The case for recharacterization is even less tenable where, as here, credit is extended by third-party lenders.[167]

*Enforcement of Loan Terms*. Plaintiffs admit not only that the credit agreements for the 2016-2018 Loans required the Sears borrowers to pay interest, but also that those borrowers actually did so. Specifically, Plaintiffs admit that the Sears borrowers paid more than $400 million in interest and fees, as well as another $518 million in principal, to the lenders "pursuant to the terms of the so-called loans."[168] Similarly, they do not dispute that the ESL Lenders, Cyrus, Cascade, and the other lenders took the necessary steps to perfect their security interests. In short, the loan terms were not "mere window dressing."[169] This, too, renders the claim that the 2016-2018 Loans were really disguised equity investments baseless.[170]

*Insider Lenders, Control, Sears' Financial Distress, and Seritage*. In the face of these numerous factors cutting against recharacterization as a matter of law, all Plaintiffs are able to muster are a handful of conclusory allegations: the First Amended Complaint alleges that Sears was not adequately capitalized at the time the lenders made the loans; it notes that insiders

---

[166]  FAC ¶¶ 357, 691; *see also id.* ¶ 65 (Cascade), ¶ 66 (Cyrus).

[167]  *See, e.g., Our Alchemy*, 2019 WL 4447535, at *8 (granting motion to dismiss in part due to debtor's ability to obtain outside financing); *BH S & B*, 420 B.R. at 159-60 (same); *In re Aéropostale, Inc.*, 555 B.R. 369, 422 (Bankr. S.D.N.Y. 2016) (same; "[h]ere, the Debtors sought out financing to fund its turnaround—it would thus be inappropriate to penalize the Term Lenders for lending to a distressed company"); *In re Pers. Commc'n Devices, LLC*, 528 B.R. 229, 239 (Bankr. E.D.N.Y. 2015) (noting "the corporation's ability to obtain financing from outside lending institutions is exhibited by Debtors obtaining approximately $114,000,000 from an unaffiliated first lien loan group," which weighed against recharacterization).

[168]  FAC ¶ 356; *see also id.* ¶ 16.

[169]  *See, e.g., Musicland*, 398 B.R. at 775 (noting that transferee "had never imposed any repayment terms" and concluding that the paperwork was mere "window dressing").

[170]  *See supra* n.160; *see also Lyondell*, 544 B.R. at 104 (noting that "in most cases where courts have recharacterized a loan as equity, the purported loan documentation did not comport with the formalities typical of debt instruments, the lender did not take any action to enforce his rights as a lender, or both").

(principally, the ESL Lenders) participated in the financings; it alleges that those insiders were "familiar enough" with Sears' business to know that Sears could not repay the loans; it claims that the insiders controlled the Sears' borrowers decisions to enter into the financing transactions; and it suggests that the insiders made the loans to protect their separate investment in Seritage.[171]

At the outset, these allegations are not only conclusory, but rife with internal inconsistencies. The First Amended Complaint alleges that "Sears could not obtain financing from outside lending institutions on the same terms as the 2016-2018 Loans because the terms ESL could offer were 'not acceptable' to outside lenders."[172] Yet, it admits that Cascade and Cyrus— "outside lending institutions"—were lenders to Sears in several of these 2016-2018 Loans. The First Amended Complaint claims that Sears could not repay the loans, and the lenders knew this. Yet, it also alleges that the loans "had tolerable risk to the 'lenders' because they were collateralized by Sears's most valuable … assets."[173] The First Amended Complaint alleges that "the insiders exerted substantial control over Sears at the time of the Related-Party Financings."[174] Yet, it admits that each of the 2016-2018 Loans was approved by the RPT Subcommittee— consisting entirely of "independent" directors and advised by a leading law firm (Weil Gotshal) and a leading investment bank (Centerview Partners)—and that Mr. Lampert "recus[ed] himself from votes to approve the Related-Party Financings."[175]

---

[171]     FAC ¶¶ 365-370.

[172]     *Id.* ¶ 367.

[173]     *Id.* ¶ 16.

[174]     *Id.* ¶ 364.

[175]     *Id.* ¶ 17 (noting the creation of the "Related-Party Transaction Subcommittee of the Sears Holdings Board" to review, "on an independent basis," various transactions, including the "Related-Party Financings"), ¶ 365 (admitting that Mr. Lampert "recus[ed] himself from votes to approve" the 2016-2018 Loans), ¶ 388 (referencing Centerview), ¶ 716 (Mr. Lampert "recused himself from voting"); *see also* Levine Decl. Ex. 23 (Amended and Restated Loan Agreement, dated May 22, 2017, Ex. 99.1 to Sears Holdings Corp., SEC Form 8-K (May 24, 2017)); Levine Decl Ex. 22 (Press Release, Ex. 99.1 to Sears Holdings Corp., SEC Form 8-K (Jan. 4, 2017)). Plaintiffs criticize the work of and decisions reached by the RPT Subcommittee, but they do not and cannot dispute that the three directors on that subcommittee were independent directors with no interest in the 2016-2018 Loans (or in the Lands' End Spin-Off or

In any event, these allegations would be woefully inadequate to state a claim for recharacterizing debt as equity, even if they were not contradicted by other allegations made in the same complaint.  As discussed above, the courts have repeatedly held that the recharacterization of a loan as a capital contribution is not warranted merely because the lender was an insider (even if, unlike here, it was the only lender and there was no third-party financing) knowledgeable about the company's finances, and the debtor was experiencing financial distress at the time the insider provided the financing.  The cases, in this district and elsewhere, so holding are legion.[176]  Simply put, insiders are allowed to provide financing in the form of debt, rather than equity, and the law is designed to encourage, not dissuade, insiders from doing so in an effort to preserve a struggling business.[177]

As for the allegation that the insiders funded their portion of the 2016-2018 Loans to protect their separate investment in Seritage, the allegation is not only conclusory (Plaintiffs fail to plead a single supporting fact) and utterly implausible, as discussed below (*see infra* § II(C)-(D)), but is entirely irrelevant in all events.  Whatever the motives of the ESL Lenders and Fairholme to help provide Sears with the 2016-2018 Loans says nothing about whether the financings were debt or equity.  Recharacterization turns on "whether the capital at issue 'in economic substance was an

---

Seritage Transaction). *See* FAC ¶¶ 57-59.

[176]    *See, e.g.*, *Dornier Aviation*, 453 F.3d at 234; *In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1152 (10th Cir. 2015); *Lyondell*, 544 B.R. at 97; *Yoga Smoga*, 2016 WL 8943849, at *13; *In re HH Liquidation, LLC*, 590 B.R. 211, 297-298 (Bankr. D. Del. 2018); *In re Lenexa Hotel, L.P.*, 2018 WL 1115199, at *10 (Bankr. D. Kan. Feb. 26, 2018); *In re SGK Ventures, LLC*, 2017 WL 2683686, at *8 (N.D. Ill. June 20, 2017); *In re Moll Indus., Inc.*, 454 B.R. 574, 584 (Bankr. D. Del. 2011); *In re Radnor Holdings Corp.*, 353 B.R. 820, 839 (Bankr. D. Del. 2006); *Emerald Casino*, 2015 WL 1843271, at *12.

[177]    *See supra* nn.156-158; *see also, e.g., Radnor Holdings*, 353 B.R. at 839.  There is nothing improper about a lender making "protective" loans to buttress prior investments in a company. *See SubMicron Sys.*, 432 F.3d at 457-58 (noting that lenders' representation on debtors' board "did not necessarily support an equity characterization").

39

equity contribution rather than a true debt obligation,'"[178] not on a plaintiff's wild conspiracy theories regarding the defendant's supposed reasons for providing the financing.

Plaintiffs allege no facts suggesting that the 2016-2018 Loans—backed by extensive credit documents, and properly perfected liens, and with major third-party lenders like Cascade and Cyrus—were, in economic substance, capital contributions, not secured debt. For that simple reason, as well as Sears' release of any such claims under the APA, the claims premised on recharacterizing the debt as equity should be dismissed.

### B.   Counts 24-25, 27-29, 31, And 33 Also Improperly Rely Upon A Legally Insufficient Theory Of Deepening Insolvency And Should Be Dismissed

Having first argued that the 2016-2018 Loans were really equity investments, Plaintiffs make a U-turn. They allege that the loans "deepened" Sears' supposed insolvency—an allegation that necessarily implies that the loans were actually debt after all. Plaintiffs claim that Mr. Lampert and the other directors breached their fiduciary duties to Sears and are liable for damages in "the amount in which the assets were wasted ... as well as the amount by which Sears [Holdings' and the other Sears borrowers'] insolvency increased as a result of the incurrence of additional debt."[179] Plaintiffs make no attempt to reconcile the irreconcilable. In places, they claim that the 2016-2018 Loans were equity, and elsewhere they say (indirectly but no less forcefully) that those loans were debt—and Plaintiffs do not attempt to justify the inherent contradiction in their theories by acknowledging it and arguing that they can plead in the alternative.

But even if their claims to recharacterize the debt as equity did not doom their deepening insolvency theory, it would fail anyway. Plaintiffs complain that the directors "wrongful[ly] prolong[ed] [Sears'] business," thereby improperly increasing its "indebtedness" through the

---

[178]   *Adelphia Commc'ns*, 365 B.R. at 73.

[179]   FAC ¶ 709; *see also id.* ¶¶ 722, 733, 749, 770.

2016-2018 Loans, "all past the time when Sears should have filed for bankruptcy protection."[180] This Court has heard this plea before. At the hearing on approval of the APA in this bankruptcy case, the Creditors' Committee argued that the Court should not approve the sale and, instead, should put Sears into liquidation, causing all of its thousands of employees to lose their jobs and Sears' vendors to lose a leading buyer of their goods. This Court rejected that argument then, and it should do so again now.

Mr. Lampert and the other Sears directors had the right to try to restructure Sears out of bankruptcy and avoid a liquidation. The law does not recognize a claim for "wrongful prolonging" of a business. "Deepening insolvency"—a theory that punishes directors for incurring debt in an effort to save a company—has been soundly rejected as a cause of action.[181] Nor does relabeling a claim rooted in deepening insolvency with another name save it from dismissal.[182] Even in jurisdictions that recognize an increase in debt as a possible damages theory, the plaintiff must still allege that the director's conduct gave rise to a separate and independent cause of action.[183] The

---

[180] *Id.* ¶ 356; *see also id.* ¶¶ 708, 721, 732, 748, 760, 768.

[181] *See, e.g., N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 30 A.2d 92, 103 (Del. 2007) (holding that directors of a corporation operating in the zone of insolvency do not owe fiduciary duties to creditors, noting that directors of a corporation may need to take economic risks to maximize the firm's value for shareholders and to allow creditors to bring direct actions against directors would "create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation"); *Fehribach v. Ernst & Young LLP*, 493 F.3d 905, 909 (7th Cir. 2007) (deepening insolvency "makes no sense when invoked to create a substantive duty of prompt liquidation that would punish corporate management for trying in the exercise of its business judgment to stave off a declaration of bankruptcy"); *Quadrant Structured Prods. Co. v. Vertin*, 115 A.3d 535, 546-47 (Del. Ch. 2015) ("Directors cannot be held liable for continuing to operate an insolvent entity in the good faith belief that they may achieve profitability, even if their decisions ultimately lead to greater losses for creditors."); *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 174, 205 (Del. Ch. 2006) ("Delaware law does not recognize [deepening insolvency] as a cause of action, because catchy though the term may be, it does not express a coherent concept."; by approving the company's incurrence of additional debt, its board "does not become a guarantor of the strategy's success" even if it "results in continued insolvency and an even more insolvent entity ...."), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007).

[182] *Radnor Holdings*, 353 B.R. at 842 ("simply calling a discredited deepening insolvency cause of action by some other name does not make it a claim that passes muster"); *see also Our Alchemy*, 2019 WL 4447541, at *9 (refusing to consider a deepening insolvency claim disguised as a breach of fiduciary duty claim).

[183] *In re Eugenia*, 649 F. Supp. 2d 105, 126 (S.D.N.Y. 2008) (plaintiff must "show that the defendant prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and its increased debt" (citation omitted)), *aff'd sub nom. Eugenia VI Venture Holdings,*

breach of duty cannot be merely that the director caused the company to incur more debt. To the contrary, as Judge Batts in this district held in an opinion affirmed by the Second Circuit on appeal, "[p]rolonging an insolvent corporation's life, without more, will not result in liability under either a tort or damage theory."[184] As discussed below, Plaintiffs offer no more in their First Amended Complaint. Their theory of "deepening insolvency," therefore, fails.

### C. Plaintiffs Allege No Other Facts To Support Their Claims Against The 2016-2018 Loans

Stripped of its defective recharacterization and deepening insolvency theories, the First Amended Complaint offers essentially nothing to support Plaintiffs' claims directed at the 2016-2018 Loans. In a single paragraph—pled entirely "[o]n information and belief"—Plaintiffs assert that the ESL Lenders participated in the 2016-2018 Loans in order to "increase opportunities for … additional spin-offs"; to "increase their chances of outrunning the statute of limitations for fraudulent transfers"; to "reduce competition for an eventual bid on Sears' assets, for which ESL could now credit bid billions of dollars of purported secured claims"; and to "guarantee the payment of interest on prior related debt."[185] These "on information and belief" allegations are entirely conclusory—Plaintiffs do not allege a single fact substantiating any of them, notwithstanding the tens of millions of dollars they spent investigating their claims before filing suit—and they fail to meet even the most basic pleading standard under *Iqbal/Twombly*, let alone the far more stringent standard required to plead claims that sound in fraud. Plaintiffs do not complain about a single spin-off or other transaction that occurred after any of the 2016-2018

---

*Ltd. v. Glaser*, 370 F. App'x 197 (2d Cir. 2010); *In re Hydrogen, L.L.C.*, 431 B.R. 337, 357-58 (Bankr. S.D.N.Y. 2010); *In re Global Serv. Grp., LLC*, 316 B.R. 451, 458 (Bankr. S.D.N.Y. 2004).

[184]    *In re Eugenia*, 649 F. Supp. 2d at 125 (quoting *In re Global Service Grp., LLC*, 316 B.R. at 458 (Bernstein, J.)).

[185]    FAC ¶ 355.

Loans (the Lands' End Spin-Off and the Seritage Transaction both occurred long before any of those loans were funded), and they do not cite any limitations period for any fraudulent transfer claim that has expired, let alone one that the ESL Defendants tried to outrun. Moreover, Plaintiffs make no attempt to explain why, if increasing opportunities for future spin-offs to Sears' shareholders and avoiding the statute of limitations applicable to claims against such shareholders for prior spin-offs were the reasons for the loans, Cascade and Cyrus—who were not Sears shareholders—would have helped fund them.

If anything, the "credit-bid" and "payment-of-interest" theories make even less sense. As to the former, Plaintiffs admit that the ESL Lenders loaned more than $3 billion in connection with the 2016-2018 Loans,[186] and that, at the time, the ESL Defendants owned "approximately 50%" of Sears' stock.[187] They do not claim that the assets were worth more than the amount loaned. Indeed, their whole theory is that the business supported by those assets was hopelessly insolvent, and that the ESL Defendants supposedly knew that. Given all of this, the suggestion that the ESL Lenders loaned billions of dollars in real money as part of a "loan to own" scheme (when they already owned 50% of the company) defies all logic.

Likewise, the "payment-of-interest-on-prior-loans" theory is unsupported and implausible. Plaintiffs never identify the supposed prior loans and, in any event, never explain why the ESL Lenders (or any other rational actor) would lend Sears $3 billion in new money just so that Sears could pay what Plaintiffs do not dispute would have been far less in interest on any prior loans.

That leaves only two remaining allegations that Plaintiffs make in an effort to suggest that there was something improper about the 2016-2018 Loans. First, in a single paragraph, again

---

[186]    *Id.* ¶ 16.

[187]    *Id.* ¶ 371.

asserted entirely "[o]n information and belief," Plaintiffs suggest that the ESL Defendants may have participated in the 2016-2018 Loans to protect their investments in Lands' End and Sears Hometown and Outlets Stores ("SHO"), both of which, they claim, had ongoing business relationships with Sears.[188]    Second, Plaintiffs offer the related speculation that the ESL Defendants may have helped fund these loans to Sears because they wanted to protect their investment in Seritage, which had leased more than 200 store locations back to Sears.[189]  Plaintiffs make this latter suggestion not once, but over and over again in the First Amended Complaint— but without ever offering a single fact substantiating Plaintiffs' rank speculation.  Repeating the same entirely conclusory allegation dozens of time does not make it any less conclusory.

In any event, these allegations are utterly implausible.  If the ESL Defendants' goal was not to provide support to Sears, but instead to prop up their investments in Seritage (or Lands' End or SHO), why would they lend money to Sears rather than simply lend to (or invest in) Seritage (or Lands' End or SHO)?  And, even if for some inexplicable reason the ESL Defendants decided to protect their investments in these other companies indirectly, rather than directly, why would the ESL Defendants lend more than $3 billion to Sears to protect what was around a $750 million investment in Seritage?[190]  Plaintiffs cannot and do not offer any answers.[191]

---

[188]    *Id.* ¶ 380.

[189]    *Id.* ¶¶ 13, 15, 374, 654, 717, 729.

[190]    *Compare id.* ¶ 16 (admitting that the ESL Defendants provided "approximately $3 billion in financing to Sears" between April 2016 and October 2018) *with* Levine Decl. Ex. 18 (Seritage Growth Properties, Schedule 13D (July 17, 2015)), at Item 3 (showing that the ESL Defendants invested approximately $757 million to acquire stock and Operating Partnership units in Seritage).

[191]    This is especially true since it is plain that Sears did not use anywhere near all of the proceeds of the 2016-2018 Loans to pay rent to Seritage.  Plaintiffs admit that Sears began to pay vendors on 15-day terms and contributed $1.163 billion to its pension funds between 2013 and 2018.  FAC ¶¶ 360, 374.

**D.    Plaintiffs' Claims Against the ESL Defendants Relating To The 2016-18 Loans Fail As A Matter Of Law**

Because Plaintiffs' "recharacterization" and "deepening insolvency" theories are untenable, and they fail to allege any facts that would support a claim relating to the 2016-2018 Loans under any other theory, the claims they plead should be dismissed.

1.    <u>Plaintiffs' Claims for Constructive Fraudulent Transfer and Unjust Enrichment (Counts 25 and 27) Fail</u>

Because Plaintiffs cannot recharacterize the 2016-2018 Loans as capital contributions, their claims for constructive fraudulent transfer (Count 25) and unjust enrichment (Count 27) fail.

The First Amended Complaint contains no allegation that the terms of the 2016-2018 Loans were themselves unfair to Sears. Plaintiffs, for example, never allege that the interest rates or the fees were above market or that any of the other terms of the 2016-2018 Loans were more onerous from the perspective of the Sears borrowers than those borrowers could have obtained from other lenders. To the contrary, Plaintiffs' allegations point to the opposite: the terms were, if anything, better than market for the Sears borrowers. Plaintiffs thus allege that, after 2016, "it is unlikely that outside lending institutions would have provided any large financing to Sears, much less $1 billion (the amount Plaintiffs allege that the ESL Lenders loaned to Sears in 2017 and 2018), and certainly not on the terms ESL offered." [192] Indeed, notwithstanding Cascade's and Cyrus's substantial participation in the 2016-2018 Loans, Plaintiffs allege that "the terms ESL could offer were 'not acceptable'' to outside lenders." [193]

These admissions are fatal to Plaintiffs' claims for constructive fraudulent transfer. Both under Section 548 of the Bankruptcy Code and state law made applicable by Section 544, Plaintiffs

---

[192]    *Id.* ¶ 367.  Plaintiffs know how to describe terms as unfair when they believe they have a basis to do so. *Cf. id.* ¶ 235 (describing the sale and lease-back in the Seritage Transaction as "one-sided"), ¶ 293 ("off-market").

[193]    *Id.* ¶ 657(l).

must establish that Sears did not receive "reasonably equivalent value" or "fair consideration" for the interest and fees they paid on the 2016-2018 Loans. Under either test, the mere allegation that Sears paid interest and fees that it was contractually obligated to pay and that were no higher than market is legally insufficient.[194] Dollar-for-dollar satisfaction of a valid contractual obligation is, by definition, reasonably equivalent value and fair consideration.[195] This is especially true where the payment is made on account of antecedent *secured* debt (and is made both to insiders and third-party lenders, like Cascade and Cyrus), as it was here, since any concerns about potential preferential treatment of an insider are alleviated.[196] While New York law requires that the payment be made in good faith, and does not always presume that a transfer made to an insider on account of an unsecured loan was in good faith, this is due to the risk that the insider may have caused the debtor to make the transfer to it in order to prefer it over other unsecured creditors; where, as here, the debt is secured, that concern is alleviated.[197]

Similarly, Plaintiffs do not and cannot state a claim for unjust enrichment. To do so, Plaintiffs would need to allege facts showing that the "benefit" conferred on the ESL Lenders— here, the payment of market (or below market) interest and fees for money actually loaned by the ESL Lenders to Sears—was somehow unjust.[198] The First Amended Complaint alleges no such

---

[194]    This is true regardless of which substantive law applies. Section 548 explicitly provides that satisfaction of a debt is "value," and the laws of Delaware and Illinois mirror that language. *See* Del. Code Ann. tit. 6 §§ 1304(a)(2) and 1305(a); 740 Ill. Comp. Stat. 160/5(a)(2) and 160/6(a). Similarly, New York law requires that the transfer be given for less than "[f]air consideration." N.Y. Debt. & Cred. Law § 272.

[195]    *See, e.g., In re Direct Response Media, Inc.*, 466 B.R. 626, 660 (Bankr. D. Del. 2012); *In re Mid-Illini Hardwoods, LLC*, 576 B.R. 598, 607 (Bankr. C.D. Ill. 2017).

[196]    *See, e.g., Korea Trade Ins. Corp. v. Neema Clothing, Ltd.*, 2015 WL 363569, at *2 (S.D.N.Y. Jan. 28, 2015) (and cases cited therein).

[197]    *Id.*

[198]    *See Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (the elements of an unjust enrichment claim are that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered); *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (elements of unjust enrichment claim are (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by

facts. To the contrary, Plaintiffs admit that the 2016-2018 Loans brought $4.2 billion into Sears,[199] which Sears needed to remain operational,[200] on better terms than Sears could have obtained from others in the market.[201] Plaintiffs' claim for unjust enrichment relating to the 2016-2018 Loans fails for this reason, as well as those discussed in Section IV below.

        2.    <u>Plaintiffs' Claims for Intentional Fraudulent Transfer and Breach of Fiduciary Duty (Counts 24, 28-29, 31, and 33) Fail</u>

To the extent that Plaintiffs' claims for intentional fraudulent transfer and breach of fiduciary duty are based on Plaintiffs' "recharacterization" or "deepening insolvency" theories, they do not state a claim because, as discussed, those theories are untenable. But to the extent these claims are premised, instead, on the handful of remaining conclusory allegations discussed above, they do not state a claim because the Plaintiffs do not meet even the most basic pleading standards under Rule 8, let alone the more demanding ones under Rule 9(b) applicable here.

In every case in federal court, the plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level."[202] A complaint cannot rely on legal conclusions unsupported by well-pled factual allegations, and the claims must be "facially plausible," which requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[203]

---

law); *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989) (a claim for unjust enrichment requires a showing that defendant retained a benefit to the plaintiff's detriment, and that the retention of that benefit violates fundamental principles of justice, equity, and good conscience).

[199]    FAC ¶ 355.

[200]    *Id.* ¶ 385.

[201]    *Id.* ¶ 367.

[202]    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[203]    *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The First Amended Complaint does not come close to meeting even these minimal pleading standards with respect to the claims relating to the 2016-2018 Loans.  As discussed above, the Plaintiffs offer a series of entirely conclusory theories, pled only on information and belief:  maybe the ESL Lenders made the loans to allow for additional, imagined spin-offs that never occurred; perhaps they did so to outrun some hypothetical, never identified statute of limitations; maybe they had some fanciful "loan to own" scheme in mind; or perhaps they loaned more than $3 billion in new money to allow Sears to pay far less in interest on existing loans or to protect the ESL Defendants' much smaller investments in other companies.  None of these conspiracy theories is supported in the First Amended Complaint by a single well-pled fact, and none is remotely plausible.

But, in any event, Plaintiffs would need to do much more to survive this motion to dismiss. Because a claim for intentional fraudulent transfer "sounds in fraud," a plaintiff must plead the claim with particularity under Rule 9(b) and must allege facts that give rise to a "strong inference" of fraudulent intent.[204]  This heightened pleading standard requires a plaintiff to show that the defendant had "actual intent to hinder, delay, or defraud" creditors.[205]  While a plaintiff may rely on the so-called "badges of fraud" to plead a claim for intentional fraudulent transfer, it must make a "strong showing of circumstantial evidence," not gesture towards a handful of badges.[206] Similarly, any breach of fiduciary duty claim that "sounds in fraud" is subject to this heightened pleading standard.[207]

---

[204]    *Lyondell*, 554 B.R. at 652; *See In re Tronox Inc.*, 429 B.R. 73, 94 (Bankr. S.D.N.Y. 2010) (citing *In re White Metal Rolling and Stamping Corp.*, 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998)).

[205]    11 U.S.C. § 548(a)(1)(A).

[206]    *See, e.g.*, *In re Refco, Inc. Sec. Litig.*, 2009 WL 7242548, at *17 (S.D.N.Y. Nov. 13, 2009); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1229-30 (C.D. Cal. 2012) (granting motion to dismiss when badges of fraud, "viewed holistically," did not give rise to an inference of actual intent).

[207]    *See, e.g.*, *In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 430-31 (Bankr. S.D.N.Y. 2005).

The First Amended Complaint does not meet the demanding Rule 9(b) standard with respect to the 2016-2018 Loans. Many of the purported "badges" of fraud that Plaintiffs cite simply double down on their flawed effort to recharacterize the loans as capital contributions.[208] Other "badges" ask the Court to draw an in inference of fraudulent intent from the mere fact that the ESL Lenders were (or were affiliated with) insiders,[209] but, as discussed, the law does not presume that insiders act fraudulently by extending credit to their companies. Still other purported "badges" simply allege that Sears was insolvent at the time of the 2016-2018 Loans—the stuff of a constructive, not intentional, fraudulent transfer claim[210]—or question the process that led to the terms for the loans,[211] even though, as discussed, Plaintiffs elsewhere admit that those terms were, from Sears' perspective, at least market. The remaining "badges" Plaintiffs cite merely repeat their implausible and entirely conclusory "loan-to-own" and "protect-Seritage" theories.[212]

Fundamentally, it defies logic to claim that the ESL Lenders, joined by Fairholme and third-party, independent lenders, such as Cascade and Cyrus, had the actual intent to "hinder, delay or defraud" Sears and its creditors when they were providing billions of dollars in liquidity *to* Sears.[213] Finally, none of the secrecy usually associated with intentional fraudulent transfer was

---

[208]   FAC ¶¶ 657 (d), (h), (k), (l), and (m).

[209]   *Id.* ¶¶ 657 (a), (b), (c), and (d).

[210]   FAC ¶ 657 (e); *see also, e.g.*, *In re Jeffrey Bigelow Design Grp.*, 956 F.2d 479, 483-84 (4th Cir. 1992) ("[T]here is a difference between actual and constructive fraudulent intent. Regardless of the ability of courts to infer actual fraudulent intent from the presence of 'badges of fraud,' actual fraudulent intent requires a subjective evaluation of the debtor's motive." (citation omitted)).

[211]   FAC ¶¶ 657 (f), (g).

[212]   *Id.* ¶ 657 (i), (j).

[213]   *See In re RSL Com Primecall, Inc.*, 2003 WL 22989669, at *10 (Bankr. S.D.N.Y. Dec. 11, 2003) (dismissing claims of self-dealing against director and controlling shareholder when he "put money into" the company at a time of financial distress "instead of taking it out").

present here. Plaintiffs do not allege that the 2016-2018 Loans were hidden because they cannot—the loans were publicly disclosed in contemporaneous SEC filings.[214]

### E.    Count 26 Should Also Be Dismissed

In Count 26, Plaintiffs assert a constructive fraudulent transfer claim relating to the 2018 Term Loan. Plaintiffs allege that the "Additional Subsidiary Guarantors" guaranteed the 2018 Term Loan Facility and granted liens on their property to secure that guarantee, even though they were not obligors on the 2015 credit facility paid down with the proceeds of the 2018 Term Loan Facility.[215] Therefore, Plaintiffs allege, the Additional Subsidiary Guarantors did not receive reasonably equivalent value for their guarantees and liens.

Like Plaintiffs' recharacterization claims, this claim is barred by the provisions of the APA. Under the APA, all "ESL Claims"—which the APA defines as including the ESL Defendants' claims under the 2018 Term Loan Facility as against all "the Debtors"[216]—are "allowed for all purposes."[217] Moreover, the APA provides for the Debtors to release the ESL Defendants from "any and all" claims "challenging the allowance of the ESL Claims."[218] And, as discussed in Section II(A)(1) above, while that release is followed by a sentence specifying that the release does not extend to those fraudulent transfer claims "not specifically described in the preceding sentence," the release of "any and all" claims "challenging the allowance of the ESL Claims" is

---

[214]    *See, e.g.*, Levine Decl. Ex. 19 (Loan Agreement, dated April 8, 2016, Ex. 10.1 to Sears Holdings Corp., SEC Form 8-K (Apr. 12, 2016)) (2016 Secured Loan Facility)); *see also In re Lyondell Chem. Co.*, 567 B.R. 55, 146 (Bankr. S.D.N.Y. 2017) (dismissing claims of intentional fraudulent transfer where there was no "heist being committed in the dead of night"), *aff'd* 585 B.R. 41 (S.D.N.Y. 2018).

[215]    FAC ¶¶ 670-682.

[216]    Levine Decl. Ex. 30 (APA) § 9.13(b). The APA refers to the 2018 Term Loan Facility as the "IP/Ground Lease Term Loan Facility." *Id.* Ex. G. It defines the "Debtors" to include "each of the debtors and debtors in possession in the Bankruptcy Cases." Levine Decl. Ex. 31 (Am. No. 1 to APA) § 1.45(e)(i) (amending APA § 9.13(e)).

[217]    Levine Decl. Ex. 30 (APA) § 9.13(b).

[218]    Levine Decl. Ex. 31 (Am. No. 1 to APA) § 1.45(e)(ii) (amending APA § 9.13(e)).

"specifically described in the preceding sentence." Moreover, the ESL Defendants were permitted to credit bid their secured claims relating to that facility and acquire the property that was the subject of the liens granted by the Additional Subsidiary Guarantors in the sale of the Debtors' assets that this Court approved.

Count 26 flies in the face of this release and credit bid. Indeed, Plaintiffs admit that the APA releases any claims for "avoidance of the 2018 Term Loan Facility.[219] Count 26 is precisely such a claim; it asserts a claim under fraudulent transfer law, which is, by definition, an avoidance claim. Yet, Plaintiffs purport to seek a "judgment ... in the amount by which the assets pledged as collateral ... lost value by nature of their having been collateralized," telling the Court that "avoidance" would be "impractical at this time."[220] Plaintiffs cannot explain why they should be allowed to circumvent the APA Release by requesting a synthetic remedy that would have the same economic effect as avoidance. Fraudulent transfer law provides for avoidance, not damages, and Section 550 of the Bankruptcy Code permits the recovery of property that a debtor has transferred (or its value) only "to the extent that [the] transfer is avoided."[221] Count 26 should be dismissed.[222]

---

[219]    FAC n.44.

[220]    *Id.* ¶ 682.

[221]    11 U.S.C. § 550(a). Count 26 also fails because it, too, is premised in large part on Plaintiffs' flawed theories of recharacterization and deepening insolvency. *See* FAC ¶ 760 ("[T]he Additional Subsidiary Guarantors on the 2018 Term Loan Facility's faux indebtedness increased as its assets were wasted by the wrongful prolonging of its businesses."), ¶ 763 ("[The Related-Party Financings] caused Sears Holdings to wrongfully pay hundreds of millions of dollars in 'interest' and 'fees' and unnecessarily incur additional 'debt,' while wasting their assets and funding billions of dollars in operating losses.").

[222]    Count 32 asserts claims against Mr. Lampert (among others) for breach of fiduciary duty relating to the guarantees and liens securing the 2018 Term Loan Facility granted by the Additional Subsidiary Guarantors, and Count 33 appears to include a claim against him for allegedly aiding and abetting the supposed breach of fiduciary duties by other Defendants in connection with the same loan facility (*see* FAC ¶¶ 762, 770). Those claims fail for the reasons discussed above in Section II as well as those discussed below in Section III.

III.  **PLAINTIFFS' CLAIMS FOR BREACH OF FIDUCIARY DUTY AND AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY SHOULD BE DISMISSED FOR SEVERAL ADDITIONAL REASONS**

In addition to the reasons set forth above with respect to the Seritage Transaction and the 2016-2018 Loans, Plaintiffs' claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty (Counts 5-8, 18-21, 28-29, and 31-33) against Mr. Lampert and any other ESL Defendants, including those relating to the Lands' End Spin-Off, should be dismissed for three independent reasons.  *First*, the claims brought on behalf of Sears Holdings with respect to the Lands' End Spin-Off and the Seritage Transaction (Counts 5-6, 8, and 18-21) are time-barred.  *Second*, each of the claims brought on behalf of Sears Holdings also fails to the extent it is premised on an alleged breach of the duty of care because Sears Holdings' Certificate of Incorporation provides a standard exculpation of its directors and officers from such claims that is fully enforceable under applicable law.  *Third*, the claims brought on behalf of subsidiaries of Sears Holdings (Counts 7, 20, and 31-32) likewise fail to state a claim because Plaintiffs do not and cannot allege that Mr. Lampert (or any other ESL Defendant) was an officer or director of any such subsidiary.

A.  **Counts 5-6, 8, And 18-21, As Brought By Sears Holdings, Are Time-Barred**

Delaware law governs Plaintiffs' breach of fiduciary duty claims brought against Mr. Lampert and the ESL Defendants for duties allegedly owed to Sears Holdings.  "Bankruptcy courts generally apply the choice of law rules of the state in which they sit."[223]  "New York choice of law rules dictate that the law of the state of incorporation governs claims for breach of fiduciary duty," and "[t]hus, because [Sears Holdings] is a Delaware corporation, Delaware law" provides the

---

[223]   *In re Ticketplanet.com*, 313 B.R. 46, 62 (Bankr. S.D.N.Y. 2004) (citations omitted).

statute of limitations for "claims for breach of fiduciary duty."[224]  Indeed, even without the internal

affairs doctrine, Delaware's statute of limitations would apply.  Courts applying New York's

borrowing statute[225] to fiduciary duty claims have looked to the limitations period under the law

of the state where the company was incorporated, especially where, as here, that corporation was

a holding company without any operations of its own or otherwise did not operate a business

overwhelmingly centered in a different state.[226]

Similarly, "because claims of aiding and abetting a breach of fiduciary duty relate to the

internal affairs of a corporation, they are also governed by the law of the state of incorporation."[227]

---

[224]    *In re Navidea Biopharms. Litig.*, 2019 WL 7187111, at *3 (S.D.N.Y. Dec. 26, 2019); *see also H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135 (S.D.N.Y. 2001) (state of incorporation supplies statute of limitations for breach of fiduciary duty counterclaim); *Barbara v. MarineMax, Inc.*, 2012 WL 6025604 (E.D.N.Y. Dec. 4, 2012) (same); *Clark v. Nevis Capital Mgmt., LLC*, 2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) (same); *Casita, L.P. v. Glaser*, 26 Misc. 3d 1240(A), 2010 WL 1049291 (N.Y. Sup. Ct. Mar. 16, 2010) (same); *In re Mervyn's Holdings, LLC*, 426 B.R. 488, 503 (Bankr. D. Del. 2010) (holding that "because the internal affairs doctrine applied, the statute of limitations of the state law in the state of incorporation applied to the breach of fiduciary claims"); *In re Circle Y of Yoakum, Tex.*, 354 B.R. 349, 359 (Bankr. D. Del. 2006) (concluding that because the debtor was a "Texas corporation" with a "mailing address" in that state, "Texas law governs the applicable limitations period" on claims for breach of fiduciary duty).  Sears Holdings is, and is alleged to be, a Delaware corporation.  FAC ¶ 25.

[225]    N.Y. C.P.L.R. § 202.

[226]    *See Interventure 77 Hudson LLC v. Halengren*, 2018 WL 2234878, at *7 (N.Y. Sup. Ct. May 16, 2018) (New York borrowing statute "CPLR 202 does not include a definition of the term 'resident' of New York.  However, … published decisions of New York state courts generally hold that the issue is controlled by the entity's state of incorporation"), *aff'd Interventure 77 Hudson LLC v. Falcon Real Estate Inv. Co.*, 172 A.D.3d 481 (N.Y. App. Div. 2019) (where a holding company operates across the country and has no single principal place of business in any one state, the state of incorporation supplies the statute of limitations for a breach of fiduciary duty claim); *see also Gordon v. Credno*, 102 A.D.3d 584, 585 (N.Y. Sup. Ct. 2013) ("[G]iven the minimal business activities of the corporation, the IAS court correctly found that the derivative claims plaintiff asserted on behalf of the corporation accrued for purposes of CPLR 202 in Wyoming, where the corporation was incorporated …."); *Verizon Directories Corp. v. Continuum Health Partners, Inc.*, 74 A.D.3d 416, 416 (N.Y. App. Div. 2010) ("For purposes of CPLR 202, plaintiff is a 'resident' of, and its cause of action accrued in, Delaware, the state of its incorporation" regardless of "asserted extensive presence" in the forum state); *Potter v. Arrington*, 11 Misc. 3d 962, 964, 969 (N.Y. Sup. Ct. 2006) (state of residency for borrowing statute purposes was Delaware for Delaware corporation, even though its primary, "if not exclusive," place of business was New York).

[227]    *Buckley v. Deloitte & Touche USA LLP*, 2007 WL 1491403, at *13 (S.D.N.Y. May 22, 2007) (collecting cases); *see also Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, 2006 WL 278138, at *12 (S.D.N.Y. Feb. 2, 2006) ("New York law generally applies the law of the state of incorporation to decide claims pertaining to the 'internal affairs' of a corporation.  Aiding and abetting the breach of a fiduciary duty is one such internal affair." (citations omitted)); *Bernstein v. Crazy Eddie, Inc.*, 702 F. Supp. 962, 986 (E.D.N.Y. 1988) ("Under New York's choice of law rules, the law of the state of incorporation governs issues of corporate fiduciary obligations."), *vacated in part on other grounds sub nom. In re Crazy Eddie Sec. Litig.*, 714 F. Supp. 1285 (1989).

As the aiding and abetting "claim[s] in this case relate[] fundamentally to the conduct of the internal affairs" of Sears Holdings, "the law of the state of incorporation—Delaware—governs."[228]

Under Delaware law, claims for both breach of fiduciary duty and aiding and abetting a breach of fiduciary duty are subject to a three-year statute of limitations.[229] Therefore, Plaintiffs may bring such claims on behalf of Sears Holdings only for alleged breaches that occurred within three years before Sears Holdings filed for bankruptcy—in other words, for breaches that occurred after October 15, 2015.[230]

Both the Lands' End Spin-Off and Seritage Transaction were completed outside the limitations period. The Lands' End Spin-Off closed on April 4, 2014.[231] The Seritage Transaction closed on July 7, 2015.[232] By definition, any alleged breaches of fiduciary duty by Sears Holdings' directors and officers, and any aiding and abetting of such breaches, with respect to either transaction must have occurred prior to, or at the very latest on the date when, the transaction closed—more than three years before Sears Holdings filed for bankruptcy. Accordingly, Sears Holdings' claims for breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty

---

[228]    *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d 123, 129 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1321 (2d Cir. 2000).

[229]    *See* Del. Code Ann. tit. 10, § 8106 ("No action … to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action … ."); *see, e.g.*, *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998) ("It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty."), *aff'd*, 725 A.2d 441 (Del. 1999); *Liu Yao-Yi v. Wilmington Tr. Co.*, 301 F. Supp. 3d 403, 416 (W.D.N.Y. 2017) (finding a three-year statute of limitations applies to aiding and abetting breach of fiduciary duty under Delaware law and collecting Delaware cases).

[230]    Under the Bankruptcy Code, any limitations period on a claim by a debtor that would be timely if filed on the debtor's petition date is tolled, but that tolling only applies if "such period has not expired before the date of the filing of the petition." 11 U.S.C. § 108(a).

[231]    *See* FAC ¶¶ 8, 199; Levine Decl. Ex. 9 (Lands' End, Inc. Press Release, dated April 4, 2014, Ex. 99.2 to Lands' End, Inc., SEC Form 8-K (Apr. 8, 2014)).

[232]    *See* FAC ¶¶ 10, 238, 257.

54

as to the Lands' End Spin-Off and the Seritage Transaction are untimely and should be dismissed.[233]

### B.  Sears Holdings' Certificate Of Incorporation Exculpates Mr. Lampert For Breaches Of The Duty Of Care

Even if timely, Plaintiffs' claims for breach of fiduciary duty on behalf of Sears Holdings against Mr. Lampert would fail to the extent they assert that Mr. Lampert breached a duty of care. Sears Holdings' Certificate of Incorporation contains a binding exculpation provision that bars Sears Holdings from claiming a breach of the duty of care against Mr. Lampert in his capacity as an officer or director of the company.  In particular, Article VII, Section F, of the Sears Holdings Certificate of Incorporation (the "Sears Charter") provides that:

> A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the General Corporation Law of the State of Delaware as the same exists on the date hereof or may hereafter be amended.[234]

Under Delaware law, such a provision is fully enforceable.[235]  Indeed, courts have found exculpatory clauses like this one to insulate not only the company's directors, but also its

---

[233]    *See In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *1, *5-6 (Del. Ch. Sept. 27, 2013) (dismissing breach of fiduciary duty claim as time-barred under Delaware law when the "terms of the [challenged] deal were fully disclosed" over three years earlier); *see also Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *6 (Del. Ch. Dec. 19, 2002) (dismissing attendant aiding and abetting claim after dismissing underlying breach of fiduciary duty claims), *aff'd*, 825 A.2d 239 (Del. 2003).

   All of Plaintiffs' claims standing in the shoes of Sears Holdings for aiding and abetting breach of fiduciary duty against Mr. Lampert (whether concerning the Lands' End Spin-Off, the Seritage Transaction, or the 2016-2018 Loans) also fail because Plaintiffs admit that Mr. Lampert was a director and officer of Sears Holdings and, as such, sue him for breach of fiduciary duty.  Under Delaware law, "[i]f a defendant has acted in a fiduciary capacity, then that defendant is liable as a fiduciary and not for aiding and abetting."  *Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *41 (Del. Ch. Apr. 14, 2017) (citation omitted); *see also In re Ezcorp Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *31 (Del. Ch. Jan. 25, 2016) (same); *Seiden v. Kaneko*, 2015 WL 7289338, at *11 (Del. Ch. Nov. 3, 2015) ("As stated, a successful aiding and abetting claim necessitates improper conduct by a *non-fiduciary*." (emphasis added)).

[234]    Levine Decl. Ex. 5 (Sears Holdings Corp. Restated Certificate of Incorporation, Ex. 3.1 to Sears Holdings Corp. Current Report, SEC Form 8-K (Mar. 24, 2005)), Art. VII, Sec. F.  "New York federal courts routinely take judicial notice of exculpation provisions in certificates of incorporation on motions to dismiss."  *In re Ampal-Am. Israel Corp.*, 543 B.R. 464, 472 (Bankr. S.D.N.Y. 2016) (collecting cases).

[235]    *See* Del. Code Ann. tit. 8, § 102; *Pereira v. Farace*, 413 F.3d 330, 341-42 (2d Cir. 2005) (Delaware GCL

officers.[236]  And the "Delaware Chancery Court and the Second Circuit have both held that exculpatory clauses … are enforceable against a bankruptcy estate representative" by directors and officers.[237]

This settled body of law controls here.  Plaintiffs allege that Mr. Lampert breached his duty of care to Sears Holdings.[238]  The Sears Charter bars these claims, and they should be dismissed.

### C.   Counts 7, 20, And 31-32, As Brought By Sears Entities Other Than Sears Holdings, Fail To State A Claim Against Mr. Lampert Because He Did Not Owe A Duty To Those Subsidiaries

Plaintiffs' claims brought on behalf of other Sears entities also fail.  Plaintiffs purport to bring claims for breach of fiduciary duty, not just by and on behalf of Sears Holdings, but also on behalf of several direct and indirect subsidiaries of Sears Holdings—Kmart, Sears Roebuck, Sears Roebuck de Puerto Rico, Sears Development, and others (Counts 7, 20, and 31-32).  Each of these claims should be dismissed for a simple reason:  Mr. Lampert was a director and later an officer of Sears Holdings, but he was not a director or officer of any of these subsidiaries and, accordingly, did not owe a fiduciary duty to them.

The First Amended Complaint alleges that Mr. Lampert was "chairman of the Sears Holdings Board from the time of the 2005 Kmart/Sears merger until his resignation on February

---

Section 102(b)(7) "makes it abundantly clear that directors are shielded from liability for breaches of the duty of care.").

[236]    *See In re Verestar, Inc.*, 343 B.R. 444, 475 (Bankr. S.D.N.Y. 2006) (applying corporate exculpatory clause that only discusses directors to both directors and officers because "decisions that impose a fiduciary duty on officers of a Delaware corporation hold them to the same standards as a director" and "[n]o reason has been suggested why an officer should be held to a higher standard"); *Continuing Creditors' Comm. of Star Telecomm'ns Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 464 (D. Del. 2004) (exculpatory clause that discussed directors also applied to claims asserted against an officer who was also a director).

[237]    *Verestar*, 343 B.R. at 472-73; *see Pereira*, 413 F.3d at 342 (finding an exculpatory clause "precludes the Trustee from bringing any due care claims seeking monetary awards against the directors, whether brought on behalf of the creditors or [the corporation] itself").

[238]    *See* FAC ¶ 485 (alleging that Mr. Lampert, as an officer and director of Sears Holdings, was "obligated by [his] duty of care but failed and refused to exercise" it), ¶ 593 (alleging same), ¶ 714 (alleging same as a director).

12, 2019."[239]  But Plaintiffs do not and cannot allege that Mr. Lampert was ever a director of any

Sears subsidiary.  To the contrary, they allege that other Defendants were the "sole" directors of

Kmart, Sears Roebuck, Sears Roebuck de Puerto Rico, and Sears Development.[240]

Plaintiffs try to get cute, however, when it comes to Mr. Lampert's role as an officer.  They

allege that in February 2013 he became the "CEO" of "Sears," a term that they define elsewhere

in the First Amended Complaint as "the overall business enterprise" of the Plaintiffs and certain

unnamed "affiliates."[241]  That allegation is meaningless.  "Overall business enterprises" do not

have directors and officers; corporations do.  Plaintiffs themselves recognize that the subsidiaries

were separate legal entities from Sears Holdings; they assert numerous claims in the names of

those subsidiaries against, among others, persons who are alleged to have been directors of those

subsidiaries, not officers or directors of Sears Holdings.[242]  To state a claim against Mr. Lampert

on behalf of a subsidiary, Plaintiffs must allege that he was an officer (or director) of that legal

entity, not that he was an officer of Sears Holdings or that he was the "CEO" of the "overall

business enterprise," whatever that means.  Plaintiffs fail to make that allegation and cannot do so,

notwithstanding the tens of millions of dollars they have spent investigating their potential claims.

That failure is dispositive.  Whether or not a parent controls the overall business enterprise,

there is "no basis for the proposition that those Defendants who had been officers and/or directors

of solely the Parent owe any fiduciary duty" to the parent's subsidiaries.[243]  Because Mr. Lampert

---

[239]    *Id.* ¶ 46.

[240]    *Id.* ¶¶ 269-273.

[241]    *Id.* ¶ 46 & n.1.

[242]    *Id.* Counts 7, 8, 20, 21, 22, 31, 32, 33.

[243]    *In re Hydrogen, L.L.C.*, 431 B.R. 337, 347-48 (Bankr. S.D.N.Y. 2010) ("[T]he weight of authority around the country holds that the directors of a parent corporation owe *no* fiduciary duties to a wholly-owned subsidiary." (collecting cases)); *RSL Commc'ns PLC ex rel. Jervis v. Bildirici*, 2006 WL 2689869, at *7 (S.D.N.Y. Sept. 14, 2006) ("[T]hose who operate the parent company owe no fiduciary duty to the wholly owned subsidiary." (quoting *Aviall, Inc. v. Ryder Sys. Inc.*, 913 F. Supp. 826, 832 (S.D.N.Y. 1996), *aff'd* 110 F.3d 892 (2d Cir. 1997)); *Trenwick Am. Lit.*

owed no duties to the subsidiaries, the breach of fiduciary duty claims brought on their behalf should be dismissed.[244]

## IV. PLAINTIFFS' CLAIMS FOR UNJUST ENRICHMENT SHOULD BE DISMISSED FOR INDEPENDENT REASONS

In addition to the reasons set forth above with respect to the Seritage Transaction and the 2016-2018 Loans, Plaintiffs' claims for unjust enrichment (Counts 4, 22, and 27), including with respect to the Lands' End Spin-Off, should be dismissed for two independent reasons. *First*, the challenged transactions were governed by actual contracts, barring relief on a quasi-contract theory. *Second,* Plaintiffs have asserted claims in law, and that precludes Plaintiffs from also seeking the equitable remedy of unjust enrichment.

### A. Counts 4, 22, And 27 Should Be Dismissed Because Written Contracts Govern Each Of The Transactions That Plaintiffs Challenge

The law of unjust enrichment sounds in quasi-contract.[245] Accordingly, a claim for unjust enrichment does not lie where an actual contract governed the transaction at issue.[246] Here, actual,

---

*Tr.*, 906 A.2d at 191 ("[T]his claim [for breach of fiduciary duty] depends on the notion that the directors of a corporate parent—Trenwick—breached fiduciary duties owed to the parent's wholly-owned subsidiary—Trenwick America. But that notion is at odds with our state's law. Under settled principles of Delaware law, a parent corporation does not owe fiduciary duties to its wholly-owned subsidiaries or their creditors.").

[244]    *See In re Hydrogen*, 431 B.R. at 348 (dismissing breach of fiduciary duty claim for failing to adequately allege the "existence of a fiduciary duty between the relevant moving Defendant and the Debtor").

[245]    *See, e.g.*, *Georgia Malone*, 973 N.E.2d at 746 ("As we have stated on several occasions, '[t]he theory of unjust enrichment lies as a quasi-contract claim' and contemplates 'an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.'" (citation omitted)).

[246]    *See, e.g.*, *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 & n.193 (Del. Ch. 2012) ("It is a well-settled principle of Delaware law that a party cannot recover under a theory of unjust enrichment if a contract governs the relationship between the contesting parties that gives rise to the unjust enrichment claim."); *2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 234 (S.D.N.Y. 2015) ("It is well settled that, under New York law, the existence of a valid and enforceable written contract … ordinarily precludes recovery in quasi contract [such as unjust enrichment] for events arising out of the same subject matter." (quoting *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956, 964 (2d Cir. 1998)); *Nesby v. Country Mut. Ins. Co.*, 805 N.E.2d 241, 243 (Ill. App. Ct. 2004) ("The theory of unjust enrichment is an equitable remedy based upon a contract implied in law. … Because it is an equitable remedy, unjust enrichment is only available when there is no adequate remedy at law. Where there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application." (citations omitted)).

written contracts governed the transactions about which Plaintiffs complain: the Lands' End Spin-Off was governed by a Separation and Distribution Agreement entered into between Sears Holdings and Lands' End [247]; the Seritage Transaction was governed by a Subscription, Distribution, and Purchase Agreement and a Master Lease [248]; and each of the 2016-2018 Loans was governed by a separate loan agreement. [249]

Because "all of the challenged transfers were governed by written agreements," Plaintiffs' "remedies must lie in fraudulent transfer claims or other theories, and not in claims alleging unjust enrichment." [250] Plaintiffs' unjust enrichment claims should be dismissed.

### B. Counts 4, 22, And 27 Also Should Be Dismissed Because Plaintiffs Allege An Adequate Remedy At Law

Plaintiffs' unjust enrichment claims fail for a second reason: Plaintiffs seek the same remedy for the same transactions under both law and equity. That is not permitted. While the "doctrine of fraudulent conveyance rests on principles of unjust enrichment," the two doctrines create distinct types of remedies. Fraudulent transfer claims are actions in law. [251] In contrast,

---

[247]    *See* Levine Decl. Ex. 10 (Separation and Distribution Agreement between Sears Holdings Corp. and Lands' End, Inc. ("Separation and Distribution Agreement"), dated April 4, 2014, Ex. 2.1 to Lands' End, Inc., SEC Form 8-K (Apr. 8, 2014)).

[248]    *See* Levine Decl. Ex. 14 (Seritage Subscription Agreement); *see, e.g.*, Levine Decl. Ex. 17 (Master Lease) (exhibiting a "Master Lease" entered into between Seritage subsidiaries and Sears subsidiaries for real estate and detailing, *inter alia*, landlord recapture rights).

[249]    *See, e.g.*, Levine Decl. Ex. 20 (First Amendment to Third Amended and Restated Credit Agreement, dated Apr 8, 2016, Ex. 10.2 to Sears Holdings Corp., SEC Form 8-K (Apr. 12, 2016)), at 1-4 & Annex A: Art. II (containing contractual terms for the "2016 Term Loan" concerning a $750 million loan); Levine Decl. Ex. 21 (Letter of Credit and Reimbursement Agreement, dated December 28, 2016, Ex. 10.1 to Sears Holdings Corp., SEC Form 8-K (Dec. 30, 2016)) (containing contractual terms concerning a $200 million letter of credit facility); Levine Decl. Ex. 24 (Sears Holdings Corp., SEC Form 8-K (Jan. 10, 2018)) (containing contractual terms concerning a $100 million loan).

[250]    *In re Stillwater Asset Backed Offshore Fund Ltd.*, 559 B.R. 563, 623-24 (Bankr. S.D.N.Y. 2016) (dismissing unjust enrichment claims arising from loans and other asset transfers because the transactions were "governed by contracts"); *see also Tronox*, 429 B.R. at 108-09 (dismissing unjust enrichment claims as precluded after finding that the asset transfers that plaintiffs had challenged were governed by contracts containing "the parties' 'rights and obligations'").

[251]    Restatement (Third) of Restitution & Unjust Enrichment § 48 cmt. a. (2011); S*ee Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 46-48 (concluding that fraudulent transfer claims "should be denominated legal rather than equitable").

unjust enrichment claims that seek restitution and disgorgement, like the claims here, are actions

in equity.[252]  These distinctions matter because when "a complete remedy is available at law," a

plaintiff may not bring an action at equity that seeks the same remedy.[253]

Plaintiffs seek the same remedy under their fraudulent transfer and unjust enrichment

claims for the Lands' End Spin-Off, the Seritage Transaction, and the 2016-2018 Loans—money,

either based on avoidance (fraudulent transfer) or restitution (unjust enrichment).[254]  Where, as

here, Plaintiffs have affirmatively pleaded *multiple* claims seeking *identical* remedies from

separate actions at law, challenging transactions arising out of binding contracts, this is "not the

unusual situation where there is no adequate remedy at law."[255]  And while, for their part, the ESL

Defendants are moving to dismiss some of the fraudulent transfer claims and of course dispute that

they are liable on any of them, they are not moving to dismiss those claims relating to the Lands'

End Spin-Off (Counts 1 and 2); nor is Seritage moving to dismiss the fraudulent transfer claims

---

[252]    *See Newbro v. Freed*, 409 F. Supp. 2d 386, 398 (S.D.N.Y. 2006) ("A claim of restitution based upon a theory of unjust enrichment is an equitable remedy."), *aff'd*, 2007 WL 642941 (2d Cir. Feb. 27, 2007).

[253]    *Granfinanciera*, 492 U.S. at 49 n.7 ("Because dollars are fungible, and respondent has not requested an accounting or other specifically equitable form of relief [for its fraudulent transfer claims], a complete remedy is available at law, and equity will not countenance an action when complete relief may be obtained at law."); *see also Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir. 2010) ("Unjust enrichment is an equitable claim that is unavailable where an adequate remedy at law exists."); *see also, e.g., In re Ritz Camera & Image, L.L.C.*, 2014 WL 432192, at *6 (Bankr. D. Del. Feb. 4, 2014) (dismissing unjust enrichment claim and finding "the parties' relationship is governed by contract and, therefore, the Trustee has a remedy at law"); *Season Comfort Corp. v. Ben A. Borenstein Co.*, 655 N.E.2d 1065, 1071 (Ill. App. Ct. 1995) ("It is axiomatic that an unjust enrichment claim is viable only when there is no adequate remedy at law.").

[254]    *Compare* FAC ¶ 445 (from a claim of actual fraudulent transfer, seeking "the amount of the value" received as a result of the Lands' End Spin-Off), *and id.* ¶ 525 (same for the Seritage Transaction), *and id.* ¶ 662 (seeking "the amount of 'interest' payments and 'fees'" received as a result of the 2016-2018 Loans), *with id.* ¶¶ 464-465 (from a claim of unjust enrichment, seeking "restitution" and "disgorging" of "the amount of the value" received as a result of the Lands' End Spin-Off), *and id.* ¶¶ 638-639 (same for the Seritage Transaction), *and id.* ¶¶ 694-695 (seeking "restitution" and "disgorging" of "the amount of 'interest' payments and 'fees'" received as a result of for the 2016-2018 Loans).

[255]    *Price v. L'Oreal USA, Inc.*, 2017 WL 4480887, at *5 (S.D.N.Y. Oct. 5, 2017) (dismissing unjust enrichment claims where plaintiff brought "conventional contract and tort claims based on the same set of facts"); *see also Steinberg v. Sherman*, 2008 WL 1968297, at *5 (S.D.N.Y. May 2, 2008) ("[B]ecause a claim of restitution based upon a theory of unjust enrichment arises in equity, and because the Receiver has an adequate remedy at law, his unjust enrichment claim is dismissed … ." (citation omitted)).

relating to the Seritage Transaction (Counts 13 and 14). In any event, Plaintiffs do not claim that they have no adequate remedy at law. Just the opposite, Plaintiffs have asserted claims in law relating to all the transactions at issue. Plaintiffs' unjust enrichment claims should therefore be dismissed.

## V.    PLAINTIFFS' CLAIM FOR RECOVERY OF A SUPPOSEDLY ILLEGAL DIVIDEND WITH RESPECT TO THE LANDS' END SPIN-OFF SHOULD BE DISMISSED BECAUSE PLAINTIFFS DO NOT DISPUTE THAT THE TRANSACTION LEFT SEARS BALANCE-SHEET SOLVENT

Plaintiffs allege that the "dividend" issued by Sears Holdings in relation to the Lands' End Spin-Off was illegal under Delaware law (Count 3).[256] This claim fails because Plaintiffs offer only an entirely conclusory assertion that Sears Holdings did not have the legally required "surplus" to approve the distribution, and that conclusion of law is contradicted by Plaintiffs' own factual allegations.

A Delaware corporation, like Sears Holdings, may make a distribution to its shareholders either out of the company's surplus or, if there is no surplus, from the company's net profits in the fiscal year of the distribution or the preceding fiscal year.[257] Delaware law defines a corporation's "surplus" as the total value of a corporation's assets minus its liabilities and capital.[258] A company's capital is defined as the total par value of the corporation's issued stock.[259] As many corporations set the par value of issued stock at one cent—including Sears Holdings at the time of the Lands' End Spin-Off [260]—courts typically view the total par value of issued stock as

---

[256]    FAC ¶ 456.

[257]    See Del. Code Ann. tit. 8, § 170(a) ("The directors of every corporation, subject to any restrictions contained in its certificate of incorporation, may declare and pay dividends upon the shares of its capital stock either … [o]ut of its surplus" or "its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year.").

[258]    Del. Code Ann. tit. 8, § 154.

[259]    See id.

[260]    See Levine Decl. Ex. 6 (Sears Holdings Corp. Annual Report, SEC Form 10-K (Mar. 18, 2014)), at 1 ("Common Shares, par value $0.01 per share.").

"essentially negligible" when evaluating a company's surplus.[261] As a "practical matter," then, Delaware law "operates roughly to prohibit distributions to stockholders that would render the company balance-sheet insolvent."[262] Conversely, if the distribution did not render the company balance-sheet insolvent, it cannot be attacked under Delaware law.[263]

This matters because the First Amended Complaint (like the original complaint[264]) contains no plausible allegation that Sears Holdings was left insolvent, from a balance-sheet standpoint, by the April 2014 Lands' End Spin-Off. In fact, Plaintiffs allege that Sears Holdings first became balance-sheet insolvent more than a year later, in July 2015, when the Seritage Transaction closed.[265]

---

[261]    *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 822-23 (N.D. Tex. 2012) (discussing evaluating a corporation's surplus when the company had a par value of each share of one cent), *aff'd*, 761 F.3d 409 (5th Cir. 2014).

[262]    *SV Inv. Partners, LLC v. Thoughtworks, Inc.*, 2010 WL 11418154, at *6 (Del. Ch. Nov. 10, 2010); *see U.S. Bank Nat'l Ass'n*, 892 F. Supp. 2d at 823 (concluding when company had a one cent par value of its stock, that the "question of whether Idearc had a surplus is dependent upon whether its total assets exceeded its total liabilities"). Indeed, while a Delaware company can certainly make a distribution to its shareholders that leaves it solvent, it may well also be able to make a distribution that leaves it technically insolvent. Delaware law has "no requirement that the distribution leave the corporation solvent," *In re Healthco Int'l, Inc.*, 195 B.R. 971, 990 (Bankr. D. Mass. 1996) (citing Del. Code Ann. tit. 8, § 170), so courts have afforded corporate directors "reasonable latitude to depart from the balance sheet to calculate surplus, so long as they evaluate assets and liabilities in good faith, on the basis of acceptable data, by methods that they reasonably believe reflect present values." *Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150, 152 (Del. 1997); *see also id.* at 154 ("Allowing corporations to revalue assets and liabilities to reflect current realities complies with the statue and serves well the policies behind the statute."); *Fotta v. Morgan*, 2016 WL 775032, at *6 (Del. Ch. Feb. 29, 2016) (recognizing that when "calculating a corporation's surplus" that "directors are not constrained by the balances of assets and liabilities as stated on the balance sheet").

[263]    *See In re Healthco Int'l, Inc.*, 195 B.R. at 990 (dismissing Delaware law excessive distribution claim when there were no allegations that the corporation's distribution "exceed[ed] its surplus and current profits").

[264]    *See* Original Complaint ¶¶ 193-203 (stating that Sears was "insolvent on a *cash-flow basis* after the Lands' End spinoff." (emphasis added)), ¶¶ 204-208 (stating that Sears had "*unreasonably small capital* after the Lands' End spinoff" (emphasis added)).

[265]    *See* FAC ¶ 10 (alleging that the "*Seritage Transaction* … left the Debtors balance-sheet insolvent" (emphasis added)), ¶ 238 (alleging that *at the time of the Seritage Transaction*, "Sears's financial condition was even worse than it had been fifteen months earlier when Lands' End was spun off" and "*[a]s a result*, Sears was insolvent on a balance-sheet basis" (emphasis added)), ¶ 414 (alleging that the sale of Sears Holdings to Transform "supports a finding that Sears was insolvent on a balance-sheet basis *as far back as the Seritage Transaction*" (emphasis added)).

Plaintiffs allege merely that the Lands' End Spin-Off left Sears Holdings "insolvent *on a cash-flow basis*."[266]  That allegation, even if credited, is insufficient to support Plaintiffs' illegal dividend claim.  Claims of cash-flow insolvency and inadequate capital focus on a debtor's future, not its present, and Delaware law permits a Delaware company to pay a dividend to its shareholders as long as it has a "surplus" at the time of the distribution—*i.e.*, it is then balance-sheet solvent.[267]

Nor can Plaintiffs salvage their illegal dividend claim with the mere conclusory assertion that Sears Holdings "did not have a capital surplus" at the time of the Lands' End Spin-Off.  A complaint must do more than simply repeat the elements of a cause of action; it must set forth facts that make it plausible that the Plaintiff can establish those elements.[268]  Here, Plaintiffs allege no such facts.

A comparison between Plaintiffs' illegal dividend claims relating to the Seritage Transaction and the Lands' End Spin-Off is telling.  Plaintiffs allege that "[a]t the time of the Seritage [Transaction], Sears Holdings' liabilities exceeded its assets and Sears Holdings had no net profits in that fiscal year or in the preceding fiscal year" and that "the Debtors were

---

[266]    *Id.* ¶ 219 (emphasis added); *see also id.* ¶¶ 209-220 (describing how the Lands' End Spin-Off left Sears Holdings unable to pay obligations that "would come due"), at 84, Heading 3 ("The Lands' End Spin-Off Left Sears Holdings and Sears Roebuck Insolvent *on a Cash-Flow Basis")* (emphasis added), ¶ 449 (alleging that the Lands' End Spin-Off occurred at a time when "Sears Holdings and Sears Roebuck had unreasonably small capital and/or at a time when Sears Holdings and Sears Roebuck intended to incur or believed they would incur debts beyond their ability to pay as such debts matured," but not alleging that the spin-off left either company insolvent from a balance-sheet standpoint).

[267]    *Compare In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 574 n.92 (S.D.N.Y. 2007) (describing "cash-flow insolvency" as "where a company intends or believes that it will incur debts that would be beyond its ability to pay as those debts mature" in the future (citation omitted)), *aff'd sub nom. Pappas v. Bank of Am. Corp.*, 309 F. App'x 536 (2d Cir. 2009), *and In re Iridium Operating LLC*, 373 B.R. 283, 347 (Bankr. S.D.N.Y. 2007) (stating that "unreasonably small capital analysis involves an evaluation of the debtor's own projections of future cash flows"), *with Pereira v. Farace*, 413 F.3d 330, 343 (2d Cir. 2005) ("the Delaware test" for insolvency "looks solely at whether the corporation has been paying bills on a timely basis and/or whether its liabilities exceed its assets"), *and SV Inv. Partners, LLC v. Thoughtworks, Inc.*, 2010 WL 11418154, at *6 (stating that Delaware law "operates roughly to prohibit distributions to stockholders that would render the company balance-sheet insolvent").

[268]    *Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting *Twombly*, 550 U.S. at 555)).

insolvent."[269]  In contrast, Plaintiffs make no such allegations regarding the Lands' End Spin-Off and, instead, simply regurgitate the element of the claim that "[a]t the time of the Lands' End Dividend, Sears Holdings did not have a capital surplus."[270]  Similarly, on their constructive fraudulent transfer claims relating to the Seritage Transaction, Plaintiffs allege that the transaction left Sears Holdings "insolvent" on a balance sheet basis, with unreasonably small capital, and intending or believing that it would be unable to pay its debts as they matured.[271]  In contrast, on their constructive fraudulent transfer claim relating to the Lands' End Spin-Off, Plaintiffs merely allege that the transaction left Sears Holdings with unreasonably small capital, and intending or believing that it would be unable to pay its debts as they matured; Plaintiffs conspicuously fail to allege that Sears Holdings was (or was rendered) balance sheet insolvent.[272]

Plaintiffs' claim (Count 3) to recover the Lands' End Spin-Off as a supposed illegal dividend under Delaware law should be dismissed.[273]

## VI.   PLAINTIFFS' CLAIM FOR DISALLOWANCE SHOULD BE DISMISSED IN SUBSTANTIAL PART, AND THEIR CLAIM FOR EQUITABLE SUBORDINATION SHOULD BE DISMISSED IN ITS ENTIRETY

In Counts 34 and 35 of the First Amended Complaint, Plaintiffs seek to have certain claims of the ESL Defendants in the Debtors' bankruptcy cases disallowed or subordinated to all other unsecured claims.  With very limited exception, these Counts fail as a matter of law.  Plaintiffs' claim for equitable subordination (Count 35) should be dismissed in its entirety, and their claim for disallowance (Count 34) should be dismissed in substantial part.

---

[269]    FAC ¶ 536.

[270]    *Id.* ¶ 456.

[271]    *See, e.g., id.* ¶ 550.

[272]    *Id.* ¶ 449.

[273]    *See, e.g., In re Healthco Int'l, Inc.,* 195 B.R. at 990 (dismissing improper distribution claim under Section 170 when there was "no allegation that Healthco's distribution to its shareholders exceeded surplus").

At the outset, Plaintiffs themselves appear to recognize that they cannot seek to have the deficiency claims of the ESL Defendants relating to the secured loan facilities that were the subject of the credit bids this Court authorized in connection with the APA disallowed or subordinated. Under the APA, all ESL claims relating to those facilities—both the secured portion that the ESL Defendants credit bid and any remaining unsecured deficiency—were "allowed … for all purposes." [274] The APA expressly barred Plaintiffs from seeking to have these "ESL Claims" disallowed or subordinated.[275] Accordingly, even the Plaintiffs appear to acknowledge that they cannot seek to have any such ESL Claims disallowed or subordinated.[276]

But Plaintiffs do request that any other claims asserted by ESL against any of the Debtors be disallowed or subordinated. With one limited exception, the Counts of the First Amended Complaint seeking such relief fail to state a claim.

### A.    Plaintiffs' Claim For Disallowance Should Be Dismissed In Substantial Part

In Count 34, Plaintiffs seek the disallowance under Section 502(d) of the Bankruptcy Code of "any and all claims assertable by or on behalf of [Mr.] Lampert, the [other] ESL Defendants, Cascade, the Cyrus Defendants, Tisch, BS 2018, the Fairholme Defendants, Berkowitz or the Seritage Defendants against the Debtors' estates, other than those previously allowed by the

---

[274]    Levine Decl. Ex. 30 (APA) § 9.13(b).

[275]    The APA defines the "ESL Claims" as all ESL claims "arising under (i) the IP/Ground Lease Term Loan Facility; (ii) the FILO Facility; (iii) the Real Estate Loan 2020; (iv) the Second Lien Term Loan; (v) the Second Lien Line of Credit Facility; (vi) the Second Lien PIK Notes and (vii) the Citi L/C Facility (together with the any security interests securing any of the Claims described in the preceding sub-clauses (b)(i)-(vii))." Levine Decl. Ex. 31 (Am. No. 1 to APA) § 1.45(b) (amending and replacing APA § 9.13(b)). It then provides that upon the closing of the sale of the Debtors' operations to Transform pursuant to the APA, each Debtor, "for itself and its estate, … (ii) covenants that it shall not seek to disallow, subordinate, recharacterize, avoid, challenge, dispute or collaterally attack the ESL Claims." Levine Decl. Ex. 30 (APA) § 9.13(a). While the same section of the APA includes a proviso that "the assertion of any Claim other than a Released Estate Claim shall not be deemed to violate this Section 9.13(a)(ii)," *id.*, the APA (as amended) defines a "Released Estate Claim[]" to include "any and all Claims and causes of action of the Debtors and their estates … (ii) against ESL arising under equitable principles of subordination or recharacterization, (iii) against ESL challenging the allowance of the ESL Claims … ." Levine Decl. Ex. 31 (Am. No. 1 to APA) § 1.45(e)(ii) (amending and replacing APA § 9.13(e)).

[276]    *See* FAC ¶¶ 783 & n.45, 786.

Court."[277]  Section 502(d), of course, provides that a claim against a debtor's bankruptcy estate of a creditor that received an avoidable transfer shall be disallowed unless and until the creditor returns the transferred property to the estate.[278]  Plaintiffs assert that the ESL Defendants, and the other parties sued in Count 34, have not returned the property that Plaintiffs claim the Debtors transferred in connection with the Lands-End Spin-Off, the Seritage Rights Offering, the Seritage Transaction, and the 2016-2018 Loans.[279]

But, for the reasons previously discussed, Plaintiffs' fraudulent transfer claims relating to the Seritage Rights Offering and the 2016-2018 Loans fail as a matter of law.[280]  And, while no defendant is seeking the dismissal at the pleading stage of Plaintiffs' fraudulent transfer claims relating to Sears' sale of real property in the Seritage Transaction, Sears sold and transferred that real property to Seritage, not to the ESL Defendants, and Plaintiffs accordingly seek relief on those claims (Counts 13 and 14) only against Seritage, not against the ESL Defendants.[281]  Thus, as to these transactions, there is no allegedly avoidable transfer to support the disallowance of any claims of the ESL Defendants under Section 502(d).  Count 34 can survive against the ESL Defendants, therefore, only with respect to the distribution of Lands' End stock to those parties in connection with the Lands' End Spin-Off that Plaintiffs challenge as a fraudulent transfer (and, for the reasons discussed above, even then Plaintiffs can only seek the disallowance of any ESL claims that were wholly unsecured and not any "ESL Claims" that are protected by the APA).

---

[277]   *Id.* ¶ 783.

[278]   11 U.S.C. § 502(d).

[279]   FAC ¶ 783.

[280]   *See supra* Sections I and II.

[281]   FAC ¶¶ 540-553.

**B.    Plaintiffs' Claim For Equitable Subordination Should Be Dismissed In Its Entirety**

In Count 35, Plaintiffs seek equitable subordination of "any claims assertable by or on behalf of Lampert, the ESL Defendants, the Fairholme Defendants, Berkowitz, Tisch, the Seritage Defendants, and John and Jane Does, other than the ESL Released Claims." [282]    As with disallowance, Plaintiffs appear to recognize that they cannot, consistently with the APA, seek the equitable subordination of any "ESL Claims" (including the deficiency portion of any of the claims secured, in part, by liens that were the subject of the ESL Defendants' credit bid under the APA) because the APA expressly bars them from doing so. [283]    But, in Count 35, Plaintiffs seek the equitable disallowance of any remaining, wholly unsecured ESL claims, including specifically any such claims arising out of the so-called "PIK Toggle Notes." [284]

That request is contrary to and barred by the express terms of the confirmed plan of reorganization (the "Plan") for the Debtors.  The Plan defines an "ESL Unsecured Claim" to include not only any "(a) unsecured deficiency claims held by any ESL Party," but also any "(b) Claims held by any ESL Party arising from or in connection with the Unsecured PIK Note and Senior Unsecured Notes" and any "(c) other prepetition unsecured claim held by any ESL Party against the Debtors." [285]    It then separately classifies the ESL Unsecured Claims against each of the Debtors from other general unsecured claims because, under the APA, the ESL Defendants agreed that they would not share in any possible recoveries arising out of claims pled in this Adversary Proceeding against them.  But, otherwise, the Plan specifically provides that the ESL

---

[282]    *See id.* ¶ 786.

[283]    Levine Decl. Ex. 30 (APA) § 9.13(b).

[284]    FAC ¶ 786.

[285]    Levine Decl. Ex. 32 (Modified Second Amended Joint Chapter 11 Plan ("Plan"), Case No. 18-23538, ECF No. 5370-1 (Oct. 15, 2019)) § 1.65.  The Plan defines "ESL Part[y]," in turn, to include all the ESL Defendants in this Adversary Proceeding. *Id.* § 1.64.

Unsecured Claims shall be *pari passu* with, not subordinated to, all other general unsecured claims.

For example, with respect to claims of creditors of Sears Holdings, the ESL Unsecured Claims are

classified in Class 5,[286] and the Plan provides that the holder of any allowed Class 5 claim "shall

receive its *Pro Rata* share," along with all other holders of allowed general unsecured claims, of

all distributions other than those from the potential sources of recovery that the ESL Defendants

agreed in the APA not to look to for payment.[287]  Plaintiffs' request that any wholly unsecured

claim of the ESL Defendants be subordinated in right to payment to, rather than receive "pro rata"

treatment with all other general unsecured claims, flies in the face of these binding provisions of

the Plan.

To be sure, the Plan also includes a sentence providing generally that "[p]ursuant to section

510 of the Bankruptcy Code, the Liquidating Trust reserves the right to reclassify any Allowed

Claim or Interest in accordance with any contractual, legal, or equitable subordination relating

thereto."[288]  But, even if that sentence were inconsistent with the provisions of the Plan specifying

that any ESL Unsecured Claim shall be *pari passu* with all other general unsecured claims, it could

not save Count 35.  Under controlling New York law, where two provisions in a contract are

inconsistent, one specific and one general, the specific provision governs.[289]  Here, the specific

provisions are those classifying the ESL Unsecured Claims and specifying their treatment.  They

specifically address the ESL Unsecured Claims; in contrast, the single sentence, which appears in

---

[286]    *Id.* § 4.5(a).

[287]    *Id.* § 4.5(b); *see also id.* § 1.132 (definition of "*Pro Rata*").

[288]    *Id.* § 15.2.

[289]    *See, e.g., Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956) (noting that "the specific provision controls" in contract interpretation).  The Plan provides for New York law to govern.  Levine Decl. Ex. 32 (Plan) § 17.9.  A bankruptcy plan is a contract by and among the debtors and their creditors.  *See In re AMR Corp.*, 562 B.R. 20, 28 (Bankr. S.D.N.Y. 2016) ("When interpreting a confirmed plan, the principles of contract law apply." (quoting *MF Global Holdings Ltd v. PricewaterhouseCoopers LLP*, 43 F. Supp. 3d 309, 313 (S.D.N.Y. 2014)).

the generic portion of the Plan addressing the effect of confirmation, includes no reference at all to any ESL Unsecured Claims.

But, in any event, there is no inconsistency. By its terms, the sentence generally addressing the Liquidating Trust's powers permits the Liquidating Trust only to seek to "reclassify" a claim based on principles of contractual, legal, or equitable subordination. While that sentence thus may allow the Liquidating Trust to seek to have a claim "reclassif[ied]" from one class specified under the Plan to another, it does not allow the Liquidating Trust to provide for a claim to be treated contrary to any possible classification specified in the Plan. Here, the only classes under the Plan subordinate to the ESL Unsecured Claims are those for "Subordinate Securities Claims"—claims subordinated under Section 510(b), not Section 510(c), of the Bankruptcy Code—and "Existing SHC Equity Interests" (with respect to the classification of claims and interests against or in Sears Holdings; for other Debtors, the comparable class is for "Intercompany Interests").[290] The Plan includes no class, junior to the ESL Unsecured Claims, for allowed claims subject to equitable

---

[290]    Levine Decl. Ex. 32 (Plan) §§ 7.7, 7.8, 7.9. The Plan defines "Subordinated Securities Claims" as claims "subject to subordination under section 510(b) of the Bankruptcy Code." *Id.* § 1.174. It defines "Existing SHC Equity Interests" as "any Interests in SHC," "Intercompany Interest" as "an Interest in a Debtor held by another of the Debtors" (or by a non-debtor subsidiary of Sears Holdings), and "Interests" to mean "any equity security." *Id.* §§ 1.71, 1.85, 1.87. Plaintiffs could not seek to equitably subordinate any ESL claim to the same level as an equity interest in any event, because equitable subordination permits the subordination of only claims to other claims and interests to other interests. 11 U.S.C. § 510(c); *see Adelphia Recovery Tr. v. Bank of America, N.A.*, 390 B.R. 80, 98-99 (S.D.N.Y. 2008); *see also In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 748-49 (6th Cir. 2001) (distinguishing equitable subordination and recharacterization).

subordination, and there is therefore no such junior class to which the Liquidating Trust could seek to "reclassify" the ESL Unsecured Claims.[291]

Count 35 should therefore be dismissed as contrary to the terms of the Plan.

## VII.  CRK PARTNERS, LLC IS A CANCELLED DELAWARE ENTITY THAT CANNOT BE SUED

Finally, to the extent the Plaintiffs purport to sue CRK Partners, LLC ("CRK")—a Delaware limited liability company that is no longer in existence—the claims against it are barred for an additional reason:  CRK is not amenable to suit.  Under the Delaware Limited Liability Company Act, a Delaware LLC that has been issued its certificate of cancellation from the Secretary of State cannot be sued.[292]  CRK was issued a certificate of cancellation on May 31, 2018, which was filed with the Secretary of State of the State of Delaware on June 1, 2018.[293]  As such, CRK cannot be sued.

---

[291]    Other provisions of the Plan underscore the point, making clear that the classification of claims under the Plan represents a compromise of all possible arguments, including those based on equitable subordination, for a different classification scheme not provided under the Plan.  *See* Levine Decl. Ex. 32 (Plan) § 9.1 ("the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have"); § 15.2 ("The allowance, classification, and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.").

[292]    Del. Code Ann. tit. 6, § 18-803(b) ("Upon dissolution of a limited liability company and *until the filing of certificate of cancellation* ... the persons winding up the limited liability company's affairs may, in the name of, and for and on behalf of, the limited liability company, prosecute and defend suits." (emphasis added)); *see also Kwon v. Yun*, 2008 WL 190058, at *1 (S.D.N.Y. Jan. 22, 2008) ("Under Delaware law, a limited liability company['s] ... capacity to sue or be sued ... . continues ... [only] ... *until the filing of a certificate of cancellation*" (emphasis added) (citations omitted) (internal quotation marks omitted)); *Matthew v. Laudamiel*, 2012 WL 605589, at *21 (Del. Ch. Feb. 21, 2012) ("The persons winding up an LLC's affairs may prosecute and defend suits on the LLC's behalf until the filing of the certificate of cancellation.  After the certificate of cancellation has been filed, suits generally may not be brought by or against an LLC."); *Metro Commnc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 138 (Del. Ch. 2004) ("[§] 18-803(b) of the LLC Act provides that suit generally may be brought by or against a limited liability company *only until the certificate of cancellation is filed*." (emphasis added)).

[293]    *See* Levine Decl. Ex. 29 (CRK Partners, LLC Certificate of Cancellation, dated May 31, 2018).  The certificate of cancellation for CRK was filed with the Delaware Secretary of State.  This Court may take judicial notice of that document as a public filing.  *See, e.g.*, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *Am. Cas. Co. of Reading, PA v. Lee Brands, Inc.*, 2010 WL 743839, at *4 (S.D.N.Y. Mar. 3, 2010) (taking judicial notice of document on file with California Secretary of State).

## CONCLUSION

For the foregoing reasons, the First Amended Complaint should be dismissed as and to the extent discussed herein.  To assist the Court, the ESL Defendants have attached a chart that for each Count of the First Amended Complaint sets forth whether the ESL Defendants are moving to dismiss the claim and the bases therefor.  *See* Ex. A.

Dated: February 21, 2020

Respectfully submitted,

WILMER CUTLER PICKERING
   HALE AND DORR LLP

*/s/ Philip D. Anker*
Philip D. Anker
Noah A. Levine
Ryanne E. Perio
philip.anker@wilmerhale.com
noah.levine@wilmerhale.com
ryanne.perio@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800

*Attorneys for Edward S. Lampert, ESL
Investments, Inc., RBS Partners LP, SPE Master I
LP, ESL Partners LP, SPE I Partners LP, RBS
Investment Management LLC, ESL Institutional
Partners LP, ESL Investors LLC, JPP LLC, and
JPP II LLC.*

## CERTIFICATE OF SERVICE

I, Philip D. Anker, hereby certify that on this 21st day of February 2020, a copy of the

foregoing Memorandum was filed electronically with the Clerk of Court through the Court's

CM/ECF system, thus serving all registered parties.

*/s/ Philip D. Anker*
Philip D. Anker